# Exhibit B

# 2019 CA 003192 B TOXIN FREE USA Vs. THE J.M. SMUCKER COMPANY et al FYP

- Case Type:
- Civil II
- Case Status
- Open
- File Date:
- 05/14/2019
- Action:
- Complaint for Deceit (Misrepresentation) Filed
- Status Date:
- 05/14/2019
- Next Event
- 

| All Information | Party | Event | Docket | Receipt | Disposition |

## Party Information

### TOXIN FREE USA
- Plaintiff

- Disposition
- 
- Disp Date
- 

| **Alias** |

| **Party Attorney** |
| - Attorney |
| - RICHMAN, KIM E. |
| - Attorney |
| - SHOOSTER, JAY |

### THE J.M. SMUCKER COMPANY
- Defendant

- Disposition
- 
- Disp Date
- 

| **Alias** |

| **Party Attorney** |
| - Attorney |
| - ROTHSTEIN, RONALD Y |

### AINSWORTH PET NUTRITION, LLC
Defendant

- Disposition
- 
- Disp Date
- 

| **Alias** |

| **Party Attorney** |
| - Attorney |
| - ROTHSTEIN, RONALD Y |

## Events

| Date/Time | Location | Type | Result | Event Judge |
|-----------|----------|------|--------|-------------|
| 08/16/2019 09:30 AM | Courtroom 415 | Initial Scheduling Conference-60 | Scheduling Conference Hearing Continued | PAN, FLORENCE Y |
| 11/22/2019 09:30 AM | Courtroom 415 | Scheduling Conference Hearing | Initial Scheduling Conf. Vacated per SCR 16(b) | PAN, FLORENCE Y |

## Docket Information

| Date | Docket Text | Image Avail. |
|------|-------------|--------------|
| 05/14/2019 | Complaint for Deceit (Misrepresentation) Filed  Receipt  427954  Date  05/15/2019 | |

| **Date** | **Docket Text** | **Image Avail.** |
|---|---|---|
| 05/15/2019 | eComplaint Filed. Submitted 05/14/2019 18:45. kd<br>(NO SUMMONS SUBMITTED AT FILING)<br>Attorney: RICHMAN, KIM E. (1022978)<br>TOXIN FREE USA (Plaintiff); | Image |
| 05/15/2019 | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 08/16/2019   Time: 9:30 am<br>Judge: PAN, FLORENCE Y   Location: Courtroom 415 | |
| 05/17/2019 | Complaint Package eServed | Image |
| 06/04/2019 | Initial Summons Requested Filed. submitted 06/04/2019 10:42. hvw<br>Attorney: RICHMAN, KIM E. (1022978)<br>TOXIN FREE USA (Plaintiff); | Image |
| 06/04/2019 | Initial Summons Requested Filed. submitted 06/04/2019 10:44. hvw<br>Attorney: RICHMAN, KIM E. (1022978)<br>TOXIN FREE USA (Plaintiff); | Image |
| 07/09/2019 | Affidavit of Service of Summons & Complaint on<br>THE J.M. SMUCKER COMPANY (Defendant); | Image |
| 07/09/2019 | Proof of Service<br>    Method      Service Issued<br>    Issued       05/15/2019<br>    Service     Summons Issued<br>    Served      07/08/2019<br>    Return      07/09/2019<br>    On         THE J M SMUCKER COMPANY<br>    Signed By   Ronald Y Rothstein<br><br>    Reason     Proof of Service<br>    Comment<br><br>    Tracking # 5000215453 | |
| 07/22/2019 | Notice of Acknowledgment of Service Filed<br>AINSWORTH PET NUTRITION, LLC (Defendant). Filed. Submitted. 07/22/2019 15:12. ncv.<br>Attorney: RICHMAN, KIM E. (1022978)<br>TOXIN FREE USA (Plaintiff); | Image |
| 07/22/2019 | Proof of Service<br>    Method   : Service Issued<br>    Issued    : 05/15/2019<br>    Service  : Summons Issued<br>    Served   : 06/07/2019<br>    Return   : 07/22/2019<br>    On       : AINSWORTH PET NUTRITION, LLC<br>    Signed By : Ronald Rothstein<br><br>    Reason   : Proof of Service<br>    Comment  :<br><br>    Tracking #: 5000215454 | |
| 07/29/2019 | Consent Motion to Extend the Time for Defendants to Move to Dismiss the Complaint and to set a Briefing Schedule Filed. submitted 07/29/2019 16:59. mw<br>Attorney: ROTHSTEIN, Mr RONALD Y (451950)<br>THE J.M. SMUCKER COMPANY (Defendant); AINSWORTH PET NUTRITION, LLC (Defendant); Receipt: 434335 Date: 07/30/2019 | Image |
| 07/29/2019 | Consent Motion to Extend the Time for Defendants to Move to Dismiss the Complaint and to set a Briefing Schedule Filed  submitted 07/29/2019 17 15  mw<br>Attorney  ROTHSTEIN, Mr RONALD Y (451950)<br>THE J M SMUCKER COMPANY (Defendant); AINSWORTH PET NUTRITION, LLC (Defendant);  Receipt 434341 Date 07/30/2019 | Image |
| 07/29/2019 | Additional eFiling Document to Consent Motion to Extend the Time for Defendants to Move to Dismiss the Complaint and to set a Briefing Schedule Filed. submitted 07/29/2019 17:15. mw<br>Attorney: ROTHSTEIN, Mr RONALD Y (451950)<br>THE J.M. SMUCKER COMPANY (Defendant); AINSWORTH PET NUTRITION, LLC (Defendant); | Image |
| 08/06/2019 | Order Granting CONSENT Motion to Extend THE Time FOR DEFENDANTS to MOVE TO DISMISS THE Complaint AND TO SET A BRIEFING SCHEDULE Entered on the Docket-SIGNED BY JUDGE FLORENCE PAN, E-FILED & E-SERVED 8/6/19. MWB | |

| **Date** | **Docket Text** | **Image Avail.** |
|---|---|---|
| 08/06/2019 | Event Resulted:<br>The following event: Initial Scheduling Conference-60 scheduled for 08/16/2019 at 9:30 am has been resulted as follows:<br><br>Result: Scheduling Conference Hearing Continued<br>Judge: PAN, FLORENCE Y    Location: Courtroom 415 | |
| 08/06/2019 | Scheduling Conference Hearing<br>Event: Scheduling Conference Hearing<br>Date: 11/22/2019    Time: 9:30 am<br>Judge: PAN, FLORENCE Y    Location: Courtroom 415 | |
| 08/06/2019 | Order Granting Consent Motion to Extend the Time for Defendants to Move to Dismiss the Complaint and to Set a Briefing Schedule signed by Judge Florence Y Pan on 8/6/2019 submitted 08/06/2019 14 52 hvw | Image |
| 08/07/2019 | Notice of Hearing Mailed Next Business Day<br><br>Notice Of Hearing<br>Sent on: 08/07/2019 08:24:21.55 | Image |
| 08/26/2019 | Defendants The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC's Motion to Dismiss Plaintiff's Complaint Filed. Submitted 08/26/2019 17:29. kd<br>Attorney: ROTHSTEIN, Mr RONALD Y (451950)<br>Mr RONALD Y ROTHSTEIN (Attorney) on behalf of THE J.M. SMUCKER COMPANY, AINSWORTH PET NUTRITION, LLC (Defendant)  Receipt: 436588  Date: 08/27/2019 | Image |
| 08/30/2019 | Returned Mail:<br>Order for: Scheduling Conference Hearing<br>Entered on: 8/7/2019<br>Mailed to: Kim E. Richman, Richman Law Group<br>Address: 8 West 12th Street, New York, NY 10027<br>Returned to Court on: 8/27/2019<br>Reason: Return to Sender | Image |
| 09/26/2019 | Plaintiff's Opposition to Defendants' Motion to Dismiss Filed 09/26/2019 15 00  TB<br>Attorney RICHMAN, KIM E  (1022978) | Image |
| 10/09/2019 | Reply in Support of Defendants The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC's Motion to Dismiss Plaintiff's Complaint Filed. Submitted 10/09/2019 15:41. ajm<br>Attorney: ROTHSTEIN, Mr RONALD Y (451950)<br>THE J.M. SMUCKER COMPANY (Defendant); AINSWORTH PET NUTRITION, LLC (Defendant); | Image |
| 10/30/2019 | Notice of Supplemental Authority Filed. Submitted 10/30/2019 16:30. kd<br>Attorney: RICHMAN, KIM E. (1022978)<br>KIM E. RICHMAN (Attorney) on behalf of TOXIN FREE USA (Plaintiff) | Image |
| 10/30/2019 | Additional eFiling Document to Notice of Supplemental Authority. Submitted 10/30/2019 16:30. kd<br>Attorney: RICHMAN, KIM E. (1022978)<br>KIM E. RICHMAN (Attorney) on behalf of TOXIN FREE USA (Plaintiff) | Image |
| 11/06/2019 | Order Denying DEFENDANTS' Motion to Dismiss Entered on the Docket SIGNED BY JUDGE FLORENCE PAN, E FILED & E SERVED 11/6/19  MWB | |
| 11/06/2019 | Order Denying Defendants' Motion to Dismiss Plaintiff's Complaint submitted 11/06/2019 14:16. ajm. Signed by Judge Pan on November 6, 2019. | Image |
| 11/18/2019 | Joint Praecipe Requesting a Scheduling Order Filed 11/18/2019 10:00. TB<br>Attorney: RICHMAN, KIM E. (1022978)<br>Attorney: ROTHSTEIN, Mr RONALD Y (451950)<br>TOXIN FREE USA (Plaintiff); THE J.M. SMUCKER COMPANY (Defendant); AINSWORTH PET NUTRITION, LLC (Defendant); | Image |
| 11/20/2019 | Track 3 - Mediation Scheduling Order Entered on the Docket<br>DCM Track Track 3 - Mediation was added on 11/20/2019 with the following milestone(s):<br>Exchange Lists of Fact Witnesses T3 due 02/18/2020<br>Proponent's Rule 26(a)(2)(B) Report T3 due 03/03/2020<br>Opponent's Rule 26(a)(2)(B) Report T3 due 04/08/2020<br>Discovery Request T3 due 04/20/2020<br>Close of Discovery T3 due 05/18/2020<br>Filing Motions T3 due 06/17/2020<br>Dispositive Motions Decided T3 due 07/17/2020<br>ADR - Mediation T3-1 due 08/03/2020<br>ADR - Mediation T3-2 due 08/31/2020<br>Pretrial T3 due 09/30/2020<br>Pretrial T3-2 due 10/30/2020 | Image |

| Date | Docket Text | Image Avail. |
|------|-------------|--------------|
| 11/20/2019 | Event Resulted:<br>The following event: Scheduling Conference Hearing scheduled for 11/22/2019 at 9:30 am has been resulted as follows:<br><br>Result: Initial Scheduling Conf. Vacated per SCR 16(b). Case placed on Mediation Track 3 per 11/18/2019 Praecipe Requesting Scheduling Order. No future dates currently scheduled. Scheduling order signed in Chambers and mailed to parties. SPJ/FYP<br><br>Judge: PAN, FLORENCE Y    Location: Courtroom 415 | |
| 11/20/2019 | Defendant The J.M. Smucker Company's Answer to Plaintiff's Complaint Filed submitted 11/20/2019 17:39 PLA Attorney: ROTHSTEIN, Mr RONALD Y (451950)<br>THE J.M. SMUCKER COMPANY (Defendant); | Image |
| 11/20/2019 | Defendant Ainsworth Pet Nutrition, LLC'S Answer to Plaintiff's Complaint Filed submitted 11/20/2019 17 42 PLA Attorney  ROTHSTEIN, Mr RONALD Y (451950)<br>AINSWORTH PET NUTRITION, LLC (Defendant); | Image |
| 12/20/2019 | Unopposed Motion for Admission Pro Hac Vice - Jay Shooster Filed. Submitted 12/20/2019 18:40. chd Attorney: RICHMAN, KIM E. (1022978)  Receipt: 446362  Date: 12/23/2019 | Image |
| 12/20/2019 | Additional eFiling Document to Unopposed Motion for Admission Pro Hac Vice - Jay Shooster Filed. Submitted 12/20/2019 18:40. chd<br>Attorney: RICHMAN, KIM E. (1022978) | Image |
| 01/06/2020 | Order Granting PLAINTIFF'S Motion to Admit Attorney JAY SHOOSTER Pro Hac Vice Entered on the Docket-SIGNED BY JUDGE FLORENCE PAN, E-FILED, E-SERVED & MAILED 1/6/20. MWB | |
| 01/06/2020 | Order Granting Plaintiff's Motion to Admit Attorney JAY SHOOSTER Pro Hac Vice signed J/Pan on 01/06/2020 Submitted on 01/06/2020 15 08  KT | Image |
| 03/06/2020 | Plaintiff's Intitial Witness List Filed submitted 03/06/2020 16:31pm.  ae Attorney: RICHMAN, KIM E. (1022978) | Image |
| 03/06/2020 | Defendants the J.M. Smucker Company and Ainsworth pet Nutrition LLC'S Initial Witness List Filed. Submitted 03/06/2020 18:21pm.  ae<br>Attorney: ROTHSTEIN, Mr RONALD Y (451950) | Image |

## Receipt

| Receipt Number | Receipt Date | Received From | Payment Amount |
|----------------|--------------|--------------|----------------|
| 427954 | 05/15/2019 | RICHMAN, KIM E. | $120.00 |
| 434335 | 07/30/2019 | ROTHSTEIN, Mr. RONALD Y. | $20.00 |
| 434341 | 07/30/2019 | ROTHSTEIN, Mr  RONALD Y | $20 00 |
| 436588 | 08/27/2019 | Ronald Y. Rothstein | $20.00 |
| 446362 | 12/23/2019 | RICHMAN, KIM E. | $20.00 |
| Total | Total | Total | Total |
| | | | $200.00 |

## Case Disposition

| Disposition | Date | Case Judge |
|-------------|------|-----------|
| Undisposed | | PAN, FLORENCE Y |

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| TOXIN FREE USA, P.O. Box 458 Unionville, CT 06085, <br><br> Plaintiff, <br><br> v. <br><br> THE J.M. SMUCKER COMPANY, 4400 Easton Commons Way, Suite 125, Columbus, OH 43219, and AINSWORTH PET NUTRITION, LLC, 18746 Mill St., Meadville, PA 16335, <br><br> Defendants. | Case No. <br><br> **COMPLAINT** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

## COMPLAINT

On behalf of itself and the general public, Plaintiff Toxin Free USA ("Toxin Free USA") brings this action against Defendants THE J.M. SMUCKER COMPANY, its wholly-owned subsidiary AINSWORTH PET NUTRITION, LLC (collectively, "Rachael Ray Nutrish" or "Defendant"), regarding the deceptive labeling, marketing, and sale of Defendant's pet food products that were or are sold under the Rachael Ray Nutrish® brand and marketed as "natural" and containing "no . . . artificial preservatives" (collectively, the "Products"),[1] and alleges the following based upon information, belief, and the investigation of counsel:

## INTRODUCTION

1.      Due to concerns about health, sustainability, and the increasing use of synthetically

---

[1] Discovery may demonstrate that additional Rachael Ray Nutrish® products are within the scope of this Complaint. Plaintiffs reserve the right to amend this complaint to include additional food items identified through the course of discovery.

1

created chemicals in the production of food, consumers are increasingly considering with how food, both for them and for their animal companions, is grown, processed, and prepared.

2.      Rachael Ray Nutrish knows that consumers seek out and wish to purchase whole, natural foods for their pets that do not contain synthetic chemicals, and that consumers will pay more for foods for their pets that they believe to be natural than they will pay for foods that they do not believe to be natural.

3.      To capture this growing market, Rachael Ray Nutrish advertises and promotes the Products as "natural" and as containing "no . . . artificial preservatives." *See* **Figures 1 & 2**, below.



**Figure 1.**

2



**Figure 2.**

4.      These claims are false, deceptive, and misleading. The Products at issue are not "natural" or free of artificial preservatives. The Products contain residues of the unnatural biocide glyphosate, as well as residues of the artificial preservative ethoxyquin.

5.      No reasonable consumer, seeing these "natural" and "no . . . artificial preservatives" representations, would expect that the Products contain unnatural biocides and artificial preservatives.

6.      In sum, Rachael Ray Nutrish is deceiving consumers into believing the Products are "natural" and contain "no . . . artificial preservatives" when, in fact, they are not natural and do contain artificial preservatives.

7. By deceiving consumers about the nature, quality, and/or ingredients of the Products, Rachael Ray Nutrish is able to sell a greater volume of the Products, to charge higher prices for the Products, and to take away market share from competing products, thereby increasing its own sales and profits.

8. Rachael Ray Nutrish's false and misleading representations and omissions violate D.C. Code § 28-3904.

9. Because Rachael Ray Nutrish's labeling and advertising of the Products tend to mislead and are materially deceptive about the true nature, quality, and ingredients of the Products, Toxin Free USA brings this deceptive advertising case on behalf of itself and the general public, and seeks relief including an injunction to halt Rachael Ray Nutrish's false marketing and sale of the Products.

## JURISDICTION AND VENUE

10. This Court has personal jurisdiction over the parties in this case. Plaintiff Toxin Free USA (formerly known as GMO Free USA), by filing this Complaint, consents to this Court having personal jurisdiction over it.

11. Plaintiff Toxin Free USA has members in the District of Columbia.

12. This Court has personal jurisdiction over Rachael Ray Nutrish pursuant to D.C. Code § 13-423. Rachael Ray Nutrish has sufficient minimum contacts with the District of Columbia to establish personal jurisdiction of this Court over it because, *inter alia*, Rachael Ray Nutrish is engaged in deceptive schemes and acts directed at persons residing in, located in, or doing business in the District of Columbia, or otherwise purposefully avails itself of the laws of this District through its marketing and sales of the Products in this District.

13. This Court has subject matter jurisdiction over this action pursuant to D.C. Code §§ 28-3905(k)(1)(B), (k)(1)(C), (k)(1)(D), and (k)(2).

4

**PARTIES**

14.     Toxin Free USA is a 501(c)(3) non-profit organization whose mission is to harness independent science and agroecology concepts to advocate for clean and healthy food and ecological systems. Toxin Free USA educates consumers about potential hazards of synthetic ingredients, pesticides and biocides, and genetically engineered organisms.

15.     Toxin Free USA performs its work throughout the United States, including in the District of Columbia.

16.     Toxin Free USA was formed in 2012 with the intent of organizing national boycotts of food companies that use genetically modified ingredients and related synthetic herbicides and pesticides in their products and pressuring companies to remove those ingredients or contaminants.

17.     Consequently, Toxin Free USA firmly believes in food transparency. The organization diligently works to promote food and ecological systems that are clean, accessible, and free of contamination. To that end, Toxin Free USA educates consumers, increasing their awareness and knowledge of glyphosate use in agricultural production and its effect on health and the environment, as well as the use and effects of artificial preservatives.

18.     Toxin Free USA's website, publications, public education, research, network building, and mobilization activities provide an important service to consumers and community activists every month.

19.     On February 22, 2019, Toxin Free USA purchased one package of Rachael Ray Nutrish's "Real Chicken & Brown Rice Recipe" Super Premium Food for Cats and one package of "Real Beef, Pea & Brown Rice Recipe" Super Premium Food for Dogs at a Target store located 3100 14th St NW #201, Washington, DC 20010, in order to evaluate their purported qualities as "natural" products containing "no . . . artificial preservatives."

5

20.     At all times mentioned herein, Rachael Ray Nutrish was and is a Pennsylvania corporation that maintains its principal place of business and headquarters in Meadville, Pennsylvania.

21.     Rachael Ray Nutrish is a wholly owned subsidiary of The J.M. Smucker Company.

22.     At all times mentioned herein, The J.M. Smucker Company was and is a Pennsylvania corporation that maintains its principal place of business and headquarters in Columbus, Ohio.

23.     Rachael Ray Nutrish markets and distributes the Products in retail outlets in the District of Columbia and throughout the United States.

24.     Upon information and belief, Rachael Ray Nutrish has caused harm to the general public of the District of Columbia.

25.     Toxin Free USA is acting on behalf of the general public as private attorneys general pursuant to D.C. Code § 28-3905(k)(1). Plaintiff is a non-profit organization pursuant to D.C. Code § 28-3901(a)(14) and a public-interest organization pursuant to D.C. Code § 28-3901(a)(15).

## FACTUAL ALLEGATIONS

26.     American consumers increasingly and consciously seek out natural and healthful food products for themselves and their pets. Once a small niche market, healthful, natural foods are now sold by conventional retailers, and their sales continue to soar.

27.     Consumers value natural foods for themselves and their pets for myriad health, environmental, and political reasons, including avoiding chemicals and additives, attaining health and wellness, helping the environment, and financially supporting companies that share these values.

A. **Rachael Ray Nutrish Cultivates a "Natural" Brand Image for its Pet Food Products.**

28.      Rachael Ray Nutrish knows that consumers seek out and wish to purchase whole, natural foods for their pets that do not contain artificial chemicals, and that consumers will pay more for pet foods that they believe to be natural than they will pay for pet foods that they do not believe to be natural.

29.      Recent national surveys have found that a majority of consumers seek out products with a "natural" label, believing that "natural" means that the products are produced without pesticides or artificial ingredients.[2]

30.      To capture this market, Rachael Ray Nutrish markets its "Super Premium" pet food as "natural" and as containing "no . . . artificial preservatives."

31.      Rachael Ray Nutrish does not qualify these statements with any disclaimer regarding the presence of glyphosate or ethoxyquin.

B. **Rachael Ray Nutrish Presents the Products as "Natural" and as Containing "No . . . Artificial Preservatives."**

32.      Rachael Ray Nutrish labels the Products as "natural" and as containing "no . . . artificial preservatives."

33.      Upon information and belief, Rachael Ray Nutrish has profited enormously from its falsely marketed products and its carefully orchestrated label and image.

34.      Consumers reasonably believe that a product or ingredient represented as "natural" does not contain residues of synthetic chemicals.

_____

[2] *See, e.g.*, Jayson L. Lusk, *Consumer Perceptions of Healthy and Natural Food Labels*, 29 (Jan. 15, 2019), https://bit.ly/2Hy06ML (finding that 68.1% more consumers perceive crops "sprayed with synthetic pesticides like glyphosate or chlorpyrifos" to be "unnatural" than "natural," and that 58.8% of consumers understand "natural" to mean "no preservatives"); Consumer Reports National Research Center, *Natural Food Labels Survey* (2015) (finding that 63% of consumers understand a "natural" label to mean that "no toxic pesticides were used").

35.    Consumers reasonably believe that a product or ingredient represented as "natural" does not contain residues of unnatural biocides.

36.    In 2015, the Consumer Reports National Research Center conducted a nationally representative phone survey to assess consumer opinion regarding food labeling.[3]

37.    Sixty-three percent of all respondents in the Consumer Reports survey said that a "natural" label on packaged and processed foods means that "no toxic pesticides were used."[4]

38.    Rachael Ray Nutrish knows and intends that when consumers see the product labels or advertisements promising the products are "natural," consumers will understand that to mean that, at the very least, that the products do not contain synthetic chemicals like pesticides and biocides.

**C.    Glyphosate Is Not Natural.**

39.    Quantitative testing has revealed that the Products contain glyphosate.

40.    Glyphosate was invented by the agrochemical and agricultural biotechnology corporation Monsanto, which began marketing the herbicide in 1974 under the trade name Roundup.[5]

41.    Glyphosate is derived from the amino acid glycine.

42.    To create glyphosate, one of the hydrogen atoms in glycine is artificially replaced with a phosphonomethyl group.

43.    Over the past several years, consumers have become increasingly conscious of the potential detrimental health effects of biocides such as glyphosate.

---

[3] Consumer Reports National Research Center, *supra* note 2.
[4] *Id.* at 2.
[5] *See* Shannon Van Hoesen, Study: Monsanto's Glyphosate Most Heavily Used Weed-Killer in History, Environmental Working Group (Feb. 2, 2016), https://www.ewg.org/release/study-monsanto-s-glyphosate-most-heavily-used-weed-killer-history.

**D.      Ethoxyquin is an Artificial Preservative.**

44.      Quantitative testing has revealed that the Products contain residues of ethoxyquin.

45.      Ethoxyquin is a synthetic[6] chemical commonly used as an artificial preservative in pet food.[7]

46.      Over the past several years, consumers have become increasingly conscious of the potential detrimental health effects of artificial preservatives such as ethoxyquin.

47.      Rachael Ray Nutrish is aware of these concerns. In a December 21, 2018 blog post on Rachael Ray Nutrish's website, the company listed ethoxyquin as one of the "5 Most Harmful Ingredients in Cat Food." Rachael Ray Nutrish has since taken down this post. **Figure 3**, below.

---

[6] *See, e.g.*, A.K. Lundebye et. al, *Levels of synthetic antioxidants (ethoxyquin, butylated hydroxytoluene and butylated hydroxyanisole) in fish feed and commercially farmed fish*, Part A, 27:12 Food Additives & Contaminants 1652 (2010).

[7] *See, e.g.*, 21 C.F.R. § 573.380  ("[Ethoxyquin] is intended for use only: (1) As a chemical preservative for retarding oxidation of carotene, xanthophylls, and vitamins A and E in animal feed and fish food and, (2) as an aid in preventing the development of organic peroxides in canned pet food").

9



# 5 Most Harmful Ingredients in Cat Food

Feeding our furry family members is the single most important thing we do as pet parents. With so many options available, it's hard to know what cat food ingredients are safe and which ones are dangerous. To stay on top of your cat's health, check food labels carefully for these five harmful ingredients before dishing out her next meal.

---

**Meat by-products**

As the name implies, meat by-products are inferior animal parts not meant for human consumption. Meat by-products can be organs, feet, nails and even rotten or cancerous meats. Bottom line—keep meat by-products off your kitty's plate. Always feed cat food (https://nutrish.com/cat) that contains real meat.

**Cornmeal**

Healthy cats require a high-protein diet. Some pet food manufactures use cornmeal as a cheap substitute for more expensive meat options. Cats that eat cornmeal are at a higher risk for allergies, obesity and feline diabetes. Cornmeal also contains melamine, which can cause kidney failure.

**Artificial food coloring**

Don't be fooled by the tempting color of your cat's food. Artificial colorings are known carcinogens. Be on the lookout for any cat food label with the colors Red #40 or Blue #2. These colors are known to give kitties severe allergies.

**Ethoxyquin**

If you see Ethoxyquin (http://www.feedingfideandfluffy.com/is-ethoxyquin-safe-in-pet-food/) in your cat food ingredient list, you might think again. Ethoxyquin is a chemical primarily used to make pesticides and rubber products. Some pet food manufacturers use Ethoxyquin as a preservative to lengthen the shelf life of cat food claiming it is perfectly safe. However, it is considered a carcinogen in humans and its effects on animals has not been well studied.

**Propylene Glycol**

**Figure 3.** Source: https://nutrish.com/blog/post/5-most-harmful-ingredients-in-cat-food.

48.    Indeed, federal regulations now require disclosure of ethoxyquin in pet food.[8]

Rachael Ray Nutrish makes no such disclosure.

---

[8] *Id.*

E.    **Rachael Ray Nutrish's Marketing Is Misleading and Omits Material Facts.**

49.    Rachael Ray Nutrish's conduct in marketing or representing that the Products are "natural" and contain "no . . . artificial preservatives" misleds and/or tends to mislead the public.

50.    D.C. consumers cannot discover the true nature of the Products from Rachael Ray Nutrish's marketing. D.C. consumers cannot discover the true nature of the Products even by visiting Rachael Ray Nutrish's website, which makes no mention of glyphosate or ethoxyquin.

51.    Discovery of the true nature of the content of the Products requires knowledge of chemistry and access to laboratory testing that is not available to the average reasonable consumer.

52.    Rachael Ray Nutrish deceptively and misleadingly conceals material facts about the Products, namely, that the Products are not "natural" and do contain artificial preservatives, because in fact the Products contain the residues of glyphosate and ethoxyquin; and that the Products are not what a reasonable consumer would consider "natural" or free of "artificial preservatives" because they in fact contain the residues of glyphosate and ethoxyquin.

53.    The production process Rachael Ray Nutrish uses for the Products is known only to Rachael Ray Nutrish and its suppliers.

54.    Rachael Ray Nutrish has not disclosed such information to Toxin Free USA or, on information and belief, to D.C. consumers.

55.    Testing reveals the presence of glyphosate and ethoxyquin residues in the Products, but only Rachael Ray Nutrish knows the methods by which its pet food is processed, or what would account for the presence of glyphosate and ethoxyquin residues in its Products.

| Product | Purchase Date | Glyphosate Residue (ppb) | Ethoxyquin Residue (ppb) |
|---|---|---|---|
| "Real Chicken & Brown Rice Recipe" Super Premium Food for Cats | 2/22/19 | 417 | 16 |
| "Real Beef, Pea & Brown Rice Recipe" Super Premium Food for Dogs | 2/22/19 | 175 | 352 |

56.     Rachael Ray Nutrish's concealment tolls the applicable statute of limitations.

57.      To this day, Rachael Ray Nutrish continues to conceal and suppress the true nature, identity, source, and method of production of its Products.

**F.    Rachael Ray Nutrish Knew or Should Have Known That Its Representations Were False.**

58.     Rachael Ray Nutrish holds itself out to the public as a trusted expert in the sourcing and processing of pet food.

59.      Rachael Ray Nutrish knew what representations it made on the labels of the Products. Rachael Ray Nutrish also knew how the pet food was sourced and processed, and therefore knew or should have known that the pet food contains residues of glyphosate, an unnatural biocide, and ethoxyquin, an artificial preservative.

60.      Rachael Ray Nutrish thus knew, or should have known, the facts demonstrating that the Products were mislabeled and falsely advertised.

61.      Consumers frequently rely on label representations and information in making purchase decisions, especially in purchasing food.

62.      Rachael Ray Nutrish made the false, misleading, and deceptive representations and omissions intending for consumers to rely upon these representations and omissions in purchasing the Products.

63.    In making the false, misleading, and deceptive representations and omissions at issue, Rachael Ray Nutrish knew and intended that consumers would purchase the Products when consumers would otherwise purchase a competing product.

64.    Consumers are willing to pay more for products that purport to be "natural" and free of artificial preservatives.

65.    In making the false, misleading, and deceptive representations and omissions at issue, Rachael Ray Nutrish also knew and intended that consumers would pay more for "natural" products that are purportedly free of unnatural agents than they would pay for products that are not "natural," furthering Rachael Ray Nutrish's private interest of increasing sales of the Products and decreasing sales of competing products that are truly natural and/or free from artificial preservatives.

66.    Rachael Ray Nutrish knows that consumers prefer natural pet foods and pet foods that do not contain unnatural or potentially dangerous chemicals or their residues. Rachael Ray Nutrish knows that consumers will pay more for "natural" pet foods or may not purchase them at all unless they are "natural" and free from unnatural and potentially dangerous chemicals.

67.    Upon information and belief, Rachael Ray Nutrish has failed to remedy the problem with the Products, thus causing ongoing harm to consumers.

68.    D.C. Consumers are at risk of real, immediate, and continuing harm if the Products continue to be sold with the misleading representations.

69.    Plaintiff contends that the Products were sold pursuant to unfair and unconscionable trade practices because the sale of Rachael Ray Nutrish's Product offends public policy and is immoral, unethical, oppressive, unscrupulous, and causes substantial economic injuries to consumers.

13

70.    Reasonable consumers do not expect the Products, represented and advertised as "natural," and as containing "no . . . artificial preservatives" to contain unnatural chemical residues such as glyphosate or artificial preservative residues such as ethoxyquin. Rachael Ray Nutrish's statements and other representations convey a series of express and implied claims and/or omissions that Rachael Ray Nutrish knows are material to the reasonable consumer in making a purchasing decision, and that Rachael Ray Nutrish intends for consumers to rely upon when choosing whether to purchase the Products and how much to pay for them.

71.    Rachael Ray Nutrish misrepresented the nature, quality, and/or ingredients of the Products and/or failed to disclose the unnatural aspects of the Products and/or the presence of residues of artificial preservatives, which was and is false, misleading, and/or likely to deceive reasonable consumers.

## CAUSE OF ACTION

### VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT

72.    Pursuant to D.C. Code §§ 28-3905(k)(1) and 28-3905(k)(2), Toxin Free USA brings this Count against Rachael Ray Nutrish, on behalf of itself and the general public of the District of Columbia, for Rachael Ray Nutrish's violation of DC CPPA, D.C. Code § 28-3901, *et seq.*

73.    Plaintiff incorporates by reference all the allegations in the preceding paragraphs of this Complaint.

74.    Rachael Ray Nutrish has labeled and advertised the Products as "natural" and has otherwise presented an image and marketing materials suggesting that the Products are natural, when in fact the Products contain residues of an unnatural chemical biocide and an artificial preservative.

14

75.    Rachael Ray Nutrish has labeled and advertised the Products as containing "no artificial preservatives" and has otherwise presented an image and marketing materials suggesting that the Products contain no artificial preservatives, when in fact the Products contain residues of an artificial preservative.

76.    Rachael Ray Nutrish's advertising of the Products misrepresents, tends to mislead, and omits facts regarding the source, characteristics, standard, quality, and grade of the Products.

77.    The Products lack the characteristics, ingredients, benefits, standards, qualities, or grades that Rachael Ray Nutrish states and implies in advertisements.

78.    Rachael Ray Nutrish's misstatements, innuendo, and omissions are material and have the tendency to mislead.

79.    Rachael Ray Nutrish knowingly did not sell the Products as advertised.

80.    The facts as alleged above demonstrate that Rachael Ray Nutrish has violated the DC CPPA, D.C. Code § 28-3901 *et seq.* Specifically, Rachael Ray Nutrish has violated D.C. Code § 28-3904, which makes it an unlawful trade practice to:

(a)    represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; . . .

(d)    represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(e)    misrepresent as to a material fact which has a tendency to mislead; . . .

(f)    fail to state a material fact if such failure tends to mislead;

(f-1)    [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead; … [or]

(h)     advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered.

81.     The DC CPPA makes such conduct an unlawful trade practice "whether or not any consumer is in fact misled, deceived or damaged thereby." D.C. Code § 28-3904.

82.     Though Toxin Free USA need not show proof of deception to succeed on its DC CPPA claim, consumers were in fact deceived. Rachael Ray Nutrish knows and should have known that reasonable consumers would believe that the Products are "natural" and contain "no . . . artificial preservatives" as advertised.

83.     Toxin Free USA has a sufficient nexus to D.C. consumers of the Products to adequately represent their interests.

84.     Because Rachael Ray Nutrish misrepresents the characteristics, ingredients, and benefits of the Products; misrepresents the standard, quality, and grade of the Products; misrepresents, fails to state, and uses innuendo and ambiguity in ways which tend to mislead reasonable consumers with regard to material facts about the Products; and advertises the Products without the intent to sell the Products as advertised, Rachael Ray Nutrish's marketing of the Products as "Natural Food" violates D.C. Code §§ 28-3904(a), (d), (e), (f), (f-1), and (h).

85.     Rachael Ray Nutrish is a "person" within the meaning of D.C. Code § 28-3901(a)(1), is a merchant under § 28-3901(a)(3), and provides "goods" within the meaning of § 28-3901(a)(7).

86.     Pursuant to D.C. Code § 28-3905(k)(1)(C), "[a] nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District, including a violation involving consumer goods or services that the organization purchased or

16

received in order to test or evaluate qualities pertaining to use for personal, household, or family purposes."

87.    Toxin Free USA is a nonprofit organization pursuant to D.C. Code § 28-3905(k)(1)(C) that on February 22, 2019 purchased Products in order to test or evaluate their qualities.

88.    Rachael Ray Nutrish's conduct violates the DC CPPA regardless of whether "any consumer is in fact misled, deceived or damaged thereby." D.C. Code § 28-3904. Pursuant to D.C. Code § 28-3905(k)(1)(A), "[a] consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District."

89.    Any consumer has the right to bring an action for redress of Rachael Ray Nutrish's unlawful behavior, *see* D.C. Code § 28-3905(k)(1)(A), and the statute does not limit consumer plaintiffs according to whether they purchased the product at issue. Nevertheless, as alleged in this Complaint, the Rachael Ray Nutrish Products are marketed and sold in the District, *see supra* ¶¶ 20, 24, and consumers within the District have purchased these Products under the misrepresentations made by Rachael Ray Nutrish. Therefore, a variety of purchasing and non-purchasing consumers could bring an action against Rachael Ray Nutrish based on the misrepresentations and omissions listed in this Complaint.

90.    Pursuant to D.C. Code § 28-3905(k)(1)(D)(i), "a public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice."

91.    The only limitation on this power of a public interest organization to act on behalf of consumers is that the public interest organization must have "sufficient nexus to the interests

involved of the consumer or class to adequately represent those interests." D.C. Code § 28-3905(k)(1)(D)(ii). As set forth in this Complaint, *see supra* ¶¶ 15-19, Plaintiff Toxin Free USA was founded with the purpose of advocating for and educating consumers, including consumers in the District of Columbia, in the arena of clean and healthy food and ecological systems. In addition, Plaintiff Toxin Free USA has retained the undersigned competent counsel, with significant experience in litigating under the DC CPPA, to pursue this action.

92.    Toxin Free USA is a public-interest organization pursuant to D.C. Code § 28-3905(k)(1)(D) and brings this action on behalf of consumers who could bring the action under D.C. Code § 28-3905(k)(1)(A).

93.    Via §§ 28-3905(k)(1)(C) and (k)(1)(D)(i), the DC CPPA allows for non-profit organizational standing and public interest organizational standing to the fullest extent recognized by the D.C. Court of Appeals in its past and future decisions addressing the limits of constitutional standing under Article III.

94.    Toxin Free USA is a "person" within the meaning of D.C. Code § 28-3901(a)(1), and a "non-profit organization" within the meaning of D.C. Code § 28-3901(a)(14).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Toxin Free USA prays for judgment against Rachael Ray Nutrish and requests the following relief:

A.    a declaration that Rachael Ray Nutrish's conduct is in violation of the DC CPPA;

B.    an order enjoining Rachael Ray Nutrish's conduct found to be in violation of the DC CPPA, as well as corrective advertising;

C.    an order granting Plaintiff costs and disbursements, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law; and

D.    such further relief, including equitable relief, as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff Toxin Free USA hereby demands a trial by jury.

DATED: May 14, 2019

**RICHMAN LAW GROUP**

By:

Kim E. Richman
krichman@richmanlawgroup.com
8 West 126th Street
New York, New York 10027
Telephone: (718) 878-4707
Facsimile: (212) 687-8292

*Attorneys for Plaintiff*

19

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

TOXIN FREE USA

Case Number: _____

vs

Date: _May 14, 2019_____

THE J.M. SMUCKER CO. and AINSWORTH
PET NUTRITION LLC

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*<br>Kim E. Richman | Relationship to Lawsuit |
| Firm Name:<br>  Richman Law Group | ☑ Attorney for Plaintiff |
| Telephone No.:          Six digit Unified Bar No.:<br>  (212) 687-8291                  1022978 | ☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE:  ☐ Non-Jury        ☐ 6 Person Jury        ☒ 12 Person Jury

Demand: $ _N/A_____        Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____        Judge: _____        Calendar #:_____

Case No.:_____        Judge: _____        Calendar#:_____

---

**NATURE OF SUIT:**        *(Check One Box Only)*

## A. CONTRACTS                              COLLECTION CASES

| | | |
|---|---|---|
| ☐ 01 Breach of Contract | ☐ 14 Under $25,000 Pltf. Grants Consent | ☐ 16 Under $25,000 Consent Denied |
| ☐ 02 Breach of Warranty | ☐ 17 OVER $25,000 Pltf. Grants Consent | ☐ 18 OVER $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 27 Insurance/Subrogation | ☐ 26 Insurance/Subrogation |
| ☐ 07 Personal Property | Over $25,000 Pltf. Grants Consent | Over $25,000 Consent Denied |
| ☐ 13 Employment Discrimination | ☐ 07 Insurance/Subrogation | ☐ 34 Insurance/Subrogation |
| ☐ 15 Special Education Fees | Under $25,000 Pltf. Grants Consent | Under $25,000 Consent Denied |
| | ☐ 28 Motion to Confirm Arbitration | |
| | Award (Collection Cases Only) | |

## B. PROPERTY TORTS

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | |
| ☐ 07 Shoplifting, D.C. Code § 27-102 (a) | | |

## C. PERSONAL TORTS

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☐ 10 Invasion of Privacy | ☐ 17 Personal Injury- (Not Automobile, Not Malpractice) |
| ☐ 02 Alienation of Affection | ☐ 11 Libel and Slander | ☐ 18 Wrongful Death (Not Malpractice) |
| ☐ 03 Assault and Battery | ☐ 12 Malicious Interference | ☐ 19 Wrongful Eviction |
| ☐ 04 Automobile- Personal Injury | ☐ 13 Malicious Prosecution | ☐ 20 Friendly Suit |
| ☒ 05 Deceit (Misrepresentation) | ☐ 14 Malpractice Legal | ☐ 21 Asbestos |
| ☐ 06 False Accusation | ☐ 15 Malpractice Medical (Including Wrongful Death) | ☐ 22 Toxic/Mass Torts |
| ☐ 07 False Arrest | ☐ 16 Negligence- (Not Automobile, Not Malpractice) | ☐ 23 Tobacco |
| ☐ 08 Fraud | | ☐ 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE        IF USED

CV-496/June 2015

# Information Sheet, Continued

**C. OTHERS**

☐ 01 Accounting  
☐ 02 Att. Before Judgment  
☐ 05 Ejectment  
☐ 09 Special Writ/Warrants  
    (DC Code § 11-941)  
☐ 10 Traffic Adjudication  
☐ 11 Writ of Replevin  
☐ 12 Enforce Mechanics Lien  
☐ 16 Declaratory Judgment  

☐ 17 Merit Personnel Act (OEA)  
    (D.C. Code Title 1, Chapter 6)  
☐ 18 Product Liability  

☐ 24 Application to Confirm, Modify,  
    Vacate Arbitration Award (DC Code § 16-4401)  
☐ 29 Merit Personnel Act (OHR)  
☐ 31 Housing Code Regulations  
☐ 32 Qui Tam  
☐ 33 Whistleblower  

**II.**

☐ 03 Change of Name  
☐ 06 Foreign Judgment/Domestic  
☐ 08 Foreign Judgment/International  
☐ 13 Correction of Birth Certificate  
☐ 14 Correction of Marriage  
    Certificate  
☐ 26 Petition for Civil Asset Forfeiture (Vehicle)  
☐ 27 Petition for Civil Asset Forfeiture (Currency)  
☐ 28 Petition for Civil Asset Forfeiture (Other)  

☐ 15 Libel of Information  
☐ 19 Enter Administrative Order as  
    Judgment [ D.C. Code §  
    2-1802.03 (h) or 32-151 9 (a)]  
☐ 20 Master Meter (D.C. Code §  
    42-3301, et seq.)  

☐ 21 Petition for Subpoena  
    [Rule 28-I (b)]  
☐ 22 Release Mechanics Lien  
☐ 23 Rule 27(a)(1)  
    (Perpetuate Testimony)  
☐ 24 Petition for Structured Settlement  
☐ 25 Petition for Liquidation  

**D. REAL PROPERTY**

☐ 09 Real Property-Real Estate  
☐ 12 Specific Performance  
☐ 04 Condemnation (Eminent Domain)  
☐ 10 Mortgage Foreclosure/Judicial Sale  
☐ 11 Petition for Civil Asset Forfeiture (RP)  

☐ 08 Quiet Title  
☐ 25 Liens: Tax / Water Consent Granted  
☐ 30 Liens: Tax / Water Consent Denied  
☐ 31 Tax Lien Bid Off Certificate Consent Granted  

_____  
Attorney's Signature  

May 14, 2019  

_____  
Date

Filed
D.C. Superior Court
05/14/2019 18:45PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| TOXIN FREE USA, P.O. Box 458 Unionville, CT 06085,<br><br>      Plaintiff,<br><br>  v.<br><br>THE J.M. SMUCKER COMPANY, 4400 Easton Commons Way, Suite 125, Columbus, OH 43219, and AINSWORTH PET NUTRITION, LLC, 18746 Mill St., Meadville, PA 16335,<br><br>      Defendants. | Case No. **2019 CA 003192 B**<br><br>**COMPLAINT**<br><br><u>DEMAND FOR JURY TRIAL</u> |

## COMPLAINT

On behalf of itself and the general public, Plaintiff Toxin Free USA ("Toxin Free USA") brings this action against Defendants THE J.M. SMUCKER COMPANY, its wholly-owned subsidiary AINSWORTH PET NUTRITION, LLC (collectively, "Rachael Ray Nutrish" or "Defendant"), regarding the deceptive labeling, marketing, and sale of Defendant's pet food products that were or are sold under the Rachael Ray Nutrish® brand and marketed as "natural" and containing "no . . . artificial preservatives" (collectively, the "Products"),[1] and alleges the following based upon information, belief, and the investigation of counsel:

## INTRODUCTION

1.  Due to concerns about health, sustainability, and the increasing use of synthetically

---

[1] Discovery may demonstrate that additional Rachael Ray Nutrish® products are within the scope of this Complaint. Plaintiffs reserve the right to amend this complaint to include additional food items identified through the course of discovery.

1

created chemicals in the production of food, consumers are increasingly considering with how food, both for them and for their animal companions, is grown, processed, and prepared.

2.    Rachael Ray Nutrish knows that consumers seek out and wish to purchase whole, natural foods for their pets that do not contain synthetic chemicals, and that consumers will pay more for foods for their pets that they believe to be natural than they will pay for foods that they do not believe to be natural.

3.    To capture this growing market, Rachael Ray Nutrish advertises and promotes the Products as "natural" and as containing "no . . . artificial preservatives." *See* **Figures 1 & 2**, below.



**Figure 1.**

2



**Figure 2.**

4.     These claims are false, deceptive, and misleading. The Products at issue are not "natural" or free of artificial preservatives. The Products contain residues of the unnatural biocide glyphosate, as well as residues of the artificial preservative ethoxyquin.

5.     No reasonable consumer, seeing these "natural" and "no . . . artificial preservatives" representations, would expect that the Products contain unnatural biocides and artificial preservatives.

6.     In sum, Rachael Ray Nutrish is deceiving consumers into believing the Products are "natural" and contain "no . . . artificial preservatives" when, in fact, they are not natural and do contain artificial preservatives.

3

7.    By deceiving consumers about the nature, quality, and/or ingredients of the Products, Rachael Ray Nutrish is able to sell a greater volume of the Products, to charge higher prices for the Products, and to take away market share from competing products, thereby increasing its own sales and profits.

8.    Rachael Ray Nutrish's false and misleading representations and omissions violate D.C. Code § 28-3904.

9.    Because Rachael Ray Nutrish's labeling and advertising of the Products tend to mislead and are materially deceptive about the true nature, quality, and ingredients of the Products, Toxin Free USA brings this deceptive advertising case on behalf of itself and the general public, and seeks relief including an injunction to halt Rachael Ray Nutrish's false marketing and sale of the Products.

## JURISDICTION AND VENUE

10.    This Court has personal jurisdiction over the parties in this case. Plaintiff Toxin Free USA (formerly known as GMO Free USA), by filing this Complaint, consents to this Court having personal jurisdiction over it.

11.    Plaintiff Toxin Free USA has members in the District of Columbia.

12.    This Court has personal jurisdiction over Rachael Ray Nutrish pursuant to D.C. Code § 13-423. Rachael Ray Nutrish has sufficient minimum contacts with the District of Columbia to establish personal jurisdiction of this Court over it because, *inter alia*, Rachael Ray Nutrish is engaged in deceptive schemes and acts directed at persons residing in, located in, or doing business in the District of Columbia, or otherwise purposefully avails itself of the laws of this District through its marketing and sales of the Products in this District.

13.    This Court has subject matter jurisdiction over this action pursuant to D.C. Code §§ 28-3905(k)(1)(B), (k)(1)(C), (k)(1)(D), and (k)(2).

## PARTIES

14.    Toxin Free USA is a 501(c)(3) non-profit organization whose mission is to harness independent science and agroecology concepts to advocate for clean and healthy food and ecological systems. Toxin Free USA educates consumers about potential hazards of synthetic ingredients, pesticides and biocides, and genetically engineered organisms.

15.    Toxin Free USA performs its work throughout the United States, including in the District of Columbia.

16.    Toxin Free USA was formed in 2012 with the intent of organizing national boycotts of food companies that use genetically modified ingredients and related synthetic herbicides and pesticides in their products and pressuring companies to remove those ingredients or contaminants.

17.    Consequently, Toxin Free USA firmly believes in food transparency. The organization diligently works to promote food and ecological systems that are clean, accessible, and free of contamination. To that end, Toxin Free USA educates consumers, increasing their awareness and knowledge of glyphosate use in agricultural production and its effect on health and the environment, as well as the use and effects of artificial preservatives.

18.    Toxin Free USA's website, publications, public education, research, network building, and mobilization activities provide an important service to consumers and community activists every month.

19.    On February 22, 2019, Toxin Free USA purchased one package of Rachael Ray Nutrish's "Real Chicken & Brown Rice Recipe" Super Premium Food for Cats and one package of "Real Beef, Pea & Brown Rice Recipe" Super Premium Food for Dogs at a Target store located 3100 14th St NW #201, Washington, DC 20010, in order to evaluate their purported qualities as "natural" products containing "no . . . artificial preservatives."

5

20.     At all times mentioned herein, Rachael Ray Nutrish was and is a Pennsylvania corporation that maintains its principal place of business and headquarters in Meadville, Pennsylvania.

21.     Rachael Ray Nutrish is a wholly owned subsidiary of The J.M. Smucker Company.

22.     At all times mentioned herein, The J.M. Smucker Company was and is a Pennsylvania corporation that maintains its principal place of business and headquarters in Columbus, Ohio.

23.     Rachael Ray Nutrish markets and distributes the Products in retail outlets in the District of Columbia and throughout the United States.

24.     Upon information and belief, Rachael Ray Nutrish has caused harm to the general public of the District of Columbia.

25.     Toxin Free USA is acting on behalf of the general public as private attorneys general pursuant to D.C. Code § 28-3905(k)(1). Plaintiff is a non-profit organization pursuant to D.C. Code § 28-3901(a)(14) and a public-interest organization pursuant to D.C. Code § 28-3901(a)(15).

## FACTUAL ALLEGATIONS

26.     American consumers increasingly and consciously seek out natural and healthful food products for themselves and their pets. Once a small niche market, healthful, natural foods are now sold by conventional retailers, and their sales continue to soar.

27.     Consumers value natural foods for themselves and their pets for myriad health, environmental, and political reasons, including avoiding chemicals and additives, attaining health and wellness, helping the environment, and financially supporting companies that share these values.

A.    **Rachael Ray Nutrish Cultivates a "Natural" Brand Image for its Pet Food Products.**

28.    Rachael Ray Nutrish knows that consumers seek out and wish to purchase whole, natural foods for their pets that do not contain artificial chemicals, and that consumers will pay more for pet foods that they believe to be natural than they will pay for pet foods that they do not believe to be natural.

29.    Recent national surveys have found that a majority of consumers seek out products with a "natural" label, believing that "natural" means that the products are produced without pesticides or artificial ingredients.[2]

30.    To capture this market, Rachael Ray Nutrish markets its "Super Premium" pet food as "natural" and as containing "no . . . artificial preservatives."

31.    Rachael Ray Nutrish does not qualify these statements with any disclaimer regarding the presence of glyphosate or ethoxyquin.

B.    **Rachael Ray Nutrish Presents the Products as "Natural" and as Containing "No . . . Artificial Preservatives."**

32.    Rachael Ray Nutrish labels the Products as "natural" and as containing "no . . . artificial preservatives."

33.    Upon information and belief, Rachael Ray Nutrish has profited enormously from its falsely marketed products and its carefully orchestrated label and image.

34.    Consumers reasonably believe that a product or ingredient represented as "natural" does not contain residues of synthetic chemicals.

---

[2] *See, e.g.*, Jayson L. Lusk, *Consumer Perceptions of Healthy and Natural Food Labels*, 29 (Jan. 15, 2019), https://bit.ly/2Hy06ML (finding that 68.1% more consumers perceive crops "sprayed with synthetic pesticides like glyphosate or chlorpyrifos" to be "unnatural" than "natural," and that 58.8% of consumers understand "natural" to mean "no preservatives"); Consumer Reports National Research Center, *Natural Food Labels Survey* (2015) (finding that 63% of consumers understand a "natural" label to mean that "no toxic pesticides were used").

35.    Consumers reasonably believe that a product or ingredient represented as "natural" does not contain residues of unnatural biocides.

36.    In 2015, the Consumer Reports National Research Center conducted a nationally representative phone survey to assess consumer opinion regarding food labeling.[3]

37.    Sixty-three percent of all respondents in the Consumer Reports survey said that a "natural" label on packaged and processed foods means that "no toxic pesticides were used."[4]

38.    Rachael Ray Nutrish knows and intends that when consumers see the product labels or advertisements promising the products are "natural," consumers will understand that to mean that, at the very least, that the products do not contain synthetic chemicals like pesticides and biocides.

**C.    Glyphosate Is Not Natural.**

39.    Quantitative testing has revealed that the Products contain glyphosate.

40.    Glyphosate was invented by the agrochemical and agricultural biotechnology corporation Monsanto, which began marketing the herbicide in 1974 under the trade name Roundup.[5]

41.    Glyphosate is derived from the amino acid glycine.

42.    To create glyphosate, one of the hydrogen atoms in glycine is artificially replaced with a phosphonomethyl group.

43.    Over the past several years, consumers have become increasingly conscious of the potential detrimental health effects of biocides such as glyphosate.

---

[3] Consumer Reports National Research Center, *supra* note 2.
[4] *Id.* at 2.
[5] *See* Shannon Van Hoesen, Study: Monsanto's Glyphosate Most Heavily Used Weed-Killer in History, Environmental Working Group (Feb. 2, 2016), https://www.ewg.org/release/study-monsanto-s-glyphosate-most-heavily-used-weed-killer-history.

**D.    Ethoxyquin is an Artificial Preservative.**

44.    Quantitative testing has revealed that the Products contain residues of ethoxyquin.

45.    Ethoxyquin is a synthetic[6] chemical commonly used as an artificial preservative in pet food.[7]

46.    Over the past several years, consumers have become increasingly conscious of the potential detrimental health effects of artificial preservatives such as ethoxyquin.

47.    Rachael Ray Nutrish is aware of these concerns. In a December 21, 2018 blog post on Rachael Ray Nutrish's website, the company listed ethoxyquin as one of the "5 Most Harmful Ingredients in Cat Food." Rachael Ray Nutrish has since taken down this post. **Figure 3**, below.

---

[6] *See, e.g.*, A.K. Lundebye et. al, *Levels of synthetic antioxidants (ethoxyquin, butylated hydroxytoluene and butylated hydroxyanisole) in fish feed and commercially farmed fish*, Part A, 27:12 Food Additives & Contaminants 1652 (2010).

[7] *See, e.g.*, 21 C.F.R. § 573.380  ("[Ethoxyquin] is intended for use only: (1) As a chemical preservative for retarding oxidation of carotene, xanthophylls, and vitamins A and E in animal feed and fish food and, (2) as an aid in preventing the development of organic peroxides in canned pet food").



# 5 Most Harmful Ingredients in Cat Food

Feeding our furry family members is the single most important thing we do as pet parents. With so many options available, it's hard to know what cat food ingredients are safe and which ones are dangerous. To stay on top of your cat's health, check food labels carefully for these five harmful ingredients before dishing out her next meal.

---

**Meat by-products**

As the name implies, meat by-products are inferior animal parts not meant for human consumption. Meat by-products can be organs, feet, nails and even rotten or cancerous meats. Bottom line—keep meat by-products off your kitty's plate. Always feed cat food (https://nutrish.com/cat) that contains real meat.

**Cornmeal**

Healthy cats require a high-protein diet. Some pet food manufactures use cornmeal as a cheap substitute for more expensive meat options. Cats that eat cornmeal are at a higher risk for allergies, obesity and feline diabetes. Cornmeal also contains melamine, which can cause kidney failure.

**Artificial food coloring**

Don't be fooled by the tempting color of your cat's food. Artificial colorings are known carcinogens. Be on the lookout for any cat food label with the colors Red #40 or Blue #2. These colors are known to give kitties severe allergies.

**Ethoxyquin**

If you see Ethoxyquin (http://www.feedingfideandfluffy.com/is-ethoxyquin-safe-in-pet-food/) in your cat food ingredient list, you might think again. Ethoxyquin is a chemical primarily used to make pesticides and rubber products. Some pet food manufacturers use Ethoxyquin as a preservative to lengthen the shelf life of cat food claiming it is perfectly safe. However, it is considered a carcinogen in humans and its effects on animals has not been well studied.

**Propylene Glycol**

**Figure 3.** Source: https://nutrish.com/blog/post/5-most-harmful-ingredients-in-cat-food.

48.    Indeed, federal regulations now require disclosure of ethoxyquin in pet food.[8]

Rachael Ray Nutrish makes no such disclosure.

---

[8] *Id.*

**E.** **Rachael Ray Nutrish's Marketing Is Misleading and Omits Material Facts.**

49.    Rachael Ray Nutrish's conduct in marketing or representing that the Products are "natural" and contain "no . . . artificial preservatives" misleds and/or tends to mislead the public.

50.    D.C. consumers cannot discover the true nature of the Products from Rachael Ray Nutrish's marketing. D.C. consumers cannot discover the true nature of the Products even by visiting Rachael Ray Nutrish's website, which makes no mention of glyphosate or ethoxyquin.

51.    Discovery of the true nature of the content of the Products requires knowledge of chemistry and access to laboratory testing that is not available to the average reasonable consumer.

52.    Rachael Ray Nutrish deceptively and misleadingly conceals material facts about the Products, namely, that the Products are not "natural" and do contain artificial preservatives, because in fact the Products contain the residues of glyphosate and ethoxyquin; and that the Products are not what a reasonable consumer would consider "natural" or free of "artificial preservatives" because they in fact contain the residues of glyphosate and ethoxyquin.

53.    The production process Rachael Ray Nutrish uses for the Products is known only to Rachael Ray Nutrish and its suppliers.

54.    Rachael Ray Nutrish has not disclosed such information to Toxin Free USA or, on information and belief, to D.C. consumers.

55.    Testing reveals the presence of glyphosate and ethoxyquin residues in the Products, but only Rachael Ray Nutrish knows the methods by which its pet food is processed, or what would account for the presence of glyphosate and ethoxyquin residues in its Products.

| Product | Purchase Date | Glyphosate Residue (ppb) | Ethoxyquin Residue (ppb) |
|---|---|---|---|
| "Real Chicken & Brown Rice Recipe" Super Premium Food for Cats | 2/22/19 | 417 | 16 |
| "Real Beef, Pea & Brown Rice Recipe" Super Premium Food for Dogs | 2/22/19 | 175 | 352 |

56.    Rachael Ray Nutrish's concealment tolls the applicable statute of limitations.

57.    To this day, Rachael Ray Nutrish continues to conceal and suppress the true nature, identity, source, and method of production of its Products.

**F.    Rachael Ray Nutrish Knew or Should Have Known That Its Representations Were False.**

58.    Rachael Ray Nutrish holds itself out to the public as a trusted expert in the sourcing and processing of pet food.

59.    Rachael Ray Nutrish knew what representations it made on the labels of the Products. Rachael Ray Nutrish also knew how the pet food was sourced and processed, and therefore knew or should have known that the pet food contains residues of glyphosate, an unnatural biocide, and ethoxyquin, an artificial preservative.

60.    Rachael Ray Nutrish thus knew, or should have known, the facts demonstrating that the Products were mislabeled and falsely advertised.

61.    Consumers frequently rely on label representations and information in making purchase decisions, especially in purchasing food.

62.    Rachael Ray Nutrish made the false, misleading, and deceptive representations and omissions intending for consumers to rely upon these representations and omissions in purchasing the Products.

63.    In making the false, misleading, and deceptive representations and omissions at issue, Rachael Ray Nutrish knew and intended that consumers would purchase the Products when consumers would otherwise purchase a competing product.

64.    Consumers are willing to pay more for products that purport to be "natural" and free of artificial preservatives.

65.    In making the false, misleading, and deceptive representations and omissions at issue, Rachael Ray Nutrish also knew and intended that consumers would pay more for "natural" products that are purportedly free of unnatural agents than they would pay for products that are not "natural," furthering Rachael Ray Nutrish's private interest of increasing sales of the Products and decreasing sales of competing products that are truly natural and/or free from artificial preservatives.

66.    Rachael Ray Nutrish knows that consumers prefer natural pet foods and pet foods that do not contain unnatural or potentially dangerous chemicals or their residues. Rachael Ray Nutrish knows that consumers will pay more for "natural" pet foods or may not purchase them at all unless they are "natural" and free from unnatural and potentially dangerous chemicals.

67.    Upon information and belief, Rachael Ray Nutrish has failed to remedy the problem with the Products, thus causing ongoing harm to consumers.

68.    D.C. Consumers are at risk of real, immediate, and continuing harm if the Products continue to be sold with the misleading representations.

69.    Plaintiff contends that the Products were sold pursuant to unfair and unconscionable trade practices because the sale of Rachael Ray Nutrish's Product offends public policy and is immoral, unethical, oppressive, unscrupulous, and causes substantial economic injuries to consumers.

70.     Reasonable consumers do not expect the Products, represented and advertised as "natural," and as containing "no . . . artificial preservatives" to contain unnatural chemical residues such as glyphosate or artificial preservative residues such as ethoxyquin. Rachael Ray Nutrish's statements and other representations convey a series of express and implied claims and/or omissions that Rachael Ray Nutrish knows are material to the reasonable consumer in making a purchasing decision, and that Rachael Ray Nutrish intends for consumers to rely upon when choosing whether to purchase the Products and how much to pay for them.

71.     Rachael Ray Nutrish misrepresented the nature, quality, and/or ingredients of the Products and/or failed to disclose the unnatural aspects of the Products and/or the presence of residues of artificial preservatives, which was and is false, misleading, and/or likely to deceive reasonable consumers.

## CAUSE OF ACTION

### VIOLATION OF THE DISTRICT OF COLUMBIA
### CONSUMER PROTECTION PROCEDURES ACT

72.     Pursuant to D.C. Code §§ 28-3905(k)(1) and 28-3905(k)(2), Toxin Free USA brings this Count against Rachael Ray Nutrish, on behalf of itself and the general public of the District of Columbia, for Rachael Ray Nutrish's violation of DC CPPA, D.C. Code § 28-3901, *et seq*.

73.     Plaintiff incorporates by reference all the allegations in the preceding paragraphs of this Complaint.

74.     Rachael Ray Nutrish has labeled and advertised the Products as "natural" and has otherwise presented an image and marketing materials suggesting that the Products are natural, when in fact the Products contain residues of an unnatural chemical biocide and an artificial preservative.

75.     Rachael Ray Nutrish has labeled and advertised the Products as containing "no artificial preservatives" and has otherwise presented an image and marketing materials suggesting that the Products contain no artificial preservatives, when in fact the Products contain residues of an artificial preservative.

76.     Rachael Ray Nutrish's advertising of the Products misrepresents, tends to mislead, and omits facts regarding the source, characteristics, standard, quality, and grade of the Products.

77.     The Products lack the characteristics, ingredients, benefits, standards, qualities, or grades that Rachael Ray Nutrish states and implies in advertisements.

78.     Rachael Ray Nutrish's misstatements, innuendo, and omissions are material and have the tendency to mislead.

79.     Rachael Ray Nutrish knowingly did not sell the Products as advertised.

80.     The facts as alleged above demonstrate that Rachael Ray Nutrish has violated the DC CPPA, D.C. Code § 28-3901 *et seq.* Specifically, Rachael Ray Nutrish has violated D.C. Code § 28-3904, which makes it an unlawful trade practice to:

(a)     represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; . . .

(d)     represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(e)     misrepresent as to a material fact which has a tendency to mislead; . . .

(f)     fail to state a material fact if such failure tends to mislead;

(f-1)   [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead; … [or]

15

(h)      advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered.

81.    The DC CPPA makes such conduct an unlawful trade practice "whether or not any consumer is in fact misled, deceived or damaged thereby." D.C. Code § 28-3904.

82.    Though Toxin Free USA need not show proof of deception to succeed on its DC CPPA claim, consumers were in fact deceived. Rachael Ray Nutrish knows and should have known that reasonable consumers would believe that the Products are "natural" and contain "no . . . artificial preservatives" as advertised.

83.    Toxin Free USA has a sufficient nexus to D.C. consumers of the Products to adequately represent their interests.

84.    Because Rachael Ray Nutrish misrepresents the characteristics, ingredients, and benefits of the Products; misrepresents the standard, quality, and grade of the Products; misrepresents, fails to state, and uses innuendo and ambiguity in ways which tend to mislead reasonable consumers with regard to material facts about the Products; and advertises the Products without the intent to sell the Products as advertised, Rachael Ray Nutrish's marketing of the Products as "Natural Food" violates D.C. Code §§ 28-3904(a), (d), (e), (f), (f-1), and (h).

85.    Rachael Ray Nutrish is a "person" within the meaning of D.C. Code § 28-3901(a)(1), is a merchant under § 28-3901(a)(3), and provides "goods" within the meaning of § 28-3901(a)(7).

86.    Pursuant to D.C. Code § 28-3905(k)(1)(C), "[a] nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District, including a violation involving consumer goods or services that the organization purchased or

received in order to test or evaluate qualities pertaining to use for personal, household, or family purposes."

87.    Toxin Free USA is a nonprofit organization pursuant to D.C. Code § 28-3905(k)(1)(C) that on February 22, 2019 purchased Products in order to test or evaluate their qualities.

88.    Rachael Ray Nutrish's conduct violates the DC CPPA regardless of whether "any consumer is in fact misled, deceived or damaged thereby." D.C. Code § 28-3904. Pursuant to D.C. Code § 28-3905(k)(1)(A), "[a] consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District."

89.    Any consumer has the right to bring an action for redress of Rachael Ray Nutrish's unlawful behavior, *see* D.C. Code § 28-3905(k)(1)(A), and the statute does not limit consumer plaintiffs according to whether they purchased the product at issue. Nevertheless, as alleged in this Complaint, the Rachael Ray Nutrish Products are marketed and sold in the District, *see supra* ¶¶ 20, 24, and consumers within the District have purchased these Products under the misrepresentations made by Rachael Ray Nutrish. Therefore, a variety of purchasing and non-purchasing consumers could bring an action against Rachael Ray Nutrish based on the misrepresentations and omissions listed in this Complaint.

90.    Pursuant to D.C. Code § 28-3905(k)(1)(D)(i), "a public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice."

91.    The only limitation on this power of a public interest organization to act on behalf of consumers is that the public interest organization must have "sufficient nexus to the interests

involved of the consumer or class to adequately represent those interests." D.C. Code § 28-3905(k)(1)(D)(ii). As set forth in this Complaint, *see supra* ¶¶ 15-19, Plaintiff Toxin Free USA was founded with the purpose of advocating for and educating consumers, including consumers in the District of Columbia, in the arena of clean and healthy food and ecological systems. In addition, Plaintiff Toxin Free USA has retained the undersigned competent counsel, with significant experience in litigating under the DC CPPA, to pursue this action.

92.    Toxin Free USA is a public-interest organization pursuant to D.C. Code § 28-3905(k)(1)(D) and brings this action on behalf of consumers who could bring the action under D.C. Code § 28-3905(k)(1)(A).

93.    Via §§ 28-3905(k)(1)(C) and (k)(1)(D)(i), the DC CPPA allows for non-profit organizational standing and public interest organizational standing to the fullest extent recognized by the D.C. Court of Appeals in its past and future decisions addressing the limits of constitutional standing under Article III.

94.    Toxin Free USA is a "person" within the meaning of D.C. Code § 28-3901(a)(1), and a "non-profit organization" within the meaning of D.C. Code § 28-3901(a)(14).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Toxin Free USA prays for judgment against Rachael Ray Nutrish and requests the following relief:

A.    a declaration that Rachael Ray Nutrish's conduct is in violation of the DC CPPA;

B.    an order enjoining Rachael Ray Nutrish's conduct found to be in violation of the DC CPPA, as well as corrective advertising;

C.    an order granting Plaintiff costs and disbursements, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law; and

D.    such further relief, including equitable relief, as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff Toxin Free USA hereby demands a trial by jury.

DATED: May 14, 2019

**RICHMAN LAW GROUP**

By:

Kim E. Richman
krichman@richmanlawgroup.com
8 West 126th Street
New York, New York 10027
Telephone: (718) 878-4707
Facsimile: (212) 687-8292

*Attorneys for Plaintiff*

19

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

INFORMATION SHEET

TOXIN FREE USA

Case Number: **2019 CA 003192 B**

vs

THE J.M. SMUCKER CO. and AINSWORTH
PET NUTRITION LLC

Date: May 14, 2019

☐ One of the defendants is being sued
in their official capacity.

| Name: *(Please Print)* Kim E. Richman | Relationship to Lawsuit |
|---|---|
| Firm Name: Richman Law Group | ☐ Attorney for Plaintiff |
| Telephone No.: (212) 687-8291    Six digit Unified Bar No.: 1022978 | ☐ Self (Pro Se) |
| | ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury        ☐ 6 Person Jury        ☒ 12 Person Jury

Demand: $ N/A        Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____    Judge: _____    Calendar #:_____

Case No.:_____    Judge: _____    Calendar#:_____

---

NATURE OF SUIT:        *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

| | | |
|---|---|---|
| ☐ 01 Breach of Contract | ☐ 14 Under $25,000 Pltf. Grants Consent | ☐ 16 Under $25,000 Consent Denied |
| ☐ 02 Breach of Warranty | ☐ 17 OVER $25,000 Pltf. Grants Consent | ☐ 18 OVER $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 27 Insurance/Subrogation | ☐ 26 Insurance/Subrogation |
| ☐ 07 Personal Property | Over $25,000 Pltf. Grants Consent | Over $25,000 Consent Denied |
| ☐ 13 Employment Discrimination | ☐ 07 Insurance/Subrogation | ☐ 34 Insurance/Subrogation |
| ☐ 15 Special Education Fees | Under $25,000 Pltf. Grants Consent | Under $25,000 Consent Denied |
| | ☐ 28 Motion to Confirm Arbitration Award (Collection Cases Only) | |

**B. PROPERTY TORTS**

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | |
| ☐ 07 Shoplifting, D.C. Code § 27-102 (a) | | |

**C. PERSONAL TORTS**

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☐ 10 Invasion of Privacy | ☐ 17 Personal Injury- (Not Automobile, Not Malpractice) |
| ☐ 02 Alienation of Affection | ☐ 11 Libel and Slander | ☐ 18 Wrongful Death (Not Malpractice) |
| ☐ 03 Assault and Battery | ☐ 12 Malicious Interference | ☐ 19 Wrongful Eviction |
| ☐ 04 Automobile- Personal Injury | ☐ 13 Malicious Prosecution | ☐ 20 Friendly Suit |
| ☒ 05 Deceit (Misrepresentation) | ☐ 14 Malpractice Legal | ☐ 21 Asbestos |
| ☐ 06 False Accusation | ☐ 15 Malpractice Medical (Including Wrongful Death) | ☐ 22 Toxic/Mass Torts |
| ☐ 07 False Arrest | ☐ 16 Negligence- (Not Automobile, Not Malpractice) | ☐ 23 Tobacco |
| ☐ 08 Fraud | | ☐ 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE        IF USED

CV-496/June 2015

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  - (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  - (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  - Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  - Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  - Judgment [ D.C. Code §
  - 2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  - 42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  - [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  - (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

**D. REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_Kevin E. Ri_____

_____
Attorney's Signature

May 14, 2019

_____
Date

CV-496/ June 2015



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

TOXIN FREE USA
Vs.                                                                        C.A. No.        2019 CA 003192 B
THE J.M. SMUCKER COMPANY et al

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Robert E. Morin

Case Assigned to: Judge FLORENCE Y PAN
Date:   May 15, 2019
Initial Conference: 9:30 am, Friday, August 16, 2019
Location:   Courtroom 415
                   500 Indiana Avenue N.W.
                   WASHINGTON, DC  20001

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W. Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief    Judge    Robert    E.    Morin

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

D.C. Superior Court
06/04/2019 10:44AM
Clerk of the Court

TOXIN FREE USA,

_____
                                    Plaintiff

vs.

AINSWORTH PET NUTRITION, LLC,
                                                    Case Number    2019 CA 003192 B

_____
                                    Defendant

**SUMMONS**

To the above named Defendant:

     You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

     You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Kim E. Richman
_____
Name of Plaintiff's Attorney

Richman Law Group
_____
Address
  8 W. 126th Street, New York, NY 10027
_____
  718.705.4579
_____
Telephone

*Clerk of the Court*

By _____
                     Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시요     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

     IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

     If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                      Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____
Nombre del abogado del Demandante

_____
Dirección

_____

_____
Teléfono

*SECRETARIO DEL TRIBUNAL*

Por: _____
Subsecretario

Fecha _____

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 연락주십시오    የአማርኛ ትርጉም ለማግኘት፣ (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

D.C. Superior Court
06/04/2019 10:44AM
Clerk of the Court

TOXIN FREE USA,

_____
                                    Plaintiff

vs.

AINSWORTH PET NUTRITION, LLC,                    Case Number    2019 CA 003192 B

_____
                                    Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Kim E. Richman
_____
Name of Plaintiff's Attorney                          _Clerk of the Court_

Richman Law Group
_____          By _____
Address                                                          Deputy Clerk
8 W. 126th Street, New York, NY 10027

718.705.4579
_____          Date    **6/6/2019**
Telephone

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요          የאማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español




**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

### CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____        *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

_____        Por: _____
Dirección                                                        Subsecretario

_____        Fecha _____
Teléfono

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

[Korean text] (202) 879-4828 [Amharic text]        [Amharic text] (202) 879-4828 [Amharic text]

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

```
D.C. Superior Court
06/04/2019 10:42AM
Clerk of the Court
```

TOXIN FREE USA,

_____
                                    Plaintiff

vs.

THE J.M. SMUCKER COMPANY

_____            Case Number    2019 CA 003192 B
                                    Defendant

## SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Kim E. Richman
_____
Name of Plaintiff's Attorney

Richman Law Group
_____
Address
  8 W. 126th Street, New York, NY 10027
_____

  718.705.4579
_____
Telephone

*Clerk of the Court*

By _____
                              Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요          የአማርኛ ትርጉም ለማግኘት (202) 879-4828          ያስውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                          Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____          *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

_____          Por: _____
Dirección                                                              Subsecretario

_____          Fecha _____
Teléfono

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

만약 번역을 원하시면 (202) 879-4828 로 전화주십시오          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                                      Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

D.C. Superior Court
06/04/2019 10:42AM
Clerk of the Court

TOXIN FREE USA,

_____
Plaintiff

vs.

THE J.M. SMUCKER COMPANY                    Case Number     2019 CA 003192 B

_____
Defendant

**SUMMONS**

To the above named Defendant:

     You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

     You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Kim E. Richman
_____
Name of Plaintiff's Attorney

Richman Law Group
_____
Address
8 W. 126th Street, New York, NY 10027
_____
718.705.4579
_____
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date     **6/6/2019**

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요          የአማርኛ ትርጉም ለማግኘት (202) 879-4828          ይደውሉ

     IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

     If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                                    Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____     *SECRETARIO DEL TRIBUNAL*
Nombre del abogado del Demandante

_____     Por: _____
Dirección                                                            Subsecretario

_____
                                                              Fecha _____

_____
Teléfono
如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면 (202) 879-4828 로 연락주십시요      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                              Super. Ct. Civ. R. 4



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

TOXIN FREE USA
_____
                    *Plaintiff(s)*

                v.                                    Case No:  2019 CA 003192 B
                                                              _____
THE J.M. SMUCKER COMPANY
_____
                    *Defendant(s)*

### NOTICE AND ACKNOWLEDGMENT OF SERVICE

To (insert name and address of the party to be served):

THE J.M. SMUCKER COMPANY, 4400 Easton Commons Way, Suite 125, Columbus, OH 43219

    The enclosed summons, complaint, initial order, and any addendum are served in accordance with Superior Court Rule of Civil Procedure 4(c)(5).
    Please sign and date the Acknowledgement at the bottom of the page. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, please indicate your relationship to that entity in the space beside your signature. If you are served on behalf of another person and you are authorized to receive process, please indicate your authority in the space beside your signature.
    If you do not complete and return the form to the sender within 21 days after it was mailed and you do not show good cause for this failure, you (or the party on whose behalf you are being served) will be required to pay 1) the costs incurred in serving the summons, complaint, initial order, and any addendum in any other manner permitted by law and 2) the reasonable expenses, including attorney's fees, for any motion required to collect those service expenses.
    If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within 21 days after you have signed, dated, and returned the form (or within 60 days if the party being served is the United States, the District of Columbia, or officers or employees of either). If you fail to do so, judgment by default may be entered against you for the relief demanded in the complaint.
    This Notice and Acknowledgment of Receipt of Summons, Complaint, Initial Order, and Any Addendum was mailed on (insert date):   6/7/19            .

_____                              6/7/19
*Signature*                                                  *Date of Signature*

### ACKNOWLEDGMENT OF RECEIPT OF SUMMONS,
### COMPLAINT, INITIAL ORDER, AND ANY ADDENDUM

    I (print name)   Ronald Y. Rothstein           received a copy of the summons, complaint, initial order, and any addendum in the above captioned matter at (insert address): Ronald Y. Rothstein
                                                     Winston & Strawn LLP (IL)
                                                     35 West Wacker Drive, Chicago, IL 60601
_____    Attorney        _____
*Signature*               *Relationship to Defendant/Authority*    *Date of Signature*
                          *to Receive Service*

Para pedir una traducción, llame al (202) 879-4828        如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction
Để có một bài dịch, hãy gọi (202) 879-4828         የአማርኛ ትርጉም ከፈለጉ (202) 879-4828 ይደውሉ        번역을 원하시면, (202) 879-4828 로 전화주십시오

CA 1-A [Rev. June 2017]                                                      Super. Ct. Civ. R. 4



**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION - Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

D.C. Superior Court
07/22/2019 15:12PM
Clerk of the Court

TOXIN FREE USA
_____
*Plaintiff(s)*

v.

Case No: ___2019 CA 003192 B___

AINSWORTH PET NUTRITION, LLC,
_____
*Defendant(s)*

### NOTICE AND ACKNOWLEDGMENT OF SERVICE

To (insert name and address of the party to be served):

AINSWORTH PET NUTRITION, LLC, 18746 Mill St., Meadville, PA 16335,

The enclosed summons, complaint, initial order, and any addendum are served in accordance with Superior Court Rule of Civil Procedure 4(c)(5).

Please sign and date the Acknowledgement at the bottom of the page. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, please indicate your relationship to that entity in the space beside your signature. If you are served on behalf of another person and you are authorized to receive process, please indicate your authority in the space beside your signature.

If you do not complete and return the form to the sender within 21 days after it was mailed and you do not show good cause for this failure, you (or the party on whose behalf you are being served) will be required to pay 1) the costs incurred in serving the summons, complaint, initial order, and any addendum in any other manner permitted by law and 2) the reasonable expenses, including attorney's fees, for any motion required to collect those service expenses.

If you do complete and return this form, you (or the party on whose behalf you are being served) must answer the complaint within 21 days after you have signed, dated, and returned the form (or within 60 days if the party being served is the United States, the District of Columbia, or officers or employees of either). If you fail to do so, judgment by default may be entered against you for the relief demanded in the complaint.

This Notice and Acknowledgment of Receipt of Summons, Complaint, Initial Order, and Any Addendum was mailed on (insert date): ___6/7/19___.

_____          6/7/19
*Signature*                      _____
                                 *Date of Signature*

### ACKNOWLEDGMENT OF RECEIPT OF SUMMONS, COMPLAINT, INITIAL ORDER, AND ANY ADDENDUM

I (print name) ___Ronald Y. Rothstein___ received a copy of the summons, complaint, initial order, and any addendum in the above captioned matter at (insert address): Ronald Y. Rothstein
Winston & Strawn LLP (IL)
35 West Wacker Drive, Chicago, IL 60601

_____    Attorney                    July 8, 2019
*Signature*                *Relationship to Defendant/Authority*    _____
                           *to Receive Service*                     *Date of Signature*

Para pedir una traducción, llame al (202) 879-4828          如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction
Để có một bài dịch, hãy gọi (202) 879-4828           የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ          번역을 원하시면, (202) 879-4828 로 전화주십시오

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **TOXIN FREE USA,** | |
| Plaintiff, | Case No. 2019 CA 003192 B |
| v. | |
| **THE J. M. SMUCKER COMPANY** and **AINSWORTH PET NUTRITION, LLC**, | |
| Defendants. | |

**AINSWORTH PET NUTRITION, LLC DISCLOSURE STATEMENT**

Pursuant to D.C. Civil Rule 7.1, Defendant Ainsworth Pet Nutrition, LLC, ("Ainsworth") hereby states as follows:

1. Ainsworth is wholly owned by Ainsworth Pet Nutrition Holdings, LLC ("Ainsworth Holdings").

2. Ainsworth Holdings is in turn wholly owned by Ainsworth Pet Nutrition Parent, LLC ("Ainsworth Parent").

3. Ainsworth Parent is in turn wholly owned by CP APN, Inc. ("CP APN").

4. CP APN is in turn wholly owned by NU Pet Company ("NU Pet").

5. NU Pet is in turn wholly owned by The J. M. Smucker Company, which is the only one of the aforementioned entities that is publicly traded.

Dated: July 29, 2019

Respectfully submitted,

_/s Ronald Y. Rothstein_
RONALD Y. ROTHSTEIN
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
RRothste@winston.com

_Counsel for Defendants_
_The J. M. Smucker Company and_
_Ainsworth Pet Nutrition, LLC_

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2019, I mailed this disclosure to Plaintiff's attorney at the

below address:

Kim E. Richman
8 West 126th Street
New York, New York 10027

*s/ Ronald Y. Rothstein*
RONALD Y. ROTHSTEIN

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **TOXIN FREE USA,** | |
| Plaintiff, | Case No. 2019 CA 003192 B |
| v. | |
| **THE J. M. SMUCKER COMPANY** and **AINSWORTH PET NUTRITION, LLC,** | |
| Defendants. | |

## THE J. M. SMUCKER COMPANY DISCLOSURE STATEMENT

Pursuant to D.C. Civil Rule 7.1, Defendant The J. M. Smucker Company states that it has no parent corporation, nor is there any publicly held corporation that owns 10% or more of its stock.

Dated: July 29, 2019

Respectfully submitted,

*/s Ronald Y. Rothstein*
RONALD Y. ROTHSTEIN
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
RRothste@winston.com

*Counsel for Defendants*
*The J.M. Smucker Company and*
*Ainsworth Pet Nutrition, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2019, I mailed this disclosure to Plaintiff's attorney at the

below address:


Kim E. Richman
8 West 126th Street
New York, New York 10027

*s/ Ronald Y. Rothstein*
RONALD Y. ROTHSTEIN

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

|  |  |
|---|---|
| **TOXIN FREE USA,** | |
| Plaintiff, | Case No. 2019 CA 003192 B |
| v. | |
| **THE J.M. SMUCKER COMPANY** and **AINSWORTH PET NUTRITION, LLC**, | |
| Defendants. | |

## CONSENT MOTION TO EXTEND THE TIME FOR DEFENDANTS TO MOVE TO DISMISS THE COMPLAINT AND TO SET A BRIEFING SCHEDULE

Defendants The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC, respectfully request an order granting Defendants an extension of time to move to dismiss Plaintiff Toxin Free USA's complaint and to set a briefing schedule for Defendants' motion to dismiss. Plaintiff has agreed to the relief requested herein. Defendants request an order permitting Defendants to file a motion to dismiss the complaint and supporting points and authorities on or before August 26, 2019. Plaintiff has requested to file its opposition to the motion on or before September 25, 2019, which Defendant does not oppose. Defendants also seek to file their reply on or before October 9, 2019.

Dated: July 29, 2019

Respectfully submitted,

*/s Ronald Y. Rothstein*
RONALD Y. ROTHSTEIN
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
RRothste@winston.com

*Counsel for Defendants*

*The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC*

## POINTS AND AUTHORITIES

1.   Plaintiff Toxin Free USA ("Plaintiff") filed the instant complaint on May 14, 2019 "[o]n behalf of itself and the general public" against Defendants The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC ("Defendants").

2.   Plaintiff brings one cause of action under the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, et seq., which authorizes a nonprofit organization or a public interest organization to "bring an action seeking relief from the use of a trade practice in violation of a law of the District." D.C. Code § 28-3905(C) and (D)(i). Plaintiff alleges that Defendants have violated the CCPA § 28-3904(a), (d), (e), (f), and (f-1).

3.   Defendants returned a Notice and Acknowledgement of Receipt of Summons, Complaint, Initial Order, and Any Addendum on July 8, 2019.

4.   Defendants deadline to answer or otherwise respond to the complaint is July 29, 2019.

5.   In light of the allegations made in the complaint and other pending litigation involving counsel for Plaintiff and counsel for Defendants, the parties agreed to an extension of Defendants' deadline to respond to the complaint and a briefing schedule for the Defendants' forthcoming motion to dismiss.

6.   Superior Court Civil Rule 6(b) allows the Court to extend the time for Defendants to respond to the complaint and the briefing deadlines for good cause.

7.   There is good cause to extend the time for Defendants to respond to the complaint and for the parties to file briefs in support of and in opposition of the motion to dismiss. The parties have agreed on a schedule to permit both parties the time necessary to fully respond to all of the allegations and forthcoming motion to dismiss arguments.

8.      Defendants respectfully request that this Court enter an order permitting Defendants to file

a motion to dismiss the complaint and supporting points and authorities on or before

August 26, 2019. Defendants further request the order permit Plaintiff to file its opposition

to the motion on or before September 25, 2019 and Defendants to file a reply on or before

October 9, 2019.


Dated: July 29, 2019                              Respectfully submitted,

                                                  *s/ Ronald Y. Rothstein*
                                                  RONALD Y. ROTHSTEIN

                                                  *Counsel for Defendants*
                                                  *The J.M. Smucker Company and*
                                                  *Ainsworth Pet Nutrition, LLC*

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **TOXIN FREE USA,** | |
| Plaintiff, | Case No. 2019 CA 003192 B |
| v. | |
| **THE J.M. SMUCKER COMPANY** and **AINSWORTH PET NUTRITION, LLC**, | |
| Defendants. | |

**ORDER**

Upon consideration of the Defendants' consent motion to extend the time for defendants to move to dismiss the complaint and to set a briefing schedule, it is, by the Court, this _____ day of _____, 2019, **ORDERED** that the motion is **GRANTED**. Defendants shall file their motion to dismiss and supporting points and authorities on or before August 26, 2019, Plaintiff shall file an opposition to the motion on or before September 25, 2019 and Defendants shall file a reply on or before October 9, 2019.

_____
Judge

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2019, I mailed this motion, points and authorities, and

proposed order to Plaintiff's attorney at the below address:

Kim E. Richman
8 West 126th Street
New York, New York 10027

_s/ Ronald Y. Rothstein_
RONALD Y. ROTHSTEIN

D.C. Superior Court
07/29/2019 17:15PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| **TOXIN FREE USA,** | |
| Plaintiff, | Case No. 2019 CA 003192 B |
| v. | |
| **THE J.M. SMUCKER COMPANY** and **AINSWORTH PET NUTRITION, LLC**, | |
| Defendants. | |

## CONSENT MOTION TO EXTEND THE TIME FOR DEFENDANTS TO MOVE TO DISMISS THE COMPLAINT AND TO SET A BRIEFING SCHEDULE

Defendants The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC, respectfully request an order granting Defendants an extension of time to move to dismiss Plaintiff Toxin Free USA's complaint and to set a briefing schedule for Defendants' motion to dismiss. Plaintiff has agreed to the relief requested herein. Defendants request an order permitting Defendants to file a motion to dismiss the complaint and supporting points and authorities on or before August 26, 2019. Plaintiff has requested to file its opposition to the motion on or before September 25, 2019, which Defendant does not oppose. Defendants also seek to file their reply on or before October 9, 2019.

Dated: July 29, 2019

Respectfully submitted,

*/s Ronald Y. Rothstein*
RONALD Y. ROTHSTEIN
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
RRothste@winston.com

*Counsel for Defendants*

*The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC*

## POINTS AND AUTHORITIES

1. Plaintiff Toxin Free USA ("Plaintiff") filed the instant complaint on May 14, 2019 "[o]n behalf of itself and the general public" against Defendants The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC ("Defendants").

2. Plaintiff brings one cause of action under the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, et seq., which authorizes a nonprofit organization or a public interest organization to "bring an action seeking relief from the use of a trade practice in violation of a law of the District." D.C. Code § 28-3905(C) and (D)(i). Plaintiff alleges that Defendants have violated the CCPA § 28-3904(a), (d), (e), (f), and (f-1).

3. Defendants returned a Notice and Acknowledgement of Receipt of Summons, Complaint, Initial Order, and Any Addendum on July 8, 2019.

4. Defendants deadline to answer or otherwise respond to the complaint is July 29, 2019.

5. In light of the allegations made in the complaint and other pending litigation involving counsel for Plaintiff and counsel for Defendants, the parties agreed to an extension of Defendants' deadline to respond to the complaint and a briefing schedule for the Defendants' forthcoming motion to dismiss.

6. Superior Court Civil Rule 6(b) allows the Court to extend the time for Defendants to respond to the complaint and the briefing deadlines for good cause.

7. There is good cause to extend the time for Defendants to respond to the complaint and for the parties to file briefs in support of and in opposition of the motion to dismiss. The parties have agreed on a schedule to permit both parties the time necessary to fully respond to all of the allegations and forthcoming motion to dismiss arguments.

8.      Defendants respectfully request that this Court enter an order permitting Defendants to file

a motion to dismiss the complaint and supporting points and authorities on or before

August 26, 2019. Defendants further request the order permit Plaintiff to file its opposition

to the motion on or before September 25, 2019 and Defendants to file a reply on or before

October 9, 2019.


Dated: July 29, 2019                                    Respectfully submitted,

                                                        *s/ Ronald Y. Rothstein*
                                                        RONALD Y. ROTHSTEIN

                                                        *Counsel for Defendants*
                                                        *The J.M. Smucker Company and*
                                                        *Ainsworth Pet Nutrition, LLC*

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **TOXIN FREE USA,** | |
| Plaintiff, | Case No. 2019 CA 003192 B |
| v. | |
| **THE J.M. SMUCKER COMPANY** and **AINSWORTH PET NUTRITION, LLC**, | |
| Defendants. | |

**ORDER**

Upon consideration of the Defendants' consent motion to extend the time for defendants to move to dismiss the complaint and to set a briefing schedule, it is, by the Court, this _____ day of _____, 2019, **ORDERED** that the motion is **GRANTED**. Defendants shall file their motion to dismiss and supporting points and authorities on or before August 26, 2019, Plaintiff shall file an opposition to the motion on or before September 25, 2019 and Defendants shall file a reply on or before October 9, 2019.

_____

Judge

# Exhibit A

# 2019 CA 003192 B TOXIN FREE USA Vs. THE J.M. SMUCKER COMPANY et al FYP

- Case Type:
- Civil II
- Case Status
- Open
- File Date:
- 05/14/2019
- Action:
- Complaint for Deceit (Misrepresentation) Filed
- Status Date:
- 05/14/2019
- Next Event
-

| All Information | Party | Event | Docket | Receipt | Disposition |

## Party Information

### TOXIN FREE USA
- Plaintiff

- Disposition
- 
- Disp Date
- 

| **Alias** |

| **Party Attorney** |
| • Attorney |
| • RICHMAN, KIM E. |
| • Attorney |
| • SHOOSTER, JAY |

### THE J.M. SMUCKER COMPANY
- Defendant

- Disposition
- 
- Disp Date
- 

| **Alias** |

| **Party Attorney** |
| • Attorney |
| • ROTHSTEIN, RONALD Y |

### AINSWORTH PET NUTRITION, LLC
Defendant

- Disposition
- 
- Disp Date
- 

| **Alias** |

| **Party Attorney** |
| • Attorney |
| • ROTHSTEIN, RONALD Y |

## Events

| Date/Time | Location | Type | Result | Event Judge |
|---|---|---|---|---|
| 08/16/2019 09:30 AM | Courtroom 415 | Initial Scheduling Conference-60 | Scheduling Conference Hearing Continued | PAN, FLORENCE Y |
| 11/22/2019 09:30 AM | Courtroom 415 | Scheduling Conference Hearing | Initial Scheduling Conf. Vacated per SCR 16(b) | PAN, FLORENCE Y |

## Docket Information

| Date | Docket Text | Image Avail. |
|---|---|---|
| 05/14/2019 | Complaint for Deceit (Misrepresentation) Filed   Receipt 427954   Date 05/15/2019 | |

| Date | Docket Text | Image Avail. |
|---|---|---|
| 05/15/2019 | eComplaint Filed. Submitted 05/14/2019 18:45. kd<br>(NO SUMMONS SUBMITTED AT FILING)<br>Attorney: RICHMAN, KIM E. (1022978)<br>TOXIN FREE USA (Plaintiff); | Image |
| 05/15/2019 | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 08/16/2019　Time: 9:30 am<br>Judge: PAN, FLORENCE Y　Location: Courtroom 415 | |
| 05/17/2019 | Complaint Package eServed | Image |
| 06/04/2019 | Initial Summons Requested Filed. submitted 06/04/2019 10:42. hvw<br>Attorney: RICHMAN, KIM E. (1022978)<br>TOXIN FREE USA (Plaintiff); | Image |
| 06/04/2019 | Initial Summons Requested Filed. submitted 06/04/2019 10:44. hvw<br>Attorney: RICHMAN, KIM E. (1022978)<br>TOXIN FREE USA (Plaintiff); | Image |
| 07/09/2019 | Affidavit of Service of Summons & Complaint on<br>THE J.M. SMUCKER COMPANY (Defendant); | Image |
| 07/09/2019 | Proof of Service<br>　Method　　Service Issued<br>　Issued　　05/15/2019<br>　Service　　Summons Issued<br>　Served　　07/08/2019<br>　Return　　07/09/2019<br>　On　　　THE J M SMUCKER COMPANY<br>　Signed By　Ronald Y Rothstein<br><br>　Reason　　Proof of Service<br>　Comment<br><br>　Tracking # 5000215453 | |
| 07/22/2019 | Notice of Acknowledgment of Service Filed<br>AINSWORTH PET NUTRITION, LLC (Defendant). Filed. Submitted. 07/22/2019 15:12. ncv.<br>Attorney: RICHMAN, KIM E. (1022978)<br>TOXIN FREE USA (Plaintiff); | Image |
| 07/22/2019 | Proof of Service<br>　Method　: Service Issued<br>　Issued　: 05/15/2019<br>　Service　: Summons Issued<br>　Served　: 06/07/2019<br>　Return　: 07/22/2019<br>　On　　: AINSWORTH PET NUTRITION, LLC<br>　Signed By : Ronald Rothstein<br><br>　Reason　: Proof of Service<br>　Comment　:<br><br>　Tracking #: 5000215454 | |
| 07/29/2019 | Consent Motion to Extend the Time for Defendants to Move to Dismiss the Complaint and to set a Briefing Schedule Filed. submitted 07/29/2019 16:59. mw<br>Attorney: ROTHSTEIN, Mr RONALD Y (451950)<br>THE J.M. SMUCKER COMPANY (Defendant); AINSWORTH PET NUTRITION, LLC (Defendant); Receipt: 434335 Date: 07/30/2019 | Image |
| 07/29/2019 | Consent Motion to Extend the Time for Defendants to Move to Dismiss the Complaint and to set a Briefing Schedule Filed  submitted 07/29/2019 17 15  mw<br>Attorney  ROTHSTEIN, Mr RONALD Y (451950)<br>THE J M  SMUCKER COMPANY (Defendant); AINSWORTH PET NUTRITION, LLC (Defendant);  Receipt 434341 Date 07/30/2019 | Image |
| 07/29/2019 | Additional eFiling Document to Consent Motion to Extend the Time for Defendants to Move to Dismiss the Complaint and to set a Briefing Schedule Filed. submitted 07/29/2019 17:15. mw<br>Attorney: ROTHSTEIN, Mr RONALD Y (451950)<br>THE J.M. SMUCKER COMPANY (Defendant); AINSWORTH PET NUTRITION, LLC (Defendant); | Image |
| 08/06/2019 | Order Granting CONSENT Motion to Extend THE Time FOR DEFENDANTS to MOVE TO DISMISS THE Complaint AND TO SET A BRIEFING SCHEDULE Entered on the Docket-SIGNED BY JUDGE FLORENCE PAN, E-FILED & E-SERVED 8/6/19. MWB | |

| Date | Docket Text | Image Avail. |
|------|-------------|--------------|
| 08/06/2019 | Event Resulted:<br>The following event: Initial Scheduling Conference-60 scheduled for 08/16/2019 at 9:30 am has been resulted as follows:<br><br>Result: Scheduling Conference Hearing Continued<br>Judge: PAN, FLORENCE Y   Location: Courtroom 415 | |
| 08/06/2019 | Scheduling Conference Hearing<br>Event: Scheduling Conference Hearing<br>Date: 11/22/2019   Time: 9:30 am<br>Judge: PAN, FLORENCE Y   Location: Courtroom 415 | |
| 08/06/2019 | Order Granting Consent Motion to Extend the Time for Defendants to Move to Dismiss the Complaint and to Set a Briefing Schedule signed by Judge Florence Y Pan on 8/6/2019  submitted 08/06/2019 14 52  hvw | Image |
| 08/07/2019 | Notice of Hearing Mailed Next Business Day<br><br>Notice Of Hearing<br>Sent on:  08/07/2019  08:24:21.55 | Image |
| 08/26/2019 | Defendants The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC's Motion to Dismiss Plaintiff's Complaint Filed. Submitted 08/26/2019 17:29. kd<br>Attorney: ROTHSTEIN, Mr RONALD Y (451950)<br>Mr RONALD Y ROTHSTEIN (Attorney) on behalf of THE J.M. SMUCKER COMPANY, AINSWORTH PET NUTRITION, LLC (Defendant)  Receipt: 436588  Date: 08/27/2019 | Image |
| 08/30/2019 | Returned Mail:<br>Order for: Scheduling Conference Hearing<br>Entered on: 8/7/2019<br>Mailed to: Kim E. Richman, Richman Law Group<br>Address: 8 West 12th Street, New York, NY 10027<br>Returned to Court on: 8/27/2019<br>Reason:  Return to Sender | Image |
| 09/26/2019 | Plaintiff's Opposition to Defendants' Motion to Dismiss Filed 09/26/2019 15 00  TB<br>Attorney  RICHMAN, KIM E  (1022978) | Image |
| 10/09/2019 | Reply in Support of Defendants The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC's Motion to Dismiss Plaintiff's Complaint Filed. Submitted 10/09/2019 15:41. ajm<br>Attorney: ROTHSTEIN, Mr RONALD Y (451950)<br>THE J.M. SMUCKER COMPANY (Defendant); AINSWORTH PET NUTRITION, LLC (Defendant); | Image |
| 10/30/2019 | Notice of Supplemental Authority Filed. Submitted 10/30/2019 16:30. kd<br>Attorney: RICHMAN, KIM E. (1022978)<br>KIM E. RICHMAN (Attorney) on behalf of TOXIN FREE USA (Plaintiff) | Image |
| 10/30/2019 | Additional eFiling Document to Notice of Supplemental Authority. Submitted 10/30/2019 16:30. kd<br>Attorney: RICHMAN, KIM E. (1022978)<br>KIM E. RICHMAN (Attorney) on behalf of TOXIN FREE USA (Plaintiff) | Image |
| 11/06/2019 | Order Denying DEFENDANTS' Motion to Dismiss Entered on the Docket SIGNED BY JUDGE FLORENCE PAN, E FILED & E SERVED 11/6/19  MWB | |
| 11/06/2019 | Order Denying Defendants' Motion to Dismiss Plaintiff's Complaint submitted 11/06/2019 14:16. ajm. Signed by Judge Pan on November 6, 2019. | Image |
| 11/18/2019 | Joint Praecipe Requesting a Scheduling Order Filed 11/18/2019 10:00. TB<br>Attorney: RICHMAN, KIM E. (1022978)<br>Attorney: ROTHSTEIN, Mr RONALD Y (451950)<br>TOXIN FREE USA (Plaintiff); THE J.M. SMUCKER COMPANY (Defendant); AINSWORTH PET NUTRITION, LLC (Defendant); | Image |
| 11/20/2019 | Track 3 - Mediation Scheduling Order Entered on the Docket<br>DCM Track Track 3 - Mediation was added on 11/20/2019 with the following milestone(s):<br>Exchange Lists of Fact Witnesses T3 due 02/18/2020<br>Proponent's Rule 26(a)(2)(B) Report T3 due 03/03/2020<br>Opponent's Rule 26(a)(2)(B) Report T3 due 04/08/2020<br>Discovery Request T3 due 04/20/2020<br>Close of Discovery T3 due 05/18/2020<br>Filing Motions T3 due 06/17/2020<br>Dispositive Motions Decided T3 due 07/17/2020<br>ADR - Mediation T3-1 due 08/03/2020<br>ADR - Mediation T3-2 due 08/31/2020<br>Pretrial T3 due 09/30/2020<br>Pretrial T3-2 due 10/30/2020 | Image |

| Date | Docket Text | Image Avail. |
|---|---|---|
| 11/20/2019 | Event Resulted:<br>The following event: Scheduling Conference Hearing scheduled for 11/22/2019 at 9:30 am has been resulted as follows:<br><br>Result: Initial Scheduling Conf. Vacated per SCR 16(b). Case placed on Mediation Track 3 per 11/18/2019 Praecipe Requesting Scheduling Order. No future dates currently scheduled. Scheduling order signed in Chambers and mailed to parties. SPJ/FYP<br><br>Judge: PAN, FLORENCE Y    Location: Courtroom 415 | |
| 11/20/2019 | Defendant The J.M. Smucker Company's Answer to Plaintiff's Complaint Filed submitted 11/20/2019 17:39 PLA Attorney: ROTHSTEIN, Mr RONALD Y (451950)<br>THE J.M. SMUCKER COMPANY (Defendant); | Image |
| 11/20/2019 | Defendant Ainsworth Pet Nutrition, LLC'S Answer to Plaintiff's Complaint Filed submitted 11/20/2019 17 42 PLA Attorney  ROTHSTEIN, Mr RONALD Y (451950)<br>AINSWORTH PET NUTRITION, LLC (Defendant); | Image |
| 12/20/2019 | Unopposed Motion for Admission Pro Hac Vice - Jay Shooster Filed. Submitted 12/20/2019 18:40. chd Attorney: RICHMAN, KIM E. (1022978)  Receipt: 446362  Date: 12/23/2019 | Image |
| 12/20/2019 | Additional eFiling Document to Unopposed Motion for Admission Pro Hac Vice - Jay Shooster Filed. Submitted 12/20/2019 18:40. chd<br>Attorney: RICHMAN, KIM E. (1022978) | Image |
| 01/06/2020 | Order Granting PLAINTIFF'S Motion to Admit Attorney JAY SHOOSTER Pro Hac Vice Entered on the Docket-SIGNED BY JUDGE FLORENCE PAN, E-FILED, E-SERVED & MAILED 1/6/20. MWB | |
| 01/06/2020 | Order Granting Plaintiff's Motion to Admit Attorney JAY SHOOSTER Pro Hac Vice signed J/Pan on 01/06/2020 Submitted on 01/06/2020 15 08  KT | Image |
| 03/06/2020 | Plaintiff's Intitial Witness List Filed submitted 03/06/2020 16:31pm.  ae Attorney: RICHMAN, KIM E. (1022978) | Image |
| 03/06/2020 | Defendants the J.M. Smucker Company and Ainsworth pet Nutrition LLC'S Initial Witness List Filed. Submitted 03/06/2020 18:21pm. ae<br>Attorney: ROTHSTEIN, Mr RONALD Y (451950) | Image |

## Receipt

| Receipt Number | Receipt Date | Received From | Payment Amount |
|---|---|---|---|
| 427954 | 05/15/2019 | RICHMAN, KIM E. | $120.00 |
| 434335 | 07/30/2019 | ROTHSTEIN, Mr. RONALD Y. | $20.00 |
| 434341 | 07/30/2019 | ROTHSTEIN, Mr  RONALD Y | $20 00 |
| 436588 | 08/27/2019 | Ronald Y. Rothstein | $20.00 |
| 446362 | 12/23/2019 | RICHMAN, KIM E. | $20.00 |
| Total | Total | Total | Total |
| | | | $200.00 |

## Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Undisposed | | PAN, FLORENCE Y |

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2019, I mailed this motion, points and authorities, and

proposed order to Plaintiff's attorney at the below address:


Kim E. Richman
8 West 126th Street
New York, New York 10027

_s/ Ronald Y. Rothstein_
RONALD Y. ROTHSTEIN

D.C. Superior Court
08/06/2019 14:52PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| TOXIN FREE USA | : | Case Number:  2019 CA 3192 B |
| v. | : | Judge: Florence Y. Pan |
| THE J.M SMUCKER COMPANY and AINSWORTH PET NUTRITION, LLC | : : | Next Hearing: November 22, 2019 |

## <u>ORDER</u>

Upon consideration of the Consent Motion to Extend the Time for Defendants to Move to Dismiss the Complaint and to Set a Briefing Schedule, filed on July 29, 2019, and for good cause shown, this 6th day of August, 2019, it is hereby

**ORDERED** that the motion is **GRANTED**; and it is further

**ORDERED** that defendants shall file their motion to dismiss on or before August 26, 2019; and it is further

**ORDERED** that plaintiff shall file its opposition on or before September 25, 2019; and it is further

**ORDERED** that defendants may file a reply brief on or before October 9, 2019; and it is further

**ORDERED** that the initial scheduling conference scheduled for August 16, 2019, is vacated and rescheduled to Friday, November 22, 2019, at 9:30 a.m. in Courtroom 415.

**SO ORDERED**.

Judge Florence Y. Pan
Superior Court of the District of Columbia

Copies to:

Kim Rochman, Esq.
*Counsel for Plaintiff*

Ronald Rothstein, Esq.
*Counsel for Defendants*



D. C. Superior Court
500 Indiana Avenue, N.W.
Room 5000-Q
Washington D.C. 20001

RECEIVED
Civil Clerk's Office
AUG 27 2019
Superior Court of the
District of Columbia
Washington, D.C.

U. S. Postage
Paid
Washington, D.C.
Permit No. 1726

KIM E. RICHMAN
Richman Law Group
8 West 12th S
NEW YORK

NIXIE      166   DE 1        0108/21/19

RETURN TO SENDER
UNDELIVERABLE AS ADDRESSED
UNABLE TO FORWARD

2019 CA 003192 B

BC: 20001219199    *2731 08238 13 42

20001>2191
i001i$8604 C02

# THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

**August 7, 2019**

CASE NAME:     TOXIN FREE USA Vs. THE J.M. SMUCKER COMPANY et al

CASE NO.       2019 CA 003192 B

The above-captioned Civil Actions case has been scheduled for Scheduling Conference Hearing on the date and time shown below.   The attorneys and any party not represented by an attorney must appear before Judge FLORENCE Y PAN.


**HEARING DATE: Friday, November 22, 2019**
**TIME: 9:30 am**
**LOCATION:   500 Indiana Avenue N.W.**
           **Courtroom 415**
           **WASHINGTON, DC  20001**


## PLEASE BRING THIS NOTICE WITH YOU WHEN YOU APPEAR.

Civil Division

# THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Civil Division

**August 7, 2019**

CASE NAME:    TOXIN FREE USA Vs. THE J.M. SMUCKER COMPANY et al

CASE NO.    2019 CA 003192 B

The above-captioned Civil Actions case has been scheduled for Scheduling Conference Hearing on the date and time shown below.   The attorneys and any party not represented by an attorney must appear before Judge FLORENCE Y PAN.

**HEARING DATE: Friday, November 22, 2019**
**TIME: 9:30 am**
**LOCATION:  500 Indiana Avenue N.W.**
              **Courtroom 415**
              **WASHINGTON, DC  20001**

## PLEASE BRING THIS NOTICE WITH YOU WHEN YOU APPEAR.

Civil Division



D. C. Superior Court
500 Indiana Avenue, N.W.
Room 5000-Q
Washington D.C. 20001

First Class Mail
U. S. Postage
Paid
Washington, D.C.
Permit No. 1726

KIM E. RICHMAN
Richman Law Group
8 West 12th Street

NEW YORK, NY 10027

2019 CA 003192 B

# THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

**August 7, 2019**

CASE NAME:     TOXIN FREE USA Vs. THE J.M. SMUCKER COMPANY et al

CASE NO.       2019 CA 003192 B

The above-captioned Civil Actions case has been scheduled for Scheduling Conference Hearing on the date and time shown below.   The attorneys and any party not represented by an attorney must appear before Judge FLORENCE Y PAN.

**HEARING DATE: Friday, November 22, 2019**
**TIME: 9:30 am**
**LOCATION:  500 Indiana Avenue N.W.**
            **Courtroom 415**
            **WASHINGTON, DC  20001**

**PLEASE BRING THIS NOTICE WITH YOU WHEN YOU APPEAR**

Civil Division



D. C. Superior Court
500 Indiana Avenue, N.W.
Room 5000-Q
Washington, D.C. 20001

First Class Mail
U. S. Postage
Paid
Washington, D.C.
Permit No. 1726

Mr RONALD Y ROTHSTEIN
WINSTON & STRAWN
35 W WACKER DR

Chicago, IL 60601

2019 CA 003192 B

Filed
D.C. Superior Court
08/26/2019 17:29PM
Clerk of the Court

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

<table>
<tr><td>

TOXIN FREE USA,

       Plaintiff,

v.

THE J. M. SMUCKER COMPANY and
AINSWORTH PET NUTRITION, LLC,

       Defendants.

</td>
<td>

Case No. 2019 CA 003192 B

HON. FLORENCE Y. PAN

</td></tr>
</table>

### DEFENDANTS THE J. M. SMUCKER COMPANY AND AINSWORTH PET NUTRITION, LLC'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendants The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC (collectively, "Defendants"), move this Court to dismiss the Complaint filed by Plaintiff Toxin Free USA under Rules 12(b)(1) and 12(b)(6) of the Superior Court Rules of Civil Procedure.

In support of the instant Motion, Defendants respectfully refer this Court to the attached Memorandum of Points and Authorities, adopted and incorporated here by reference.

### ORAL HEARING REQUESTED

Pursuant to Rule 12-I(h) of the Superior Court Rules of Civil Procedure, Defendants respectfully request an oral hearing on this motion,

[SIGNATURE BLOCK ON NEXT PAGE]

Dated: August 26, 2019                    Respectfully submitted,

                                          **The J. M. Smucker Company and**
                                          **Ainsworth Pet Nutrition, LLC**

                              By:    /s/ Ronald Y. Rothstein
                                     Ronald Y. Rothstein (D.C. Bar No. 451950)
                                     Sean H. Suber *(Pro Hac Vice Forthcoming)*
                                     **WINSTON & STRAWN LLP**
                                     35 West Wacker Drive
                                     Chicago, Illinois 60601
                                     (312) 558-5600
                                     RRothste@winston.com
                                     SSuber@winston.com

                                     *Counsel for Defendants*
                                     *The J. M. Smucker Company and*
                                     *Ainsworth Pet Nutrition, LLC*

2

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

**TOXIN FREE USA,**

      Plaintiff,

   v.

**THE J. M. SMUCKER COMPANY** and
**AINSWORTH PET NUTRITION, LLC,**

      Defendants.

Case No. 2019 CA 003192 B

HON. FLORENCE Y. PAN

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANTS THE J. M. SMUCKER COMPANY AND**
**AINSWORTH PET NUTRITION, LLC'S**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Ronald Y. Rothstein
(D.C. Bar No. 451950)
Sean H. Suber
*(Pro Hac Vice Forthcoming)*
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
RRothste@winston.com
SSuber@winston.com

*Counsel for Defendants*
*The J. M. Smucker Company and Ainsworth Pet Nutrition, LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................... Error! Bookmark not defined.

INTRODUCTION.....................................................................................................1

BACKGROUND ......................................................................................................3

LEGAL STANDARDS.............................................................................................3

ARGUMENT ...........................................................................................................4

   I.     Plaintiff Lacks Standing. ...............................................................................4

        A.     Plaintiff Cannot Bring a Generalized Grievance on the Public's Behalf...............4

        B.     Plaintiff's Manufactured, Self-Inflicted Injury Is Insufficient to Confer Standing.....................................................................................................6

        C.     Plaintiff Has No Claim for Injunctive Relief........................................................8

        D.     Plaintiff lacks a "Particularized" Basis to Allege All of Defendants' Products Contained Glyphosate and Ethoxyquin from the Supposed "Testing." .................8

   II.    The Nutrition Labeling and Education Act ("NLEA") Standardized the Requirements for Food Labeling and Preempts Plaintiff's Claims....................................................11

   III.   Alternatively, the Case Should Be Dismissed Under the Primary Jurisdiction Doctrine Because the FDA and EPA Are Already Considering the Issues in this Case.............13

   IV.   The Complaint Is Implausible and Inadequately Pleaded ...........................................14

        A.     Defendants' Representations Are Not Materially Misleading............................15

        B.     Defendants' Representations Are Accurate and Truthful....................................17

CONCLUSION .......................................................................................................20

RULE 12-I(a) CERTIFICATION

PROPOSED ORDER

CERTIFICATE OF SERVICE

EXHIBITS

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach,*
  469 F.3d 129 (D.C. Cir. 2006) ...................................................................................... 7, 10

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................................... 19, 20

*Axon v. Citrus World, Inc.,*
  354 F. Supp. 3d 170 (E.D.N.Y. 2018) ......................................................................... 15, 18

*Beyond Pesticides v. Dr Pepper Snapple Grp., Inc.,*
  2019 WL 2744685 (D.D.C. July 1, 2019) ................................................................... *passim*

*Cipollone v. Liggett Grp., Inc.,*
  505 U.S. 504 (1992) ...................................................................................................... 11

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ...................................................................................................... 9

*Comer v. Wells Fargo Bank, N.A.,*
  108 A.3d 364 (D.C. App. 2015) ................................................................................... 4

*Cordes v. Boulder Brands USA, Inc.,*
  2018 WL 6714323 (C.D. Cal. Oct. 17, 2018) ............................................................. 8

*D.C. Appleseed Ctr. for Law & Justice, Inc. v. D.C. Dep't of Ins., Sec., &*
  *Banking,*
  54 A.3d 1188 (D.C. 2012) ............................................................................................ 6, 7

*Fahey ex rel. D.C. v. Deoleo USA, Inc.,*
  2018 WL 5840664 (D.D.C. Nov. 8, 2018) ................................................................. 11

*Equal Rights Ctr. v. Properties Int'l,*
  110 A.3d 599 (D.C. 2015) ............................................................................................ 7, 8

*Fair Emp't Council v. BMC Mktg. Corp.,*
  28 F.3d 1268 (D.C. Cir. 1994) ..................................................................................... 8

*Food & Water Watch, Inc. v. Vilsack,*
  808 F.3d 905 (D.C. Cir. 2015) ..................................................................................... 8

*Gaminde v. Lang Pharma Nutrition, Inc.,*
  2019 WL 1338724 (N.D.N.Y. Mar. 25, 2019) ........................................................... 9, 11

ii

*In re Gen. Mills Glyphosate Litig.*,
   2017 WL 2983877 (D. Minn. July 12, 2017) ............................................................ 16, 17

*Gibson v. Quaker Oats Co.*,
   2017 WL 3508724 (N.D. Ill. Aug. 14, 2017) ............................................................ 12, 13

*Grayson v. AT & T Corp.*,
   15 A.3d 219 (D.C. 2011) ................................................................................ *passim*

*Heard v. Johnson*,
   810 A.2d 871 (D.C. 2002) ........................................................................................ 4

*Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*,
   471 U.S. 707 (1985) ............................................................................................... 11

*Keranen v. Nat'l R.R. Passenger Corp.*,
   743 A.2d 703 (D.C. 2000) ...................................................................................... 20

*Lawlor v. Dist. of Columbia*,
   758 A.2d 964 (D.C. 2000) ...................................................................................... 13

*Lewis v. Casey*,
   518 U.S. 343 (1996) ................................................................................................. 5

*Mallof v. D.C. Bd. of Elections & Ethics*,
   1 A.3d 383 (D.C. 2010) .......................................................................................... 10

*Merrell Dow Pharm., Inc. v. Oxendine*,
   649 A.2d 825 (D.C. App. 1994) ............................................................................. 11

*Nat'l Consumers League v Gerber Products Co.*,
   2015 WL 4664213 (D.C. Super. Ct. Aug. 05, 2015) ............................................... 7

*Nat'l Treasury Emps. Union v. United States*,
   101 F.3d 1423 (D.C. Cir. 1996) ............................................................................... 6

*Parks v. Ainsworth Pet Nutrition, LLC*,
   377 F. Supp. 3d 241 (S.D.N.Y. 2019) ................................................................. *passim*

*Pelayo v. Nestle USA, Inc.*,
   989 F. Supp. 2d 973 (C.D. Cal. 2013) .................................................................... 17

*Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*,
   68 A.3d 697 (D.C. App. 2013) ................................................................................ 19

*Potomac Dev. Corp. v. Dist. of Columbia*,
   28 A.3d 531 (D.C. 2011) ......................................................................................... 19

*Saucier v. Countrywide Home Loans*,
    64 A.3d 428 (D.C. 2013) ........................................................................ 14, 15

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ................................................................................... 9

*Tingling-Clemmons v. D.C.*,
    133 A.3d 241 (D.C. 2016) .............................................................. 16, 19, 20

*UMC Dev., LLC v. D.C.*,
    120 A.3d 37 (D.C. 2015) ............................................................................ 3, 4

*Wallace v. ConAgra Foods, Inc.*,
    747 F.3d 1025 (8th Cir. 2014) .......................................................... 1, 10, 11

*Williams v. Purdue Pharma Co.*,
    297 F. Supp. 2d 171 (D.D.C. 2003) ............................................................. 6

*Witte v Iovate Health Sciences Int'l.*,
    2016 WL 11527770 (D.C. Super. Sep. 20, 2016) .................................. 15, 18

**Statutes**

21 U.S.C. § 301 .................................................................................................. 11

21 U.S.C. § 321 ............................................................................................. 12, 13

21 U.S.C. § 343-1 ...................................................................................... 2, 11, 12

21 U.S.C. § 346a ............................................................................................... 12

D.C. Code § 28-3901, *et seq.* .................................................................... *passim*

D.C. Code §§ 28-3904 ....................................................................................... 14

D.C. Code §§ 28-3905 ......................................................................................... 3

**Other Authorities**

21 C.F.R. § 573.380 ................................................................... 2, 12, 15, 18

21 C.F.R. § 1001.1 ............................................................................................ 12

40 C.F.R. § 180.364 .................................................................................... 2, 15

80 Fed. Reg. 69905 (Nov. 12, 2015) ................................................................ 14

Fed. R. Civ. P. 8 ...................................................................................... 16, 19, 20

Fed. R. Civ. P. 12 ................................................................................................ 4, 15, 18

Jayson L. Lusk, *Consumer Perceptions of Healthy and Natural Food Labels*
    (Jan. 15, 2019), *available at* https://bit.ly/2Hy06ML ........................................17

U.S. Const., art. I ...................................................................................................4

U.S. Const., art. III .......................................................................................... 4, 8, 11

U.S. Envtl. Prot. Agency, Proposed Interim Registration Review Decision Case
    Number 0178, 35, 40 (Apr. 28, 2019), *available at*
    https://www.regulations.gov/contentStreamer?documentId=EPA-HQ-OPP-
    2009-0361-2344&contentType=pdf .................................................................14

## INTRODUCTION

Plaintiff Toxin Free USA brings this Complaint seeking a declaratory judgement, an injunction, costs, and equitable relief from The J. M. Smucker Company and Ainsworth Pet Nutrition, LLC ("Defendants"). Plaintiff claims it bought two bags of Defendants' pet food, and had someone conduct some type of test that supposedly detected miniscule, trace residue amounts of glyphosate (a common herbicide) and ethoxyquin (a synthetic preservative). Based on this, Plaintiff is trying to sue Defendants "on behalf of the general public" under the D.C. Consumer Protection Procedures Act ("CPPA"), because Plaintiff says Defendants are deceiving consumers into believing Defendants' pet food products are "natural" and contain "no ... artificial preservatives" and Plaintiff thinks they are not natural and do contain artificial preservatives.

*Plaintiff lacks standing.* This case should be dismissed just like an identical case brought by Plaintiff's counsel was dismissed a little over a month ago. *See Beyond Pesticides v. Dr Pepper Snapple Grp., Inc.*, 2019 WL 2744685 (D.D.C. July 1, 2019). As Judge Lamberth explained in that case, "interest groups cannot bring a generalized grievance on the public's behalf." *Id.* The Complaint must be dismissed here because Plaintiff "never shows it or a member suffered an actual injury." *Id.* (citation omitted). Indeed, Plaintiff's counsel has tried and failed to sue these same Defendants before. *See Parks v. Ainsworth Pet Nutrition, LLC*, 377 F. Supp. 3d 241, 248 (S.D.N.Y. 2019). The result here should be the same because "Plaintiff does not have standing to seek injunctive relief" for the class as Plaintiff "has not alleged a risk of future harm." *Id.* at 249. In short, Plaintiff lacks standing because it cannot bring claims for products it did not buy and interest groups cannot bring a generalized grievance on the public's behalf. *See Grayson v. AT & T Corp.*, 15 A.3d 219, 247 (D.C. 2011) (en banc). Dismissal is appropriate because Plaintiff has not pleaded that the products bought by *other* consumers contain or will contain any amount of glyphosate or ethoxyquin. *See Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1030 (8th Cir. 2014).

1

***Plaintiff's claims are preempted.*** Even if Plaintiff could overcome its shortcomings with standing, Plaintiff's claims are also preempted by the Nutrition Labeling and Education Act ("NLEA"), which expressly preempts state requirements "not identical" to the NLEA's label requirements. *See* 21 U.S.C. § 343-1(a)(2). Because the Complaint argues that the pet food labels are misleading because they omit information that neither the NLEA nor federal regulators require, the Complaint is preempted and should be dismissed. Alternatively, the Court should wait to address the merits and dismiss this case under the primary jurisdiction doctrine while the Environmental Protection Agency ("EPA") concludes its review of glyphosate and the Food and Drug Administration ("FDA") finalizes its guidance on the definition of the word "natural."

***Finally, the Complaint is implausible and inadequately pleaded.*** If this Court does reach the merits, then Plaintiff's Complaint should be dismissed because it is implausible. The crux of the Complaint is that Defendants deceived D.C. consumers because "testing" supposedly revealed that Defendants' cat food product had at .447 parts per million ("ppm") of glyphosate residue on it and .016 ppm of ethoxyquin residue on it, while the dog food allegedly had .175 ppm of glyphosate on it and contained .352 ppm of ethoxyquin residue. *See* Compl. ¶ 55. But this alleged amount of residue is far below the *400 ppm* EPA tolerance for glyphosate residue on animal feed. *See* 40 C.F.R. § 180.364(a)(1). And the ethoxyquin levels are far below the *150 ppm* FDA tolerance. *See* 21 C.F.R. § 573.380. It is simply "'implausible that a reasonable consumer would believe that a product labeled ["Natural"] could not contain a trace amount of glyphosate that is far below the amount' deemed tolerable by the FDA." *Parks*, 377 F. Supp. 3d at 247 (citation omitted).

For these reasons, this Court should dismiss the Complaint in its entirety and with prejudice. In the alternative, Defendants request an order dismissing these proceedings until the EPA completes its review of glyphosate or the FDA issues guidance on the definition of "natural."

## BACKGROUND

Plaintiff "Toxin Free USA" filed its Complaint on May 14, 2019 "[o]n behalf of itself and the general public." Compl. ¶ 1.[1] Plaintiff brings this case under the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901, *et seq.*, which authorizes nonprofits to "bring an action seeking relief from the use of a trade practice in violation of a law of the District." D.C. Code §§ 28-3905(C), (D)(i).

Plaintiff says it "purchased one package of [Defendants'] 'Real Chicken & Brown Rice Recipe' Super Premium Food for Cats and one package of 'Real Beef, Pea & Brown Rice Recipe' Super Premium Food for Dogs at a Target store located 3100 14th St NW #201, Washington, DC 20010, in order to evaluate their purported qualities as 'natural' products containing 'no ... artificial preservatives.'" Compl., ¶ 19 and Figures 1 and 2. Plaintiff claims this packaging is deceptive because "testing" allegedly revealed trace amounts of glyphosate and ethoxyquin residue at minuscule levels measured in *parts per billion.* Compl., ¶ 55. The Complaint alleges that reasonable consumers do not expect the Products to contain trace amounts of glyphosate or ethoxyquin residue and that consumers relied on the labels in choosing to purchase the Products over competing pet food. *See* Compl., ¶ 70. As a result, the Complaint seeks a declaration that Defendants' conduct violates the CPPA; an order enjoining Defendants from continuing the conduct and requiring Defendants to issue corrective advertising; an order granting Plaintiff costs and attorneys' fees; and any further equitable relief the Court deems proper. *See* Compl., Prayer for Relief.

## LEGAL STANDARDS

"[A] challenge to a plaintiff's standing is properly raised as a challenge to the court's subject matter jurisdiction via a motion to dismiss under [Rule] 12(b)(1)." *UMC Dev., LLC v. D.C.,*

---

[1] Plaintiff's counsel brought this case a month after a federal court in New York dismissed a near identical complaint against Defendants. *See Parks v. Ainsworth Pet Nutrition, LLC*, 377 F. Supp. 3d 241 (S.D.N.Y. 2019).

3

120 A.3d 37, 42 (D.C. 2015). When, as here, a challenge to jurisdiction is "facial," this Court must "determine jurisdiction by looking only at the face of the complaint and taking the allegations in the complaint as true." *Heard v. Johnson*, 810 A.2d 871, 877–78 (D.C. 2002) (citation omitted).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Comer v. Wells Fargo Bank, N.A.*, 108 A.3d 364, 371 (D.C. App. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted).

## ARGUMENT

### I.  Plaintiff Lacks Standing.

To start, Plaintiff cannot satisfy the requirements of standing. "Standing is a threshold jurisdictional question which must be addressed prior to and independent[ly] of the merits of a party's claims." *UMC Dev.*, 120 A.3d 37, 42 (D.C. 2015) (quoting *Grayson v. AT & T Corp.*, 15 A.3d 219, 229 (D.C. 2011) (en banc)). "Although the District of Columbia courts were created under Article I of the U.S. Constitution, [they] generally adhere to the case and controversy requirement of Article III, and look to federal standing jurisprudence when considering the issue of a plaintiff's standing." *Id.* at 42 (footnote omitted). "To satisfy the requirements of 'constitutional standing,' a plaintiff in our local courts must adequately allege that (1) she suffered an injury in fact, (2) the injury is fairly 'traceable to the defendant's action,' and (3) the injury will likely be 'redressed' by a favorable decision." *Id.* at 42–43 (footnote omitted).

### A.  Plaintiff Cannot Bring a Generalized Grievance on the Public's Behalf.

Plaintiff lacks standing to bring claims on behalf of the class for harm in the past or in the future because Plaintiff cannot rest its claim entirely "'on the legal rights or interests of third parties'" and it therefore "cannot demonstrate the requisite injury-in-fact for standing in [this] court[]." *Grayson*, 15 A.3d at 246–247. Put simply, when, as here, a plaintiff "brings his claim in

4

a wholly representative capacity, [the plaintiff] essentially implies that as the 'party seeking re-view,' he 'himself [is not] among the injured.'" *Id.* at 247; *see also Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been in-jured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.") (citation and quotation marks omitted).

Plaintiff appears to believe that it can somehow get around this because it says that, under the CPPA, the "only limitation on th[e] power of a public interest organization to act on behalf of consumers is that the public interest organization must have 'sufficient nexus to the interests in-volved of the consumer or class to adequately represent those interests.'" Compl., ¶ 91 (quoting D.C. Code § 28-3905(k)(1)(D)(ii)). And Plaintiff says it satisfies the prerequisites to bring a claim on behalf of the general public because it says it "was founded with the purpose of advocating for and educating consumers" on these issues and it "has retained ... competent counsel, with signifi-cant experience in litigating under the DC CPPA, to pursue this action." *Id.*

But Plaintiff is wrong. As Judge Lamberth explained, Plaintiff's counsel "misreads § 28-3905" because "it only allows an organization to sue on the public's behalf *if it also alleges an injury to itself or to its members*." *Beyond Pesticides*, 2019 WL 2744685, at *2 n.1 (emphasis added) (citation omitted). As discussed throughout this memorandum, Plaintiff has not done so.

While Plaintiff may feel that its mission "of organizing national boycotts of food compa-nies," Compl., ¶ 16, is sufficient to confer standing, this is not the case. An organization's "'mere interest' in the alleged unlawfulness of [a company's] business practices, 'no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization adversely affected or aggrieved for standing

purposes'" under the CPPA. *See Grayson*, 15 A.3d at 247 (quoting *Friends of Tilden Park, Inc. v. D.C.*, 806 A.2d 1201, 1207 (D.C. 2002)) (alterations removed).

Plaintiff fails to understand that, "in those cases where an organization alleges that a defendant's conduct has made the organization's *activities* more difficult, the presence of a direct conflict between the defendant's conduct and the organization's *mission* is … ***not alone sufficient*** [] to establish standing." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (bold-italic emphasis added), cited in *Equal Rights Ctr. v. Properties Int'l*, 110 A.3d 599, 604 n.3 (D.C. 2015). The D.C. Court of Appeals has analyzed the CPPA in detail and explained that the "amendments to the CPPA do not evidence an intent by the Council to override or disturb our constitutional standing requirement." *Grayson*, 15 A.3d at 245; *see also Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 178 (D.D.C. 2003) (explaining that, despite its broad language, the CPPA "[does] not change the requirements for standing under D.C. law"). In the end, organizations must still "'satisf[y] the constitutional requirements and prudential prerequisites of traditional standing analysis.'" *D.C. Appleseed Ctr.*, 54 A.3d at 1205–06 (footnote omitted). Plaintiff has not done that here because it has not alleged an actual injury and "the alleged injury to the organization … [is] one that is shared by a large class of citizens and [is] thus insufficient to establish injury in fact." *Nat'l Treasury Emps. Union*, 101 F.3d at 1430 (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

Thus, Plaintiff cannot escape the fact that it lacks standing because "interest groups cannot bring a generalized grievance on the public's behalf." *Beyond Pesticides*, 2019 WL 2744685, at *1 (citing *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)).

### B.  Plaintiff's Manufactured, Self-Inflicted Injury Is Insufficient to Confer Standing.

Plaintiff lacks standing because it has suffered no injury. "District of Columbia courts follow the federal *Lujan* test to determine a plaintiff's standing." *Nat'l Consumers League v Gerber*

*Products Co.*, 2015 WL 4664213, at *4 (D.C. Super. Ct. Aug. 05, 2015) (citation omitted). Under that test, "a person who brings a CPPA enforcement action must have suffered or must be in imminent danger of suffering an injury-in-fact." *Grayson*, 15 A.3d at 245. This also goes for organizations, which must "satisf[y] the constitutional requirements and prudential prerequisites of traditional standing analysis" and must ""allege[] such a personal stake in the outcome of the controversy" (as) to warrant' court intervention." *D.C. Appleseed Ctr. for Law & Justice, Inc. v. D.C. Dep't of Ins., Sec., & Banking*, 54 A.3d 1188, 1205–06 (D.C. 2012) (citation omitted).

Plaintiff has suffered no injury because it admits it purchased the products to *manufacture* a self-inflicted injury for this lawsuit. Plaintiff admits that it "purchased" two bags of Defendants' pet food products "in order to evaluate their purported qualities as 'natural' products containing 'no ... artificial preservatives." Compl., ¶ 19. But as Judge Lamberth explained when dismissing a similar complaint from another organization represented by Plaintiff's counsel, "that falls short of an economic injury sufficient to confer standing" since Plaintiff "never alleges it relied on the challenged labels" and instead "admits it purchased the products only 'to evaluate their purported qualities … as a 'Natural' product." *Beyond Pesticides*, 2019 WL 2744685, at *1 (citation omitted).

The D.C. Court of Appeals has "acknowledged … important limitations on the scope of standing," one of which "prohibits an organization from" doing what Plaintiff is trying to do here: "manufactur[ing] the injury necessary to maintain a suit from its expenditure of resources on that very suit." *Equal Rights Ctr.*, 110 A.3d at 604 n.3 (citations and some internal quotation marks omitted). Based on this principle, courts applying the *Lujan* test "do not recognize such self-inflicted harm." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (citation omitted); *see also Fair Emp't Council v. BMC Mktg. Corp.*, 28 F.3d 1268, 1277 (D.C. Cir. 1994) (rejecting the "circular position" that "the time and money that plaintiffs spend in bringing suit against a defendant would itself constitute a sufficient 'injury in fact'"

7

since that "would effectively abolish the requirement altogether").

For this reason alone, this Court should dismiss Plaintiff's counsel's latest attempt to get around the basic principles of Article III standing. *See Beyond Pesticides*, 2019 WL 2744685, at *1; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 921–22 (D.C. Cir. 2015) (HEN-DERSON, J., concurring) ("[A]ny injury they suffer … is a self-inflicted injury that would not establish Article III standing.… I would reject its organizational standing argument because its only expenditures are made for 'pure issue-advocacy'"—"an insufficient injury") (citations omitted).

### C.  Plaintiff Has No Claim for Injunctive Relief.

Plaintiff also lacks standing to bring claims for injunctive relief. A "plaintiff seeking forward-looking relief, such as an injunction, must allege facts showing that the injunction is necessary *to prevent injury otherwise likely to happen in the future*." *Equal Rights Ctr.*, 110 A.3d at 603–04 (emphasis added). Here, Plaintiff only alleges that a group of "D.C. Consumers are at risk of … continuing harm if the Products continue to be sold"—not Plaintiff itself. *See* Compl. ¶ 68. Thus, "Plaintiff does not have standing to seek injunctive relief" for the class because "Plaintiff has not alleged a risk of future harm." *Parks*, 377 F. Supp. 3d at 249. Just as in *Parks*, Plaintiff's failure to allege future harm is "'effectively a concession that [it] does not intend to purchase the product in the future.'" 377 F. Supp. 3d at 249 (citation omitted); *accord Cordes v. Boulder Brands USA, Inc.*, 2018 WL 6714323, at *4 (C.D. Cal. Oct. 17, 2018) ("The complete absence of any allegations about Plaintiff's future intentions with regard to the Product is enough for the Court to find that he lacks standing to sue for injunctive relief.").

### D.  Plaintiff lacks a "Particularized" Basis to Allege All of Defendants' Products Contained Glyphosate and Ethoxyquin from the Supposed "Testing."

Finally, Plaintiff lacks standing because it fails to allege that all of Defendants' other pet food products sold to consumers contain trace levels of glyphosate and ethoxyquin. This is fatal to

8

Plaintiff's claim because it has not pleaded a particularized injury for the public and "[p]articular-ization is necessary to establish an injury in fact," because, for "an injury to be 'particularized,' it 'must affect the plaintiff in a *personal and individual way.*'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (citation omitted) (emphasis added). "[M]ere speculation" that an injury did or might occur "cannot satisfy the requirement that any injury in fact must be fairly traceable to" a defendant's alleged wrongdoing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–11 (2013).

Here, Plaintiff baldly alleges that "testing" of two bags of Defendants' pet food allegedly "reveals the presence of glyphosate and ethoxyquin residues." Compl., ¶ 55. But courts have found this to be insufficient. For example, in *Gaminde v. Lang Pharma Nutrition, Inc.*, a court dismissed a claim when a plaintiff "relied on [a] conclusory and unsubstantiated allegation that 'the CVS Krill Oil purchased by [plaintiff] was mislabeled in that it did not contain 300mg of Omega-3 Krill Oil.'" 2019 WL 1338724, at *2 (N.D.N.Y. Mar. 25, 2019). In that case, the plaintiff alleged that his bottle of CVS Krill Oil did not have 300mg of Omega-3 Krill Oil because the USDA had conducted a study and "concluded that two bottles of CVS Krill Oil contained approximately sixty percent of the purported 30mg of Omega-3 Krill Oil." *Id.* (citation omitted). The court dismissed the complaint because it found that it was "speculation to allege that because two CVS Krill Oil bottles in a USDA study were found to have less than the stated amount of Omega-3 Krill Oil, the bottle that [plaintiff] purchased must as well." *Id.* (citations omitted).

This Court should do the same here because it would have to speculate to accept the infer-ences in the Complaint. Put simply, just because some unspecified testing of two bags of Defend-ants' Product allegedly revealed trace amounts of glyphosate and ethoxyquin, it does not logically or necessarily follow that whatever bag of pet food any other D.C. consumer buys will also contain trace amounts of glyphosate and ethoxyquin. This Court need not, and should not, engage in that

speculation. *See Grayson*, 15 A.3d at 246 (reiterating that a "plaintiff must allege facts showing … a likelihood, as opposed to mere speculation, that an 'injury will be redressed by a favorable decision'") (footnote omitted); *Mallof v. D.C. Bd. of Elections & Ethics*, 1 A.3d 383, 397 (D.C. 2010) (finding plaintiff lacked standing and likening it to federal decisions where, like here, "the purported injury 'rest[ed] on gross speculation' and was 'far too fanciful to merit treatment as an "injury in fact"'") (footnote omitted).

Plaintiff tries to get around the speculative nature of its Complaint, by saying "[d]iscovery of the true nature of the content of the Products requires knowledge of chemistry and access to laboratory testing that is not available to the average consumer." Compl., ¶ 51.

But courts have rejected this excuse as well. In *Wallace v. ConAgra Foods, Inc.*, for example, the plaintiffs alleged that Hebrew National beef products were not 100% kosher beef as advertised, based on allegations that certain slaughterhouses did not follow kosher rules. *See* 747 F.3d 1025 (8th Cir. 2014). Like here, the plaintiffs tried to justify their complaint by saying it was "'impossible for any reasonable consumer to detect' whether purportedly kosher meat is non-kosher." *Id.* at 1030. This made no difference. The court dismissed the complaint because the "allegations fail[ed] to show that any of the *particular packages* of Hebrew National beef *they personally purchased* contained non-kosher beef" and plaintiffs "gave no reason to think *all* the beef marked as kosher under the quota did not meet kosher standards." *Id.* (emphases added). The court emphasized that it could not "discern from the complaint how many packages were tainted with non-kosher beef," and noted that it was "unclear whether even a bare majority of Hebrew National packages were not kosher." *Id.* (citation omitted). Thus, the court found that "it is pure speculation to say the particular packages sold to the [plaintiff]s were tainted by non-kosher beef" and dismissed the complaint because "the Supreme Court has reminded lower courts that speculation and

conjecture are not injuries cognizable under Article III." *Id.* at 1031 (citation omitted).

This Court should do the same. Plaintiff has not alleged facts supporting an inference that *the particular recipes* of Defendants' products *that other D.C. consumers buy* will actually contain the alleged trace amounts of glyphosate and ethoxyquin in Plaintiff's bags. Thus, Plaintiff lacks standing. *See Gaminde*, 2019 WL 1338724, at *2; *ConAgra Foods*, 747 F.3d at 1030–31; *see also Fahey ex rel. D.C. v. Deoleo USA, Inc.*, 2018 WL 5840664, at *2 (D.D.C. Nov. 8, 2018) (rejecting reliance on study results to support inference that particular bottle of product was mislabeled because of the speculation that would be required).

## II.   The Nutrition Labeling and Education Act ("NLEA") Standardized the Requirements for Food Labeling and Preempts Plaintiff's Claims.

 Plaintiff's claims are preempted because "state law that conflicts with federal law is 'without effect.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (citation omitted). As relevant here, "'a federal law may expressly preempt state law.'" *Merrell Dow Pharm., Inc. v. Oxendine*, 649 A.2d 825, 828 (D.C. App. 1994) (citation omitted). This goes for federal statutes and regulations. *See Hillsborough Cty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

Plaintiff's claims are expressly preempted because they are premised on the notion that glyphosate and ethoxyquin must be listed on Defendants' food labels. Congress passed the NLEA, which amended the Food, Drug, and Cosmetic Act's ("FDCA") and included an express preemption provision that says no state "may directly or indirectly establish ... any requirement for the labeling of food ... that is ***not identical*** to the requirement" of the relevant federal regulations. *See* 21 U.S.C. § 343-1(a)(2) (emphasis added). "Not identical" covers any state law requirement "concerning the … labeling of food … (i) [] not imposed by or contained in the applicable provision; or (ii) [that] differ[s] from those specifically imposed by or contained in the applicable provision." 21 C.F.R. §1001.1(c)(4).

11

Federal law does not require Defendants to include glyphosate or ethoxyquin residue on the label of their pet food as neither is an ingredient or additive.

For glyphosate, as one federal court explained in *Gibson v. Quaker Oats Co.*, a case with near identical facts to this case, "it is obvious that Congress intended to prohibit states from imposing food labeling requirements on manufacturers." 2017 WL 3508724, at *4 (N.D. Ill. Aug. 14, 2017). Finding allegations of deceptive advertising due to the alleged presence of glyphosate preempted, the court held "§ 346a, Tolerances and Exemptions for Pesticide Chemical Residues, addresses the presence of pesticides and herbicides present in foods and establishes tolerances for the same." *Id.* (citing 21 U.S.C. § 346a). "And, in that provision of the statute there is a sub-section addressing a state's authority to 'establish or enforce any regulatory limit on a qualifying pesticide chemical residue in or on any food if a qualifying Federal determination applies[.]'" *Id.* (quoting 21 U.S.C. § 346a(n)(4)). Thus, the claim is preempted due to this "express language establishing a clear and manifest purpose that preempts state regulation of food labeling." *Id.*

As for ethoxyquin, Plaintiff claims "federal regulations now require disclosure of ethoxyquin in pet food," and that Defendants "make[] no such disclosure." Compl., ¶ 48 (citing 21 C.F.R. § 573.380). But this misstates the regulatory requirements because 21 C.F.R. § 573.380 only requires the labeling of ethoxyquin when it is used as an "additive." Here, the alleged ethoxyquin residue does not fit the federal definition of an additive, which requires intentional conduct. *See* 21 U.S.C. § 321(s) (explaining that the "term 'food additive' means any substance ***the intended use*** of which may reasonably be expected to result directly or indirectly in its becoming a component or otherwise affecting the characteristics of any food") (emphasis added).

And as for Plaintiff's claims about using the word "natural" and the phrase "no artificial preservatives," *Gibson* is likewise instructive because it explained that the FDA has historically

determined that food production methods do not implicate terms such as "natural" on labels. *See* 2017 WL 3508724, at *4 . It concluded that the regulations, coupled with the statutory provisions appropriating responsibility for food labeling to the FDA, preempt the field. *Id.*

Thus, here, as in *Gibson*, Plaintiff's attempt to use a state consumer protection law to impose labeling requirements that neither Congress and regulators have eschewed in their comprehensive regulation "in the field of food labeling" is preempted. *Id.* at *4.

## III. Alternatively, the Case Should Be Dismissed Under the Primary Jurisdiction Doctrine Because the FDA and EPA Are Already Considering the Issues in this Case.

If this Court does not find Plaintiff's claims preempted by federal law, then Plaintiff's claims should be stayed or dismissed under the primary jurisdiction doctrine. Under the primary jurisdiction doctrine, the court may exercise its discretion and abstain from hearing a case that concerns an issue "within the special competence" of an administrative agency. *See Lawlor v. Dist. of Columbia*, 758 A.2d 964, 973 (D.C. 2000). The primary jurisdiction doctrine considers the frequent overlap between agency and judicial jurisdiction and "allocate[s] initial decision-making responsibility ... where such overlaps and potential for conflict exist." *Id.* at 974.

Plaintiff's Complaint alleges that Defendants' Products are deceptively labeled because they contain trace amounts of glyphosate and ethoxyquin residue. Compl., ¶¶ 74–79. Whether a product can be labeled as "natural" or free from artificial preservatives when it contains trace amounts of glyphosate and ethoxyquin residue in the *parts per billion* is an issue "within the special competence" of the EPA and the FDA. *Lawlor*, 758 A.2d at 973. In fact, the EPA is reviewing glyphosate and making proposals that are relevant here. For example, the EPA is "proposing that the number of significant figures be modified for certain tolerances, and that new tolerances be established for various vegetable and fruit groups and subgroups," and the EPA is also "proposing

certain labeling clean-up/consistency efforts to bring all glyphosate labels up to modern stand-ards." U.S. Envtl. Prot. Agency, Proposed Interim Registration Review Decision Case Number 0178, 35, 40 (Apr. 28, 2019), *available at* https://www.regulations.gov/contentStreamer?documentId=EPA-HQ-OPP-2009-0361-2344&contentType=pdf. And the FDA is addressing what types of foods can have the "natural" label and whether manufacturers can label foods with synthetic ingredients as being "natural." *See* 80 Fed. Reg. 69905, 69909–10 (Nov. 12, 2015).

This guidance will help this Court evaluate Plaintiff's claims and implicates the precise type of highly technical, discretionary regulatory issues that the EPA and FDA should resolve in the first instance. So if this Court does not dismiss this case for the other reasons set forth above, the Court should dismiss this case under the primary jurisdiction doctrine.

## IV.    The Complaint Is Implausible and Inadequately Pleaded

If the Court does reach the merits, the Complaint should be dismissed because the claims are implausible. Plaintiff alleges that Defendants violated Subsections (a), (d), (e), (f), and (f-1) of the CPPA. Subsections (a) and (d) make it unlawful to represent that a product has certain ingredients or benefits that it does not have, or to represent that a product is of a particular standard that it is not. *See* D.C. Code §§ 28-3904(a), (d). To state a claim under these provisions, Plaintiff must plausibly allege that Defendants' trade practices are false, deceptive, or misleading to a "reasonable consumer." *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. 2013). Subsections (e), (f), and (f-1) make it unlawful to make material misrepresentations about a product. *See* D.C. Code §§ 28-3904(e), (f), and (f-1). For these claims, the reasonable consumer standard applies *and* the purportedly unlawful statement or omission must be "material"—in other words, it must be

one that "'a significant number of unsophisticated consumers would find that information important in determining a course of action.'" *Saucier*, 64 A.3d at 442 (citation omitted).[2]

Plaintiff's Complaint falls short of these requirements because it is based on the implausible notion that Defendants' packaging is false and misleading because it says Defendants "are deceiving consumers into believing the Products are 'natural' and contain 'no … artificial preservatives,' when, in fact, they are not natural and do contain artificial preservatives." Compl., ¶ 6. This is insufficient because, as stated in the dismissal of *Parks*, "a reasonable consumer would not be so absolutist" as Plaintiff. *See Parks*, 377 F. Supp. 3d at 247.

Plaintiff has not pleaded sufficient facts for this Court to infer Defendants materially misled the public—in fact, there are not even facts showing Defendants misled the public at all.

## A.  Defendants' Representations Are Not Materially Misleading

The Complaint falls short because it does not allege that the alleged trace amounts of glyphosate and ethoxyquin are harmful to pets or unlawful. Nor could Plaintiff plead such facts because the alleged amount of glyphosate residue on the cat and dog food is far below the *400 ppm* EPA tolerance for glyphosate residue in animal feed—.00104% and .00044% of the tolerance, respectively. *See* 40 C.F.R. § 180.364(a)(1). Likewise, the alleged ethoxyquin levels are far below the *150 ppm* FDA tolerance—.00011% and .00235%, specifically. *See* 21 C.F.R. § 573.380.

These immaterial levels are not enough for a plausible claim. "Given the widespread use of herbicides," it is "'implausible that a reasonable consumer would believe that a product labeled ['Natural'] could not contain a trace amount of glyphosate that is far below the amount deemed

---

[2] When, as here, CPPA claims are premised on facially implausible allegations, DC courts do not hesitate to dismiss them at the Rule 12 stage. *See, e.g., Witte v Iovate Health Sciences Int'l.*, 2016 WL 11527770, at *4 (D.C. Super. Sep. 20, 2016) ("Considering the facts before it and the arguments by the parties, this Court concludes that Plaintiff has failed to allege facts to support a claim that Xenadrine Ultimate's package tends to mislead consumers").

tolerable by the FDA." *Axon v. Citrus World, Inc.*, 354 F. Supp. 3d 170, 183 (E.D.N.Y. 2018).[3]

"The presence of negligible amounts of glyphosate in a dog food product that do not have harmful, 'toxic,' or 'carcinogenic' effects is not likely to affect consumers' decisions in purchasing the product and is thus not material." *Parks*, 377 F. Supp. 3d at 248 (citation omitted). At most, Plaintiff vaguely suggests that consumers might be concerned about the supposed "***potential*** detrimental health effects" of glyphosate and ethoxyquin. *See* Compl., ¶¶ 43, 46 (emphasis added). But Plaintiff does not provide allegations that these theoretical concerns are likely to actually affect consumers' purchasing decisions. *See Tingling-Clemmons v. D.C.*, 133 A.3d 241, 246 (D.C. 2016) ("The requirement of facial plausibility 'asks for more than a sheer possibility that a defendant has acted unlawfully,' and a complaint falls short of showing a plausible entitlement to relief if it 'pleads facts that are merely consistent with a defendant's liability.' To satisfy Rule 8(a), plaintiffs must 'nudge[ ] their claims across the line from conceivable to plausible.'") (citation omitted).

This is particularly problematic for Plaintiff's Complaint because, as the court explained in *In re General Mills Glyphosate Litigation*, it is simply "not plausible to allege that the statement 'Made with 100% Natural Whole Grain Oats' means that there is no trace glyphosate in Nature Valley Products *or that a reasonable consumer would so interpret the label*." 2017 WL 2983877, at *6. Indeed, as the court explained, a defendant's decision to label its products as "natural" "cannot plausibly be interpreted to be more restrictive with regard to synthetic residue than the standard for labelling a product as 'organic' under federal law." *Id.* (citation omitted).

It has been determined that "[c]onsumers generally conflate the notions of 'natural' and 'organic,' … and, thus, it is implausible that a reasonable consumer would believe ingredients

---

[3] *See also In re Gen. Mills Glyphosate Litig.*, 2017 WL 2983877, at *5 (D. Minn. July 12, 2017) ("It is implausible that a reasonable consumer would believe that a product labelled as having one ingredient—oats—that is '100% Natural' could not contain a trace amount of glyphosate that is far below the amount permitted for organic products…. It would be nearly impossible to produce a processed food with no trace of any synthetic molecule").

allowed in a product labeled 'organic,' … would not be allowed in a product labeled 'all natural.'" *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 973, 979 (C.D. Cal. 2013). The recent study about consumer expectations cited by Plaintiff only confirms this fact. *See* Compl., ¶ 29 n. 2 (citing Jayson L. Lusk, *Consumer Perceptions of Healthy and Natural Food Labels* (Jan. 15, 2019), *available at* https://bit.ly/2Hy06ML). In that study, the author repeatedly explains that his findings "suggest that it is possible for a final product to be considered natural" by consumers "even if a process used to make the product is not." Lusk, *Consumer Perceptions* at 29. According to the author, this likely resulted from "a lack of knowledge about organic production practices" by consumers—not misleading advertising by food producers. *See id.*[4] Thus, the Complaint is insufficient because it ignores the fact that it is more plausible that consumers will make purchasing decisions based on Defendants' compliance with federal laws and regulations. *Cf. In re Gen. Mills*, 2017 WL 2983877, at *6 ("[I]t is not plausible that a product can satisfy the organic standard for biocides yet its label can be deemed be false for stating that it is natural because it contains trace amount of biocides…. [O]rganic labelling rules are aimed at the exact issue in this case—the amount of pesticides and biocides applied to crops and found in products.").

## B.  Defendants' Representations Are Accurate and Truthful

The Complaint is also insufficient because Plaintiff only "asserts that the Products contain trace amounts of glyphosate, *but not that the Products are composed of unnatural ingredients*." *Parks*, 377 F. Supp. 3d at 247 (emphasis added). Plaintiff's failure to allege that Defendants actually, and intentionally, make their products with unnatural ingredients or synthetic preservatives distinguishes Plaintiff's claims from typical claims of this sort.

Indeed, though Plaintiff says Defendants "market [their] … pet food as 'natural' and as

---

[4] In fact, the survey found that "[o]verall, results suggested nuanced, and [ ] logically inconsistent, views about the meaning of 'natural.'" Lusk, *Consumer Perceptions* at 2.

containing 'no … artificial preservatives,'" Compl., ¶ 30, this is misleading in and of itself. Plaintiff conveniently fails to show the Court the entire label where Defendants inform consumers that no "artificial preservatives" were "put in" the products by Defendants. *See* Exs. A, B.[5] Defendants' products state that they were made with no artificial preservatives because they were not. There is nothing misleading about that in the slightest. And, nothing in the Complaint indicates otherwise.

Likely recognizing that Defendants did not add glyphosate and ethoxyquin to their Products, the Complaint only alleges that Defendants "knew how the pet food was sourced and processed, and therefore *knew or should have known* that the pet food contains residues of glyphosate, an unnatural biocide, and ethoxyquin, an artificial preservative." Compl., ¶ 59 (emphasis added). But, as explained above, the regulatory requirements discussing ethoxyquin (21 C.F.R. § 573.380) do not require its disclosure on the label because it is not an additive.

As the court in *Axon v. Citrus World, Inc.* explained, in typical "cases, the defendant is accused of introducing unnatural *ingredients* into a product labeled 'natural.'" 354 F. Supp. 3d at 183 (collecting cases). In cases like this one, however, the Complaint contains no allegations that either ethoxyquin or "[g]lyphosate …. is [] an 'ingredient' added to defendant's products"—if anything, they are simply "substance[s] introduced through the growing process." *Id*. And a claim should not be actionable under a consumer protection statute when, as here, a defendant merely "call[s] a product 'natural' when it contains trace amounts of a commonly used pesticide introduced early in the production process." *Id.* at 183–84 (quoting *Podpeskar v. Dannon Co., Inc.*, 2017 WL 6001845, at *5 (S.D.N.Y. Dec. 3, 2017) ("plaintiff[] claims that she was deceived by yogurt labels containing the word 'natural' because rather than alleging that an ingredient used in

---

[5] This Court can review the entire packaging "when ruling on Rule 12(b)(6) motions to dismiss" because it is "incorporated into the complaint by reference, and [a] matter[] of which a court may take judicial notice." *Witte v Iovate Health Scis. Int'l*, 2016 WL 11527770, at *1 (D.C. Super. Ct. Sep. 20, 2016) (citation omitted).

the products was unnatural, plaintiff contended that 'several steps back in the food chain, there may have been something unnatural ingested by a cow'")).

Here, Plaintiff does not assert that Defendants make their products with unnatural ingredients. Plaintiff merely claims that Defendants "should have known" that these trace amounts were allegedly in two bags. This only underscores another flaw with the Complaint: its failure to allege sufficient information about the "quantitative testing" that supposedly discovered trace amounts of glyphosate or ethoxyquin. After all, Plaintiff's allegations must not only be plausible, but they must also be adequately pleaded under Rule 8. Conclusory assertions are not sufficient to survive a motion to dismiss for failure to state a claim; "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Potomac Dev. Corp. v. Dist. of Columbia*, 28 A.3d 531, 544 (D.C. 2011) (citing *Iqbal*, 556 U.S. at 678 (2009))

Here, Plaintiff's claim is premised on the allegation that Defendants had glyphosate or ethoxyquin in their Products and that Defendants *knew or should have known* as much because of unspecified "quantitative testing." But how and on what basis? Plaintiff has given Defendants notice "of what the … claim is," *but not* "*the grounds upon which it rests.*" *Tingling-Clemmons*, 133 A.3d at 245 (citation and quotation marks omitted) (emphasis added). Defendants have no idea how they are supposed to defend themselves or how they should have known that these levels would be found through whatever methods used by this unexplained "quantitative testing."

While Rule 8 "does not require 'detailed factual allegations,'" *Iqbal*, 556 U.S. at 678 (citation omitted), Plaintiff cannot withhold "further factual enhancement" like the name of the laboratory that did this "quantitative testing"; the testing conditions; and the testing process. *See Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 709 (D.C. App. 2013) (explaining that a complaint that does not "tender more than 'naked assertion[s] devoid of further

factual enhancement,'" fails to state a claim) (citation omitted). Under Rule 8, Plaintiff must at least plead facts so Defendants can evaluate the basis for the allegation that they "knew or should have known" that these amounts are allegedly in Defendants Products. *See Tingling-Clemmons*, 133 A.3d at 246 ("The requirement of facial plausibility 'asks for more than a sheer possibility that a defendant has acted unlawfully,' and a complaint falls short of showing a plausible entitlement to relief if it 'pleads facts that are merely consistent with a defendant's liability.' To satisfy Rule 8(a), plaintiffs must 'nudge[ ] their claims across the line from conceivable to plausible.'").

At minimum, Plaintiff needed to at least allege facts drawing a connection explaining how Defendants knew or should have known that these pesticides were allegedly in Defendants' Products. *See Keranen v. Nat'l R.R. Passenger Corp.*, 743 A.2d 703, 713 (D.C. 2000) ("Even under our liberal rule of pleading, to be sufficient, a complaint must 'fairly put[ ] the defendant on notice of the claim against him.'... Keranen[']s complaint ... [fails to] assert a causal relationship between the alleged negligent training and the accident which allegedly resulted in his knee injury.") (internal citations omitted). Plaintiff did not do so. Instead, it only put forth an "unadorned, the-defendant-unlawfully-harmed-me" allegation through an unspecified testing "accusation." *Iqbal*, 556 U.S. at 678, 696 (citation omitted). This is not enough. "Rule 8 ... does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79 (citation omitted). This Court should not condone this gamesmanship for a Complaint inadequately pleaded under Rule 8(a).

## CONCLUSION

This Court should dismiss the Complaint in its entirety and with prejudice or, in the alternative, dismiss these proceedings on primary jurisdiction grounds.

Dated: August 26, 2019          Respectfully submitted,

**The J. M. Smucker Company and
Ainsworth Pet Nutrition, LLC**

By: _/s/ Ronald Y. Rothstein_
     Ronald Y. Rothstein (D.C. Bar. No. 451950)
     Sean H. Suber *(Pro Hac Vice Forthcoming)*
     **WINSTON & STRAWN LLP**
     35 West Wacker Drive
     Chicago, Illinois 60601
     (312) 558-5600
     RRothste@winston.com
     SSuber@winston.com

     *Counsel for Defendants*
     *The J. M. Smucker Company and*
     *Ainsworth Pet Nutrition, LLP*

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

**TOXIN FREE USA,**

            Plaintiff,

    v.

**THE J. M. SMUCKER COMPANY** and
**AINSWORTH PET NUTRITION, LLC,**

            Defendants.

Case No. 2019 CA 003192 B

Hon. Florence Y. Pan

DEFENDANTS THE J. M. SMUCKER COMPANY AND
AINSWORTH PET NUTRITION, LLC'S
<u>RULE 12-I(a) CERTIFICATION</u>

Pursuant to Rule 12-I(a) of the Superior Court Rules of Procedure, the undersigned certifies

that the parties conferred on the relief requested in the underlying motion and Plaintiff did not

consent to such relief.

Dated: August 26, 2019                Respectfully submitted,

                                      **The J. M. Smucker Company and
                                      Ainsworth Pet Nutrition, LLC**

                              By:   _/s/ Ronald Y. Rothstein_____
                                      Ronald Y. Rothstein (D.C. Bar No. 451950)
                                      Sean H. Suber *(Pro Hac Vice Forthcoming)*
                                      **WINSTON & STRAWN LLP**
                                      35 West Wacker Drive
                                      Chicago, Illinois 60601
                                      (312) 558-5600
                                      RRothste@winston.com
                                      SSuber@winston.com

                                      *Counsel for Defendants
                                      The J. M. Smucker Company and
                                      Ainsworth Pet Nutrition, LLC*

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

**TOXIN FREE USA,**

        Plaintiff,

    v.

**THE J. M. SMUCKER COMPANY** and
**AINSWORTH PET NUTRITION, LLC,**

        Defendants.

Case No. 2019 CA 003192 B

HON. FLORENCE Y. PAN

**[PROPOSED] ORDER**

Upon review of Defendants The J. M. Smucker Company and Ainsworth Pet Nutrition, LLC's Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Superior Court Rules of Civil Procedure, and good cause being shown, it is hereby:

**ORDERED** that the Motion is **GRANTED**; and it is further:

**ORDERED** that Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**

                               _____
                               Honorable Judge Florence Y. Pan
                               (signed in chambers)

<u>Copies via CaseFileXpress</u>:
Kim E. Richman, Esq.
Ronald Y. Rothstein, Esq.

### SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

|  |  |
|---|---|
| **TOXIN FREE USA,**<br><br>            Plaintiff,<br><br>    v.<br><br>**THE J. M. SMUCKER COMPANY** and<br>**AINSWORTH PET NUTRITION, LLC,**<br><br>            Defendants. | Case No. 2019 CA 003192 B<br><br>HON. FLORENCE Y. PAN |

## CERTIFICATE OF SERVICE

On August 26, 2019, the undersigned hereby certifies that a true and correct copy of The J. M. Smucker Company and Ainsworth Pet Nutrition, LLC's Motion to Dismiss, the Memorandum of Points and Authorities in Support of the Motion to Dismiss, and the corresponding exhibits and certifications were electronically served via the CaseFileXpress system on:

Kim E. Richman
Richman Law Group
8 West 126th Street
New York, NY 10027
Phone: (718) 878-4707
Fax: (212) 687-8292
E-mail: krichman@richmanlawgroup.com

*Counsel for Plaintiff Toxin Free USA*

By:  _/s/ Ronald Y. Rothstein_____
      Ronald Y. Rothstein (D.C. Bar No. 451950)
      **WINSTON & STRAWN LLP**
      35 West Wacker Drive
      Chicago, Illinois 60601
      (312) 558-5600
      RRothste@winston.com

      *Counsel for Defendants*
      *The J. M. Smucker Company and*
      *Ainsworth Pet Nutrition, LLC*

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

**TOXIN FREE USA,**

Plaintiff,

v.

**THE J. M. SMUCKER COMPANY** and
**AINSWORTH PET NUTRITION, LLC,**

Defendants.

Case No. 2019 CA 003192 B

HON. FLORENCE Y. PAN

**INDEX OF EXHIBITS TO DEFENDANTS THE J. M. SMUCKER COMPANY
AND AINSWORTH PET NUTRITION, LLC'S
MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

**Exhibit A**    Back of Defendants' Super Premium Food for Dogs, Real Beef, Pea &
Brown Rice Recipe (Plaintiff's Figure 1)

**Exhibit B**    Back of Defendants' Super Premium Food for Cats, Real Chicken &
Brown Rice Recipe (Plaintiff's Figure 2)

# EXHIBIT A

**Back of Defendants' Super Premium Food for Dogs, Real Beef, Pea & Brown Rice Recipe (Plaintiff's Figure 1)**



**Simple. That's how I like my recipes.** That's why I worked with a team of pet nutrition experts to create Rachael Ray™ Nutrish® Real Beef & Brown Rice Recipe made with simple, natural ingredients with added vitamins & chelated minerals. Real U.S. farm-raised beef is the #1 ingredient. Then I combined it with wholesome grains and veggies. Know what I didn't put in? Poultry by-product meal, artificial flavors or artificial preservatives. Nothing but good, wholesome food here!

*actual size!*

**Back of Defendants' Super Premium Food for Dogs, Real Beef, Pea & Brown Rice Recipe (Plaintiff's Figure 1)**

# EXHIBIT B

**Back of Defendants' Super Premium Food for Cats, Real Chicken & Brown Rice Recipe (Plaintiff's Figure 2)**



**Back of Defendants' Super Premium Food for Cats, Real Chicken & Brown Rice Recipe (Plaintiff's Figure 2)**

Filed
D.C. Superior Court
09/26/2019 15:00PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

| | |
|---|---|
| TOXIN FREE USA,<br><br>               Plaintiff,<br><br>      v.<br><br>THE J.M. SMUCKER COMPANY, and<br>AINSWORTH PET NUTRITION, LLC,<br><br>          Defendants. | Case No. 2019 CA 003192 B<br><br>Hon. Florence Y. Pan |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

I.    The NLEA Does Not Preempt Toxin Free USA's Claims. .................................................... 1

II.   Application of the Primary Jurisdiction Doctrine is Inappropriate. ........................................ 3

III.  The CPPA Gives Toxin Free USA Statutory Standing to Bring This Claim. ................... 4

   A.   The CPPA Provides Liberal Standing for Non-Profit Organizations. ............................. 5

      1.   Toxin Free USA Has Statutory Standing Under § 28-3905(k)(1)(D). .......................... 5

      2.   Toxin Free USA Has Statutory Standing Under § 28-3905(k)(1)(C). ........................... 7

   B.   Rachael Ray Nutrish Mistakenly Argues Based on Pre-Amendment CPPA Precedent and
   Inapposite Federal Precedent. .............................................................................................. 8

IV.   Toxin Free USA Alleges a Valid and Plausible CPPA Claim. ......................................... 10

   A.   It Is the Presence of Synthetic Chemicals That Makes the Representations Misleading,
   Not the Amount of Synthetic Chemicals. ............................................................................ 11

   B.   The Claim Is Plausible. ................................................................................................... 13

   C.   The Allegations of the Complaint Are Complete and Specific. ...................................... 14

      1.   Glyphosate and Ethoxyquin Do Not Have to Be Ingredients in Order for the "Natural"
      Representation to Be Misleading. ...................................................................................... 14

      2.   Rachael Ray Nutrish Is Liable for Its Misrepresentation Regardless of Whether It
      Intentionally Added Glyphosate and Ethoxyquin. ............................................................. 15

      3.   Challenges to the Testing Alleged in the Complaint Are a Matter for Discovery, Not
      for a Motion to Dismiss. ................................................................................................... 16

   D.   Rachael Ray Nutrish's Remaining Arguments Are Distractors and Not Germane to Toxin
   Free USA's Claim. ............................................................................................................... 17

      1.   Rachael Ray Nutrish's Misrepresentations Are About Whether the Products Are
      Natural—Not Whether They Are Safe. ............................................................................. 17

      2.   Rachael Ray Nutrish's Misrepresentations Are About Whether the Products Are
      Natural—Not Whether They Meet Federal Pesticide Tolerance Levels. ........................... 18

      3.   Rachael Ray Nutrish's Misrepresentations Are About Whether the Products Are
      Natural—Not Whether They Are Organic. ........................................................................ 19

Conclusion ................................................................................................................................ 20

## TABLE OF AUTHORITIES

**CASES**

*Animal Legal Def. Fund v. Hormel Foods Corp.*, No. 2016 CA 004744, 2017 D.C. Super. LEXIS 9 (Sept. 20, 2017).................................................................................................................. 13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................ 17

*Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753 (9th Cir. 2015).......................................... 2

*Ault v. J.M. Smucker Co.*, No. 13-cv-3409, 2014 U.S. Dist. LEXIS 67118 (S.D.N.Y. May 15, 2014) ....................................................................................................................................... 2, 20

*Axon v. Citrus World, Inc.*, 354 F. Supp. 3d 170 (E.D.N.Y. 2018) ............................. 2, 3, 14, 15

*Axon v. Florida's Nat. Growers, Inc.*, No. 19-203 (2d Cir.).......................................................... 14

*Banks v. Eastern Sav. Bank*, 8 A.3d 1239 (D.C. App. 2010)....................................................... 15

*Beyond Pesticides v. Dr. Pepper Snapple Grp., Inc.*, 2019 U.S. Dist. LEXIS 109812 (D.D.C. July 1, 2019) ............................................................................................................................. 4, 6, 8

*Buonasera v. Honest Co.*, 208 F. Supp. 3d 555 (S.D.N.Y. 2016) ............................................... 15

*Davis v. United States*, 397 A.2d 951 (D.C. 1979)....................................................................... 15

*Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913 (N.D. Cal. 2012) ............................................... 13

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028 (2015) ....................................... 15

*Emerine v. Yancey*, 680 A.2d 1380 (D.C. App. 1996)................................................................. 17

*Fahey ex rel. D.C. v. Deoleo USA, Inc.*, No. 18-cv-2047, 2018 U.S. Dist. LEXIS 190934 (D.D.C. Nov. 8, 2018) .......................................................................................................................... 8, 10

*Friends of the Earth v. Sanderson Farms, Inc.*, No. 17-cv-03592, 2018 U.S. Dist. LEXIS 220547 (N.D. Cal. Dec. 3, 2018)....................................................................................................... 15

*Gaminde v. Lang Pharma Nutrition, Inc.*, No. 1:18-cv-300, 2019 U.S. Dist. LEXIS 48595 (N.D.N.Y. Mar. 25, 2019)..................................................................................................... 10

*Gibson v. Quaker Oats Co.*, No. 16-cv-4853, 2017 U.S. Dist. LEXIS 130696 (N.D. Ill. Aug. 14, 2017) ..................................................................................................................................... 2

*Grayson v. AT&T Corp.*, 15 A.3d 219 (D.C. Cir. 2011)........................................................ 5, 9, 10

*Gubala v. CVS Pharm., Inc.*, No. 14 C 9039, 2016 U.S. Dist. LEXIS 32759 (N.D. Ill. Mar. 15, 2016) ..................................................................................................................................... 15

*Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188 (N.D. Cal. 2014)................................. 20

*Hughes v. Ester C Co.*, 330 F. Supp. 3d 862 (E.D.N.Y. 2018)................................................... 19

*In re General Mills Glyphosate Litigation*, No. 16-2869, 2017 U.S. Dist. LEXIS 108469 (D. Minn. July 12, 2017).......................................................................................................... 14, 20

*In re Herbal Supplements Mktg. & Sales Practices Litig.*, No. 15-cv-5070, 2017 U.S. Dist. LEXIS 76207 (N.D. Ill. May 19, 2017) ............................................................................. 15

*In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956 (N.D. Cal. 2019)................................ 18

*In re Roundup Prods. Liab. Litig.*, No. 16-md-02741, 2018 U.S. Dist. LEXIS 114760 (N.D. Cal. July 10, 2018).................................................................................................................. 18

*In re: Simply Orange Orange Juice Mktg. & Sales Practices Litig.*, MDL No. 2361, 2013 U.S. Dist. LEXIS 28080 (W.D. Mo. Mar. 1, 2013)................................................................... 18

*Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628 (6th Cir. 2010)................................................ 18

*Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1 (D.D.C. 2019) ............................................................ 12

*Mass. Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48 (D.D.C. 2018)................................... 15

*Modern Mgmt. Co. v. Wilson*, 997 A.2d 37 (D.C. App. 2010)................................................. 13

*Molovinsky v. Fair Emp't Council*, 683 A.2d 142 (D.C. 1996)....................................................8

*Nat'l Consumers League v. Bimbo Bakeries USA*, No. 2013 CA 006548 B, 2015 D.C. Super. LEXIS 5 (D.C. Super. Apr. 2, 2015) ..............................................................................5, 7

*Nat'l Consumers League v. Doctor's Assocs., Inc.*, No. 2013 CA 006549 B, 2014 D.C. Super. LEXIS 15 (Sept. 12, 2014) ..................................................................................... 11

*Nat'l Consumers League v. Gerber Prods. Co.*, No. 2014 CA 008202 B, 2015 D.C. Super. LEXIS 10 (Aug. 5, 2015)....................................................................................5, 8

*Organic Consumers Ass'n v. Bigelow Tea Co.*, No. 2017 CA 008375 B, 2018 D.C. Super. LEXIS 11 (D.C. Super. Ct., Oct. 10, 2018). ..............................................................11

*Organic Consumers Ass'n v. Bigelow Tea Co.*, No. 2017 CA 008375 B, 2018 D.C. Super. LEXIS 11 (Oct. 31, 2018)................................................................................. passim

*Organic Consumers Ass'n v. General Mills, Inc.*, No. 2016 CA 006309 B, 2017 D.C. Super. LEXIS 11 (Sept. 22, 2017) ........................................................................................3

*Organic Consumers Ass'n v. General Mills*, No. 2016 CA 6309 B, 2017 D.C. Super. LEXIS 4 (July 6, 2017) ...................................................................................... passim

*Organic Consumers Ass'n v. Pret A Manger (USA) Ltd.*, No. 2018 CA 006750 B, 2019 D.C. Super. LEXIS 5 (Apr. 29, 2019)....................................................................4, 10

*Parker v. J.M. Smucker Co.*, No. 13-0690, 2013 U.S. Dist. LEXIS 120374 (N.D. Cal. Aug. 23, 2013) ..........................................................................................................2

*Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 973 (C.D. Cal. 2013) ............................................ 20

*Petrosino v. Stearns's Prods.*, No. 16-CV-7735 (NSR), 2018 U.S. Dist. LEXIS 55818 (S.D.N.Y. Mar. 30, 2018)........................................................................................ 15

*Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697 (D.C. App. 2013)...... 17

*Portuguese Am. Leadership Council of the United States, Inc. v. Investors' Alert, Inc.*, 956 A.2d 671 (D.C. App. 2008) ...................................................................................... 16

*Reilly v. Chipotle Mexican Grill, Inc.*, No. 15-Civ-23425, 2016 U.S. Dist. LEXIS 193452 (S.D. Fla. Apr. 20, 2016) ................................................................................................ 15

*Saucier v. Countrywide Home Loans*, 64 A.3d 428 (D.C. App. 2013)....................................... 12

*Segedie v. Hain Celestial Grp., Inc.*, No. 14-CV-5029, 2015 U.S. Dist. LEXIS 60739 (S.D.N.Y. May 7, 2015) ................................................................................................. 20

*Silva v. Smucker Nat. Foods, Inc.*, No. 14-CV-6154, 2015 U.S. Dist. LEXIS 122186 (E.D.N.Y. Sep. 14, 2015) ...............................................................................................2

*Silva v. Smucker Nat. Foods, Inc.*, No. 14-CV-6154, 2015 U.S. Dist. LEXIS 122186 (E.D.N.Y. Sept. 14, 2015) ..............................................................................................15

*Tran v. Sioux Honey Ass'n Coop*, No. 8:17-cv-110, 2018 U.S. Dist. LEXIS 146380 (C.D. Cal. Aug. 20, 2018) ..............................................................................................2, 15, 20

*Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025 (8th Cir. 2014)................................................ 10

*Ward One Democrats, Inc. v. Woodland*, 898 A.2d 356 (D.C. App. 2006) ................................ 19

*Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171 (D.D.C. 2003).......................................... 9

## STATUTES

D.C. Consumer Protection Procedures Act................................................................. passim

Food, Drug, and Cosmetic Act ...............................................................................1, 2

Nutrition Labeling and Education Act .............................................................................1

## OTHER AUTHORITIES

Committee on Public Services and Consumer Affairs Memorandum on Bill 19-0581 ........ passim

Dechartres, J., et al., *Glyphosate and glyphosate-based herbicide exposure during the peripartum period affects maternal brain plasticity, maternal behaviour and microbiome*, Journal of Neuroendocrinology (Jan. 9, 2019) ......................................................................... 18

Jayson L. Lusk, *Consumer Perceptions of Healthy and Natural Food Labels* (Jan. 15, 2019) ... 19

Restatement of Law (Second) Torts § 538(2)......................................................................... 12

Wyatt Sassman, "A Survey of Constitutional Standing in State Courts," 8 Ky. J. Equine, Agric. & Nat. Resources Law 350 (2015) ..................................................................................... 8

## REGULATIONS

40 C.F.R. § 180 ................................................................................................................... 19

7 CFR § 205 ................................................................................................................... 19, 20

Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms, 56 Fed. Reg. 60421-01 (Nov. 27, 1991) ................................................................................ 18

Defendants J.M. Smucker Company and Ainsworth Pet Nutrition's (collectively, "Rachael Ray Nutrish") Motion to Dismiss Plaintiff Toxin Free USA's Complaint is not well founded. First, Rachael Ray Nutrish makes a preemption argument that has been repeatedly rejected by this Court and others. Second, Rachael Ray Nutrish asks that this Court apply the doctrine of primary jurisdiction and dismiss or stay the case pending action from the FDA on the definition of "natural" on food labeling, despite years of inaction from the FDA and this Court's numerous rejections of identical arguments. Third, in arguing that Toxin Free USA lacks standing, Rachael Ray Nutrish fails to acknowledge that this action is brought in state (not federal) court under the statutory scheme of the 2012 amendments to the D.C. Consumer Protection Procedures Act (CPPA). Fourth, Rachael Ray Nutrish argues that Toxin Free USA has failed to state a claim, against the weight of this Court's CPPA precedent in similar cases, and against the weight of consumer-protection decisions nationwide. Accordingly, the Motion to Dismiss should be denied.

I.    **The NLEA Does Not Preempt Toxin Free USA's Claims.**

Rachael Ray Nutrish argues that Toxin Free USA's CPPA claim is expressly preempted by the Food, Drug, and Cosmetic Act (FDCA), as amended by the Nutrition Labeling and Education Act (NLEA). The argument mischaracterizes Toxin Free USA's claims as an attempt to require that glyphosate and ethoxyquin be listed on the Products' labels as ingredients or additives. (MTD 11-13.) To the contrary, only the presence of Rachael Ray Nutrish's representations that the Products are "natural" and contain "no . . . artificial preservatives" makes the hidden glyphosate and ethoxyquin unlawful.[1] Defendant J.M. Smucker Company has lost this

---

[1] Rachael Ray Nutrish's only basis for construing Toxin Free USA's claims as seeking to require inclusion of glyphosate and ethoxyquin on the Products' labels as ingredients or additives is the Complaint's statement that Rachael Ray Nutrish does not disclose ethoxyquin even though federal regulations now require disclosure of ethoxyquin in animal feed and canned pet food. (Compl. ¶¶ 47 n.7, 48,). This statement was included in the Complaint for context, particularly to illustrate the public concern surrounding ethoxyquin. Nowhere does the Complaint state that Toxin Free USA seeks disclosure of glyphosate or ethoxyquin as a form of relief, and read as a whole, the Complaint is

same preemption argument repeatedly. *See Ault v. J.M. Smucker Co.*, No. 13-cv-3409, 2014 U.S. Dist. LEXIS 67118, at \*11 (S.D.N.Y. May 15, 2014) ("Eliminating 'All Natural' has no effect on Defendant's ingredient labeling and therefore cannot conflict with FDA labeling requirements . . . '[t]his is not a preempted theory'." (quoting *Parker v. J.M. Smucker Co.*, No. 13-0690, 2013 U.S. Dist. LEXIS 120374, at \*4 (N.D. Cal. Aug. 23, 2013))).

Under the FDCA, food is misbranded if "its labeling is false or misleading in any particular." 21 U.S.C. § 343(a)(1). "Because the FDA has not created a rule for when food products may be labeled 'natural,' courts have found that plaintiffs' state law claims challenging the use of 'natural' as false and misleading are not preempted by the FDCA." *Axon v. Citrus World, Inc.*, 354 F. Supp. 3d 170, 181 (E.D.N.Y. 2018) (collecting cases); *see also, e.g., Tran v. Sioux Honey Ass'n Coop*, No. 8:17-cv-110, 2018 U.S. Dist. LEXIS 146380, at \*7 (C.D. Cal. Aug. 20, 2018) ("'[T]he FDCA does not preempt state laws that allow consumers to sue . . . manufacturers that label or package their products in violation of federal standards'." (quoting *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 757 (9th Cir. 2015) (alteration omitted)). The reasoning behind the lack of preemption is explained in yet another case against Defendant J.M. Smucker Co.: "The FDA has not approved Smucker's labeling its products 'natural,' and . . . the FDA has not promulgated any formal rule governing when food products may or may not be labeled 'natural' that would have preemptive effect." *Silva v. Smucker Nat. Foods, Inc.*, No. 14-CV-6154, 2015 U.S. Dist. LEXIS 122186, at \*11 (E.D.N.Y. Sep. 14, 2015) (citations omitted).

The only case cited by Rachael Ray Nutrish in support of preemption, *Gibson v. Quaker Oats Co.*, No. 16-cv-4853, 2017 U.S. Dist. LEXIS 130696, at \*4 (N.D. Ill. Aug. 14, 2017) (MTD 12-13), is distinguishable because its plaintiffs *were* seeking disclosure of glyphosate on labels,

---

plainly concerned with whether Rachael Ray Nutrish's representations that the Products are "All Natural" and contain "no . . . artificial preservatives" are false or misleading.

*see Axon*, 354 F. Supp. 3d at 180 ("I find *Gibson* distinguishable and unpersuasive . . . the *Gibson*

plaintiffs were seeking disclosure of glyphosate."), and the decision is premised on an error:

> [T]he *Gibson* court came to its preemption conclusion by misquoting 21 U.S.C.
> § 343-1. The *Gibson* court writes: "The statute states 'no State or political
> subdivision of a State may directly or indirectly establish under any authority or
> continue in effect as to any food in interstate commerce'[.]" In actuality, 21 U.S.C.
> § 343-1 goes on to state (without a period) that only state requirements "not
> identical" to certain federal requirements are preempted.

*Id.* at 180-81; *see also Organic Consumers Ass'n v. General Mills, Inc.*, No. 2016 CA 006309 B,

2017 D.C. Super. LEXIS 11, at **1-2 (Sept. 22, 2017) (Edelman, J.) (distinguishing *Gibson*).

## II.    Application of the Primary Jurisdiction Doctrine is Inappropriate.

Rachael Ray Nutrish contends that this case should be stayed or dismissed under the

primary jurisdiction doctrine because the issues involved are within the special competence of the

EPA and the FDA. (MTD 13-14.) District courts consistently decline to exercise the doctrine of

primary jurisdiction in similar cases. *See, e.g.*, *Organic Consumers Ass'n v. General Mills*, No.

2016 CA 6309 B, 2017 D.C. Super. LEXIS 4, at *20 (July 6, 2017) (Edelman, J.) (declining to

invoke primary jurisdiction because whether marketing food products that contain detectable

levels of glyphosate as "Made with 100% Natural Whole Grain Oats" violates the CPPA "falls

within the conventional experience of the court system"); *Organic Consumers Ass'n v. Bigelow

Tea Co.*, No. 2017 CA 008375 B, 2018 D.C. Super. LEXIS 11, at **6-8 (Oct. 31, 2018) (similar).

Aside from an unsupported assertion that Toxin Free USA's claims concern "highly

technical" issues (they do not), Rachael Ray Nutrish makes no argument for why the false

advertising claims at issue are within the special competence of the EPA and the FDA. Rachael

Ray Nutrish does point out that the EPA is currently conducting its standard 15-year registration

review of glyphosate. But the purpose of this routine review is to evaluate whether glyphosate can

still be safely used as a pesticide, not to determine any issue central to this CPPA case, such as

whether glyphosate is "natural" (undisputedly, it is not), or whether reasonable consumers would expect glyphosate residue in pet foods labeled "natural."[2] *See, e.g.*, *Organic Consumers Ass'n v. Pret A Manger (USA) Ltd.*, No. 2018 CA 006750 B, 2019 D.C. Super. LEXIS 5, at *8-11 (Apr. 29, 2019) (declining to invoke primary jurisdiction where "the Court is not being asked to rule on whether the glyphosate levels found in [Defendant's] Products are acceptable, rather the Court is being asked to address 'whether a reasonable consumer is likely to be deceived by the use of the term 'natural' on foods that contain synthetic residues' in violation of the CPPA").

Rachael Ray Nutrish also cites a request for comment published by the FDA nearly four years ago to suggest that the FDA is in the process of addressing usage of the term "natural" on food product labeling. (MTD 14.) The comment period for this request closed on May 10, 2016, and the FDA has taken no further public action on the issue. For more than two years now, District courts have no longer considered this request for comment to be a basis for invoking primary jurisdiction. *See, e.g.*, *General Mills*, 2017 D.C. Super. LEXIS 4, at **19-20; *Bigelow Tea Co.*, 2018 D.C. Super. LEXIS 11, at **7-8; *Pret A Manger*, 2019 D.C. Super. LEXIS 5, at **9-11.

## III.    The CPPA Gives Toxin Free USA Statutory Standing to Bring This Claim.

Rachael Ray Nutrish's argument on standing demonstrates a lack of appreciation for what type of case this is, the court in which it arises,[3] and the import of the D.C. Council's 2012 amendments to the CPPA's organizational standing provisions. Since those amendments took effect in April 2013, courts have freely found standing for organizational plaintiffs. *See, e.g.*, *Bigelow Tea Co.*, 2018 D.C. Super. LEXIS 11, at *5; *General Mills, Inc.*, 2017 D.C. Super. LEXIS

---

[2] *See, e.g.*, *Why We Review Pesticides*, EPA, https://www.epa.gov/pesticide-reevaluation/why-we-review-pesticides (last visited Sept. 14, 2019).

[3] Rachael Ray Nutrish's very first statement about standing concerns *Beyond Pesticides v. Dr. Pepper Snapple Grp., Inc.*, 2019 U.S. Dist. LEXIS 109812 (D.D.C. July 1, 2019) (MTD 1)—a federal case that specifically drew a distinction between standing requirements in federal court and what "works in the District of Columbia's courts" under the CPPA. *Beyond Pesticides*, 2019 U.S. Dist. LEXIS 109812 at **3-4.

4, at **4-18; *Nat'l Consumers League v. Gerber Prods. Co.*, No. 2014 CA 008202 B, 2015 D.C. Super. LEXIS 10, at *17 (Aug. 5, 2015) (Ross, J.); *Nat'l Consumers League v. Bimbo Bakeries USA*, No. 2013 CA 006548 B, 2015 D.C. Super. LEXIS 5, at *14 (D.C. Super. Apr. 2, 2015) (Mott, J.).

### A.    The CPPA Provides Liberal Standing for Non-Profit Organizations.

The 2012 amendments to the CPPA's standing provisions were a direct response by the D.C. Council to *Grayson v. AT&T Corp.*, 15 A.3d 219, 232 n.29 (D.C. Cir. 2011), which held that "the CPPA retains [an] injury-in-fact standing requirement." The legislature explained:

> Bill 19-581 clarifies that non-profit organizations and public interest organizations may act as private attorneys general for the public under circumstances that ensure the organization has a sufficient stake of its own to pursue the case with appropriate zeal. Those clarifications provide the court with a variety of ways to consider standing options that satisfy the prudential standing principles for non-profit and public interest organizations acting as private attorneys general, while encouraging the courts to be receptive to other approaches that rely on different means of ensuring a sufficient stake in the outcome of the case.

Committee on Public Services and Consumer Affairs Memorandum on Bill 19-0581 (the "Alexander Report," Nov. 18, 2012), at 2. Toxin Free USA possesses standing under either of two standing provisions enacted through Bill 19-0581: § 28-3905(k)(1)(D), which provides "maximum standing" (Alexander Report 6), or § 28-3905(k)(1)(C). Despite citing *Grayson* at least nine times, Rachael Ray Nutrish fails to mention that Toxin Free USA relies on broad the organizational standing provisions that were "expanded" specifically in response to the *Grayson* decision.

### 1.    Toxin Free USA Has Statutory Standing Under § 28-3905(k)(1)(D).

The standing provided for by D.C. Code § 28-3905(k)(1)(D)—meant to encompass even "bases for standing that the D.C. courts have not yet had occasion to consider" (Alexander Report 6)—allows a public interest organization to bring any action that a consumer could bring under (k)(1)(A), so long as the organization has a sufficient nexus to the consumer's interests. D.C. Code

§ 28-3905(k)(1)(D)(i)-(ii). The CPPA "establishes an enforceable right to truthful information from merchants," § 28-3901(c), and allows any consumer to "bring an action seeking relief from the use of a trade practice in violation of a law of the District," § 28-3905(k)(1)(A), regardless of "whether or not any consumer is in fact misled, deceived, or damaged thereby," § 28-3904. *See, e.g.*, *General Mills*, 2017 D.C. Super. LEXIS 4, at \*\*6-7 ("[T]he deprivation of the CPPA statutory right to be free from improper trade practices may constitute an injury-in-fact sufficient to establish standing, even though the plaintiff would have suffered no judicially cognizable injury in the absence of the statute." (citation omitted)). Accordingly, (k)(1)(D) allows a public interest organization with a sufficient nexus to consumer interests to bring an action for relief when untruth enters the marketplace, regardless of whether the organization itself suffers this informational injury, or any injury-in-fact recognized under federal precedent. (*See also* Alexander Report 6.)[4]

The Complaint alleges that Rachael Ray Nutrish has caused misrepresentations to enter the D.C. market, so the only remaining questions relevant to standing under Section 28-3905(k)(1)(D) are whether Toxin Free USA is a public-interest organization as defined in Section § 28-3901(a)(15), and whether Toxin Free USA has "sufficient nexus to the interests involved." The Complaint alleges that Toxin Free USA is a public-interest organization pursuant to D.C. Code § 28-3901(a)(15) (Compl. ¶¶ 11, 14-18, 83, 87, 91, 92, 94), and that Toxin Free USA has "sufficient nexus" under D.C. Code § 28-3905(k)(1)(D)(ii): Toxin Free USA was "founded with the purpose of advocating for and educating consumers" regarding the use of genetically modified ingredients and related synthetic herbicides. (Compl. ¶¶ 16, 91.) Toxin Free USA works to mobilize, educate, and advocate on behalf of consumers—including those in the District (*see id.*

---

[4] Section (k)(1)(D) was intended to, and does, recognize organizational standing beyond prior reliance on federal Article III precedent. *See, e.g.*, *Beyond Pesticides*, 2019 U.S. Dist. LEXIS 109812, at \* 3 (distinguishing federal organizational standing from what "works in the District of Columbia's courts" under CPPA).

¶¶ 11, 15)—to promote transparency regarding the use and effects of synthetic ingredients, biocides, and preservatives (*id.* ¶¶ 14, 17-18).[5]

## 2.    Toxin Free USA Has Statutory Standing Under § 28-3905(k)(1)(C).

Toxin Free USA also has standing under the narrower D.C. Code § 28-3905(k)(1)(C):

> A nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District, ***including a violation involving consumer goods or services that the organization purchased or received in order to test or evaluate qualities*** pertaining to use for personal, household, or family purposes.

Through its codification of "tester" standing, the D.C. Council explicitly overrode precedent regarding "manufactured standing" or "self-inflicted harm"[6] that might otherwise preclude the purchase of a product for testing as a basis for injury-in-fact: "Subparagraph (B) authorizes these individuals to bring an action on their own behalf[] for the good or service they purchased or received for the purpose of testing it without running afoul of a smattering of decisions denying standing based on notions of 'self-inflicted harm' or 'manufactured standing'." Alexander Report 4. The Council ensured that "testers" do not need to be misled in order "to have suffered an injury-in-fact" and made clear that "a testing organization that has not actually been misled may nevertheless have standing based on a violation of its right to truthful information about the goods or services it tests." *Id.* at 4-5. Toxin Free USA possesses "tester" standing because it "purchased or received in order to test or evaluate qualities." (Compl. ¶¶ 19, 87.)

---

[5] *See, e.g.*, *Bigelow Tea Co.*, 2018 D.C. Super. LEXIS 11, at **4-5 ("Plaintiff's mission and work of protecting consumers through promoting accurate labeling of consumer goods shows sufficient nexus to satisfy § 28-3905(k)(1)(D)(ii)"); *Bimbo Bakeries USA*, 2015 D.C. Super. LEXIS 5, at *13 ("the court finds that [the organizational plaintiff's] mission, goal, and work of protecting consumers through various efforts including promoting accurate labeling of consumer goods show sufficient nexus").

[6] Rachael Ray Nutrish's argument regarding "Manufactured, Self-Inflicted Injury" does not address or even mention the D.C. Council's explicit rejection of its "manufactured standing" theory as a defense to actions brought under D.C. Code § 28-3905(k)(1)(C).

### B. Rachael Ray Nutrish Mistakenly Argues Based on Pre-Amendment CPPA Precedent and Inapposite Federal Precedent.

Rachael Ray Nutrish cites only one post-amendment CPPA case decided in a District court, *Gerber Prods. Co.*, 2015 D.C. Super. LEXIS 10. That decision is a ***denial*** of a motion to dismiss, and specifically holds that (1) a public interest organization with a sufficient nexus ***can*** bring an action "on behalf of the interests of a consumer or a class of consumers" under D.C. Code § 28-3905(k)(1)(D); and (2) purchasing a product for testing ***does*** satisfy the standing requirement. *Id.*, 2015 D.C. Super. LEXIS 10 at *14-18. Thus, the only post-amendment decision cited by Rachael Ray Nutrish confirms that the CPPA reaches the "full extent of standing as may be recognized by the District of Columbia courts." *Id.* at *18 (citing Alexander Report 6).[7]

The two other post-amendment CPPA cases cited by Rachael Ray Nutrish to support its argument on standing are federal decisions. (MTD 1, 5-8, 11 (citing *Beyond Pesticides*, 2019 U.S. Dist. LEXIS 109812; *Fahey ex rel. D.C. v. Deoleo USA, Inc.*, No. 18-cv-2047, 2018 U.S. Dist. LEXIS 190934 (D.D.C. Nov. 8, 2018))). As set forth *supra*, III n.5, *Beyond Pesticides* specifically distinguished between standing requirements in federal court and what "works in the District of Columbia's courts" under the CPPA.[8] The plaintiff in *Fahey ex rel. D.C.* was an individual consumer, not an organizational plaintiff, and the opinion does not even mention the word "standing," let alone evaluate the scope of organizational standing under the CPPA.

---

[7] State courts are masters of their own jurisdiction and not bound by Article III of the U.S. Constitution unless they choose to be, or are legislatively constrained to be. *See generally, e.g.*, Wyatt Sassman, "A Survey of Constitutional Standing in State Courts," 8 Ky. J. Equine, Agric. & Nat. Resources Law 350 (2015). The D.C. Court of Appeals held in 1996 that it "is not bound by Article III" standing requirements that apply in the federal courts. *Molovinsky v. Fair Emp't Council*, 683 A.2d 142, 146 (D.C. 1996).

[8] Rachael Ray Nutrish cites the *Beyond Pesticides* decision for the proposition that § 28-3905 "only allows an organization to sue on the public's behalf if it also alleges an injury to itself or to its members," but this statement, made in a footnote as an aside, cites only to § 28-3905(k)(1)(C)—not 28-3905(k)(1)(D), which provides "maximum standing" (Alexander Report 6) and contains no requirement for a separate injury apart from that to District consumers, provided the organization has a sufficient nexus to represent them. *See* 2019 U.S. Dist. LEXIS 109812 at *2 n.1.

The remaining two CPPA decisions Rachael Ray Nutrish cites in its standing argument predate the 2013 amendments, but Rachael Ray Nutrish selectively quotes language to portray them as rulings on the scope of the 2013 amendments. (MTD 6 (citing *Grayson*, 15 A.3d at 245, and *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 177 (D.D.C. 2003))). In fact, the only time that Rachael Ray Nutrish mentions any amendments is when it cites *Grayson* for the proposition that the "D.C. Court of Appeals has analyzed the CPPA in detail and explained that the 'amendments to the CPPA do not evidence an intent by the Council to override or disturb our constitutional standing requirement'." (MTD 6 (quoting 15 A.3d at 245).) Of course, the ***2011 Grayson*** decision is not referring to the ***2013*** amendments, which were explicitly intended to expand standing in response to the *Grayson* decision. *See* Alexander Report 2. Indeed, Rachael Ray Nutrish's quotation of *Grayson* omits the beginning of the clause, which specifies that "the ***2000 amendments*** to the CPPA do not evidence . . . ." *Grayson*, 15 A.3d at 245 (emphasis added). Likewise, Rachael Ray Nutrish cites *Williams* for the proposition that "despite its broad language, the CPPA '[does] not change the requirements for standing under D.C. law'" (MTD 6), omitting the full quotation, which specifies that "The amendment to the CPPA in 2000 did not change the requirements for standing under D.C. law, despite its broad language." 297 F. Supp. 2d at 178.

Rachael Ray Nutrish makes two last-ditch arguments that have been rejected in District courts. First, it argues that Toxin Free USA does not have standing to seek injunctive relief because it "only alleges that a group of 'D.C. Consumers are at risk of . . . continuing harm if the Products continue to be sold'—not Plaintiff itself." (MTD 8 (quoting Compl. ¶ 68)). But the CPPA explicitly authorizes "tester" plaintiffs like Toxin Free USA to seek injunctive relief:

> Plaintiffs do not seek injunctive relief based upon possible future purchases of Defendant's products; rather, having procured standing by the purchase of one such product, they seek injunctive relief against practices that they allege to be unlawful under the CPPA. By its explicit terms, the CPPA permits parties to sue on behalf

of others for violations of the Act, including those related to consumer goods and services, *see* D.C. Code §§ 28-3905(k)(1)(B)-(D), and it permits injunctive relief, *see id.* at § 28-3905(k)(2)(D).

*General Mills*, 2017 D.C. Super. LEXIS 4, *18.[9]

Second, Rachael Ray Nutrish argues that Toxin Free USA lacks standing because it has not plausibly alleged that "Defendants' products **that other D.C. consumers buy** will actually contain the alleged trace amounts of glyphosate and ethoxyquin in Plaintiff's bags." (MTD 11.) Rachael Ray Nutrish's argument ignores the explicit purpose of the "tester" standing provision codified in D.C. Code §§ 28-3905(k)(1)(C), which is to allow testing organizations like Toxin Free USA to analyze a **sample** of a manufacturers' products and bring an action "on behalf of itself or any of its members, or on any such behalf and on behalf of the general public." *Id.* Rachael Ray Nutrish cites only federal class-action cases in which the named plaintiffs themselves did not have specific evidence regarding the package they purchased.[10] Here, Toxin Free USA alleges that it tested two products that it purchased and that the test results demonstrated that these specific products did not conform to Rachael Ray Nutrish's representations. (Compl. ¶¶ 19, 87.)

## IV. Toxin Free USA Alleges a Valid and Plausible CPPA Claim.

This court has repeatedly found that, where there is glyphosate residue, no matter what the amount, a "natural" label can violate the CPPA. *See, e.g., Pret A Manger*, 2019 D.C. Super. LEXIS 5, at **7-8 (holding that restaurant's "natural" marketing "has the potential to mislead consumers

---

[9] *See also Grayson*, 15 A.3d at 245 (holding that plaintiff had standing to seek an injunction based upon past purchases and that "the very design of the CPPA's injunctive remedy serves to sufficiently redress the alleged threatened **statutory injury**" (emphasis added)). Grayson was not required to show that he would personally benefit from the injunction, or that he would purchase the defendant's calling cards again. Thus, as Judge Edelman recognized in *General Mills*, "[a]dopting Defendant's argument would discard this holding from the Court of Appeals and render large portions of the CPPA superfluous." *General Mills*, 2017 D.C. Super. LEXIS 4, at *18.

[10] *See Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025 (8th Cir. 2014); *Gaminde v. Lang Pharma Nutrition, Inc.*, No. 1:18-cv-300, 2019 U.S. Dist. LEXIS 48595, at *6 (N.D.N.Y. Mar. 25, 2019); *Fahey*, 2018 U.S. Dist. LEXIS 190934, *6; *see also General Mills*, 2017 D.C. Super. LEXIS 4, at **15-16 (finding that *Wallace v. ConAgra Foods, Inc.* was "inapposite" where specific products purchased by plaintiff allegedly tested positive for glyphosate and noting that plaintiffs in *Wallace* "did not allege that they had purchased products produced by the defendant manufacturer that exhibited the defects on which the plaintiffs based their claims.").

who reasonably may believe that a food product with the label 'natural' does not contain any chemical agents"); *Bigelow Tea Co.*, 2018 D.C. Super. LEXIS 11, at **11-12 (allowing claims to proceed for "natural" labels on tea containing 0.38 parts-per-million (ppm) of glyphosate); *General Mills*, 2017 D.C. Super. LEXIS 4, at **24-25 ("Plaintiffs [allege] that Defendants' products contain traces of a chemical agent while representing to be made from 100% natural whole grain oats, and that Defendants thus mislead consumers seeking to purchase and consume 'natural' foods."). Nothing suggests that the same precedent would not apply to the equally synthetic chemical ethoxyquin. Moreover, even without this precedent, dismissal of Toxin Free USA's claims at the pleading stage—denying a public-interest organization its day in court before any discovery is taken—would be a radical step. *See, e.g.*, *Nat'l Consumers League v. Doctor's Assocs., Inc.*, No. 2013 CA 006549 B, 2014 D.C. Super. LEXIS 15, at *16 (Sept. 12, 2014) (Nash, J.) (holding that whether marketing strategy makes representations about "characteristics" or "ingredients" is issue of fact, appropriately resolved at trial).

Nevertheless, Rachael Ray Nutrish maintains that this case cannot continue. At no point does it attempt to argue that glyphosate or ethoxyquin is "natural," or that consumers understand these synthetic chemicals to be "natural." Instead, Rachael Ray Nutrish focuses on the ***amount*** of residue, contending that the presence of unnatural chemicals or artificial preservatives should not matter if there is not ***very much*** residue. In so doing, Rachael Ray Nutrish confuses what "materiality" means under the CPPA and relies on precedent from other courts while ignoring District precedent directly on point.

### A.    It Is the Presence of Synthetic Chemicals That Makes the Representations Misleading, Not the Amount of Synthetic Chemicals.

The Subsection titled "A. Defendants' Representations Are Not Materially Misleading" (MTD 15-17) argues that the "natural" representation cannot be misleading because the amount of

glyphosate and ethoxyquin in the Products is too low to be material. (*E.g.*, *id.* 15.) Rachael Ray

Nutrish fails to realize that, while the presence of synthetic chemical residues is what makes the

representation *false*, it is not what makes the representation *material*. Materiality is a component

of CPPA § 28-3904(e), (f), and (f-1). (Rachael Ray Nutrish's argument is not relevant to the

alleged violations of § 28-3904(a), (d), or (h). (Compl. ¶ 80.)) For purposes of subsections (e), (f),

and (f-1), a representation is material if

> a reasonable [person] would attach importance to its existence or nonexistence in
> determining his or her choice of action in the transaction in question; or the maker
> of the representation knows or has reason to know that its recipient regards or is
> likely to regard the matter as important in his or her choice of action, although a
> reasonable [person] would not so regard it.

*Saucier v. Countrywide Home Loans*, 64 A.3d 428, 442 (D.C. App. 2013) (internal alterations

omitted) (quoting Restatement of Law (Second) Torts § 538(2)); *see also, e.g.*, *Krukas v. AARP,*

*Inc.*, 376 F. Supp. 3d 1, 41 (D.D.C. 2019) (quoting *Saucier* to find materiality in CPPA case).

Thus, materiality goes to whether the consumer attaches importance to the statement, not to the

truth or falsity of the statement. The Complaint adequately alleges materiality by this standard:

> 1.    Due to concerns about health, sustainability, and the increasing use of
>        synthetically created chemicals in the production of food, consumers are
>        increasingly considering [] how food, both for them and for their animal
>        companions, is grown, processed, and prepared.
>
> 29.   Recent national surveys have found that a majority of consumers seek out
>        products with a "natural" label, believing that "natural" means that the
>        products are produced without pesticides or artificial ingredients.

(Compl. ¶¶ 1-2, 28-29.) At least one of the surveys cited in the Complaint (*id.* ¶ 29 n.2) has been

found to meet a plaintiff's pleading burden in the context of glyphosate residue:

> Specifically, Plaintiff points to a 2015 Consumer Reports [survey] of 1,005 adults
> indicating that 'sixty-three percent of all respondents' said that 'a natural label on
> packaged and processed foods means that "no toxic pesticides were used".' . . .
> Thus, by representing the tea as being 'natural' when it allegedly contains
> glyphosate, Defendant may mislead consumers seeking to purchase only 'natural'
> foods, and Plaintiff has alleged enough facts to survive a motion to dismiss."

*Bigelow Tea Co.*, 2018 D.C. Super. LEXIS 11, at 11.[11]

### B.    The Claim Is Plausible.

Rachael Ray Nutrish's "materiality" argument actually questions not the materiality of the "natural" representation but whether the representation was false at all, *i.e.*, whether the pet food was rendered unnatural by the presence of synthetic chemicals. Rachael Ray Nutrish asserts that the amount of glyphosate and ethoxyquin in the Products is "immaterial" (MTD 15), "negligible" (*id.* 16), and of "theoretical concern[]" (*id.*)—*i.e.*, not that glyphosate and ethoxyquin residues are "natural," but that consumers should not care if synthetic residues are in the food. That argument is misplaced; if consumers seek "natural" products to avoid exposure to synthetic residues (as the surveys cited by Toxin Free USA suggest that they do), then it does not matter whether the residue is harmful, or at what level.[12] One analogy is gluten. Consumers avoid gluten for all sorts of reasons, legitimate or otherwise. A manufacturer may not sell foods with gluten residues, represent them as free from gluten residue, and then reject false advertising claims on the basis that gluten residue is "safe." The CPPA is designed to protect consumer choice and an honest marketplace, not to make safety determinations for consumers.[13]

Thus, D.C. courts have found claims precisely like this to be plausible. *See supra*, IV (collecting cases). Against the weight of authority from this Court, Rachael Ray Nutrish relies

---

[11] *See also, e.g., Animal Legal Def. Fund v. Hormel Foods Corp.*, No. 2016 CA 004744, 2017 D.C. Super. LEXIS 9, at **6-7 (Sept. 20, 2017) (Kravitz, J.) (in case relating to production of purportedly "natural" meat, holding, "ALDF points to surveys indicating that a majority of consumers believe 'natural' means more than the mere absence of artificial ingredients and that nearly two-thirds of consumers believe 'no nitrates' means no nitrates whatsoever").

[12] *Cf. Donohue v. Apple, Inc.*, 871 F. Supp. 2d 913, 920 (N.D. Cal. 2012) ("While a product defect that causes a safety hazard is certainly more likely to give rise to an actionable injury, neither the [unfair competition law] nor Article III requires a plaintiff to show that his health has been put at risk to get through the courthouse doors. After all, injury for standing purposes is not a question of degree or genre, but of concreteness.").

[13] *See* § 28-3901(b) ("The purposes of this chapter are to: (1) assure that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices; (2) promote, through effective enforcement, fair business practices throughout the community; and (3) educate consumers to demand high standards and seek proper redress of grievances."); *Modern Mgmt. Co. v. Wilson*, 997 A.2d 37, 62 (D.C. App. 2010) ("The purpose of the CPPA is to protect consumers from a broad spectrum of unscrupulous practices by merchants, therefore the statute should be read broadly to assure that the purposes are carried out.").

heavily on a Minnesota court's decision, *In re General Mills Glyphosate Litigation*, No. 16-2869, 2017 U.S. Dist. LEXIS 108469 (D. Minn. July 12, 2017). (*E.g.*, Motion 16 & n.3.) But *In re Gen. Mills* concerned a different situation: the marketing claim "made with 100% natural whole grain oats"—*i.e.*, a single ingredient being called "natural" in a granola bar with many ingredients. The Minnesota court found the statement about a single ingredient insufficient to make consumers believe the entire product to be free of unnatural substances. *See In re Gen. Mills*, 2017 U.S. Dist. LEXIS 108469, at *15. Here, by contrast, Rachael Ray Nutrish markets the ***entire*** Products as "natural," which is a misrepresentation if glyphosate and/or ethoxyquin is found anywhere in them.

### C.    The Allegations of the Complaint Are Complete and Specific.

The Motion section titled "B. Defendants' Representations Are Accurate and Truthful" is a tangle of several interwoven arguments. (MTD 17-20.) Unentwined, each argument fails.

### 1.    Glyphosate and Ethoxyquin Do Not Have to Be Ingredients in Order for the "Natural" Representation to Be Misleading.

Rachael Ray Nutrish contends that a "natural" representation cannot be misleading if a product contains hidden synthetic chemicals, but only if the chemicals are actually ingredients. (MTD 18-19.) This counterintuitive suggestion does find support in a single New York decision, *Axon v. Citrus World, Inc.*, which is now on appeal before the Second Circuit, *see Axon v. Florida's Nat. Growers, Inc.*, No. 19-203 (2d Cir.). But *Axon*, a putative class action brought by an individual under New York law, is directly contravened by CPPA precedent. *See Bigelow Tea Co.*, 2018 D.C. Super. LEXIS 11, at *11 (denying motion to dismiss plaintiff's claim that consumers may be misled by "natural" ingredients containing residue of non-ingredient substance); *General Mills*, 2017 D.C. Super. LEXIS 4, at **24-25 (same). *Axon* also runs contrary to cases nationwide that

recognize no such distinction between unnatural ingredients and other substances,[14] and the *Axon* court was at pains even to distinguish precedent from within its own circuit.[15]

### 2. Rachael Ray Nutrish Is Liable for Its Misrepresentation Regardless of Whether It Intentionally Added Glyphosate and Ethoxyquin.

As an extension of its invalid ingredients/contaminants distinction, Rachael Ray Nutrish argues that it cannot be liable for misleading consumers about the Products being "natural" and containing "no . . . artificial preservatives" unless it intentionally added glyphosate and ethoxyquin. (MTD 17.) Rachael Ray Nutrish's argument contravenes the plain language of the CPPA, which makes it an unlawful trade practice to represent that goods, *inter alia*, have "characteristics" that they do not have or are of a "particular standard [or] quality" if they are not—*without* reference to intent or how the characteristics, standard, or quality came to be. *See* D.C. Code § 28-3904(a), (d). Toxin Free USA is aware of no precedent that would add a requirement that the characteristics have been intentionally altered, and doing so would be improper.[16] Second, even if Rachael Ray

---

[14] *See, e.g., Friends of the Earth v. Sanderson Farms, Inc.*, No. 17-cv-03592, 2018 U.S. Dist. LEXIS 220547, at *9 (N.D. Cal. Dec. 3, 2018) (holding that reasonable consumer may believe that "100% Natural" and "no additives or artificial ingredients" could also mean no synthetic pharmaceuticals are used in entire production process); *Tran*, 2018 U.S. Dist. LEXIS 146380, at **14-15 (C.D. Cal. Aug. 20, 2018) (holding that reasonable consumer "may interpret '100% Pure' to mean that the final product does not contain any substance (even in trace amounts) that is not essential to the honey, particularly synthetic substances such as glyphosate"); *Reilly v. Chipotle Mexican Grill, Inc.*, No. 15-Civ-23425, 2016 U.S. Dist. LEXIS 193452, at *12 (S.D. Fla. Apr. 20, 2016) (denying motion to dismiss plaintiff's claims that animals fed genetically modified crops were not "non-GMO" as advertised). *Cf. In re Herbal Supplements Mktg. & Sales Practices Litig.*, No. 15-cv-5070, 2017 U.S. Dist. LEXIS 76207, at *17 (N.D. Ill. May 19, 2017) (allowing claims to proceed based on supplements that allegedly "do not contain what is listed on their labels" but instead "are packed with cheaper 'filler' ingredients, or contain substances not identified on the bottles"); *Gubala v. CVS Pharm., Inc.*, No. 14 C 9039, 2016 U.S. Dist. LEXIS 32759, at **44-47 (N.D. Ill. Mar. 15, 2016) (allowing claims to proceed based on chemicals not included in ingredients list).

[15] Contrary decisions that the *Axon* court attempted to distinguish included *Petrosino v. Stearns's Prods.*, No. 16-CV-7735 (NSR), 2018 U.S. Dist. LEXIS 55818 (S.D.N.Y. Mar. 30, 2018); *Buonasera v. Honest Co.*, 208 F. Supp. 3d 555 (S.D.N.Y. 2016) (Marrero, J.); *Silva v. Smucker Nat. Foods, Inc.*, No. 14-CV-6154, 2015 U.S. Dist. LEXIS 122186 (E.D.N.Y. Sept. 14, 2015)).

[16] *See, e.g., Mass. Lobstermen's Ass'n v. Ross*, 349 F. Supp. 3d 48, 63 (D.D.C. 2018) (quoting *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015): "The problem with this approach is the one that inheres in most incorrect interpretations of statutes: It asks us to add words to the law to produce what is thought to be a desirable result."); *Banks v. Eastern Sav. Bank*, 8 A.3d 1239, 1244 (D.C. App. 2010) ("When interpreting a statute, its words 'should be construed according to their ordinary sense and with the meaning commonly attributed to them.' *Davis v. United States*, 397 A.2d 951, 956 (D.C. 1979).").

Nutrish were correct, and intentionality could be read into the statute, this could not be decided on a motion to dismiss. The Complaint alleges:

> 59.    Rachael Ray Nutrish knew what representations it made on the labels of the Products. Rachael Ray Nutrish also knew how the pet food was sourced and processed, and therefore knew or should have known that the pet food contains residues of glyphosate, an unnatural biocide, and ethoxyquin, and artificial preservative.
>
> 60.    Rachael Ray Nutrish thus knew, or should have known, the facts demonstrating that the Products were mislabeled and falsely advertised.

(Compl. ¶¶ 59-60.) Toxin Free USA has not yet had the opportunity to take any discovery in this case, and therefore would not have had the opportunity to find out how the residues end up in the Products even if that information were material. Dismissal under such circumstances is not appropriate. *See, e.g., Portuguese Am. Leadership Council of the United States, Inc. v. Investors' Alert, Inc.*, 956 A.2d 671, 682 (D.C. App. 2008) (reversing dismissal in absence of discovery on "precise role that these defendants played in the overall advertisement operation").

### 3.    Challenges to the Testing Alleged in the Complaint Are a Matter for Discovery, Not for a Motion to Dismiss.

The Complaint alleges that on February 22, 2019, Toxin Free USA purchased Rachael Ray Nutrish "Real Chicken & Brown Rice Recipe" Super Premium Food for Cats and "Real Beef, Pea & Brown Rice Recipe" Super Premium Food for Dogs in order to evaluate their qualities (Compl. ¶ 19), and that quantitative testing reveals that these Products contain glyphosate (*id.* ¶ 39) and ethoxyquin (*id.* ¶ 44). And although it is not necessary to stating the CPPA claim—which rests upon the presence of residues, not their amount, *see supra* Section III.B—the Complaint also provides the precise amount of each substance found in the two Products, *i.e.*, 175 and 417 ppb glyphosate and 16 and 352 ppb ethoxyquin. (Compl. ¶ 55.) Nevertheless, Rachael Ray Nutrish argues that it cannot defend the allegations of the Complaint because it lacks a detailed description of the methodology by which the Products were tested. (MTD 19 ("Defendants have no idea how

they are supposed to defend themselves or how they should have known that these levels would

be found through whatever methods used by this unexplained "'quantitative testing'.".) Rachael

Ray Nutrish cites general standards for pleading requirements, such as *Ashcroft v. Iqbal*, 556 U.S.

662 (2009) (*id.* 19-20), and then without further explanation argues that Toxin Free USA's detailed

Complaint fails to "tender more than 'naked assertion[s] devoid of further factual enhancement'."

(*Id.* (quoting *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 709 (D.C.

App. 2013)).) That is absurd. Rachael Ray Nutrish makes no attempt to explain why it would

matter to answering the Complaint whether the testing was done via liquid chromatography mass

spectrometry (LCMS) testing or with the enzyme-linked immunobsorbent assay (ELISA) method.

Moreover, even if the Complaint did lack specificity, the proper remedy would be a request for a

more definite statement, which Rachael Ray Nutrish has not made. *See, e.g.*, *Emerine v. Yancey*,

680 A.2d 1380, 1384 (D.C. App. 1996) ("The usual means of remedying a complaint that is so

vague that it does not admit of a response is to file a motion for a more definite statement.").

> **D.    Rachael Ray Nutrish's Remaining Arguments Are Distractors and Not
> Germane to Toxin Free USA's Claim.**

> **1.    Rachael Ray Nutrish's Misrepresentations Are About Whether the
> Products Are Natural—Not Whether They Are Safe.**

Rachael Ray Nutrish argues that it cannot be deceptive to make "natural" or

"no . . . artificial preservatives" claims if the amount of synthetic chemicals in the Products does

not render them "harmful." (MTD 15.) Rachael Ray Nutrish seizes upon a single statement in the

Complaint: "Plaintiff vaguely suggests that consumers might be concerned about the supposed

'*potential* detrimental health effects' of glyphosate and ethoxyquin." (*Id.* 16. (emphasis in

original)) There is a difference between (1) describing why consumers value natural products, and

(2) stating a claim based on health harms from a product.[17] Toxin Free USA is plainly describing why consumers value natural products, *i.e.*, why they pay more for such products.

### 2. Rachael Ray Nutrish's Misrepresentations Are About Whether the Products Are Natural—Not Whether They Meet Federal Pesticide Tolerance Levels.

Rachael Ray Nutrish next argues that it cannot be deceptive to call the Products "natural" if the amount of synthetic chemicals in the Products falls below federal tolerance levels. (*E.g.*, MTD 15.)  This misunderstands Toxin Free USA's claims. At no point does the Complaint suggest that Rachael Ray Nutrish is not permitted to source ingredients tainted with glyphosate or ethoxyquin residue (*e.g.*, Am. Compl. ¶ 10)—just that it cannot also call them "natural." The FDA itself has determined that the term "natural" can be misleading[18]; Toxin Free USA cites surveys demonstrating that consumers understand the term to mean, *inter alia*, that unnatural pesticides were not involved in the production process (*e.g.*, Am. Compl. ¶¶ 38-40). If by "natural," Rachael Ray Nutrish means only that the Products meet contamination tolerance levels required of ***all*** foods, then its pet food is no more "natural" than any other on the market, and Rachael Ray Nutrish is misleading consumers by suggesting otherwise.[19]

---

[17] If this were a case about the safety of glyphosate, Toxin Free USA would have cited the growing body of science demonstrating that glyphosate is bio-accumulative and therefore harmful even in residual amounts, *see, e.g.*, Dechartres, J., et al., *Glyphosate and glyphosate-based herbicide exposure during the peripartum period affects maternal brain plasticity, maternal behaviour and microbiome*, Journal of Neuroendocrinology (Jan. 9, 2019) (establishing significant alteration in gut microbiota following exposure to glyphosate at residual levels), or the several recent high-profile verdicts in favor of plaintiffs who allege that glyphosate exposure caused their non-Hodgkin's lymphoma, *see, e.g.*, *In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 957 (N.D. Cal. 2019); *In re Roundup Prods. Liab. Litig.*, No. 16-md-02741, 2018 U.S. Dist. LEXIS 114760, at *184 (N.D. Cal. July 10, 2018).

[18] *See* Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms, 56 Fed. Reg. 60421-01, 60466 (Nov. 27, 1991) ("The meaning and use of the term 'natural' on the label are of considerable interest to consumers and industry. Data suggest that uses of 'natural' claims are confusing and misleading to consumers and frequently breach the public's legitimate expectations about their meaning.").

[19] *See, e.g.*, *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 638 (6th Cir. 2010) (finding that statements regarding lack of substances prohibited by regulation "would be inherently misleading because they falsely imply that conventional" competing products contain those substances); *In re: Simply Orange Orange Juice Mktg. & Sales Practices Litig.*, MDL No. 2361, 2013 U.S. Dist. LEXIS 28080, at **8-10 (W.D. Mo. Mar. 1, 2013) (rejecting argument that orange juice products processed with orange oil, orange essence, and other volatile and chemically engineered compounds could be labeled "natural" so long as they complied with applicable regulations).

Rachael Ray Nutrish also argues that because *Consumer Perceptions of Healthy and Natural Food Labels* found "nuanced" and sometimes "inconsistent" consumer interpretations of the term "natural," it must be "more plausible that consumers will make purchasing decisions based on Defendants' compliance with federal laws and regulations." (MTD 17 (citing Compl. ¶ 29 n.2).) This argument does not favor dismissal here, for at least three reasons:

- **First,** Rachael Ray Nutrish contends apparently that the consumer who sees a "natural" representation must be thinking about the Code of Federal Regulations, Title 40, Chapter I, Subchapter E, Part 180 ("Tolerances and Exemptions for Pesticide Chemical Residues in Food").[20] Rachael Ray Nutrish cites no authority suggesting that a reasonable consumer, in the grocery or pet-store aisle, is not only aware of federal pesticide residue allowances, but also actively considering those allowances when making a purchasing decision.

- **Second**, Rachael Ray Nutrish, by its argument, admits that "natural" is a term open to consumer interpretation, including the interpretation that Toxin Free USA suggests, which precludes dismissal on the pleadings. (MTD 17.) Where a representation is open to interpretation, survey evidence is taken during discovery to understand how a reasonable consumer is likely to understand the representation.[21]

- **Third**, a dismissal on the pleadings does not rest upon which assumption is "***more*** plausible," as Rachael Ray Nutrish argues. Determining what is ***more*** plausible is the purpose of evidence and fact-finding. The standard at this stage of proceedings is simply that confusion ***is*** plausible among reasonable consumers, not that it is "more" plausible.

### 3. Rachael Ray Nutrish's Misrepresentations Are About Whether the Products Are Natural—Not Whether They Are Organic.

Rachael Ray Nutrish argues that, if the Products contain less synthetic chemical residue than might be permitted in an organic pet food, it is permissible to label them "natural." The

---

[20] It is unclear from the Motion whether Rachael Ray Nutrish is also referring to the Code of Federal Regulations, Title 7, Chapter I, Subchapter M, Part 205 ("National Organic Program"). *See infra*, Part IV.D.3. In any event, the very study about which Rachael Ray Nutrish is arguing finds "a lack of knowledge about organic production practices" among consumers (MTD 17 (quoting Jayson L. Lusk, *Consumer Perceptions of Healthy and Natural Food Labels* (Jan. 15, 2019), at 29.) A generalized "lack of knowledge" hardly supports the assertion that "consumers will make purchasing decisions based on Defendants' compliance with federal laws and regulations." (MTD 17.)

[21] *See, e.g., Hughes v. Ester C Co.*, 330 F. Supp. 3d 862, 872 (E.D.N.Y. 2018) ("To satisfy the reasonable consumer standard, a plaintiff must adduce extrinsic evidence—ordinarily in the form of a survey—to show how reasonable consumers interpret the challenged claims."); *Ward One Democrats, Inc. v. Woodland*, 898 A.2d 356, 364 (D.C. App. 2006) (in trademark case premised on consumer confusion, holding, "Proof of a secondary meaning requires direct or circumstantial evidence that the public's primary association is not with the product but with its producer or source. Direct evidence may include consumer testimony or scientific surveys of actual consumers").

argument that "organic" *per se* creates a higher standard has been rejected in the context of "natural" representations. *See Ault*, 2014 U.S. Dist. LEXIS 67118, at *3, **18-19 (denying J.M. Smucker Co.'s motion to dismiss "natural" label claims because consumer can be misled by term "natural," even if product meets definition of "organic"); *see also, e.g., Tran*, 2018 U.S. Dist. LEXIS 146380 at *17; *Segedie v. Hain Celestial Grp., Inc.*, No. 14-CV-5029, 2015 U.S. Dist. LEXIS 60739, at **25-27 (S.D.N.Y. May 7, 2015); *Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1194 (N.D. Cal. 2014).[22] Moreover, at no point does Rachael Ray Nutrish argue that its pet food actually *is* organic or could be labeled as such, so even if consumers were to confuse the standards, the "natural" label would be misleading. In truth, organic standards do allow for some unnatural substances. *See* 7 C.F.R. § 205.605(b) (enumerating synthetic substances permitted in organic foods). "Natural" is different from "organic"; if a "natural" product allowed for unnatural substances, what exactly would the word mean?

## Conclusion

For all the foregoing reasons, Plaintiff Toxin Free USA asks the Court to deny Defendants' Motion to Dismiss. In the event the Court is inclined to grant any portion of the Motion to Dismiss, Plaintiff requests leave to amend the Complaint.

---

[22] To support its position, Rachael Ray Nutrish returns again to the Minnesota decision *In re Gen. Mills*, (MTD 16 (citing *In re Gen. Mills*, 2017 U.S. Dist. LEXIS 108469, at *18), 17 (same)), *see supra*, as well as on a California case, *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 973, 979 (C.D. Cal. 2013) (MTD 17). In the *Pelayo* case, the plaintiff alleged that Buitoni Pastas were falsely labeled "All Natural" because they contained the ingredients xanthan gum and soy lecithin. *See id.* at 975-76. The plaintiff, however, was not able to describe what "All Natural" meant, or why the ingredients did not meet that standard. It was then the *plaintiff* who attempted to rely on federal organic standards, apparently lacking any other way to define "All Natural." Toxin Free USA has provided a definition of "natural" (including the absence of unnatural biocides artificial preservatives, *see, e.g.*, Compl. ¶ 5) and the reason why the Products do not meet that definition (because they contain glyphosate and ethoxyquin residues, *see, e.g., id.* ¶ 4).

DATED: September 25, 2019

Respectfully submitted.

**RICHMAN LAW GROUP**

_____

Kim E. Richman
krichman@richmanlawgroup.com
8 West 126th Street
New York, New York 10027
Telephone: (718) 878-4707
Facsimile: (212) 687-8292

_Attorney for Plaintiff_

Filed
D.C. Superior Court
10/09/2019 15:41PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**TOXIN FREE USA,**

       Plaintiff,

    v.

**THE J. M. SMUCKER COMPANY** and
**AINSWORTH PET NUTRITION, LLC,**

       Defendants.

Case No. 2019 CA 003192 B

HON. FLORENCE Y. PAN

## REPLY IN SUPPORT OF DEFENDANTS
## THE J. M. SMUCKER COMPANY AND
## AINSWORTH PET NUTRITION, LLC'S
## <u>MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>

Ronald Y. Rothstein
(D.C. Bar No. 451950)
Sean H. Suber
*(Pro Hac Vice Forthcoming)*
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
RRothste@winston.com
SSuber@winston.com

*Counsel for Defendants*
*The J. M. Smucker Company and Ainsworth Pet Nutrition, LLC*

## TABLE OF CONTENTS

**ARGUMENT** ...........................................................................................................................**1**

   I.    Plaintiff lacks standing. ..............................................................................................1

   II.   The primary jurisdiction doctrine should apply. ........................................................5

**CONCLUSION** ......................................................................................................................**5**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beyond Pesticides v. Dr Pepper Snapple Grp., Inc.*,
2019 WL 2744685 (D.D.C. July 1, 2019)........................................................................3, 5

*D.C. Appleseed Center for Law and Justice, Inc. v. District of Columbia
Department of Insurance, Securities, and Banking*,
54 A.3d 1188 (D.C. 2012) ................................................................................................4

*D.C. v. Walters*,
319 A.2d 332 (D.C. 1974) ...............................................................................................4

*Equal Rights Ctr. v. Properties Int'l*,
110 A.3d 599 (D.C. 2015) .............................................................................................2, 4

*Grayson v. AT&T Corp.*,
15 A.3d 219 (2011) .......................................................................................................1, 2

*Hancock v. Urban Outfitters*,
830 F.3d 511 (D.C. Cir. 2016) .........................................................................................4

*Little v. SunTrust Bank*,
204 A.3d 1272 (D.C. 2019)...........................................................................................3, 4

*M. A. P. v. Ryan*,
285 A.2d 310 (D.C. 1971) ...............................................................................................4

*Mann v. Bahi*,
251 F. Supp. 3d 112 (D.D.C. 2017)..................................................................................3

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016)......................................................................................................3

*Tolson v. The Hartford Fin. Services Grp., Inc.*,
278 F. Supp. 3d 27 (D.D.C. 2017)....................................................................................4

*Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*,
259 F.2d 921 (D.C. Cir. 1958) .........................................................................................4

**Statutes**

D.C. Code Ann. § 11-721(d)...............................................................................................2

D.C. Code Ann. § 28-3905(k)........................................................................................1, 2, 3

## ARGUMENT[1]

### I.    Plaintiff lacks standing.

Plaintiff's Opposition is wrong in every way when it comes to standing. Plaintiff says it "relies on broad [sic] the organizational standing provisions that were 'expanded' specifically in response to the *Grayson* decision." Opp'n at 5. But even after the 2012 Amendments to the CPPA, there is nothing in §§ 28-3905(k)(1)(C) or (D) that gives Plaintiff the right to bring this case.

Plaintiff starts with § 28-3905(k)(1)(D) so Defendants will start there as well. The plain language of this provision states that a public interest organization may sue on behalf of a specific "consumer" or "class of consumers" (noticeably, ***not*** the general public) if, and only if, the specific consumer or class could bring an action on their own behalf:

> Subject to sub-subparagraph (ii) of this subparagraph, a public interest organization may, ***on behalf of the interests of a consumer or a class of consumers***, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District ***if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice.***

D.C. Code Ann. § 28-3905(k)(1)(D)(i) (emphases added);[2] *see also* Compl., ¶ 90.

Given the plain language of § 28-3905(k)(1)(D)(i), and the requirement that Plaintiff sue on behalf of a "consumer" or "class of consumers," Plaintiff's Complaint is inadequately pleaded because the Complaint says Plaintiff is only suing "[o]n behalf of itself and the general public"— not on behalf of others similarly situated. *See* Compl. at 1; *see also id.*, ¶ 9 (explaining that it "brings this deceptive advertising case on behalf of itself and the general public"); *id.*, ¶ 72.

---

[1] Out of respect for this Court's five-page limit for Reply briefs, this Reply will focus only on the arguments about standing and primary jurisdiction because resolving these arguments can render Defendants' remaining arguments moot. That said, Defendants reaffirm and reassert each of their other arguments as if fully set forth herein.

[2] Subparagraph A says that a "consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District." D.C. Code Ann. § 28-3905(k)(1)(A).

Cases under § 28-3905(k)(1)(D) were not meant to be brought by public interest organizations with no nexus to a specific consumer or class. Even the legislative history Plaintiff relies upon says that "Subparagraph (D) is not without important limits" and that a case "shall be dismissed if the court determines the public interest organization does not have sufficient nexus to the interests involved ***of the consumer or class***." Ex. A, Council of the District of Columbia, Committee Report on Bill 19-0581 (Nov. 28, 2012), at 6 (emphasis added). Indeed, the requirements of § 28-3905(k)(1)(D), which call for a claim on behalf of a "consumer or a class of consumers," are distinct from the requirements of § 28-3905(k)(1)(C), which call for claims on behalf of the "general public." *See also* Ex. A, Committee Report, Report from District of Columbia Bar (Oct. 11, 2012), at 2 ("We understand the two provisions are disjunctive and not conjunctive").

Thus, given Plaintiff's failure to plead a claim on behalf of a consumer or a class of consumers, Plaintiff cannot proceed under § 28-3905(k)(1)(D).[3] *See Equal Rights Ctr. v. Properties Int'l*, 110 A.3d 599, 604 (D.C. 2015) ("[A]n organization's mere interest in a problem or its opposition to an unlawful practice is not sufficient to demonstrate injury in fact, nor is a simple setback to an organization's abstract social interests.") (citations omitted).

---

[3] Indeed, though Plaintiff says the 2012 Amendments "expanded" standing, the DC Attorney General explained that this is not really the case "because a public interest organization need not bring a suit on its own behalf in order to advocate on behalf of the general public." Ex. A, Committee Report, Statement from the Office of the Attorney General for the District of Columbia (Oct. 11, 2012), at 9. "Instead," the AG's Office explained, "the organization can offer pro bono legal representation to a member of the general public who is injured-in-fact and therefore meets the normal standing requirement." *Id.* Following this approach is far more prudent than Plaintiff's misguided approach, which the AG's Office noted "would compel the Court of Appeals to confront the issue of whether to (1) follow the law and depart from the so-called 'constitutional standing requirement,' or (2) adhere to the standing requirement and strike down [§ 28-3905(k)(1)(D)]." *Id.* Thus, if this Court is inclined to find that Plaintiff has standing, Defendants reserve the right to challenge the constitutionality of § 28-3905(k) and would request that this Court note that this case involves a controlling question of law over which there is substantial ground for a difference of opinion. *See* D.C. Code Ann. § 11-721(d). After all, as the AG's Office explained, adopting Plaintiff's approach calls for "litigation over whether the D.C. courts should alter their usual standing requirements," given that "the Court of Appeals stated: 'Regardless of the words used in different cases to articulate our standing requirement … we have said since the creation of the current District of Columbia court system that we will follow the federal constitutional standing requirement.'" Ex. A, AG Statement at 8 (quoting *Grayson v. AT&T Corp.*, 15 A.3d 219, 235 (2011)).

Plaintiff is also wrong about § 28-3905(k)(1)(C), which Judge LAMBERTH correctly explained when noting that Plaintiff's counsel "misreads § 28-3905" because the provision "only allows an organization to sue on the public's behalf if it also alleges an injury to itself or to its members." *Beyond Pesticides v. Dr Pepper Snapple Grp., Inc.*, 2019 WL 2744685, at *2 n.1 (D.D.C. July 1, 2019) (citing D.C. Code Ann. § 28-3905(k)(1)(C)).

Recognizing that it needs to allege a harm, Plaintiff claims that it has standing because it says that "[t]hrough its codification of 'tester' standing, the D.C. Council explicitly overrode precedent regarding 'manufactured standing' or 'self-inflicted harm' that might otherwise preclude the purchase of a product for testing as a basis for injury-in-fact." Opp'n at 7. But this is incorrect. Just this March, the Court of Appeals reiterated that plaintiffs must "alleg[e] a[] particularized or concrete injury in fact or 'risk of real harm,' flowing from any alleged misrepresentations made by [a defendant]." *Little v. SunTrust Bank*, 204 A.3d 1272, 1275 (D.C. 2019) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)). Even when the CPPA says there can be a violation "whether or not any consumer is in fact misled, deceived, or damaged," the Court of Appeals clarified that plaintiffs must still "alleg[e] an injury that is concrete and particularized," and "establish that the injury in fact is 'fairly traceable to the challenged conduct of the defendant' and 'likely to be redressed by a favorable decision'" because "'a plaintiff [does not] automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory rights and purports to authorize that person to sue to vindicate that right.'" *Id.* at 1274 (quoting *Spokeo*, 136 S. Ct. at 1543, 1548–50). And contrary to Plaintiff's claims, the Court specifically explained that "[t]hese requirements have been applied to claims under the CPPA." *Id.* (footnote omitted).[4]

---

[4] Indeed, while Plaintiff says Defendants rely on "inapposite federal precedent," it is beyond telling that even the Court of Appeals cited many federal cases to advance principles that show Plaintiff lacks standing. *See, e.g., Little*, 204 A.3d at 1274 n.3 (quoting *Mann v. Bahi*, 251 F. Supp. 3d 112, 119 (D.D.C. 2017), for its proposition that "'Although it might violate the CPPA to present misleading information even if no one was misled, a private plaintiff

3

The legislative history does not help Plaintiff either. Far from it, the legislative history looks to *D.C. Appleseed Center for Law and Justice, Inc. v. District of Columbia Department of Insurance, Securities, and Banking*, 54 A.3d 1188 (D.C. 2012), and notes that the history is "intended to clarify that the CPPA allows for non-profit organizational standing to the fullest extent recognized by the D.C. Court of Appeals in its past and future decisions addressing the limits of constitutional standing under Article III." Ex. A, Committee Report at 5. And this history clarifies that organizations must still "'satisf[y] the constitutional requirements and prudential prerequisites of traditional standing analysis.'" *D.C. Appleseed Ctr.*, 54 A.3d at 1205–06 (footnote omitted).

The required prudential considerations from all D.C. Court of Appeals cases require that this Court "follow[] the principles of standing … to promote sound judicial economy" because "an adversary system can best adjudicate real, not abstract, conflicts." *D.C. v. Walters*, 319 A.2d 332, 338 n.13 (D.C. 1974). And the Court of Appeals has recognized that a conflict is "abstract" when there is (what later Court of Appeals cases have described as) manufactured, self-inflicted harm. *See Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 927 (D.C. Cir. 1958) ("[I]t is neither the petitioner's nor the court's place to protect [a party] from hypothetical, self-inflicted losses.").[5] Indeed, in 2015, the Court specifically "acknowledged … important limitations on the scope of standing" with CPPA claims, one of which "prohibits an organization from" doing what Plaintiff is trying to do here: "manufactur[ing] the injury necessary to maintain a suit from its expenditure of resources on that very suit." *Equal Rights Ctr.*, 110 A.3d at 604 n.3 (citations and some quotation marks omitted). Plaintiff's claim is meritless.

---

cannot bring a suit to enforce that claim unless he or she has suffered an injury in fact.'"); *id.* (quoting *Tolson v. The Hartford Fin. Services Grp., Inc.*, 278 F. Supp. 3d 27, 37 (D.D.C. 2017), for its proposition that "'a plaintiff must allege that she suffered some threatened or actual injury resulting from … putatively illegal action to maintain a CPPA claim in a D.C. court'"); *id.* (quoting *Hancock v. Urban Outfitters*, 830 F.3d 511, 514 (D.C. Cir. 2016) for "remanding to dismiss a CPPA complaint where plaintiffs failed to allege any cognizable injury; 'an asserted injury to even a statutorily conferred right must actually exist'").

[5] D.C. Circuit decisions before 1971 are binding. *See M. A. P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).

In the end, Judge LAMBERTH was correct when he explained that by alleging it bought Defendants' products, Plaintiff "never alleges it relied on the challenged labels" and "admits it purchased the products only 'to evaluate their purported qualities as a product,'" which is insufficient because courts in the District "'do not recognize' that 'self-inflicted harm' [i]s an injury in fact." *Beyond Pesticides*, 2019 WL 2744685, at * 1. On this basis, this case should be dismissed.

## II.    The primary jurisdiction doctrine should apply.

Even if this Court does find that Plaintiff has standing, this case should be dismissed under the primary jurisdiction doctrine to at least await FDA guidance on the term "natural."

Contrary to what Plaintiff says, *see* Opp'n at 4, the FDA is pursuing this issue. In fact, less than a year ago, the FDA wrote a letter informing Congress that the FDA's proceedings to define the word "natural" on food labeling remain open and active; that the "FDA recognizes this is an important matter for consumers and the food industry"; and that the FDA is "actively working on this issue, and in 2019, the FDA plans to publicly communicate next steps regarding Agency policies related to 'natural.'" Ex. B., 12/19/18 FDA Letter to Congress. This should not be ignored. This Court would gain significant insight into judging the plausibility of Plaintiff's claim given the FDA's forthcoming guidance on the definition of "natural." The Court would be well served by awaiting the feedback from the FDA, which has explained that it has "received and reviewed more than 7,600 comments" on this issue; it "recognizes that there are widespread differences in beliefs regarding what criteria should apply for products termed 'natural'"; and that it is formulating a definition so that "the 'natural' claim must be true and based on science." *Id.*

## CONCLUSION

For these reasons, this Court should dismiss the Complaint in its entirety and with prejudice or, in the alternative, dismiss these proceedings on primary jurisdiction grounds.

Dated: October 9, 2019           Respectfully submitted,

**The J. M. Smucker Company and
Ainsworth Pet Nutrition, LLC**

By:  /s/ Ronald Y. Rothstein
       Ronald Y. Rothstein (D.C. Bar. No. 451950)
       Sean H. Suber *(Pro Hac Vice Forthcoming)*
       **WINSTON & STRAWN LLP**
       35 West Wacker Drive
       Chicago, Illinois 60601
       (312) 558-5600
       RRothste@winston.com
       SSuber@winston.com

       *Counsel for Defendants*
       *The J. M. Smucker Company and*
       *Ainsworth Pet Nutrition, LLP*

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

|  |  |
|---|---|
| **TOXIN FREE USA,** | |
| Plaintiff, | |
| v. | Case No. 2019 CA 003192 B |
| **THE J. M. SMUCKER COMPANY** and **AINSWORTH PET NUTRITION, LLC,** | HON. FLORENCE Y. PAN |
| Defendants. | |

## CERTIFICATE OF SERVICE

On October 9, 2019, the undersigned certifies that a true and correct copy of The J. M. Smucker Company and Ainsworth Pet Nutrition, LLC's Reply in Support of the Motion to Dismiss and the corresponding exhibits were electronically served via the CaseFileXpress system on:

Kim E. Richman
Richman Law Group
8 West 126th Street
New York, NY 10027
Phone: (718) 878-4707
Fax: (212) 687-8292
E-mail: krichman@richmanlawgroup.com

*Counsel for Plaintiff Toxin Free USA*

By:  _/s/ Ronald Y. Rothstein_____
    Ronald Y. Rothstein (D.C. Bar No. 451950)
    **WINSTON & STRAWN LLP**
    35 West Wacker Drive
    Chicago, Illinois 60601
    (312) 558-5600
    RRothste@winston.com

    *Counsel for Defendants*
    *The J. M. Smucker Company and*
    *Ainsworth Pet Nutrition, LLC*

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

TOXIN FREE USA,

            Plaintiff,

    v.

THE J. M. SMUCKER COMPANY and
AINSWORTH PET NUTRITION, LLC,

            Defendants.

Case No. 2019 CA 003192 B

HON. FLORENCE Y. PAN

## INDEX OF EXHIBITS TO REPLY IN SUPPORT OF DEFENDANTS THE J. M. SMUCKER COMPANY AND AINSWORTH PET NUTRITION, LLC'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

**Exhibit A**      Councilmember Yvette M. Alexander, Council of the District of Columbia, Committee on Public Services and Consumer Affairs, Committee Report on Bill 19-0581, the "Consumer Protection Amendment Act of 2012" (Nov. 28, 2012)

**Exhibit B**      Letter from Scott Gottlieb, M.D., Commissioner of Food and Drugs at the United States Food and Drug Administration, to Representative David Valadao, Member of the United States House of Representatives from California's 21st District (Dec. 19, 2018)

# EXHIBIT A

**COUNCIL OF THE DISTRICT OF COLUMBIA**
**COMMITTEE ON PUBLIC SERVICES AND CONSUMER AFFAIRS**
**COMMITTEE REPORT**
**1350 Pennsylvania Avenue, NW, 20004**

**TO:**      All Councilmembers

**FROM:**   Councilmember Yvette M. Alexander, Chairperson, Committee on Public
            Services and Consumer Affairs

**DATE:**    November 28, 2012

**SUBJECT:**  Report on Bill 19-0581, the "Consumer Protection Amendment Act of 2012"

The Committee on Public Services and Consumer Affairs to which Bill 19-0584, the "Consumer Protection Amendment Act of 2012" was referred, reports favorably thereon and recommends its adoption by the Council.

CONTENTS

|       |                                      |     |
|-------|--------------------------------------|-----|
| I.    | Background and Committee Reasoning    | 1   |
| II.   | Legislative Chronology                | 8   |
| III.  | Summary of Testimony                  | 8   |
| IV.   | Fiscal Impact                         | 8   |
| V.    | Section-by-Section Analysis           | 8   |
| VI.   | Impact on Existing Law                | 9   |
| VII.  | Committee Action                      | 9   |
| VIII. | Attachments                           | 9   |

## I.    BACKGROUND & COMMITTEE REASONING

The stated purpose of Bill 19-0581, the "Consumer Protection Amendment Act of 2012," is to amend Title 28 of the District of Columbia Code to revise the definition of consumer; to prohibit the willful use of falsehood, innuendo, or ambiguity; to prohibit representing that a transaction confers rights that it does not; to provide explicit new authorization for non-profit organizations and public interest organizations to bring suit under the District's consumer protection statute; to recognize a right of action for consumers that purchase products for the purpose of testing and evaluating those products; and to establish a unit pricing requirement for consumer commodities.

In 2000, the Council amended the Consumer Protection Procedures Act (CPPA) to allow non-profit public interest organizations and the private bar to bring litigation in the public interest. In an effort to provide a more robust consumer protection enforcement structure, the 2000 amendments permitted persons (including non-profit organizations and other entities) to sue "on behalf of themselves or the general public" when the act had been violated. *See* D.C.

Code § 28-3905 *et seq.* Accordingly, in years past, both public interest organizations and the private bar have acted as "private attorneys general" in the District of Columbia by suing on behalf of members of the general public that would have been injured by a given unlawful trade practice, and have obtained great relief for District of Columbia citizens.[1]

However, in 2011, the Court of Appeals rendered a decision in *Grayson v. AT & T Corp,* 15 A.3d 319 (D.C. 2011) (*en banc*) that limited standing to persons that had suffered an actual injury, or an "injury-in-fact." The court stated that it had followed the injury-in-fact standing requirement applied by the Supreme Court under Article III of the Constitution as a prudential matter even though the District of Columbia courts are not subject to Article III—and the Court of Appeals was unwilling to determine that the CPPA overrode these requirements in the absence of an explicit indication of intent to do so by the Council of the District of Columbia. While *Grayson* did not discuss litigation brought by non-profit public interest organizations, the decision had a chilling effect on non-profit public interest organizations litigating cases in the public interest.[2]

Bill 19-581 clarifies that non-profit organizations and public interest organizations may act as private attorneys general for the public under circumstances that ensure the organization has a sufficient stake of its own to pursue the case with appropriate zeal. Those clarifications provide the courts with a variety of ways to consider standing options that satisfy the prudential standing principles for non-profit and public interest organizations acting as private attorneys general, while encouraging the courts to be receptive to other approaches that rely on different means of ensuring a sufficient stake in the outcome of the case.

Questions raised by public interest advocates[3] and other judicial decisions have also demonstrated the need for additional clarifying amendments in B19-581 pertaining to the types of violations that are actionable under the act, each of which is discussed below.

Lastly, Bill 19-581 introduces a new Unit Pricing requirement for the District of Columbia retailers that will make it easier for consumers to compare prices of goods by basing the cost of the goods on a unit of measure. The Unit Pricing scheme was derived from a model act drafted by the National Institute of Standards and Technology, which many industry trade associations had a part in creating. The model act has been adopted by nineteen states, including Maryland.

### A. *Section 28-3901 – Definitions and Purposes*

The bill makes a number of revisions and additions to the definitions in section 28-3901(a).

---

[1] For example, the National Consumers League, a consumer organization founded in 1899, brought suit on behalf of the general public against Kellogg Company for making false health claims on its cereal boxes. *See, e.g., Nat'l Consumers League v. Kellogg Co.,* No. 2009 CA005211 B (D.C. Super. Ct.). As a result of that litigation, Kellogg agreed to donate $200,000 to food-based charities and programs and 8,000 cases of cereal to local D.C. food banks and charities.

[2] *See generally* Attachment 3, Testimony from October 11, 2012 Hearing on B19-0581, the "Consumer Protection Procedures Act of 2012."

[3] *Id.*

Section 28-3901(a)(2) is revised to make a number of clarifications to the definition of "consumer." First, it clarifies the distinctions between the noun and adjective uses of the term. Second, in conjunction with revisions to 28-3905(k)(1) regarding who can bring action, it broadens the definition to include those who purchase or receive for the purpose of testing.

Third, it incorporates key elements of the definition of "consumer" as used in the Magnuson Moss Warranty Act, 15 U.S.C. § 2301(1) (2006), by replacing "primarily" with "normally" and specifying that the acquisition of the good or service cannot be for the purposes of resale. Using "normally" in the adjective definition will remove any necessity to prove what portion of a consumer's use of the good or service is devoted to personal, household, or family purposes, so long as one of those purposes can be shown to be among a consumer's normal uses of the good or service. Adding "other than for purposes of resale" to the noun definition ensures that the other changes to the definition do not inadvertently open up the CPPA to suits regarding business-to-business disputes or to suits against consumers by sellers, lessors, and other suppliers. It should be noted that this restriction is not intended to exclude personal investments (such as securities or collectibles) from the definition, even though they may have been acquired for eventual resale. It is the intention of the Committee that private actions under the CPPA remain confined to those brought by consumers as that term is generally understood, and as refined and expanded here by these amendments.

Section 28-3901(a) is also revised to add definitions of "non-profit organization" and "public interest organization," new terms in section 28-3905(k)(1) that describe who can bring private actions in the circumstances described.

The bill amends section 28-3901(c) to clarify that the CPPA establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia. This is intended to more explicitly illuminate that the kinds of harm actionable under the CPPA include the provision of untruthful or misleading information, whether or not measurable economic damages demonstrably result to any particular consumer. In part, this also responds to standing questions raised in *National Consumers League v. General Mills*, 680 F. Supp. 2d 132, 135 (D.D.C. 2010) and *Equal Rights Center v. Post Properties, Inc.*, 657 F. Supp. 2d 197, 201 (D.D.C. 2009) regarding whether an interest in truthful information is a sufficient stake upon which to base a claim. This change affirms that such an interest is indeed sufficient and codifies language found in *Grayson v. AT&T*, 15 A.3d 219, 249 (D.C. 2011) (en banc) ("The basis for Mr. Grayson's standing and the manifestation of his alleged injury in fact is similar to that in *Havens, supra*. There, the Court determined that § 804(d) of the Fair Housing Act[94] 'established an enforceable right to truthful information concerning the availability of housing,' *id.* at 373, 102 S. Ct. 1114, and thus, plaintiffs were injured in fact and had standing to sue because of 'deprivation of information about housing availability,'), and *Shaw v. Marriott Int'l Inc.*, 605 F.3d 1039, 1042 (2010) ("[t]he deprivation of . . . a statutory right [to be 'free from improper trade practices'] may constitute an injury-in-fact sufficient to establish standing, even though the plaintiff `would have suffered no judicially cognizable injury in the absence of [the] statute.").

**B. _Section 28-3905 – Complaint Procedures_**

The bill revises section 28-3905(k)(1), which provides a private right of action for violations of the CPPA and other consumer protection laws, to provide further clarity in the wake of the D.C. Court of Appeals' decision in _Grayson_. In _Grayson_, the court held that the Council, in its 2000 amendments to the CPPA, had not clearly demonstrated that it had altered the court's jurisprudence regarding the scope of who has standing to bring legal action. The court's prior holdings on standing for the courts of the District of Columbia, established under Article I of the U.S. Constitution, had looked to the standing limits established for federal courts under Article III, specifically the requirement that plaintiffs must have their own injury-in-fact as the basis for bringing action. The DC Court of Appeals held in _Grayson_ that, if the Council had intended to alter these prior holdings, it would have made that intent more explicit in the statute or in the legislative history.

Although _Grayson_ involved suit by individuals, in its wake, uncertainty has arisen regarding whether its holding also applies to suits by non-profit organizations, including those organized and operating to promote the interests of consumers, whom the 2000 amendments to the CPPA were designed to encourage to act as private attorneys general on behalf of those interests.

The bill responds to _Grayson_ by being more explicit about what kinds of suits the Council intends to authorize. The bill would replace the single standing provision, which _Grayson_ interpreted more narrowly with respect to suits by individuals, with four separate, independent standing provisions. Each provision illuminates the differing situations in which consumers or organizations acting on behalf of consumer interests might have standing to sue under the act.

### i. _Consumers_

New subsection (k)(1)(A) provides a right of action for consumers. It is not intended to alter any right a consumer currently has to bring an action, whether individually, jointly with other consumers, as a private attorney general on behalf of the general public, as the representative of a class of consumers, or otherwise.

### ii. _Testers_

New subsection (k)(1)(B) provides a right of action for consumers who act as product or service testers. Such consumers need not actually have been misled by a misrepresentation regarding a consumer good or service to have suffered an injury-in-fact giving rise to an actionable claim. As the amendment to section 3901(c) makes clear, the CPPA establishes an enforceable right to truthful information from merchants in their marketing of consumer goods and services. Subparagraph (B) authorizes these individuals to bring an action on their own behalf, for the good or service they purchased or received for the purpose of testing it without running afoul of a smattering of decisions denying standing based on notions of "self-inflicted harm" or "manufactured standing." They may also bring an action on behalf of themselves and

the general public, so as to better enable them to obtain relief in scope that fully addresses the prohibited practice.

Such "tester standing" has a long and storied history in our nation's civil rights jurisprudence. In *Havens Realty v. Coleman*, 455 US 363 (1982), the Supreme Court upheld the standing of an organization seeking to enforce nondiscrimination laws of Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, 42 U.S.C.§ 3604, when that organization sent "testers" into a housing complex inquiring about rental properties. In affirming the statutory injury of the black tester, the *Havens* court determined that the Fair Housing Act conferred standing to plaintiff via his statutory right to truthful information in the context of housing accommodations. Similarly, the D.C. Court of Appeals has held with regard to a D.C. civil rights statute that "the statutory violation and accompanying injury exist without respect to the testers' intentions in initiating the encounters." *Molovinsky v. Fair Employment Council of Greater Washington, Inc.*, 683 A.2d 142, 146 (D.C. 1996) (analyzing D.C. Human Rights Act).

Like the testers in *Havens* and *Molovinsky*, D.C. consumers must be allowed to offer to purchase, or actually purchase, products or services with the intent of determining whether those products or services are what they claim to be.

### iii. *Non-profit Organizations*

New subsection (k)(1)(C) provides a similar right of action to that in subparagraph (B), for non-profit organizations who test consumer goods or services. As with an individual who tests goods or services, a testing organization that has not actually been misled may nevertheless have standing based on a violation of its right to truthful information about the goods or services it tests. The non-profit organization may sue on behalf of its own interests, or on behalf of the interests of any of its members. And as with subparagraph (B), the non-profit organization may sue on behalf any of the above interests as well as the interests of the general public, to better enable it to obtain the full relief that ends unlawful practices.

But new section (k)(1)(C) goes further than standing for testers. Indeed, it is intended to clarify that the CPPA allows for non-profit organizational standing to the fullest extent recognized by the D.C. Court of Appeals in its past and future decisions addressing the limits of constitutional standing under Article III. *E.g.*, *D.C. Appleseed Center for Law and Justice, Inc. v. District of Columbia Department of Insurance, Securities, and Banking*, 2012 *D.C. App. LEXIS* 473 (D.C. 2012). Such standing may be based on injury to the organization's activities or injury to any of the organization's members. For example, a public interest organization may bring a CPPA action seeking relief against violations that significantly impair its ability to effectively serve consumers. *Cf. Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (standing based on impairment of housing counseling services). Or a membership organization, such as an association of persons of retirement age, may bring a CPPA action seeking relief against violations that harm consumers who are members of the organization. *Cf. Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977) (associational standing on behalf of apple growers).

This section also addresses the decision in *National Consumers League v. General Mills* (680 F. Supp. 2d 132 (D.D.C. 2010)) and *D.C. Appleseed Center for Law and Justice, Inc., v. District of Columbia Dept. of Ins., Securities, and Banking, Respondent, et al.* (--A.3d --, 2012 WL 4006425 (D.C. 2012)). In *General Mills*, the Court held that an organization does not have standing if the alleged violation only sets back the organization's abstract social interests or frustrates its objectives. *See General Mills*, 680 F. Supp. 2d at 135 ("challenging conduct like General Mills' alleged mislabeling is the very purpose of consumer advocacy organizations…[General Mills'] conduct does not hamper NCL's advocacy effort; if anything it gives NCL an opportunity to carry out its mission."). However, in *Appleseed*, the court held that the organization had standing because the defendant had interfered with one of its many projects, specifically, the enhancement of the availability of affordable healthcare.

### iv. *Public Interest Organizations*

New subsection (k)(1)(D) responds most directly to *Grayson* and the Committee's desire to explicitly state the maximum of the Council's intentions for maximum standing in enacting the 2000 amendments to the CPPA. Subparagraph (D) is intended to reach, for persons who qualify as public interest organizations under section 3901(a)(15), the full extent of standing as may be recognized by the District of Columbia courts. This may include bases for standing that the D.C. courts would find not reached by subparagraph (C). And it may include bases for standing that the D.C. courts have not yet had occasion to recognize at all.

For example, the Committee recognizes that public interest organizations – non-profit organizations that are organized and operating in whole or in part for the purpose of promoting interests of consumers – can have a special suitability for promoting those interests through court action in appropriate circumstances, and may be able to do so in situations where it is not feasible for the affected consumers to do so personally.

Subparagraph (D) is intended to explicitly and unequivocally authorize the court to find that a public interest organization has standing beyond what would be afforded under subparagraphs (A)-(C), beyond what would be afforded under a narrow reading of prior DC court decisions, and beyond what would be afforded in a federal case under a narrow reading of prior federal court decisions on federal standing.

Subparagraph (D) is not without important limits, however. In addition to the threshold requirement that only a public interest organization may bring action under (D), (D)(ii) provides that an action brought under (D) shall be dismissed if the court determines that the public interest organization does not have sufficient nexus to the interests involved of the consumer or class to adequately represent those interests. This enables the court to ensure that, as it considers the application of standing principles to new situations, standing is recognized in those circumstances where the public interest organization has a sufficient stake in the action – whether or not the stake falls squarely within the stakes recognized in prior cases – to be relied upon to pursue the action with the requisite zeal and concreteness.

### C. *Section 28-3904(f-1) – Additional Unlawful Act*

The bill also adds a new section 28-3904(f-1) which prohibits the willful use, in written representations, of falsehood, innuendo, or ambiguity as to a material fact. It has come to the Council's attention that in many instances, while facts may exist in the public domain as to veracity of claims made, merchants nevertheless flood the market with countervailing representations to hide the truth. In such scenarios, courts have inconsistently found materiality. *Cf. U.S. v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 208 (D.D.C. 2006), *aff'd in part and vacated in part on other grounds, U.S. v. Philip Morris USA, Inc.*, 566 F.3d 109 (D.C. 2009) ("companies similarly spent years confusing the public about the link between cigarettes and cancer.") and *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1130-31 (E.D.N.Y. 2006) (same) *with Dahlgren v. Audiovox Commc'ns Corp.*, 2010 WL 2710128, at *18 (D.C. Superior July 8, 2010). New 28-3904(f-1) seeks to address this inconsistency and provide a cause of action when merchants bury the truth and leave false impressions without outright stating falsehoods.

### D. *Section 28-3904(e-1) – Additional Unlawful Act*

The bill adds to 28-3904 (e-1) as a violation if a merchant represents that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law. According to testimony from the National Consumers League and other consumer advocates in the District of Columbia, it is a common for merchants to insert illegal terms into contracts and then seek their enforcement. This amendment is intended to address that practice.

### E. *New Chapter 53 – Unit Pricing Act*

Finally, the bill adds a unit pricing measure, which is based in part on the Department of Commerce's National Institute of Standards and Technology ("NIST") model act. Currently, nineteen (19) states and two (2) territories have unit pricing laws or regulations in force. Eleven (11) of these have mandatory unit pricing provisions: Connecticut, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Oregon, Puerto Rico, Rhode Island, Vermont and the Virgin Islands. *See* NIST Handbook 130, Chapter II (2013) (available at http://www.nist.gov/pml/wmd/pubs/hb130-13.cfm).

According to the Food Marketing Institute, an industry trade association, three quarters of all grocery shoppers rely on unit pricing to make comparisons. Unit pricing provides the price of good based on cost per unit of measure, and is calculated by dividing the price of the product by an accepted unit of measurement (e.g. grams, liters). It allows customers to compare the value of different brands, sized packages, types and products, by permitting customer to use one consistent measure. It also reduces the need for excessive packaging that can prove deceptive.

Unit pricing benefits retailers by promoting sales and helping customers compare prices of the same product between two stores, enabling business to showcase that they have the lowest prices and the best value. Ultimately, it helps consumers to make a more educated purchase decision that promotes health competition among businesses.

Many stores voluntarily provide unit pricing, but in an inconsistent manner and using different units of measurement for similar products or only selectively providing pricing for certain brands in a product category. A survey done by the National Consumers League found that unit pricing is not uniform in the District of Columbia. Among seven stores surveyed, NCL found that each store had different labeling system, there was a wide variation in the units used, and many pricing calculations were incorrect. This can mislead consumers comparing products or prices between stores.

The Unit Pricing Act adopts the exemptions found at Md. Code Ann., Com. Law § 14-101.

## II.    LEGISLATIVE CHRONOLOGY

November 15, 2011    Bill 19-0581, the "Consumer Protection Amendment Act of 2012," is introduced by Councilmember Cheh, co-sponsored by Chairman Mendelson, and referred to the Committee on Public Services and Consumer Affairs.

November 25, 2011    Notice of intent to act on Bill 19-0581 is published in the D.C. Register.

September 14, 2012    Notice of public hearing is published in the D.C. Register.

October 11, 2012    Committee on Public Services and Consumer Affairs holds a public hearing on Bill 19-0581

November 28, 2012    Committee on Public Services and Consumer Affairs marks-up Bill 19-0581.

## III.    SUMMARY OF TESTIMONY

The Committee on Public Services and Consumer Affairs held a public hearing on Bill 19-0581, the "Consumer Protection Amendment Act of 2012" on October 11, 2012. Please see the attached testimony.

## IV.    FISCAL IMPACT

According to the Fiscal Impact Statement prepared by the Office of the Chief Financial Officer dated November 20, 2012, funds are sufficient in the FY 2013 through FY 2016 budget and financial plan to implement Bill 19-581.

## V.    SECTION BY SECTION ANALYSIS

Section 1:    Amends Chapter 39 of Title 28 of the District of Columbia Code to revise the definition of consumer, add additional unlawful trade practices, and authorize

8

non-profit organizations, consumers, public interest organizations, consumer testers to sue under the act, and recognizes the right to truthful information.

Section 2:    Establishes a Unit Pricing Act in Chapter 53 of Title 28 of the District of Columbia Code that creates a Unit Pricing requirement for the District of Columbia.

Section 3:    Fiscal Impact Statement.  Standard Council language.

Section 4:    Effective Date.  Establishes the effective date by stating the standard 30-day Congressional review language.

## VI.    IMPACT ON EXISTING LAW

B19-0581 will impact existing law by amending Chapter 39 of Title 28 of the District of Columbia Code to amend the definitions, standing, and unlawful practices provisions.

## VII.    COMMITTEE ACTION

On November 28, 2012, in an additional Committee meeting, the Committee on Public Services and Consumer Affairs met to consider Bill 19-581, the "Consumer Protection Amendment Act of 2012".  The meeting was called to order in room 120 at 12:17 p.m., and Bill 19-581 was the second matter on the agenda.  After the determination of a quorum, with Chairperson Alexander, Councilmembers Bowsers, Cheh, and Graham, and Chairman Mendelson present, Chairperson Alexander presented the committee print and report. Councilmember Graham made a motion to add back in language located on page 2, lines 21-23 and page 3, lines 1-2 from the committee print draft that had been removed.  Councilmember Graham and Chairperson Mendelson voted "aye," and Chairperson Alexander, Councilmember Bowser, and Councilmember Cheh voted "no."  Chairperson Alexander subsequently moved the committee print and report for a vote with leave for the staff to make necessary technical and editorial changes.  Both the committee print and report were unanimously approved.    The meeting was adjourned at 1:30 p.m.

## VIII.    ATTACHMENTS

1.    B19-0581 as introduced.
2.    Hearing Notice and Witness List.
3.    Testimony.
5.    Committee Print of B19-0581.
5.    Fiscal Impact Statement.

Councilmember Mary M. Cheh

A BILL

_____

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

_____

Councilmember Mary M. Cheh introduced the following bill, which was referred to the Committee on _____.

To amend title 28 of the District of Columbia Code to revise the definition of consumer; to prohibit the willful use of falsehood, innuendo, or ambiguity; to prohibit representing that a transaction confers rights that it does not; to prohibit unfair business practices; to explicitly authorize non-profit organizations to bring suit under the District's consumer protection statute; to create a right of action for non-profits organizations whose public interest activities have been perceptibly impaired; and to create a unit pricing requirement for consumer commodities.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA,

That this act may be cited as the "Consumer Protection Amendment Act of 2011".

TITLE I. Consumer Protection Amendment Act.

Sec. 101. Short Title.

This title may be cited as the "District of Columbia Consumer Protection

Procedures Amendment Act of 2011".

Sec. 102. Chapter 39 of title 28 is amended as follows:

(a) Section 3901 is amended as follows:

(1) Paragraph (2) is amended by striking the phrase "without exception,

which is primarily for personal, household, or family use;" and inserting the phrase

1

1    "without exception, which is distributed in commerce and which is normally used for

2    personal, household, or family purposes; consumer goods or services include those which

3    consumers normally use for personal, household or family use, even if those products are

4    used both for personal and commercial purposes;" in its place.

5             (2)  A new paragraph (14) is added to read as follows:

6             "(14)  "Non-profit" means an organization or institution that is exempt

7    from federal income tax under the provisions of 26 U.S.C.S. § 501(c)(3), (4), (5), (10),

8    (11), (19), or (20), and that meets the requirements of subchapter I of Chapter 3 of Title

9    29.".

10        (b)  Section 3904 is amended as follows:

11             (1)  By adding a new subsection (f-1) to read as follows:

12             "(f-1)  Use innuendo or ambiguity as to a materials fact, which has a

13    tendency to mislead;".

14             (2)  By adding a new subsection (r)(6) to read as follows:

15             "(6)  Representing that a transaction confers or involves rights, remedies,

16    or obligations which it does not have or involve, or which are prohibited by law;".

17             (3)  By adding a new subsection (ii) to read as follows:

18             "(ii)  Engage in any unfair business act or practice, which occurs when the

19    practice:

20                 "(1)  Offends established public policy or when the practice is

21    immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers,

22    and the practice is not outweighed by countervailing benefits to consumers; or

2

1    "(2) Threatens an incipient violation of an antitrust law, or violates

2    the policy or spirit of one of those laws because its effects are comparable to or the same

3    as a violation of the law, or otherwise significantly threatens or harms competition.".

4    (c) Section 3905(k) is amended to read as follows:

5    "(k)(1)(A) A person, including a corporation, may bring an action under this

6    chapter seeking relief from the use by any person of a trade practice in violation of a law

7    of the District.

8    "(B) A non-profit may bring an action under this chapter on behalf

9    of its members or the general public if it can demonstrate that a particular member of the

10    non-profit or of the general public would have had standing, regardless of whether or not

11    the organization itself has suffered or would suffer an injury in fact.

12    "(C) A non-profit may bring an action under this chapter on its

13    own behalf if it can establish that its public interest activities have been perceptibly

14    impaired. The term "perceptibly impaired" shall include diversion of resources and

15    interference with institutional efforts.

16    "(2) Any claim under this chapter shall be brought in the Superior Court of

17    the District of Columbia and may recover or obtain the following remedies:

18    "(A) Treble damages, or $ 1,500 per violation, whichever is

19    greater, payable to the consumer;

20    "(B) Reasonable attorney's fees;

21    "(C) Punitive damages;

22    "(D) An injunction against the use of the unlawful trade practice;

3

1           "(E)  In representative actions, additional relief as may be

2    necessary to restore to the consumer money or property, real or personal, which may have

3    been acquired by means of the unlawful trade practice; or

4           "(F)  Any other relief which the court deems proper.".

5                      TITLE II. Unit Pricing Act.

6    Sec. 201. Short Title.

7    This title may be cited as the "Unit Pricing Protection Act of 2011".

8    Sec. 202. Definitions.

9    For the purposes of this title, the term:

10    (1) "Combination packages" shall mean a package intended for retail sale,

11    containing two or more individual packages or units of dissimilar commodities.

12    (2) "Commodity" shall mean any food, drug, cosmetic, or other article, product,

13    or commodity of any kind or class which is:

14           (A) Customarily produced for sale at retail for consumption by individuals

15    for purposes of personal care or in the performance of services ordinarily performed in or

16    around the household; and

17           (B) Usually consumed or expended in the course of that use or

18    performance other than by wear or deterioration from use.

19    (3) "Person" shall mean both plural and the singular and includes individuals,

20    partnerships, corporations, companies, societies, and associations.

21    (4) "Unit Price" or "unit pricing" shall mean the retail price of an item expressed

22    in dollars and cents per unit.

4

1      (5) "Variety packages" shall mean  package intended for retail sale, containing

2    two or more individual packages or units of similar, but not identical, commodities.

3    Commodities that are generically the same, but that differ in weight, measure, volume,

4    appearance, or quality, are considered similar but not identical.

5      Sec. 203. Application.

6      Except for random and uniform weight packages that clearly state the unit, each

7    person who sells, offers, or displays for sale a consumer commodity at retail shall provide

8    the unit price information in the manner prescribed herein.

9      204. Terms for Unit Pricing.

10      The declaration of the unit price of a particular commodity in all package sizes

11    offered for sale in a retail establishment shall be uniformly and consistently expressed in

12    terms of:

13      (a) Price per kilogram or 100 grams, or price per pound or ounce, if the net

14    quantity of contents of the commodity is in terms of weight.

15      (b) Price per liter or 100 milliliters, or price per dry quart or dry pint, if the net

16    quantity of contents of the commodity is in terms of dry measure or volume.

17      (c) Price per liter or 100 milliliters, or price per gallon, quart, pint, or fluid ounce,

18    if the net quantity of contents of the commodity is in terms of liquid volume.

19      (d) Price per individual unit or multiple units if the net quantity of contents of the

20    commodity is in terms of count.

21      (e) Price per square meter, square decimeter, or square centimeter, or price per

22    square yard, square foot, or square inch, if the net quantity of contents of the commodity

23    is in terms of area.

1    Sec. 205. Exemptions.

2    The following categories of commodities shall be exempt from this act:

3    (1) Commodities packaged in quantities of less than 28 grams (1 ounce) or

4    29 milliliters (1 fluid ounce) or when the total retail price is 50 cents or less.

5    (2) When only one brand of a particular commodity in only one size is

6    offered for sale in a particular retail establishment.

7    (3) Variety packages; and

8    (4) Combination Packages.

9    Sec. 206. Pricing.

10    (a) The unit price shall be to the nearest cent when a dollar or more. If the unit

11    price is under a dollar, it shall be listed:

12    (1) To the tenth of a cent, or

13    (2) To the whole cent.

14    (b) The retail establishment shall have the option of using (a)(1) or (2), but shall

15    not implement both methods.

16    (c) The retail establishment shall accurately and consistently use the same method

17    of rounding up or down to compute the price to the whole cent.

18    Sec. 207. Presentation of Price.

19    (a) In any retail establishment in which the unit price information is provided in

20    accordance with the provisions of this act, that information may be displayed by means of

21    a sign that offers the unit price for one or more brands and/or sizes of a given commodity,

22    by means of a sticker, stamp, sign, label, or tag affixed to the shelf upon which the

6

1    commodity is displayed, or by means of a sticker, stamp, sign, label, or tag affixed to the

2    consumer commodity.

3        (b) Where a sign providing unit price information for one or more sizes or brands

4    of a given commodity is used, that sign shall be displayed clearly and in a non-deceptive

5    manner in a central location as close as practical to all items to which the sign refers.

6        (c) If a single sign or tag includes the unit price information for more than one

7    brand or size of a given commodity, the following information shall be provided:

8            (1) The identity and the brand name of the commodity.

9            (2) The quantity of the packaged commodity; provided, that more than one

10   package size per brand is displayed.

11           (3) The total retail sales price.

12           (4) The price per appropriate unit, in accordance with section 203.

13       Sec. 208. Uniformity.

14       (a) If different brands or package sizes of the same consumer commodity are

15   expressed in more than one unit of measure, the retail establishment shall unit price the

16   items consistently.

17       (b) When metric units appear on the consumer commodity in addition to other

18   units of measure, the retail establishment may include both units of measure on any

19   stamps, tags, labels, signs, or lists.

20       Sec. 209. Civil penalties.

21       Any person who violates any provision of this act, or any regulation promulgated

22   pursuant to this act, may be assessed a civil penalty not to exceed $500 for each violation.

23       Sec. 210. Rules.

7

1    The Mayor may issue rules to effectuate the provisions of the act.

2    Sec. 211. Effective Date.

3    This title shall take effect on January 1, 2013.

4    Sec. 301. Fiscal impact statement.

5    The Council adopts the fiscal impact statement in the committee report as the

6    fiscal impact statement required by section 602(c)(3) of the District of Columbia Home

7    Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-

8    206.02(c)(3)).

9    Sec. 401. Effective date.

10    This act shall take effect following approval by the Mayor (or in the event of veto

11    by the Mayor, action by the Council to override the veto), a 30-day period of

12    Congressional review as provided in section 602(c)(1) of the District of Columbia Home

13    Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-

14    206.02(c)(1)), and publication in the District of Columbia Register.

# Council of the District of Columbia
# Committee on Public Services and Consumer Affairs
# Notice of Public Hearing
## 1350 Pennsylvania Ave., N.W., Suite 6 Washington, D.C. 20004

**COUNCILMEMBER YVETTE M. ALEXANDER, CHAIRPERSON
COMMITTEE ON PUBLIC SERVICES AND CONSUMER AFFAIRS ANNOUNCES A
PUBLIC HEARING**

on

**Bill 19-0581, the "Consumer Protection Amendment Act of 2011"**

on

**Thursday, October 11, 2012
10:00 a.m., Room 120, John A. Wilson Building
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004**

Councilmember Yvette M. Alexander, Chairperson of the Committee on Public Services and Consumer Affairs, announces a public hearing on Bill 19-0581, the "Consumer Protection Amendment Act of 2011". The public hearing will be held at 10:00 a.m. on Thursday, October 11, 2012 in Room 120 of the John A. Wilson Building.

The stated purpose of Bill 19-0581 is to prohibit the willful use of falsehood, innuendo, or ambiguity; to prohibit representing that a transaction confers rights that it does not; to prohibit unfair business practices; to explicitly authorize non-profit organizations to bring suit under the District's consumer protection statute; to create a right of action for non-profit organizations whose public interest activities have been perceptibly impaired; and to create a unit pricing requirement for consumer commodities.

Those who wish to testify should contact Melanie Williamson, Legislative Counsel, at (202) 741-2112 or via e-mail at mwilliamson@dccouncil.us, and provide their name, address, telephone number, organizational affiliation and title (if any) by close of business, Tuesday, October 9, 2012. Persons wishing to testify are encouraged, but not required, to submit 15 copies of written testimony. If submitted by the close of business on Tuesday, October 9, 2012, the testimony will be distributed to Councilmembers before the hearing. Witnesses should limit their testimony to four minutes; less time will be allowed if there are a large number of witnesses.

If you are unable to testify at the hearing, written statements are encouraged and will be made a part of the official record. Copies of written statements should be submitted either to Ms. Williamson or to Ms. Nyasha Smith, Secretary to the Council, Room 5 of the Wilson Building, 1350 Pennsylvania Avenue, N.W. Washington, D.C. 20004. The record will close at 5:30 p.m. on Thursday, October 25, 2012.

# COUNCIL OF THE DISTRICT OF COLUMBIA
# PUBLIC HEARING
# COMMITTEE ON PUBLIC SERVICES AND CONSUMER AFFAIRS
**Witness List**

1350 Pennsylvania Avenue, N.W., Washington, D.C. 20004

## COUNCILMEMBER YVETTE M. ALEXANDER, CHAIRPERSON
## COMMITTEE ON PUBLIC SERVICES AND CONSUMER AFFAIRS ANNOUNCES A
## PUBLIC HEARING

on

**Bill 19-0581, the "Consumer Protection Amendment Act of 2011"**

on

**Thursday, October 11, 2012**
**10:00 a.m., Room 120, John A. Wilson Building**
**1350 Pennsylvania Avenue, N.W.**
**Washington, D.C. 20004**

## Witness List

### Public Witnesses

| | | |
|---|---|---|
| 1. | Michael Sindram | Public Witness |
| 2. | Sally Greenberg | Executive Director, National Consumers League |
| 3. | George Slover | Member, Steering Committee, Antitrust and Consumer Law Section of the District of Columbia Bar |
| 4. | Jonathan K. Tycko | Attorney, Tycko & Zavareei LLP |

### Executive Witnesses

| | | |
|---|---|---|
| 5. | Bennett Rushkoff | Chief, Public Advocacy Section, Public Interest Division, Office of the Attorney General |



### 1. Landlord-Tenant: The CPPA Should Provide Tenants with a Means for Challenging Unfair and Deceptive Practices in the Context of Landlord-Tenant Relations.

We suggest that the CPPA be amended to make clear that it applies to unfair and deceptive practices in the landlord-tenant context, just like any other consumer transaction. At present, the Act specifically forbids the District from enforcing CPPA violations in the context of landlord-tenant relations. *See* D.C. Code § 28-3903(c). The D.C. Court of Appeals has interpreted this provision to make the CPPA wholly inapplicable in the landlord-tenant context, even where the enforcing party is not the District but rather a private, injured person. *See Gomez v. Independence Mgmt.*, 967 A.2d 1276 (2009).

As a result of this limitation, tenants have been without any meaningful way to challenge a host of unlawful trade practices by their landlords. For example, it is common practice for some landlords to impose illegal charges and fees on tenant accounts, including excessive late fees, attorney's fees (prohibited by law), court costs (also prohibited by law, absent a judgment), and unwarranted charges for repairs. It is also common for landlords to include illegal clauses in their standard leases, including provisions waiving the right to a jury trial or obligating the tenant to pay legal fees. The other CPPA exemptions involve transactions that are either adequately covered by a different comprehensive scheme (like utility regulation) or that involve delicate constitutional issues (like religious freedom or free speech). Those rationales do not apply to deceptive and unfair charges and fees, because the existing substantive and procedural law in landlord-tenant cases does not provide tenants with an effective remedy.

As the law currently stands, a tenant's only way of challenging these practices is to refuse to pay the charges or fees, thereby prompting a lawsuit for eviction. This is a risky strategy that places the tenant's housing needlessly and unfairly in jeopardy. And many tenants, understandably, are simply unwilling to gamble with their homes in this way. Instead of fighting, they elect to pay these illegal charges and fees simply to keep their accounts in good standing.

A substantial number of other jurisdictions, including Massachusetts, New Jersey, New York, North Carolina, Vermont, Washington, and Wisconsin, allow parties to apply their consumer protection statutes to landlord-tenant relationships. There is no reason the District should be different.

*Recommendation: To remedy this gap in the law, we suggest an amendment to the statute that simply strikes § 28-3903(c)(2)(A), which has been interpreted as prohibiting application of the CPPA to landlord-tenant relations.*

### 2. Standing: The CPPA Should Proactively Prevent Consumer Injuries by Allowing Non-profit Organizations to Seek Injunctive Relief to Protect Consumers from Unfair and Deceptive Practices.

We support Councilmember Cheh's proposal to amend the law to explicitly authorize non-profit organizations to sue under the District's CPPA, as the Council intended to do when it enacted the CPPA. In *Grayson v. AT&T Corp.*, 15 A.3d 219, 237 (D.C. 2011), the D.C. Court of Appeals concluded that the language of the CPPA was not clear enough to override the Court's customary reliance on the standing rules applicable to federal courts under Article III of the Constitution. We think that some minor changes to the language of the pending bill would help achieve the Council's stated intent and thus provide an opportunity to stop unfair and deceptive practices before consumers are hurt.



CENTER FOR
Science IN THE
Public Interest
*The nonprofit publisher of
Nutrition Action Healthletter*

October 9, 2012

Yvette Alexander
Chair
Committee on Public Services & Consumer Affairs
Office of Ward 7
1350 Pennsylvania Avenue, NW Suite 6
Washington, DC 20004

**Re:    Testimony on the Consumer Protection Amendment Act of 2011**
**(Bill 19-0581)**

Dear Ms. Alexander:

The Center for Science in the Public Interest ("CSPI") submits written
testimony in support of The Consumer Protection Amendment Act of 2011 (Bill
19-0581).

### Statement of Interest

CSPI is a national non-profit consumer advocacy organization dedicated
to advocating for government policies and corporate practices that promote
healthy diets, prevent deceptive marketing practices, and ensure that science is
used to promote the public welfare. CSPI's Litigation Project, a non-profit law
firm, was created in 2004, when consumer protection at the federal level by the
FDA, FTC, and USDA was at a low point. To fill the void left by the inactive
government agencies, we use state and federal courts to protect the public's
welfare. CSPI's Litigation Project provides experienced lawyers to represent
plaintiffs in a variety of state and federal lawsuits that champion consumer rights
and consumer protections. CSPI's Litigation Project has obtained many binding
settlements resulting in honest labeling of ingredients and halting deceptive
marketing. Litigation, or the threat of litigation, has spurred many companies to
change their marketing practices, including removing artificial trans fats from
their foods and reducing the marketing of junk foods to kids. Litigation has thus
effectuated real, positive change by resulting in outcomes that incrementally
improve the public's health and welfare.

### *Grayson v. AT&T Corp.*:[1] Misapprehension of the Intent of D.C.'s Consumer Protection Procedures Act ("DC CPPA")

The District of Columbia Court of Appeals' decision in *Grayson* effectively
rewrote the DC CPPA by inserting into the law a standing requirement that the
Council never intended. The Consumer Protection Act of 2000 specifically
allowed public interest organizations to bring suit, in the public interest, for
injunctive relief and disgorgement of illegal proceeds associated with illegal

---

[1] 15 A.3d 219 (D.C. 2011) (en banc).

trade practices. Contrary to the express intent of the Council, the D.C. Court of Appeals decision in *Grayson* found that the Council did not intend to eliminate the standing requirement, that a plaintiff suffer injury-in-fact, in order to state a claim under the DC CPPA. In so holding, the D.C. Court of Appeals countermanded the clear decision of the Council to extend standing in consumer protection cases to representative plaintiffs, such as non-profit advocacy organizations. The decision thus effectively (and erroneously) impairs the ability of organizations that use litigation, or the threat of litigation, to vigorously defend consumer rights from challenging corporate misbehavior in court.

The Consumer Protection Amendment Act of 2011 would aid in consumer protection by clarifying the Council's intent to eliminate the court-imposed requirement that a plaintiff suffer injury-in-fact to have standing to bring a claim under the DC CPPA. The Amendment explicitly and unequivocally provides that a non-profit may bring an action on behalf of its members or the general public in one of two ways. A non-profit can file suit if it demonstrates that a particular member of the non-profit or of the general public would have had standing, regardless of whether or not the organization itself has suffered or would suffer an injury-in-fact.[2] Alternatively, the Act also provides that a non-profit can file suit if it can establish that its public interest activities have been perceptibly impaired (e.g., the diversion of resources and interference with institutional efforts).[3] These important, even essential, amendments will better able non-profit advocacy organizations to do the important work of consumer protection — work that is often one of the first to be cut during government budgetary downsizing.

As the law stands now, consumers only have recourse after suffering an injury-in-fact — after they have already suffered injury. Because of the court decision, there is now no mechanism by which ongoing illegal trade practices can be stopped before harm to a consumer. Often the injury-in-fact in consumer cases is the cost of a consumer good – usually no more than a small monetary sum (e.g., the cost of a food or supplement in lawsuits brought by CSPI). A lone consumer is less likely to act. Non-profits frequently receive complaints from members or the public, and see patterns of deceptive marketing through continued monitoring of the marketplace. Also, nonprofits are better equipped and able than individuals to correct wrongs perpetrated on the American public by overzealous corporate entities.

An example of the DC CPPA's current interpretation impairing public interest activities is *Center for Science in the Public Interest v. Burger King Corp.*[4] In *Burger King*, CSPI filed suit on behalf of itself, its D.C. members, and on behalf of the interests of the general public to stop Burger King's use of trans fats in its products – which CSPI alleged was a public health hazard and a misrepresentation in violation of D.C. CPPA. Extending the holding in *Grayson* to non-profits, the Court of Appeals dismissed the lawsuit, thus summarily silencing CSPI's voice and chilling its future advocacy efforts. In a second case,

---

[2] Proposed amendment, section 3905(k)(1)(B).
[3] Proposed amendment, section 3905(k)(1)(C).
[4] Civil Case No. 07-1092 (RJL), Memorandum Opinion, (February 19, 2008).

CSPI v. MillerCoors[5], CSPI was forced to agree to dismiss because of the direct effect of *Grayson*.

Non-profit advocacy organizations dedicated to working for the consumer interest, and the public good, are uniquely positioned to provide necessary protections to D.C. consumers and to act where and when government may not. **Passage of** the Consumer Protection Amendment Act of 2011 would clarify the Council's intent and thus enable non-profit advocacy organizations to continue their work to protect consumer rights and effectuate change where governmental entities might not.

### Conclusion

For the foregoing reasons, CSPI wholeheartedly supports The Consumer Protection Amendment Act of 2011 and urges its passing.

Respectfully submitted,

Michael F. Jacobson, Ph.D.
Executive Director

Stephen Gardner
Director of Litigation

Seema Rattan
Assistant Director of Litigation

By:

Seema Rattan

---

[5] Civil Case No. 2008-CA-006605 B, Unopposed Motion to Dismiss with Prejudice, (March 2, 2011), and Order of Dismissal with Prejudice, (March 11, 2011).



D I S T R I C T   O F   C O L U M B I A   B A R

*Antitrust and Consumer Law Section*

The Consumer Protection Act Amendment of 2011
http://dcclims1.dccouncil.us/images/00001/20111116102513.pdf

Report with Recommendations, Prepared for Submission as Testimony
For the Hearing Scheduled For October 11, 2012: **COMMITTEE ON PUBLIC
SERVICES AND CONSUMER AFFAIRS PUBLIC HEARING on
Bill 19-0581, the "Consumer Protection Amendment Act of 2011"**

by the Antitrust and Consumer Law Section of the D.C. Bar

**Steering Committee: Don A. Resnikoff, Tracy D. Rezvani, Co-Chairs**

**Principal Authors: Tracy D. Rezvani, Don Resnikoff, George Slover, Wendy
Weinberg**

## STANDARD DISCLAIMER

The views expressed herein represent only those of the Antitrust and Consumer
Law Section of the District of Columbia Bar and not those of the D.C. Bar or its Board of
Governors.[1]

### Introduction

As explained in the Notice of Hearing, the stated purpose of Bill 19-0581 is [1] to
prohibit the willful use of falsehood, innuendo, or ambiguity; to prohibit representing that a
transaction confers rights that it does not; and to prohibit unfair business practices; [2] to
explicitly authorize non-profit organizations to bring suit under the District's consumer
protection statute; to create a right of action for non-profit organizations whose public
interest activities have been perceptibly impaired; and [3] to create a unit pricing requirement
for consumer commodities.

The Section offers comments on all three parts of the proposed legislation.

### Standing for Nonprofit Organizations

We support the proposal to explicitly authorize non-profit organizations to bring suit
under the District's consumer protection statute and to create a right of action for non-profit
organizations. We agree that it is important to solidify the ability of non-profits to bring

---

[1] The Section's steering committee was presented with a copy of the legislation and this proposed public
statement. A vote was taken on September 24, 2012. The statement was adopted without dissent on a vote
if six-to-zero with three abstentions.



# DISTRICT OF COLUMBIA BAR

*Antitrust and Consumer Law Section*

representative actions under the Consumer Protection Procedures Act. Non-profits bring unique perspective and insights to consumer protection through their representation of the populations that they serve. They generally seek to advance the public welfare and may be able to bring actions on sensitive issues when it is politically difficult for an Attorney General to do so. Since they are not motivated by profit, they also have the ability to bring actions that may address a substantial harm, but that would not necessarily bring sufficient monetary return to individual plaintiffs or their attorneys to make private suit practical or realistic.

The D.C. Consumer Protection Act of 2000 included an amendment to the CPPA to allow non-profit public interest organizations and the private bar to bring litigation in the public interest. The District of Columbia Court of Appeals in *Grayson v. AT&T Corp.*[2] imposed the prudential requirement on the *individual* plaintiffs in that case that they must suffer an injury-in-fact to have standing to bring a claim. While the *Grayson* decision did not discuss litigation brought by non-profit public interest organizations, the decision has had a chilling impact on litigation by non-profits.

The proposed bill more clearly defines the statutory authorization for suits to be brought by non-profit organizations acting as private attorneys general. Pursuant to the legislation, such suits may proceed in D.C. Superior Court. Section 3901(a)(14) defines "non-profit organization" in relation to federal non-profit law under 26 U.S.C. § 501(c).

Relevant language of the proposed legislation includes the following:

(B) A non-profit may bring an action under this chapter on behalf of its members or the general public if it can demonstrate that a particular member of the non-profit or of the general public would have had standing, regardless of whether or not the organization itself has suffered or would suffer an injury in fact.

(C) A non-profit may bring an action under this chapter on its own behalf if it can establish that its public interest activities have been perceptibly impaired. The term "perceptibly impaired" shall include diversion of resources and interference with institutional efforts.

We understand that the two provisions are disjunctive and not conjunctive, meaning that they provide a nonprofit two separate, independent avenues for a private right of action for non-profit organizations under the statute.

While the local D.C. courts are not Constitutional courts, they do have authority to determine prudential standing requirements with regard to non-profit organizations.

---

[2] 15 A.3d 319 (D.C. 2011) (en banc).



## DISTRICT OF COLUMBIA BAR
*Antitrust and Consumer Law Section*

We do not think that imposition by the D.C. Courts of prudential standing limits on suits by individuals is a reason to oppose the legislation. We view the legislation as avoiding what we regard as inappropriate application of standing requirements articulated in *Grayson*. As such, we expect that non-profits can draw complaints that serve the public interest and where possible, include legally sufficient standing allegations. But the overarching point, and our reason for supporting the proposed legislation, is that in light of the case law with regard to standing and remedies, we think the proposed Act will appropriately facilitate enforcement actions by non-profits that will be of significant benefit to the public.

In summary, we anticipate that the proposed D.C. legislation that permits and encourages non-profits to bring cases in the public interest will confer a substantial public benefit in the form of useful consumer protection and other litigation. The need for non-profits to act as private attorneys general is great in D.C., where administrative enforcement of the consumer laws by D.C. government has been eliminated, and consumer enforcement by the Attorney General's office has been curtailed.

### Unit pricing requirement for consumer commodities.

Unit pricing provides the price of goods based on cost per unit of measure, making it easier for consumers to compare prices. It is calculated by dividing the price of the product by an accepted unit of measurement depending on the type of product (e.g., grams, liters). The proposed language is based on a model act created by the National Conference of Weights and Measures and is supported by the Department of Commerce's National Institute of Standards and Technology.[3] It should be noted that many industry trade associations worked with NIST to create the model act.

We understand that as of August 2011, there are nineteen states and two territories that have adopted unit pricing,[4] including Maryland.[5] We have spoken with an official in the Division of Consumer Protection of Maryland's Office of the Attorney General, who informed us that there have been no enforcement actions within the state since its enactment of a similar law. This suggests that unit pricing laws are easily implemented, that compliance is easy to maintain, and that the law will not materially impact resources at the District of Columbia's Office of the Attorney General.

---

[3] National Institute of Standards and Technology, NIST Handbook 130: Uniform Law and Regulations in the Areas of Legal Metrology and Engine Fuel Quality as Adopted by the 96th National Conference on Weights and Measures 2011, at 135-40 (2012), *available at* http://www.nist.gov/pml/wmd/pubs/upload/2012-h130-final2.pdf.

[4] National Institute of Standards and Technology, NIST Handbook 130: Uniform Law and Regulations in the Areas of Legal Metrology and Engine Fuel Quality as Adopted by the 96th National Conference on Weights and Measures 2011, at 10-13 (2012), *available at* http://www.nist.gov/pml/wmd/pubs/upload/2012-h130-final2.pdf.

[5] Md. Code Ann., Com. Law § 14-101 to -107.



D I S T R I C T   O F   C O L U M B I A   B A R

*Antitrust and Consumer Law Section*

Unit pricing allows customers to compare value between different brands, different sized packages, different package types, and different products. It allows consumers to identify the best value and use one consistent measure to sort through various package sizes, brands, and substitute products. It also provides a better indicator of the price premium being charged for a brand—a premium that may be perceived by consumers as an indicator of higher value. Unit pricing places the focus on the pricing of the product rather than the brand name. It also helps reduce any incentive among sellers to use excessive packaging as a means of making quantity appear larger than it is.

Unit pricing also benefits retailers by promoting sales and private label products, and reducing pricing errors. With a uniform unit pricing system, consumers can also compare prices of the same product between stores. This will benefit businesses by providing a way to showcase that they have the lowest prices and best value. Unit pricing is consistent with the premise of the federal Fair Packaging and Labeling Act, that informed consumers are a crucial component of the market.[6] Unit pricing enables consumers to make a more educated purchase decision and promotes healthy competition among businesses.

Creating a uniform system for unit pricing eliminates inconsistencies that arise through voluntary use. Many stores voluntarily provide unit pricing, but this is done in an inconsistent manner, including using different units of measurement for similar products, or selectively providing unit pricing, for only certain brands in a product category. This can mislead consumers when they compare products, or compare prices between stores. Instituting a uniform unit pricing system will eliminate this confusion by mandating consistent and accurate labels for all products and stores.

### Legislative provisions prohibiting unfair business practices

The amendment also proposes additions of specific language to the D.C. CPPA to harmonize it with consumer statutes in the federal system and in other states. For example, the amendment clarifies the definition of "consumer" when used as an adjective and brings it in line with the definition under the Magnuson-Moss Warranty Act.[7] Additionally, there are several proposed additions to section 3904 that are designed to provide improved protections for consumers:

- 3904(f-1) Use innuendo or ambiguity as to a material fact, which has a tendency to mislead

Proposed new section 3904(f-1) borrows language from the Kansas Consumer Protection Act and is similar to language found in the Hawaii Uniform Deceptive Trade

---

[6] 15 U.S.C. § 1451 (2006).
[7] 15 U.S.C. § 2301(1) (2006).



### DISTRICT OF COLUMBIA BAR
*Antitrust and Consumer Law Section*

Practices Act. This prevents businesses from mischaracterizing their goods or services and preying on consumers who are expecting to receive something different. Kansas courts clarify that the intent needed is the intent to engage in the act, not the intent to violate the statute.[8]

- 3904(r)(6) Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law

Proposed new section 3904(r)(6) adds an additional factor for courts to consider in determining whether a term or provision is unconscionable. This language is similar to language found in the consumer protection statutes of Alaska, California, Tennessee, Texas, and Guam. The proposed addition strengthens consumers' ability to receive the benefit of the bargain, and disincentivizes merchants from attempting to trick consumers into believing they are going to receive something different than what is actually being provided. It also prevents merchants from including terms that cannot come into effect because they are prohibited by law. This subsection allows courts to evaluate transactions to determine whether the merchant represented that the deal contained terms that will not take effect.

- 3904(ii) Engage in any unfair business act or practice, which occurs when the practice: (1) Offends established public policy or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and the practice is not outweighed by countervailing benefits to consumers; or (2) Threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

Proposed new section 3904(ii) seeks to prohibit merchants from engaging in unfair acts or practices, which are defined as occurring in two circumstances. Paragraph (1) prohibits acts that offend established public policy, or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. This language originates with an FTC rule prohibiting certain advertisements that neither violate laws nor are deceptive but nonetheless are unfair.[9] The language has been adopted by courts in analyzing consumer statutes in Hawaii,[10] Louisiana,[11] Massachusetts,[12] and North Carolina[13] as a way to define an unfair trade practices. Oklahoma uses the phrase to

---

[8] *York v. InTrust Bank, N.A.,* 962 P.2d 405, 421 (Kan. 1998).
[9] 29 Fed. Reg. 8324, 8355 (July 2, 1964); *see FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233, 244 n.5 (U.S. 1972).
[10] *Balthazar v. Verizon Haw., Inc.,* 123 P.3d 194, 202 (Haw. 2005).
[11] *Monroe Med. Clinic, Inc. v. Hosp. Corp. of Am.,* 622 So.2d 760, 781 (La. Ct. App. 1993).
[12] *Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., Inc.,* 532 N.E.2d 660, 664 (Mass. 1989).
[13] *John v. Phoenix Mut. Life Ins. Co.,* 266 S.E.2d 610, 621 (N.C. 1980).



D I S T R I C T   O F   C O L U M B I A   B A R
*Antitrust and Consumer Law Section*

statutorily define an unfair trade practice.[14]  The proposed bill also contains a provision that these prohibited practices must not be outweighed by countervailing benefits to consumers.  This produces a balancing effect in which only those practices that have an ultimate negative impact on consumers are prohibited.[15]

Paragraph (2) prohibits unfair competition amongst merchants, in light of the negative impact anticompetitive conduct has on consumers.  The prohibition applies not only to antitrust violations, but also to practices that otherwise significantly harm or threaten to harm competition.  These practices harm consumers by undermining competitive markets.  This language originated in California case law that interpreted the state's Unfair Competition Law.[16]

### Conclusion

The Antitrust and Consumer Law Section of the District of Columbia Bar encourages the passing of this bill *in toto*.

---

[14] Okla. Stat. tit. 15, § 752(14).

[15] *Camacho v. Auto. Club of S. Cal.*, 48 Cal. Rptr. 3d 770, 779 (Ct. App. 2006).

[16] *Cel-Tech Commc'ns, Inc. v. L.A.Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999).

**Statement of Bennett Rushkoff**
**Chief, Public Advocacy Section**
**Office of the Attorney General for the District of Columbia**


**Before the Committee on Public Services and Consumer Affairs**
**Yvette M. Alexander, Chairperson**
**Regarding Bill 19-581:**
**Consumer Protection Amendment Act of 2011**





**Office of the Attorney General**
**District of Columbia**


**October 11, 2012**


**10:00 a.m., Room 120**
**John A. Wilson Building**
**1350 Pennsylvania Avenue, NW**
**Washington, D.C.**

Good morning Chairman Alexander, and members and staff of the

Committee on Public Services and Consumer Affairs. I am Bennett Rushkoff,

Chief of the Public Advocacy Section in the Office of the Attorney General (OAG)

for the District of Columbia. On behalf of the Executive, I am pleased to offer

testimony today on Bill 19-581, the Consumer Protection Amendment Act of 2011.

Through the Public Advocacy Section, the OAG is responsible for

enforcement of the District's primary consumer protection law – the Consumer

Protection Procedures Act (CPPA). This is carried out through investigations of

suspected violations and filings of actions in D.C. Superior Court. The CPPA

authorizes the OAG to seek court injunctions and to recover civil penalties and

consumer restitution. In addition, the CPPA allows consumers to bring lawsuits on

behalf of themselves and the general public to stop unlawful trade practices,

including violations of the debt collection law. Consumers can recover $1,500 per

violation, plus punitive damages and attorney's fees.

Title I of the bill offers a number of amendments intended to strengthen the

CPPA. Title II of the bill would provide the District with its own unit pricing law.

We do support the pro-consumer intent behind the bill. Periodic review and

amendment of the CPPA is necessary if the law is to fulfill its purpose of

2

"assur[ing] that a just mechanism exists to remedy all improper trade practices and deter the continuing use of such practices."[1]

However, the Executive cannot support Bill 19-581 in its current form. Many of the provisions of Bill 19-581, while well intended, do not add significantly to the consumer protections in the existing law and risk making the law unnecessarily vague and confusing, and thus subject to unnecessary collateral litigation. We lay these various problems in the bill out in detail below. The Executive is willing to work with the Committee and stakeholders on amendments to the CPPA that would provide additional protections for consumers.

### Section 102(a)

The CPPA applies generally to "consumer goods and services," and the term "consumer" is defined broadly in the current law.[2] Section 102(a)(1) of Bill 19-581 would amend the definition of "consumer" to describe anything

> without exception, which is distributed in commerce and which is normally used for personal, household, or family purposes; consumer goods and services include those which consumers normally use for personal, household or family use, even if those products are used both for personal and commercial purposes;

The apparent intention of the amendment is to clarify that the definition of "consumer" applies even to goods and services that are not used *exclusively* for

---

[1] D.C. Code § 28-3901(b)(1).

[2] *See* D.C. Official Code § 28-3901(a)(2). "Consumer" means a person who does or would purchase, lease (from), or receive consumer goods or services, including a co-obligor or surety, or a person who does or would provide the economic demand for a trade practice; as an adjective, "consumer" describes anything, without exception, which is primarily for personal, household, or family use.

3

"personal, household, or family purposes." However, the amendment would

introduce unnecessary ambiguity in the area of business-to-business transactions.

Right now, it is clear that the CPPA does not apply to business-to-business

transactions in the ordinary course because it applies only to a good or service that

is or would be purchased "primarily for personal, household, or family use." The

proposed amendment would have the CPPA apply to a good or service that is

"distributed in commerce and which is normally used for personal, household, or

family use." Arguably, the amendment would expand the CPPA's coverage to

include any business-to-business transaction that involves goods that are normally

used by consumers, such as a transaction involving a wholesaler's supply of goods

to a retail store.

## Section 102(b)(1)

The heart of the CPPA is a list of 35 unlawful trade practices.[3] These

include some very broad proscriptions, including one making it a CPPA violation

for a merchant to "misrepresent as to a material fact which has tendency to

mislead," and another making it a CPPA violation for a merchant to "fail to state a

material fact if such failure tends to mislead."[4]

Section 102(b)(1) of Bill 19-581 would introduce a new unlawful trade

practice: the "[u]se of innuendo or ambiguity as to a material[] fact, which has a

---

[3] *See* D.C. Official Code § 28-3904.
[4]*See* D.C. Official Code § 28-3904(e) and (f).

4

tendency to mislead." This amendment is not needed. The misleading use of "innuendo or ambiguity" necessarily involves a misleading failure to state a material fact, and a misleading failure to state a material fact is already a violation of the CPPA. Indeed, the misleading use of "innuendo or ambiguity" is a classic example of a misleading failure to state a material fact. Almost invariably, when a "failure to state a material fact" is misleading, it is because there has been an express or implied representation that must be qualified or clarified to avoid misleading consumers.

### Section 102(b)(2)

The CPPA's list of unlawful trade practices includes "mak[ing] or enforc[ing] unconscionable terms or provisions of sales or leases."[5] Five factors, among others, are to be considered in determining whether a term or provision is unconscionable. Each of these factors involves considerations other than whether there has been the kind of deception that would mislead a reasonable consumer. For example, a term or provision is more likely to be found unconscionable if there is a "gross disparity" between the price charged by the merchant and the market value received by the consumer.[6] The idea behind unconscionability is that there are some transactions that, even if presented to consumers in a non-misleading

---

[5] *See* D.C. Code § 28-3904(r).
[6] *See* D.C. Code § 28-3904(r)(3).

manner, are so unbalanced in favor of the merchant, and so unfair to consumers, that they do not belong in the marketplace.

Section 102(b)(2) of Bill 19-581 would introduce a new factor to be used in applying the prohibition of "unconscionable terms or provisions"; whether there is a representation that the "transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." Unlike the existing unconscionability factors, this factor would require consideration of whether the merchant had made a misleading representation. This amendment is confusing and would be counter-productive. By blurring the distinction between violations based on misleading statements or omissions, and violations based on unconscionable terms or provisions, this proposed language would undermine the idea that unconscionability does not require a showing that what the merchant did was objectively misleading in any way.

### Section 102(b)(3)

Section 102(b)(3) of Bill 19-581 would make it a violation of the CPPA to engage in an "unfair" business practice, including a practice that is (1) "immoral" or "unethical" and (2) "not outweighed by countervailing benefits to consumers." We believe that a general unfairness standard would introduce too much uncertainty if it were added to the CPPA's list of unlawful trade practices. We can agree that merchants should not engage in "immoral" or "unethical" practices. However, a general prohibition against "immoral" or "unethical" conduct is too

6

vague and it would not provide merchants with adequate guidance as to what is expected of them. This proposed amendment does not belong in the CPPA.[7]

In addition, Section 102(b)(3) of Bill 19-581 would make it a violation of the CPPA to violate "the policy or spirit" of an antitrust law. Once again, the proposed language is too vague and the Council should not amend the CPPA to include such language. Merchants are responsible for complying with the antitrust laws, and the laws themselves are construed in light of the policies behind them. Merchants cannot be expected to comply with the "policy or spirit" behind an antitrust law.

## Section 102(c)

Section 102(c) of Bill 19-581 would give certain non-profit organizations standing to bring CPPA actions (i) on behalf of their members, (ii) on their own behalf when a trade practice has "perceptibly impaired" the organizations' public interest activities, or (iii) on behalf of the general public.

To have standing to bring a claim in court, a party must normally allege that it has suffered, or is in imminent risk of suffering, a concrete injury-in-fact. In federal courts, "injury-in-fact" is treated as a constitutional requirement that cannot be changed by statute. Two of the three prongs in Section 102(c) articulate established variations of this traditional standing requirement. As the first prong

---

[7] The general unfairness standard proposed by Section 102(b)(3) of Bill 19-581 might belong in a law that authorized a specialized agency to conduct rulemakings in the area of trade regulation, including rulemakings outlawing specific business practices determined to be "immoral" or "unethical." However, as previously stated, it does not belong in the CPPA.

7

asserts, there situations in which membership organizations may assert legal claims based on injuries to their members, as opposed to injuries to the organizations themselves.[8]   In addition, as the second prong asserts, a public interest organization generally has standing to oppose an unlawful practice that has "perceptibly impaired" the organization's activities, even if the unlawful practice is directed only at the population served by the organization.[9]

What I am calling the "third prong" of Section 102(c) appears to respond to a recent decision of the D.C. Court of Appeals, *Grayson v. AT&T Corp.*,[10] which held that the CPPA – notwithstanding its broad language granting a private right of action to a "person" who is "acting for the interests of itself, its members, or the general public" – should not be construed as dispensing with normal standing requirements.  This prong would authorize a nonprofit organization – without any showing of injury to itself or its members – to bring an action on behalf of the general public if the nonprofit can show that a member of the general public would have standing to bring the action.

Expanding standing to sue under the CPPA in the way contemplated by Bill 19-581 is unnecessary and could lead to extended litigation over whether the D.C. courts should alter their usual standing requirements.  In its *Grayson* decision, the Court of Appeals stated: "Regardless of the words used in different cases to

---

[8] *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977) (discussing "associational standing").
[9] *See Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).
[10] 15 A.3d 219 (2011).

articulate our standing requirement . . . we have said since the creation of the current District of Columbia court system that we will follow the federal constitutional standing requirement."[11] The "constitutional standing requirement" to which the Court referred includes injury or threatened injury to the plaintiff. Therefore, by dispensing with normal standing requirements when certain nonprofit organizations bring CPPA cases on behalf of the general public, Bill 19-581 would compel the Court of Appeals to confront the issue of whether to (1) follow the law and depart from the so-called "constitutional standing requirement," or (2) adhere to the standing requirement and strike down the "third prong" of Section 102(c).

The expansion of standing under the CPPA is unnecessary because a public interest organization need not bring a suit on its own behalf in order to advocate on behalf of the general public. Instead, the organization can offer pro bono legal representation to a member of the general public who is injured-in-fact and therefore meets the normal standing requirement. Under the CPPA, as presently written, that member of the public can bring an action not only on his or her own behalf, but also on behalf of the general public. By representing such a plaintiff, a public interest organization can become a legal advocate on behalf of the general public and can seek injunctive relief and consumer restitution on behalf of a wide group of affected consumers.

---

[11] *Id.* at 235.

9

Finally, we note that Bill 19-581 would limit special nonprofit-organization standing to those nonprofits to that are organized under District law and exempt from federal income tax under one of several IRS Code provisions, such as section 501(c)(3). It is not clear what interest is served by limiting standing in this way. Whether or not a nonprofit organization can be an effective advocate on behalf of its members, its own public interest activities, or consumers generally depends not on whether it is organized under District law or is exempt from federal taxation. Indeed, there is nothing to prevent an anti-consumer organization that pursues what it sees as the public interest to organize under District law and achieve 501(c)(3) status with the IRS. Rather than try to define in advance the general types of organization that will effectively advocate in the interests of consumers in a CPPA case, the bill could authorize the court to make a factual determination as to whether the particular organizational plaintiff before the court is adequately representing the organization's members or the public.

### Unit Pricing Act

Title II of Bill 19-581 deals with the Unit Pricing Act. Unit pricing is of substantial value to many consumers. By statutorily prescribing a set of common standards for unit pricing, the proposed Unit Pricing Act would help to ensure that consumers are able to understand the unit prices displayed in retail stores and make informed comparisons between the prices being charged for different brands or sizes.

Bill 19-581 proposes a Unit Pricing Act that closely tracks the Uniform Unit

Pricing Regulation adopted by The National Conference on Weights and Measures,

a copy of which is attached to this testimony.

A section of the proposed Unit Pricing Act in Bill 19-581 that does *not*

closely track the corresponding part of the Uniform Regulation is the

"Application" section. The Application section [Sec. 203] of the proposed Unit

Pricing Act states that "each person who sells, offers, or displays for sale a

consumer commodity at retail shall provide the unit price information in the

manner prescribed herein." By contrast, the Uniform Regulation's Application

section makes clear that the unit-pricing standards in the Uniform Regulation apply

only to stores that are *voluntarily* providing unit-pricing for their goods.

Just as unit pricing can be valuable to consumers, it can be quite costly for a

retailer, especially a low-tech retailer that sells a relatively small volume of

consumer goods. For some retailers, requiring the use of unit pricing could greatly

increase their cost of doing business in D.C. If the Council decides to make unit

pricing mandatory, it should consider making exceptions for small, family-run

businesses. For example, the State of Maryland makes unit pricing mandatory as a

general rule, but exempts certain categories of retailers, such as a retailer that

"[d]uring the preceding calendar year, sold a gross volume of consumer

commodities of less than \$750,000" or a retailer that "[i]s owned and operated by

11

not more than one individual and the members of his immediate family."[12]  The

Council may want to consider a similar approach.

       Thank you, Councilmember Alexander, for providing me with the

opportunity to present the views of the Executive on Bill 19-581.  You should be

commended for your continuing interest in seeing that the CPPA comes ever closer

to fulfilling its stated purpose of ridding the District of Columbia of all unlawful

trade practices.  As previously stated, while the Executive cannot support the bill in

its current form, we are willing to work with you and stakeholders on a viable

alternative.  I would be happy to answer any questions.

---

[12] *See* MD Code, Commercial Law, § 14-102.



**NATIONAL CONSUMERS LEAGUE**

1701 K Street, NW, Suite 1200    Washington, DC 20006

Main: (202) 835-3323    Fax: (202) 835-0747    www.nclnet.org

**Re: Testimony of Sally Greenberg, Executive Director, National Consumers League,**

**RE: *The Consumer Protection Amendment Act of 2011* Bill 19-0581 (2011)**

**October 11, 2012**

Committee on Public Services & Consumer Affairs
Chairperson Yvette Alexander
1350 Pennsylvania Avenue, NW Suite 6
Washington, DC 20004

Dear Chairperson Alexander:

The National Consumers League submits the following statement in support of the Act.

### Statement Of Interest

The National Consumers League ("NCL"), founded in 1899, is the nation's oldest consumer organization. The mission of the NCL is to promote fairness and economic justice for consumers and workers in the United States and abroad. The NCL is a non-profit advocacy group which provides government, businesses, and other organizations with the individual's perspective on concerns including, *inter alia*, child labor, workers rights, and other work place issues. The NCL appears before legislatures, administrative agencies, and the courts across the country, advocating the enactment and vigorous enforcement of laws that effectively protect consumers and employees. The NCL also educates the public in ways to avoid fraud in the marketplace through its National Fraud Center and seeks to increase awareness of and mobilize public resistance to unsavory, anti-consumer behavior. For more than 100 years the NCL has worked to promote a fair

marketplace for workers and consumers. This was the reason for the NCL's founding in 1899 and still guides it into its second century.

## The Existing Enforcement Structure

Under the existing enforcement structure, consumer protection is provided by three types of entities:

1)    the Office of the Attorney General,
2)    the private bar, and
3)    public interest organizations.

Note, the consumer protection enforcement authority and budget of the Department of Consumer and Regulatory Affairs (DCRA) has been suspended since 1994 as a cost-saving measure.

## Shortfalls in the Existing System

The NCL believes the following are shortcomings in the existing system for consumer protection enforcement which supports the passage The Consumer Protection Amendment Act of 2011:

- Suspension of DCRA's authority removed an important mechanism for halting unlawful trade practices,
- The Consumer Fund §28-3911 (Act 19-98, § 9003(a)) in 2011 which received monies from private and public enforcement actions for future enforcement actions by the OAG, was eliminated.
- The D.C. Court of Appeals decision in *Grayson v. AT&T Corp.*[1] prevents nonprofit organizations without traditional Article III standing from bringing suit on behalf of the general public to halt the continued use of unlawful trade practices, leaving a gap in enforcement which previously existed from the 2000 Amendments.
- There is no regulation governing unit pricing in retail stores, leaving consumers without sufficient information to make informed purchases

## Introduction

The Consumer Protection Amendment Act of 2011[2] is designed to strengthen protections given to consumers through the creation of additional illegal trade practices, the granting of standing to nonprofit organizations (without traditional Article III standing) to act on behalf of the general public, and the introduction of unit pricing.

## Brief History of Consumer Enforcement in the District of Columbia

---

[1] 15 A.3d 319 (D.C. 2011) (en banc).
[2] B19-581 (2011).

The DCRA Office of Compliance was established by statute in 1976 as the District's "principal consumer protection agency."[3]

The D.C. Council suspended DCRA enforcement of the Consumer Protection Procedures Act in 1994.[4] This was renewed in 1998[5] and 2000.[6] As of 2010, the DCRA's Office of Consumer Protection has been discontinued due to these budgetary shortfalls. The NCL believes that the long-term deprivation of enforcement resources from the DCRA, coupled with the elimination of the Consumer Fund, has financially impacted public enforcement of consumer protection laws. As a result of this budgetary suspension, the CPPA is mainly enforced through private actions once a consumer has already suffered some type of injury. This has left consumers with private remedial actions as their only recourse. Without any significant proactive enforcement, consumers are largely left without protections from illegal trade practices until it is too late.

The private enforcement mechanism currently in place has many shortfalls that do not adequately protect consumers and is not a substitute for DCRA or OAG enforcement. The current system does not allow consumers to pursue injunctive relief from practices that are ongoing but have not resulted in injury yet or from practices that have harmed others but not the plaintiff. The Court of Appeals' decision in *Grayson* established that the only persons that can bring suit to halt illegal trade practices are those who have already suffered an injury-in-fact.

### Standing for Nonprofit Organizations

The D.C. Council passed the Consumer Protection Act of 2000, which included an amendment to the CPPA to allow public interest organizations and the private bar to bring suit for injunctive relief and disgorgement of illegal proceeds in the public interest. Despite the clear language of the statute, and its legislative history, the District of Columbia Court of Appeals in *Grayson* held that the amendment did not reveal an explicit intent of the D.C. Council to eliminate the requirement that the plaintiff suffer an injury-in-fact to enjoy standing to bring a claim. The court examined the legislative and drafting history of the amendments and determined that the D.C. Council did not clearly signal its intent to overturn the prudential standing requirements the Court had previously adopted. This bill clearly seeks to provide such clarity.

The amendment to section 3905(k)(1)(B) and (C) here expresses the clear intent of the Council to grant nonprofit organizations standing under the CPPA without the need to suffer an injury-in-fact to itself or its members and to legislatively and partially overrule *Grayson*. This is a necessary step because budget cuts have left the CPPA with

---

[3] D.C. Code § 28-3902(a) (2012).

[4] Multiyear Budget Spending Reduction and Support Emergency Act of 1994, Act 10-389, § 808, 42 D.C. Reg. 229-30 (Jan. 13, 1995).

[5] Consumer Protection Amendment Act of 1998, Act 12-399, § 1403 (suspending enforcement through 2000).

[6] Consumer Protection Act of 2000, Act 13-375, § 1402 (suspending enforcement through 2002).

diminished funding for government enforcement. This amendment seeks to fill that void by authorizing nonprofits groups to pursue cases that normally would be prosecuted by the DCRA or OAG. The U.S. District Court for the District of Columbia held that the National Consumers League (NCL) bringing suit as a private attorney general on behalf of the general public did not have Article III standing when it could not allege an individualized injury to itself or when it lacked organizational standing.[7] While the case was remanded back to D.C. Superior Court where standing was initially found, *Grayson* later mandated the suit's dismissal prior to a resolution on the merits.

This stands in sharp contrast to a matter NCL prosecuted and resolved *prior to* the Court of Appeals' issuance of *Grayson*. The NCL, brought suit on behalf of the general public against Kellogg Company for false advertising in relation to allegedly false health claims made on its cereal boxes.[8] This litigation resulted in a settlement agreement whereby Kellogg donated $200,000 to food based charities and programs and 8,000 cases of cereal (or approximately 100,000 boxes) to local D.C. food banks and charities.[9] In Ward 7 alone, this settlement benefited the following charities with food initiatives: Nehemiah's Food Pantry, First National Baptist Church, Incarnation Church St. Vincent; Pennsylvania Baptist Church and Food & Clothing Center of Ward 7. Actions like this demonstrate the beneficial nature of permitting private attorney general claims to be prosecuted by nonprofit organizations.

This amendment explicitly allows suits brought by nonprofit organizations, when acting as private attorneys general, to proceed in D.C. Superior Court and provide necessary protections to the District's consumers. Section 3901(a)(14) defines nonprofit organizations in relation to federal nonprofit law under 26 U.S.C. § 501(c). Other D.C. law regarding nonprofits reference federal law and there is no definition of nonprofits under the D.C. Code.[10] This ensures that the organizations allowed to bring suit without an injury-in-fact are doing so for the public benefit.

## Clarifying the Definition of Consumer and Consumer Goods or Services

The amendment clarifies the definition of consumer when used as an adjective and brings it in line with the definition of consumer under the Magnusson-Moss Warranty Act.[11] That act similarly defines a consumer product as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes."[12] Thus, the change seeks to include property that is not

---

[7] *The Nat'l Consumers League v. Gen. Mills, Inc.*, 680 F. Supp. 2d 132, 134-36 (D.D.C. 2010).

[8] *The Nat'l Consumers League v. Kellogg Company*, No. 2009 CA005211 B (D.C. Super. Ct.)

[9] The allegedly false statements were also halted by other litigation.

[10] *See, e.g.*, D.C. Code §§ 2-1210.01(7), 42-2801(8), 42-3601(1), 47-3505(a), 47-857.11(1), § 51-103(h). The sections on incorporated nonprofits and unincorporated nonprofits associations do not contain a definition of a nonprofit. *See* D.C. Code §§ 29-101.02, 29-1102(5).

[11] 15 U.S.C. § 2301(1) (2006).

[12] *Id.* The language also mirrors the U.C.C. definition of consumer goods, defined as "goods that are used or bought for use primarily for personal, household, or family purposes." D.C. Code § 28:9-102(a)(23).

used *exclusively* for personal, family, or household purposes. This eliminates the unintended consequence that consumer goods or services, which are typically used for consumer purposes, could fail to qualify for protections under the CPPA because of use for commercial purposes.

### Additions to Unlawful Trade Practices

There are several proposed additions to section 3904 that are designed to provide improved protections for consumers against unscrupulous business practices:

### *"(f-1) Use innuendo or ambiguity as to a materials fact, which has a tendency to mislead"*

Section 3904(f-1) prohibits the willful use in written representations of falsehood, innuendo, or ambiguity as to a material fact. This language is borrowed from the Kansas Consumer Protection Act[13] and is similar to the Hawai'i Uniform Deceptive Trade Practices Act.[14] This prevents businesses from mischaracterizing their goods or services and preying on consumers who are expecting to receive something different. Kansas courts clarify that the intent needed is intent to engage in the act, not intent to violate the statute.[15]

### *Representing that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law"*

Section 3904(r)(6) adds an additional factor for courts to consider in determining whether a term or provision is unconscionable. This language is similar to language found in the consumer protection statutes of Alaska,[16] California,[17] Tennessee,[18] Texas,[19] and Guam.[20] This strengthens consumers' ability to receive the benefit of the bargain and disincentivizes merchants from attempting to trick consumers into believing they are going to receive something different than they are providing. It also prevents merchants from including terms that cannot come into effect because they are prohibited by law. Taken together, this subsection allows courts to police transactions to determine whether the merchant represented that the deal contained terms that will not take effect.

### *"(ii) Engage in any unfair business act or practice, which occurs when the practice: (1) Offends established public policy or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and the practice is not outweighed by countervailing benefits to consumers; or (2) Threatens an incipient*

---

[13] Kan. Stat. Ann. § 50-626(b)(2).

[14] HRS § 481A–3(a)(12) (catchall clause stating that "any other conduct which similarly creates a likelihood of confusion or of misunderstanding" is a deceptive trade practice).

[15] *York v. InTrust Bank, N.A.*, 962 P.2d 405, 421 (Kan. 1998).

[16] Alaska Stat. § 45.50.471(b)(14).

[17] Cal. Civ. Code § 1770(a)(14)

[18] Tenn. Code Ann. § 47-18-104(b)(12).

[19] Tex. Bus. & Com. Code Ann. § 17.46(b)(12).

[20] 5 Guam Code Ann. § 32201(b)(12).

*violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."*

Section 3904(ff) prohibits merchants from engaging in unfair acts or practices, which are defined as occurring in two circumstances. Subsection (1) prohibits acts that offend established public policy, or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. This language originates with an FTC rule prohibiting certain advertisements that neither violate laws nor are deceptive but nonetheless are unfair.[21] The language has been adopted by courts in analyzing consumer statutes in Hawaii,[22] Louisiana,[23] Massachusetts,[24] and North Carolina[25] as a way to define an unfair trade practices. Oklahoma uses the phrase to statutorily define an unfair trade practice.[26] The proposed bill also contains a provision that these prohibited practices must not be outweighed by countervailing benefits to consumers. This produces a balancing effect in which only those practices that have an ultimate negative impact on consumers are prohibited.[27]

Subsection (2) polices unfair competition amongst merchants because of the negative impact they have on consumers. This subsection also applies to practices that otherwise significantly harm or threaten to harm competition. Taken together, these practices harm consumers by undermining competitive markets. This language originated in California case law that interpreted the state's Unfair Competition Law.[28]

### Unit Pricing

Unit pricing provides the price of goods based on cost per unit of measure. It is calculated by dividing the price of the product by an accepted unit of measurement depending on the type of product (e.g., grams, liters) and provides an intensive price. The proposed language is based off a model act created by the National Conference of Weights and Measures and is supported by the Department of Commerce's National Institute of Standards and Technology.[29] Three quarters of all grocery shoppers rely on unit pricing to make comparisons, according to the Food Marketing Institute, an industry trade association. It should be noted that many industry trade associations worked with NIST to create the model act.

---

[21] 29 Fed. Reg. 8324, 8355 (July 2, 1964); *see FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (U.S. 1972).

[22] *Balthazar v. Verizon Haw., Inc.*, 123 P.3d 194, 202 (Haw. 2005).

[23] *Monroe Med. Clinic, Inc. v. Hosp. Corp. of Am.*, 622 So.2d 760, 781 (La. Ct. App. 1993).

[24] *Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., Inc.*, 532 N.E.2d 660, 664 (Mass. 1989).

[25] *John v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610, 621 (N.C. 1980).

[26] Okla. Stat. tit. 15, § 752(14).

[27] *Camacho v. Auto. Club of S. Cal.*, 48 Cal. Rptr. 3d 770, 779 (Ct. App. 2006).

[28] *Cel-Tech Commc'ns, Inc. v. L.A.Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999).

[29] National Institute of Standards and Technology, NIST Handbook 130: Uniform Law and Regulations in the Areas of Legal Metrology and Engine Fuel Quality as Adopted by the 96th National Conference on Weights and Measures 2011, at 135-40 (2012), *available at* http://www.nist.gov/pml/wmd/pubs/upload/2012-h130-final2.pdf.

As of August 2011, there are nineteen states and two territories that have adopted unit pricing.[30] This includes D.C.'s sister jurisdiction Maryland.[31] We have spoken with a member of the Division of Consumer Protection of Maryland's Office of the Attorney General and found that there have been no enforcement actions within the state since its introduction of a similar law. This demonstrates that unit pricing laws are easily implemented and compliance is easy to maintain.

Unit pricing allows customers to compare value between different brands, different sized packages, different package types, and different products.[32] It allows consumers to identify the best value and use one consistent measure to sort through various package sizes, brands, and substitute products. It also provides an indicator of relative quality among different brands. Unit pricing places the focus on the pricing of the product rather than the brand name. It also reduces the need for excessive packaging that can prove deceptive.

Unit pricing also benefits retailers by promoting sales and private label products, which are often less costly than a brand name product, and helps reduce pricing errors. With a uniform unit pricing system consumers can also compare prices of the same product between stores. This will benefit businesses by providing a way to showcase that they have the lowest prices and best value. Unit pricing is consistent with the goals of the federal Fair Packaging and Labeling Act that informed consumers are a crucial component of the market.[33] Unit pricing provides information to consumers that allow them to make a more educated purchase decision and promotes healthy competition among businesses.

Creating a uniform system for unit pricing eliminates inconsistencies that arise through voluntary use. Many stores voluntarily provide unit pricing, but this is done in an inconsistent manner, including using different units of measurement for similar products or only selectively providing unit pricing for only certain brands in product category. A survey done by NCL found that unit pricing is not done uniformly in D.C.[34] Among the seven stores surveyed that had voluntarily provide unit pricing, NCL found that each store had a different labeling system, there was wide variation in the units used, and many pricing calculations were incorrect. This can mislead consumers when comparing products or if they compare prices between stores. Instituting a uniform unit

---

[30] National Institute of Standards and Technology, NIST Handbook 130: Uniform Law and Regulations in the Areas of Legal Metrology and Engine Fuel Quality as Adopted by the 96th National Conference on Weights and Measures 2011, at 10-13 (2012), *available at* http://www.nist.gov/pml/wmd/pubs/upload/2012-h130-final2.pdf.

[31] Md. Code Ann., Com. Law § 14-101 to -107.

[32] *See* Hans R. Isakson & Alex R. Maurizi, *The Consumer Economics of Unit Pricing*, 10 J. Marketing Res. 277 (1973); Vincent-Wayne Mitchell et al., *Consumer Awareness, Understanding and Usage of Unit Pricing*, 14 Brit. J. Mgmt. 173 (2003); Kent B. Monroe & Peter J. LaPlace, *What Are the Benefits of Unit Pricing?*, J. Marketing, July 1972, at 16.

[33] 15 U.S.C. § 1451 (2006).

[34] National Consumers League, *The Case for Unit Pricing: Benefits of Reliable, Standard Food Labeling*.

pricing system will eliminate this confusion by mandating consistent and accurate labels for all products and stores.

## CONCLUSION

For these reasons, the NCL supports The Consumer Protection Amendment Act of 2011 and urges its passage.

Sally Greenberg
Executive Director
National Consumers League

# Legal Counsel
# for the Elderly

**Public Hearing on B19-581: Consumer Protection Amendment Act of 2011**
**October 11, 2012**
**Committee on Public Services and Consumer Affairs**
**Councilmember Yvette Alexander, Chairperson**

**Testimony of Jennifer L. Berger and Amy R. Mix, Esq. of**
**AARP Legal Counsel for the Elderly**

Legal Counsel for the Elderly (LCE) is a non-profit provider of legal services to D.C. residents aged 60 plus, and an affiliate of AARP. For over 35 years, LCE has championed the dignity and rights of Washington, D.C.'s elderly residents by providing free legal and social work services to those in need. LCE's staff and volunteers assist more than 5,000 elders each year. Twenty percent of LCE's cases involve housing advocacy to preserve affordable housing among the District's most vulnerable residents.

LCE's Consumer Fraud and Abuse Prevention Unit assists with foreclosure prevention that results from predatory lending, foreclosure rescue scams, and mortgage and/or real property tax arrears. LCE's Alternatives to Landlord/Tenant Court for the Elderly Project is a social work/legal collaborative that seeks to vindicate tenants' rights to habitable and affordable housing. District agencies (Superior Court, Office on Aging social services network, and Department of Housing and Community Development) refer District elders to LCE to prevent loss of their most valuable and often sole assets: their homes.

LCE supports Public Hearing on B19-581: Consumer Protection Amendment Act of 2011 but recommends certain changes to ensure full protection for elderly consumers and tenants. A more vibrant, protective consumer protective statute is necessary to protect District residents from all unscrupulous business practices, including those of housing providers.

I.    **Non-profit organizations should be able to vindicate the interests of the populations they serve by bringing suit under the District's consumer protection statute.**

Legal Counsel for the Elderly provides direct service to individuals and represents individuals, or classes of individuals, whose housing rights have been impaired. That said, we support the right of non-profit organizations to be able to sue for injunctive relief to stop an unfair or deceptive practice prior to one of our clients suffering injury from those practices. Non-profit standing to protect the public from deceptive trade practices supports judicial economy, as it prevents massive amounts of individual litigation on the same issue by stemming wrongs before they occur. In turn, and optimistically, businesses benefit from learning early that their trade practices are illegal, and thereby preventing further legal liability.

601 E Street, NW| Washington, DC 20049| 202-434-2120| 202-434-6464 fax| 202-434-6562 TTY| www.aarp.org/lce
Legal Counsel for the Elderly is affiliated with AARP.
Part of the Senior Service Network – Supported by the DC Office on Aging.

LCE is a co-signatory to the letter The Legal Aid Society of DC submitted on the standing issue. As such, we incorporate by reference the technical suggestions in the October 5, 2012 letter, to enhance the language of B19-581.

## II.    B19-581 should be amended to strike the preclusion of the CPPA applying to landlord/tenant relations.

The DC Court of Appeals case, *Gomez v. Independence Management of Delaware, Inc.*, 967 A.2d 1276 (2009) holds that the Council did not intend to create a private right of action under the CPPA in the realm of L-T relations. Moreover, the CPPA is explicit in 29-3903(c)(2)(A) that the DCRA may not "apply the provisions of Section 28-3905 to landlord-tenant relations." This is troubling, as the Rental Housing Act does not cover all deceptive practices a landlord could engage in, nor have as expansive remedies as the CPPA.

Several other states, including Maryland[1], Massachusetts[2], New Jersey[3], New York[4], North Carolina[5], Vermont[6] and Wisconsin[7], allow parties to apply their consumer protection statutes to landlord-tenant relationships. The District, which otherwise has other tenant protections should similarly protect tenants under the CPPA. As is, the Rental Housing Act does not provide protections for all tenant/housing provider transactions, which opens the door to housing provider abuses.

### A. The Rental Housing Act only protects tenants from certain, limited housing provider practices.

D.C. Code §§ 42-3501.01 et seq. prescribes that a tenant can file a petition under the following circumstances: illegal rent increase (lack of housing provider registration with the RAD; a larger rent increase than allowed; lack of proper rent increase notice 30 days before the rent increase; lack of filing the proper rent increase forms with the RAD; or an increase taken while the unit is not in substantial compliance with the housing regulations); services and facilities elimination or reduction; retaliation; an improper notice to vacate; security deposit overcharge, or failure to return the deposit, with interest; and interference with tenant association right to organize.

Many of the elderly tenants LCE serves complain of illegal charges by their housing providers that are not related to rent. For instance, one tenant, a Ward 7 resident, was sued in Landlord/Tenant Court for forty different late fees when the lease agreement did not provide for late fees. The landlord dismissed the eviction action but was never penalized for the erroneous late fees, because the Small Claims Court dismissed the CPPA suit for lack of tenant standing to sue. There was no recourse for this tenant to sue the landlord for wasting her time in court, and as a result a similar case of erroneous late fees arose two years later. This tenant is willing to

---

1 Maryland Commercial Law Title 13 – Consumer Protection Act; 13-301 Unfair or Deceptive Trade Practices
2 Massachusetts General Laws Part I, Title XV, Chapter 93A §1
3 N.J.S.A. 56:8-2I; applied to Landlord-Tenant relationships by 49 Prospect Street Tenants Association v. Sheva Gardens Inc., 547 A.2d 1134 (N.J. Super. Ct. App. Div. 1988)
4 N.Y. GBS. LAW Article 22-A § 349
5 N.C. Gen. Stat. §75-1 The NC Court of Appeals has held that Residential rental agreements fall within Chapter 75 because "the rental of residential housing is" considered commerce pursuant to N.C. Gen. Stat. § 75-1.1.  Love v. Pressley, 34 N.C.App. 503, 516, 239 S.E.2d 574, 583 (1977), cert. denied, 294 N.C. 441, 241 S.E.2d 843 (1978).
6 Vermont Statutes Annotated Title 9 Chapter 63.
7 Wis. Stat. 100.20(5); Wis. Stat. § 704.95.

speak with Council further about how stressful and time-consuming her court experience was, and just asked that her name and telephone number not be in this public document.

Housing providers should not get special preference over other business people, as leases are contracts and housing providers businesspeople just as in any other consumer transaction. Given the age and limitations of LCE's clients, erroneous fees, and ensuing erroneous law suits, are a severe hardship. A robust CPPA, that includes the landlord/tenant relationship, is critical to remedy this evil.

### B. The Rental Housing Act has limited remedies compared with the CPPA.

Under the Rental Housing Act, relief is limited to rent refunds, treble damages and attorney's fees. Treble damages are only available in instances of bad faith. Under the CPPA, however, in addition to damages of the greater of $1500 per violation or treble damages, consumers can get reasonable attorney's fees, punitive damages, injunctive relief, and restoration of money or property. See DC Code 28-3905(k)(1).

### Conclusion.

As advocates for elderly tenants and consumers, we support a strong consumer protection statute that enables tenants to vindicate their rights under the CPPA. We welcome the opportunity to meet with your staff and tenant/consumer advocates to discuss our suggestions and concerns more fully. I may be reached at (202) 434-2155 if you would like to speak with LCE or get the contact information for the Ward 7 resident referenced in the testimony. Thank you for recognizing the importance of a robust consumer protection statute to District of Columbia residents.

Sincerely,

Jennifer L. Berger
Supervising Attorney
Alternatives to Landlord/Tenant Court for the Elderly Project

Amy R. Mix
Supervising Attorney
Consumer Fraud and Abuse Unit

3

STATEMENT OF

JONATHAN K. TYCKO
TYCKO & ZAVAREEI LLP
2000 L STREET, N.W., SUITE 808
WASHINGTON, DC 20036
(202) 973-0900

SUBMITTED TO THE COMMITTEE ON PUBLIC SERVICES AND CONSUMER AFFAIRS
OF THE COUNCIL OF THE DISTRICT OF COLUMBIA

IN CONNECTION WITH

THE PUBLIC HEARING ON
BILL 19-0581, "THE CONSUMER PROTECTION AMENDMENT ACT OF 2011"

OCTOBER 11, 2012

CHAIRPERSON ALEXANDER AND MEMBERS OF THE COMMITTEE:

My name is Jonathan K. Tycko. I have been a practicing attorney for approximately 20 years, the great majority of that spent in the area of civil litigation. I received my law degree from Columbia Law School in 1992, spent two years as a law clerk for a federal judge, and then joined a large firm here in the District of Columbia. For the past 10 years, I have been a partner with the law firm of Tycko & Zavareei LLP, a firm that focuses on complex civil litigation. Thank you for this opportunity to address the Committee on the important issue of reforming the District of Columbia Consumer Protections Procedure Act (the "CPPA"), currently codified at D.C. Code §§ 28-3901-3913.

Our law firm has represented plaintiffs in various matters under the CPPA. This statute plays a crucial role in the policing of unlawful trade practices in the District of Columbia, especially in a day and age when government enforcers have limited resources with which to pursue consumer protection cases.

I believe that the proposed amendments to the CPPA are important and are steps in the right direction. I would also ask this committee to consider one additional change to the bill. Specifically, I would urge the council to enshrine the right of D.C. consumers to bring actions under the CPPA based upon purchases of goods and services used for "testing" their characteristics. So-called "tester standing" has a solid pedigree in our nation's jurisprudence and is a necessity in many consumer protection actions.

I will address each of these issues in turn.

## 1. The Changes Proposed by the Consumer Protection Amendment Act of 2011 Are Necessary

The Consumer Protection Amendment Act of 2011 will strengthen protections given to consumers by explicitly granting standing to nonprofit organizations to act on behalf of the

2

general public, by clarifying the types of purchases covered by the CPPA, and by improving the scope of the protections afforded by the CPPA.

### a. Standing for Nonprofit Organizations

The amendment to section 28-3905(k)(2) would grant non-profit organizations (as defined under 26 U.S.C. § 501(c)) standing under the CPPA. This amendment would allow suits brought by nonprofit organizations, when acting as private attorneys general, to proceed in D.C. Superior Court. Nonprofit, public interest organizations provide an important consumer protection function. Among other things, such organizations may have direct contact with members of the public, and may therefore become aware of issues of concern. Public interest organizations may have the resources and the technical expertise to understand certain forms of difficult-to-understand consumer fraud. Allowing organizations themselves to bring private actions will provide necessary protections to the District's consumers.

Nonprofit organizations will thereby be relieved of the additional burden of enlisting a specific member to serve as a plaintiff in a private action. In many cases this is a difficult obstacle, as many of an organization's members prefer anonymity or are concerned about personally participating in the rigors of private litigation, even if they support the goals of the litigation.

Importantly, however, the amendments do not jettison Article III standing requirements of a "distinct and palpable injury," in the words of the *Grayson* court. *Grayson v. AT&T*, 15 A.3d. 218, 234 (D.C. 2011). Indeed, non-profit organizational standing is limited to situations where the organization "can demonstrate that a particular member of the non-profit or of the general public *would have had standing*[.]" This proposed amendment to the CPPA in many way mirrors the requirements of "associational standing," a doctrine that has been recognized by

both the United States Supreme Court and the District of Columbia Court of Appeals. *See, e.g.,* *UAW v. Brock,* 477 U.S. 274, 290 (1986); *Friends of Tilden Park, Inc. v. District of Columbia,* 806 A.2d 1201, 1207 (D.C. 2002). Accordingly, this amendment builds upon a form of standing that has already been determined by the courts to satisfy constitutional requirements.

With this important protection, the amendments strike a prudent balance—allowing nonprofit organizations to do the important work of discerning and acting on consumer fraud, while also demanding something akin to Article III standing.

**b. Clarifying the Definition of Consumer and Consumer Goods or Services**

The amendment seeks to include goods and services that—while not used *exclusively* for personal, family, or household purposes—could fail to qualify for protections under the current CPPA because of partial use for commercial purposes. This helpful amendment eliminates the unintended consequence that consumer goods or services, which are typically used for consumer purposes, could be excluded from CPPA coverage simply because they were purchased by a small business owner or were subject to a mixed use by a consumer. For example, if a taxi driver (one of D.C.'s independent businessmen and women) purchases a cell phone for both personal use, and for taking calls from potential customers, this purchase would be covered under the amended CPPA but potentially not covered by the current version of the Act.

**c. Improvements To Scope of Protections**

There are several proposed additions to Section 3904 that are designed to provide improved protections for consumers against unscrupulous business practices:

(i)      The proposed Section 3904(f-1) prohibits the willful use in written representations of falsehood, innuendo, or ambiguity as to a material fact. This prevents businesses from mischaracterizing their goods or services and preying on

4

consumers who are expecting to receive something different. As is well-known, marketing and branding is a sophisticated science these days. Products or marketing materials may be designed to mislead consumers without stating outright untruths. This amendment would ensure such deceptive tactics would fall under the ambit of the CPPA.

(ii)   The proposed Section 3904(r)(6) adds an additional factor for courts to consider in determining whether a term or provision of a bargain is unconscionable. This language is similar to language found in one of the consumer protection statutes of California. Accordingly, there is a significant amount of case law that makes use of, and interprets, similar language. *See, e.g.*, *Cel-Tech Communications, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999). Simply put, this amendment makes it illegal for a merchant or services provider to mislead or deceive consumers, even if the merchant or services provider does not make an outright misrepresentation. It also prevents merchants from including terms in a bargain that cannot actually come into effect because they are prohibited by law.

(iii)   The proposed Section 3904(ff) prohibits merchants from engaging in unfair acts or practices, which are defined as occurring in two circumstances. Subsection (1) prohibits acts that offend established public policy, or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. This language tracks an existing FTC rule prohibiting certain advertisements that neither violate laws nor are deceptive but nonetheless are unfair. 29 Fed. Reg. 8324, 8355 (July 2, 1964); 16 C.F.R. 408. The proposed bill also contains a provision that these prohibited practices must not be outweighed by countervailing benefits to

consumers. This produces a balancing test, to be applied by judges and juries, in which only those practices that have an ultimate negative impact on consumers are prohibited. Subsection (2) polices unfair competition amongst merchants because of the negative impact they have on consumers. This subsection also applies to practices that otherwise significantly harm or threaten to harm competition. Taken together, these practices harm consumers by undermining competitive markets.

**2.    The CPPA Should Be Amended To Ensure That Products or Services Purchased By Consumers For the Purpose of Testing Form a Valid Basis for a Claim**

There are many instances in which a consumer is required to purchase a product or service in order to determine whether or not it is, in fact, what it claims to be. In terms of consumer products, this includes a product that claims to have certain characteristics that are not discernable to the human senses. For example, if a consumer believed a gas station in the District of Columbia was selling gasoline as "91 Octane" when in fact it was a lower grade of gas, the consumer would likely have to purchase gasoline and have it analyzed by a competent lab in order to confirm his suspicions. This is also true for many food products. Similarly, in the realm of consumer services, a consumer may need to make use of (or attempt to make use of) the services in order to determine whether the services are being appropriately offered. Such "testing"—again, necessary to conclude whether or not the product or service is what is claims to be, or otherwise violates the CPPA—should not preclude a consumer from turning to the CPPA for a remedy.

Such "tester standing" has a long and storied history in our nation's civil rights jurisprudence. In *Havens Realty v. Coleman*, 455 US 363 (1982), the Supreme Court upheld the standing of an organization seeking to enforce nondiscrimination laws of title VIII of the Civil

Rights Act of 1968, the Fair Housing Act, 42 U.S.C.§ 3604, when that organization sent "testers" into a housing complex inquiring about rental properties. While the white tester was told units were available, the black tester, with the same qualifications as the white tester, was told otherwise. Neither tester, it should be noted, intended to actually rent units—in fact, the black tester applied with the expectation of being denied. *Id.* at 366-369. In affirming the statutory injury of the black tester, the *Havens* court determined that the Fair Housing Act conferred standing to plaintiff via his statutory right to truthful information in the context of housing accomodations. *See also FEC v. Atkins*, 524 US 11 (1998) (prudential standing is satisfied when the injury asserted by a plaintiff "arguably [falls] within the zone of interests to be protected or regulated by the statute . . . in question"). And as the D.C. Court of Appeals has held with regard to a D.C. civil right statute, "the statutory violation and accompanying injury *exist without respect to the testers' intentions in initiating the encounters*." *Molovinsky v. Fair Employment Council of Greater Washington, Inc.*, 683 A.2d 142, 146 (D.C. 1996) (analyzing D.C. Human Rights Act).

Like the testers in *Havens* and *Molovinsky*, D.C. consumers must be allowed to offer to purchase, or actually purchase, products or services with the intent of determining whether those products or services are what they claim to be. Obviously, if the product or service provided is sufficient and is not accompanied with deceptive practices, the test would not have been injured—and would therefore not have standing to file suit under the CPPA. But if the product or service turns out to have been sold in violation of the CPPA, a D.C. consumer's right to be free from improper trade practices has been compromised. And that should be enough to provide standing in a CPPA action.

The D.C. Court of Appeals has never directly addressed this issue, although it has suggested that perhaps tester standing is enough. In *Ford v. ChartOne*, 908 A.2d 72, 83 (D.C. 2006) the Court of Appeals held that a person who had purchased his medical records for the purpose of future litigation had engaged in a "consumer transaction" under the CPPA because pursuing compensation for injuries was a personal motive. *Ford* recognized that as long as a "consumer" (as opposed to a businessman) makes the relevant purchase, such a purchase is covered by the CPPA. *See also Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C.1989). In *dicta*, that court, focusing on the difference between retail and wholesale purchasers, stated that if a "purchaser is not engaged in the regular business of purchasing this type of goods or service and reselling it" then the transaction would qualify for coverage under the CPPA.

While courts interpreting the CPPA have allowed "tester standing" to proceed in some cases, we are aware of at least one ruling in D.C. Superior court that has rejected such tester standing, and other D.C. rulings—including *Grayson*—could be misconstrued to prohibit tester standing. Specifically, defendants can and have argued that certain cases hold there is no standing when an injury is "self-inflicted." *See, e.g., Petro-Chem Processing, Inc. v. E.P.A.*, 866 F.2d 433, 438 (D.C. Cir. 1989); *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006). These cases are each distinguishable (and indeed, neither address the tester standing at issue here), but they nonetheless can and have been used to attempt to convince courts that a plaintiff who purchases a product or service for testing is somehow "at fault" for any harm he suffers as a result of that purchase, and thus lacks standing. In addition, this uncertainty about tester standing has, I believe, dissuaded consumers and their attorneys from bringing worthy consumer protection suits under the CPPA.

We therefore suggest that the proposed amendments to Sec. 102. Chapter 39 of title 28 be further amended as indicated by the highlighted language:

> Section 3901, Paragraph (2) is amended by striking the phrase "without exception, which is primarily for personal, household, or family use;" and inserting the phrase
>
> "without exception, which is distributed in commerce and which is normally used for personal, household, or family purposes; consumer goods or services include those which consumers normally use for personal, household or family use, even if those products are used both for personal and commercial purposes; **consumer goods or services include those which are purchased or acquired for purposes of evaluating the characteristics of a consumer good or service**" in its place.

The CPPA already does not require that a consumer show "reliance" or damages for a viable claim under the CPPA. As stated in the statute, a violation of the CPPA occurs "whether or not any consumer is in fact misled, deceived or damaged thereby[.]" D.C. Code 28-3904. *See also Shaw v. Marriott*, 605 F.3d 1039 (D.C. Cir. 2010). Therefore, the minor amendment we propose would only have the effect of foreclosing any effort by potential wrongdoers to argue that a consumer was not truly a "consumer" if she "suspected" she would be the victim of a deceptive trade practice before engaging in a consumer transaction. That argument, if allowed to be successful, would (and has) foreclosed viable CPPA claims, and the consumers of the District of Columbia are worse off because of it.

## CONCLUSION

For these reasons, I support the Consumer Protection Amendment Act of 2011 and urge its passage with the additional amendment discussed herein.

I thank the Chairperson and members of the Committee for their consideration of my statement.

9

1   **Committee Print**
2   **Committee on Public services and Consumer Affairs**
3   **Wednesday, November 28, 2012**
4
5
6                                    A BILL
7
8                              ————————————
9
10
11                 IN THE COUNCIL OF THE DISTRICT OF COLUMBIA
12
13                              ————————————
14
15   To amend Title 28 of the District of Columbia Code to revise the definition of consumer;
16          to prohibit the willful use of falsehood, innuendo, or ambiguity; to prohibit
17          representing that a transaction confers rights that it does not; to provide explicit
18          new authorization for non-profit organizations and public interest organizations to
19          bring suit under the District's consumer protection statute; to recognize a right of
20          action for consumers that purchase goods and services for the purpose of testing
21          and evaluating those goods and services; and to establish a unit pricing
22          requirement for consumer commodities.
23
24          BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA,

25   That this act may be cited as the "Consumer Protection Amendment Act of 2012".

26          Sec. 1. Chapter 39 of Title 28 of the District of Columbia Code is amended as

27   follows:

28          (a) Section 28-3901(a) is amended as follows:

29                 (1) Paragraph (2) is amended to read as follows:

30                 "(2) "consumer" means:

31                        "(A) when used as a noun, a person who, other than for purposes

32   of resale, does or would purchase, lease (as lessee), or receive consumer goods or

33   services, including as a co-obligor or surety, or does or would otherwise provide the

34   economic demand for a trade practice;

                                       1

1          "(B) when used as an adjective, describes anything, without

2    exception, that:

3                    "(i) a person does or would purchase, lease (as lessee), or

4    receive and normally use for personal, household, or family purposes; or

5                    "(ii) a person, acting on behalf of the general public, or on

6    behalf of any of its members, purchases or receives in order to test or evaluate qualities

7    pertaining to personal, household, or family purposes.".

8          (2)  A new paragraph (14) is added to read as follows:

9          "(14) "non-profit organization" means a person who:

10              "(A) is not an individual; and

11              "(B) is neither organized nor operating, in whole or in significant

12   part, for profit.".

13         (3) A new paragraph (15) is added to read as follows:

14         "(15) "public interest organization" means a non-profit organization that

15   is organized and operating, in whole or in part, for the purpose of promoting interests or

16   rights of consumers.".

17       (b)  Section 3901(c) is amended to read as follows:

18       "(c) This chapter shall be construed and applied liberally to promote its purpose.

19   This chapter establishes an enforceable right to truthful information from merchants

20   about consumer goods and services that are or would be purchased, leased, or received in

21   the District of Columbia.".

22       (c)  Section 28-3905(k)(1) is amended to read as follows:

2

1    "(A)  A consumer may bring an action seeking relief from a trade practice in

2    violation of a law of the District when that trade practice involves consumer goods or

3    services that the consumer purchased, leased (as lessee), or received.

4    "(B)  An individual may, on behalf of that individual's interests, or on behalf of

5    the interests of both the individual and the general public, bring an action seeking relief

6    from the use of by any person of a trade practice in violation of a law of the District when

7    that trade practice involves consumer goods or services that the individual purchased or

8    received in order to test or evaluate qualities pertaining to use for personal, household, or

9    family purposes.

10    "(C)  A non-profit organization may, on behalf of its own interests or on behalf of

11    the interests of any of its members, or on behalf of any such interests and the interests of

12    the general public, bring an action seeking relief from the use of a trade practice in

13    violation of a law of the District involving consumer goods or services, including, but not

14    limited to, a violation involving consumer goods or services that the organization

15    purchased or received in order to test or evaluate qualities pertaining to use for personal,

16    household, or family purposes.

17    "(D)(i)  Subject to clause (ii), a public interest organization may, on behalf of the

18    interests of a consumer or a class of consumers, bring an action seeking relief from the

19    use by any person of a trade practice in violation of a law of the District, if the consumer

20    or class could bring an action under subparagraph (A) for relief from such use by such

21    person of such trade practice.

3

1          "(ii)  An action brought under clause (i) shall be dismissed

2   if the court determines that the public interest organization does not have sufficient nexus

3   to the interests involved of the consumer or class to adequately represent those interests."

4          (d)  Section 28-3904 is amended as follows:

5              (1)  By adding a new subsection (f-1) to read as follows:

6                  "(f-1)  Use innuendo or ambiguity as to a material fact, which has a

7   tendency to mislead;".

8              (2)  By adding a new subsection (e-1) to read as follows:

9                  "(e-1)  Representing that a transaction confers or involves rights,

10  remedies, or obligations which it does not have or involve, or which are prohibited by

11  law;".

12         (e)  Section 29-3905(k)(2) is amended to read as follows:

13             "(2) Any claim under this chapter shall be brought in the Superior Court

14  of the District of Columbia and may recover or obtain the following remedies:

15                 "(A)  Treble damages, or $1,500 per violation, whichever is

16  greater, payable to the consumer;

17                 "(B)  Reasonable attorney's fees;

18                 "(C)  Punitive damages;

19                 "(D)  An injunction against the use of the unlawful trade practice;

20                 "(E)  In representative actions, additional relief as may be

21  necessary to restore to the consumer money or property, real or personal, which may have

22  been acquired by means of the unlawful trade practice; or

23                 "(F)  Any other relief which the court deems proper.".

1  Sec. 2.  A new Chapter 52 is added to Title 28 to read as follows:

2      "CHAPTER 52.  Unit Pricing Requirement.

3      "§29-5201.  Short Title.  This chapter may be cited as the Unit Pricing

4  Requirement Act of 2012.

5      "§29-5202.  Definitions.

6      "For the purposes of this title, the term:

7      "(a) "Combination packages" shall mean a package intended for retail sale,

8  containing two or more individual packages or units of dissimilar commodities.

9      "(b) "Commodity" shall mean any food, drug, cosmetic, or other article, product,

10  or commodity of any kind or class which is:

11      "(1) Customarily produced for sale at retail for consumption by

12  individuals for purposes of personal care or in the performance of services ordinarily

13  performed in or around the household; and

14      "(2) Usually consumed or expended in the course of that use or

15  performance other than by wear or deterioration from use.

16      "(c) "Person" shall mean both plural and the singular and includes individuals,

17  partnerships, corporations, companies, societies, and associations.

18      "(d) "Unit Price" or "unit pricing" shall mean the retail price of an item expressed

19  in dollars and cents per unit.

20      "(e) "Variety packages" shall mean  package intended for retail sale, containing

21  two or more individual packages or units of similar, but not identical, commodities.

22  Commodities that are generically the same, but that differ in weight, measure, volume,

23  appearance, or quality, are considered similar but not identical.

5

1        "§29-5203. Application.

2        "Except for random and uniform weight packages that clearly state the unit, each

3    person who sells, offers, or displays for sale a consumer commodity at retail shall provide

4    the unit price information in the manner prescribed herein.

5        "§29-5204. Terms for Unit Pricing.

6        "The declaration of the unit price of a particular commodity in all package sizes

7    offered for sale in a retail establishment shall be uniformly and consistently expressed in

8    terms of:

9        "(a) Price per kilogram or 100 grams, or price per pound or ounce, if the net

10   quantity of contents of the commodity is in terms of weight.

11       "(b) Price per liter or 100 milliliters, or price per dry quart or dry pint, if the net

12   quantity of contents of the commodity is in terms of dry measure or volume.

13       "(c) Price per liter or 100 milliliters, or price per gallon, quart, pint, or fluid

14   ounce, if the net quantity of contents of the commodity is in terms of liquid volume.

15       "(d) Price per individual unit or multiple units if the net quantity of contents of the

16   commodity is in terms of count.

17       "(e) Price per square meter, square decimeter, or square centimeter, or price per

18   square yard, square foot, or square inch, if the net quantity of contents of the commodity

19   is in terms of area.

20       "§29-5205. Exemptions.

21       "This subtitle does not apply to:

22       "(a) Prepackaged food which contains separately identifiable items that are

23   separated by physical division within the package;

6

1    "(b) Any item sold only by prescription;

2    "(c) Any item subject to the packaging or labeling requirements of the federal

3    Bureau of Alcohol, Tobacco and Firearms or to any pricing requirements under federal

4    law;

5    "(d) Any item actually being sold through a vending machine;

6    "(e) Any item delivered directly to a retail sales agency without passing through

7    warehousing or other inventory facility used by the agency;

8    "(f) Commodities packaged in quantities of less than 28 grams (1 ounce) or 29

9    milliliters (1 fluid ounce) or when the total retail price is 50 cents or less;

10    "(g) When only one brand of a particular commodity in only one size is offered

11    for sale in a particular retail establishment;

12    "(h) Variety packages;

13    "(i) Combination Packages;

14    "(j) A person with less than a gross volume of sales of consumer commodities in

15    excess of $ 30,000,000, and to whom at least one of the following applies:

16    "(1) During the preceding calendar year, sold a gross volume of consumer

17    commodities of less than $ 750,000;

18    "(2) Is not part of a company which consists of ten or more sales agencies

19    in or out of the District of Columbia;

20    "(3) Derives less than 15 percent of its total revenues from consumer

21    commodities subject to this Chapter; or

22    "(4) Is owned and operated by not more than one individual and the

23    members of the person's immediate family.

7

1      "§29-5206. Pricing.

2      "(a) The unit price shall be to the nearest cent when a dollar or more. If the unit

3  price is under a dollar, it shall be listed:

4      "(1)  To the tenth of a cent, or

5      "(2)  To the whole cent.

6      "(b) The retail establishment shall have the option of using (a)(1) or (2), but shall

7  not implement both methods.

8      "(c) The retail establishment shall accurately and consistently use the same

9  method of rounding up or down to compute the price to the whole cent.

10      "§29-5207. Presentation of Price.

11      "(a) In any retail establishment in which the unit price information is provided in

12  accordance with the provisions of this act, that information may be displayed by means of

13  a sign that offers the unit price for one or more brands and/or sizes of a given commodity,

14  by means of a sticker, stamp, sign, label, or tag affixed to the shelf upon which the

15  commodity is displayed, or by means of a sticker, stamp, sign, label, or tag affixed to the

16  consumer commodity.

17      "(b) Where a sign providing unit price information for one or more sizes or brands

18  of a given commodity is used, that sign shall be displayed clearly and in a non-deceptive

19  manner in a central location as close as practical to all items to which the sign refers.

20      "(c) If a single sign or tag includes the unit price information for more than one

21  brand or size of a given commodity, the following information shall be provided:

22      "(1) The identity and the brand name of the commodity.

8

1    "(2) The quantity of the packaged commodity; provided, that more than
2    one package size per brand is displayed.

3    "(3) The total retail sales price.

4    "(4) The price per appropriate unit, in accordance with section 203.

5    "§29-5208. Uniformity.

6    "(a) If different brands or package sizes of the same consumer commodity are
7    expressed in more than one unit of measure, the retail establishment shall unit price the
8    items consistently.

9    "(b) When metric units appear on the consumer commodity in addition to other
10    units of measure, the retail establishment may include both units of measure on any
11    stamps, tags, labels, signs, or lists.

12    "§29-5209. Civil penalties.

13    "Any person who violates any provision of this act, or any regulation promulgated
14    pursuant to this act, may be assessed a civil penalty not to exceed $500 for each violation.

15    "§29-5210. Rules.

16    "The Mayor may issue rules to effectuate the provisions of this act."

17    Sec. 3. Fiscal impact statement.

18    The Council adopts the fiscal impact statement in the committee report as the
19    fiscal impact statement required by section 602(c)(3) of the District of Columbia Home
20    Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-
21    206.02(c)(3)).

22    Sec. 4. Effective date.

9

1       This act shall take effect following approval by the Mayor (or in the event of veto

2   by the Mayor, action by the Council to override the veto), a 30-day period of

3   Congressional review as provided in section 602(c)(1) of the District of Columbia Home

4   Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-

5   206.02(c)(1)), and publication in the District of Columbia Register.

# Government of the District of Columbia
## Office of the Chief Financial Officer



**Natwar M. Gandhi**
Chief Financial Officer

## MEMORANDUM

| | |
|---|---|
| **TO:** | The Honorable Philip H. Mendelson<br>Chairman, Council of the District of Columbia |
| **FROM:** | Natwar M. Gandhi<br>Chief Financial Officer |
| **DATE:** | November 20, 2012 |
| **SUBJECT:** | Fiscal Impact Statement – "Consumer Protection Amendment Act of 2011" |
| **REFERENCE:** | Bill 19-581 – Draft Committee Print as Shared with the Office of Revenue Analysis on November 7, 2012 |

## Conclusion

Funds are sufficient in the FY 2013 through FY 2016 budget and financial plan to implement the bill.

## Background

The bill expands current consumer protection laws by broadening definitions, adding specific rights for non-profits, and creating a unit pricing requirement at retail establishments for most consumer commodities.

The definition of consumer[1] is expanded by the bill to include persons who buy items for commercial purposes, not just family or household use. The bill also broadens the types of business practices considered unlawful,[2] including:

1) Transactions in which ambiguity, innuendo or falsehood are purposefully utilized to obfuscate facts;
2) Leases or property sales that imply conferring rights that are prohibited by law;
3) Practices that are unethical, unfair, harm competition, or offend established public policy.

The bill creates a right of action for non-profit organizations to bring suit under the District's consumer protection statutes[3] on their own behalf, or if their public interest activities have been impaired. It also establishes jurisdiction for these claims and remedies for damages.

---

[1] As defined in D.C. Official Code § 28-3901(a)(2).

[2] D.C. Official Code § 28-3904 describes unlawful business practices.

The Honorable Philip H. Mendelson
FIS:  Bill 19-581, "Consumer Protection Amendment Act of 2011" Draft committee print shared with the
Office of Revenue Analysis on November 7, 2012

Title II of the bill is called the Unit Pricing Protection Act of 2011. This section requires retailers to
clearly and consistently present unit pricing[4] information for most household products[5] in a
manner related to the contents of the commodity. For example, a product sold by the pound must
have the cost per pound displayed by a retailer next to[6] the total cost of the product.

## Financial Plan Impact

Funds are sufficient in the FY 2013 through FY 2016 budget and financial plan to implement the
bill. The bill does not require District agencies to expand the scope of their current enforcement
roles. It merely adds to the list of consumer protection violations that may be prosecuted at the
discretion of the Office of the Attorney General.

---

[3] D.C. Official Code Title 28, Subtitle II, Chapter 39.

[4] Unit price is the retail price expressed as dollars and cents per unit of measure. Examples of unit measure
include weight, size, or number of units in a package.

[5] Exemptions are permitted for: items less than an ounce, items costing less than 50 cents, items with only
one size offered for sale, and variety or combination packages in which multiple (dissimilar) products are
grouped. Other exemptions are made depending on the type of retail establishment.

[6] A retailer may choose to tag each product or shelf, or display a summary sign with unit pricing information
for one or more sizes or brands of a commodity.

# EXHIBIT B


U.S. FOOD & DRUG
ADMINISTRATION

December 19, 2018

The Honorable David Valadao
U.S. House of Representatives
Washington, DC 20515

Dear Representative Valadao:

Thank you for your letter of November 29, 2018, in which you write the Food and Drug Administration (FDA or the Agency) requesting an update on the Agency's progress in defining the term "natural." FDA recognizes this is an important matter for consumers and the food industry.

In late 2015, FDA sought feedback from consumers and the industry on whether the Agency should define the word "natural" on food labeling (80 FR 69905). FDA received and reviewed more than 7,600 comments. FDA recognizes that consumers are trusting in products labeled as "natural" without clarity around the term. Just like other claims made on products regulated by FDA, the Agency believes the "natural" claim must be true and based on science. At the same time, FDA recognizes that there are widespread differences in beliefs regarding what criteria should apply for products termed "natural," and that many of those criteria may not be based on public health considerations. FDA is actively working on this issue, and in 2019, FDA plans to publicly communicate next steps regarding Agency policies related to "natural."

Thank you, again, for contacting us regarding this matter. If you have any further questions or concerns, please let us know.

Sincerely,

Scott Gottlieb, M.D.
Commissioner of Food and Drugs

U.S. Food & Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
www.fda.gov

# EXHIBIT A

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| **CLEAN LABEL PROJECT FOUNDATION, et al.,**<br>        **Plaintiffs,**<br><br>    **v.**<br><br>**PANERA, LLC,**<br>        **Defendant.** | **2019  CA  001898 B**<br><br><br>**Judge Yvonne Williams** |

## ORDER DENYING MOTION TO DISMISS

Before the Court is Defendant Panera, LLC's ("Panera") Motion to Dismiss the Complaint ("Motion"), filed on June 25, 2019.  Plaintiffs Clean Label Project Foundation ("Clean Label Project") and GMO Free USA filed an Opposition to the Motion on July 25, 2019. Panera filed its Reply on August 8, 2019.  For the following reasons, the Motion shall be **DENIED**.

### I.     BACKGROUND

Panera sells food products through its retail outlets that it advertises and promotes as "clean."  Compl. ¶ 4.  Panera uses the description "clean" or "100% clean" in its marketing at its physical locations, as well as on menus, bags, signs and labels throughout its stores and restaurants.  *Id.* ¶ 21.

On March 12, 2019, Plaintiffs purchased food products from a Panera location in order to evaluate the marketing of the products as "clean."  *Id.* ¶ 89.  Specifically, Plaintiffs purchased the following items: (a) Whole Grain Bagel; (b) Mediterranean Veggie Sandwich; (c) Oatmeal Raisin with Berries Cookie; (d) Oatmeal with Apple Chips and Pecans; and (e) Greek Yoghurt with Mixed Berries (collectively "Products").  *Id.* ¶ 6.  Plaintiffs sent the Products to an independent laboratory to conduct testing using liquid chromatography mass spectrometry,

1

which revealed the presence of pesticides, fungicides, and a synthetic biocide, glyphosate. *Id.* ¶¶ 25–27. Plaintiffs allege that because Panera's Products contain these contaminants, consumers are misled by Panera's use of the term "clean," and are deceived into believing that the Products are free from these chemical residues which may have detrimental health effects. *Id.* ¶¶ 7, 34–43. As a result of this portrayal of food products as "clean," Panera is able to sell a greater volume of products, charge higher prices for products, and take away market share from competing products. *Id.* ¶ 9.

Plaintiffs filed the Complaint on March 22, 2019 against Panera, its parent company Panera Bread Company, and its parent company JAB Holding Company, S.A.R.L.[1] *Id.* at 1. The Complaint claims that Panera's false and misleading representations and omissions violate the District of Columbia Consumer Protection Procedures Act ("CPPA"). Panera filed its Motion to Dismiss on June 25, 2019. The Motion seeks dismissal for lack of subject matter jurisdiction on the on the grounds that Plaintiffs lack standing to bring their claims. Def.'s Mot. at 1. The Motion also argues that even if the Court were to find proper standing, Plaintiffs have failed to state a claim regarding Panera's use of the term "clean." *Id.* Plaintiffs filed the Opposition to the Motion on July 25, 2019 and Panera filed its Reply on August 8, 2019.

## II.    LEGAL STANDARD

A Complaint should be dismissed under Rule 12(b)(1) if the trial court lacks subject matter jurisdiction. Super. Ct. Civ. R. 12(b)(1). A question of subject matter jurisdiction "concerns the court's authority to adjudicate the type of controversy presented by the case under consideration." *In re J.W.*, 837 A.2d 40, 44 (D.C. 2003) (quoting *In re R.L.*, 590 A.2d 123, 128 (D.C. 1991) (citing 1 RESTATEMENT (SECOND) OF JUDGMENTS § 11 (1982)). Whether the trial

---

[1] On June 13, 2019, Plaintiffs voluntarily dismissed their claims against Panera Bread Company and JAB Holding Company, S.A.R.L. As such, Panera is the only remaining Defendant.

court has subject matter jurisdiction is a question of law which is reviewed de novo. *Davis & Assocs. v. Williams*, 892 A.2d 1144, 1148 (D.C. 2006).

A complaint should be dismissed under Rule 12(b)(6) if it does not satisfy the requirement of Rule 8(a) that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Potomac Development Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011) (quotation and citations omitted). For the purposes of a motion to dismiss, the complaint must be construed in the light most favorable to the plaintiff and its allegations taken as true. *McBryde v. Amoco Oil Co.*, 404 A.2d 200, 202 (D.C. 1979). A complaint that passes muster under this standard is "specific enough to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Tingling-Clemons v. District of Columbia*, 133 A.3d 241, 245 (D.C. 2016) (quotation, brackets, and citation omitted).

"A complaint should not be dismissed because a court does not believe that a plaintiff will prevail on its claim; indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Carlyle Investment Management, LLC v. Ace American Insurance Co.*, 131 A.3d 886, 894 (D.C. 2016) (quotations, brackets, and citations omitted). In addition, the Court should "draw all inferences from the factual allegations of the complaint in the plaintiff's favor." *Id.* (quotations and citations omitted). However, legal conclusions "are not entitled to the assumption of truth," *Potomac Development Corp.*, 28 A.3d at 544 (quotation and citation omitted), so "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Sundberg v. TTR Realty, LLC*, 109 A.3d 1123, 1128-29 (D.C. 2015) (quotation omitted). The "complaint must plead factual

3

content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged." *Poola v. Howard University*, 147 A.3d 267, 276 (D.C. 2016) (quotation omitted).

## III.    DISCUSSION

### A.  Dismissal for Lack of Subject Matter Jurisdiction

Defendant asserts that the Court lacks subject matter jurisdiction because Plaintiffs do not have Article III standing to bring their claims. Def.'s Mot. at 3–6. However, the Court determines that Plaintiffs have established standing. "A defect of standing is likewise a defect in subject matter jurisdiction." *UMC Dev., LLC v. District of Columbia*, 120 A.3d 37, 43 (D.C. 2015). To meet the constitutional standing requirements under Article III, a plaintiff must: (1) show an "injury-in-fact" which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical, (2) which is fairly traceable to the challenged action of the defendant, and (3) likely to be redressed by a favorable decision. *Padou v. District of Columbia*, 77 A.3d 383, 388–89 (D.C. 2013). The Court of Appeals has ruled that a plaintiff bringing a claim under the District of Columbia Consumer Protection Procedures Act ("CPPA") can satisfy the injury-in-fact requirement "solely by virtue of statutes creating legal rights, the invasion of which creates standing." *Grayson v. AT&T Corp.*, 15 A.3d 219, 247 (D.C. 2011). The deprivation of a statutory right derived from improper trade practices that are in violation of the CPPA may constitute an injury-in-fact sufficient to establish standing, even though a plaintiff would have suffered no judicially cognizable injury in the absence of the statute. *See Shaw v. Marriott Int'l, Inc.*, 605 F.3d 1039, 1042 (D.D.C. 2010). Nevertheless, a violation of a statute creates the particularized injury required by Article III only when an individual right has been conferred on a party by statute. *Id.*

4

Under the CPPA, "a nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District, including a violation involving consumer goods or services that the organization purchased or receive in order to test or evaluate qualities pertaining to use for personal, household, or family purposes." D.C. Code § 28-3905(k)(1)(C). The CPPA also provides that "a public interest organization may, on behalf of the interests of consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action [as an individual consumer] for relief from such use by such person of such trade practice." D.C. Code § 28-3905(k)(1)(D)(i). However, to bring a successful action under subsection (D), the organization must have a "sufficient nexus to the interest involved of the consumer or class to adequately represent those interests." § 28-3905(k)(1)(D)(ii).

Plaintiffs articulate that they have standing under both D.C. Code § 28-3905(k)(1)(C) as nonprofit organizations, and subsection (D) as public interest organizations. The Complaint describes that Clean Label Project and GMO Free USA are 501(c)(3) non-profit organizations. Compl. ¶¶ 80, 86. Plaintiffs further describe that the Products were purchased from a Panera location in order to evaluate the marketing of these products as "clean." *Id.* ¶ 89. Plaintiffs sent the Products to an independent laboratory for testing, which revealed the presence of glyphosate, pesticides, and fungicides. *Id.* ¶¶ 26, 27. The Court finds this to be sufficient to establish standing under subsection (C).

Regarding § 28-3905(k)(1)(D), both Plaintiffs are public interest organizations. GMO Free USA states that its "mission is to harness independent science and agroecology concepts to advocate for clean and healthy food and ecological systems." *Id.* ¶ 80. Similarly, Clean Label

Project's mission is to "educate the public so they can make informed choices on cleaner option every time they shop" and have an "interest in food label truth and transparency and consumers' right to know what is in the products they purchase." *Id.* ¶¶ 86, 88. This Court has previously found that the mission, goal, and work of protecting consumers through various efforts including promoting accurate labeling of consumer goods shows a sufficient nexus. *See Nat'l Consumers League v. Bimbo Bakeries USA*, Civil Case No. 2013 CA 006548 B, 2015 D.C. Super. LEXIS 5, at *14 (Apr. 2, 2015). The Court finds this to be sufficient to establish standing under subsection (D).

Accordingly, Plaintiffs have adequately alleged that they are in the class of plaintiffs who have a statutory right to bring a CPPA action. The deprivation of that right constitutes an injury-in-fact that is sufficient to establish standing, even though Plaintiffs may not have suffered a judicially cognizable injury in the absence of the statute. *See Shaw*, 605 F.3d at 1042. Thus, the Court has subject matter jurisdiction over Plaintiffs' claims.

### B. Dismissal for Failure to State a Claim

Panera argues that Plaintiffs claim should be dismissed because they fail to plausibly allege conduct that would mislead a reasonable consumer. Def.'s Mot. at 6–8.

The CPPA determines it an unfair or deceptive trade practice to: (a) represent that goods or services have a source . . . certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; (d) represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another; (e) misrepresent as to a material fact which has a tendency to mislead; (f) fail to state a material fact if such failure tends to mislead; (f-1) use innuendo or ambiguity as to a material fact, which has a tendency to mislead; and (h) advertise or offer good or services without the intent to sell them or without the intent to sell

6

them as advertised or offered.  D.C. Code § 28-3904(a), (d), (e), (f), (f-1), (h).  Under the CPPA, "a claim 'of an unfair trade practice is properly considered in terms of how the practice would be viewed and understood by a reasonable consumer.'"  *Whiting v. AARP*, 637 F.3d 355, 363–64 (D.C. Cir. 2011) (quoting *Pearson v. Soo Chung*, 961 A.2d 1067, 1075 (D.C. 2008)).  A court may "appropriately grant a motion to dismiss on a deceptive practices claim if no reasonable person would be . . . deceived." *Whiting*, 637 F.3d at 364.

Panera labels and advertises food products as "clean" and has "presented an image and marketing materials suggesting that the Products do not contain residues of any non-food items, including artificial chemicals . . .when in fact the Products may contain synthetic fungicides and pesticides and an unnatural chemical biocide." Compl. ¶ 96.  Plaintiffs allege that reasonable consumers are misled and deceived by Panera's description of the Products as "clean" or "100% clean," and are led to believe they are purchasing food which contains no artificial chemical residues. *Id.* ¶ 61.  Plaintiffs further allege that Panera's advertising practices are in violation of the CPPA because "Panera misrepresents the characteristics, ingredients, and benefits of the Products; misrepresents the standard, quality and grade of the Products; misrepresents, fails to state and uses innuendo and ambiguity in ways which tend to mislead reasonable consumers with regard to material facts about the Products; and advertises the Products without the intent to sell the Products as advertised." *Id.* ¶ 105.

Panera argues that Plaintiffs' claims are implausible because "no reasonable consumer could be misled by Panera's labeling" since Panera's website provides a "readily accessible" definition of what it defines as "clean." Def.'s Mot. at 7.  However, Plaintiffs make the valid assertion that a "consumer in a Panera retail outlet, faced with a barrage of "clean" food representations, cannot be expected to delay purchasing food in order to visit Panera's website

and hunt through several pages to find one titled 'Food Promise: Clean,' or even to know that such a webpage exists." Pl.'s Opp'n at 12–13. The Court agrees that expecting consumers who enter a Panera location and see food marketed as "clean" to, then, load Panera's website for the Panera-specific definition of the word before purchasing food may exceed the scope of what is reasonable in those circumstances. As such, the Court finds Plaintiffs provide sufficient factual allegations, taken as true, to plausibly allege that a reasonable consumer could be misled by Panera's use of "clean," despite the online definition. As such, the Complaint establishes a CPPA violation claim that the Court will not dismiss at this stage.

### C.  Federal Preemption

Panera argues that the Food Drug and Cosmetic Act ("FDCA") preempts Plaintiffs' claims because the FDCA and the Nutrition Labeling and Education Act ("NLEA") have permitted certain quantities of pesticide chemical residues in food. Def.'s Mot. at 12–14. The FDCA provides that no state "may directly or indirectly establish . . . any requirement for the labeling of food . . . that is not identical to the requirement" of federal regulations. 21 U.S.C. § 343-1(a)(2), (5). The FDCA and the Administrator of the Environmental Protection Agency ("EPA") have set a "tolerance" level for contaminants if the EPA determines that it is safe. 21 U.S.C. § 346a(b)(2)(A)(i). Under this regulatory guideline, residues of glyphosate of up to 30 ppm are permissible, which is approximately 50 to 1000 times greater than the residue levels allegedly detected in Panera's tested Products. 40 C.F.R. § 180.364.

Panera argues that Plaintiffs' claims are inconsistent with federal law because Plaintiffs are requesting "that the Court create a new requirement that contradicts the regulations and policies promulgated by the EPA and FDA." Def.'s Mot. at 13. While the FDCA and NLEA set the limits of acceptable residues of glyphosate in foods, Panera confuses the core issue of this

case. Plaintiffs are not alleging that it is unacceptable to have any trace amount of glyphosate in the food products, but are rather contending that the presence of glyphosate, pesticides, or fungicides contradicts what a reasonable consumer would consider as "clean" or "100% clean" food. Compl. ¶ 61. An interpretation of "clean" in food labeling would not directly or indirectly contravene the FDCA and NLEA's regulations of safe levels of glyphosate. While Panera may use these regulations and standards as a basis for whether a certain level of glyphosate residue in foods is safe, this does not preempt the claim overall as Plaintiffs are challenging the use of the word "clean" in reference to food that contains the chemical substances. Accordingly, Panera's claim that Plaintiffs' allegations are precluded by federal law is without merit.

## IV.    CONCLUSION

In sum, the Court finds that Plaintiffs do have Article III standing as nonprofit and public interest organizations to bring their CPPA claims against Panera. Moreover, Plaintiffs have plausibly alleged a CPPA violation claim against Panera upon which relief can be granted, and this claim is not preempted by federal regulations. Therefore, the Court denies Panera's Motion.

Accordingly, it is this 11th day of October, 2019, hereby,

**ORDERED** that Panera's Motion to Dismiss the Complaint shall be **DENIED**.

**IT IS SO ORDERED**.

Judge Yvonne Williams

Date: October 11, 2019

Copies to:

Kim E. Richman
*Counsel for Plaintiffs*

Christopher Cole
*Counsel for Defendant*

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| TOXIN FREE USA,<br><br>                    Plaintiff,<br><br>        v.<br><br>THE J.M. SMUCKER COMPANY, and<br>AINSWORTH PET NUTRITION, LLC,<br><br>                    Defendants. | Case No. 2019 CA 003192 B<br><br> Hon. Florence Y. Pan |

## NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiff Toxin Free USA ("Plaintiff") hereby brings to the Court's attention a recent ruling in *Clean Label Project Found., et al. v. Panera LLC*, No. 2019 CA 001898 B, 2019 D.C. Super. LEXIS 14 (Oct. 11, 2019), in further support of Plaintiff's Opposition to Defendant's Motion to Dismiss. The *Panera LLC* matter is analogous to the present action, concerning the misleading advertising of food products as "clean" despite the presence of synthetic biocides, including glyphosate. Plaintiff Toxin Free USA is also a plaintiff in the *Panera LLC* matter, under its original name, GMO Free USA.

The decision of Judge Yvonne Williams denying dismissal in *Panera LLC* is relevant to several of the arguments at issue in the present Motion to Dismiss, including: (1) whether nonprofit and public interest organizations like Plaintiff have statutory standing under the D.C. Consumer Protection Procedures Act; (2) whether it is plausible to allege that reasonable consumers would be misled by marketing statements implying the absence of artificial chemical residues; and (3) whether claims alleging that affirmative, unregulated marketing representations (like "clean" or

1

"natural") are misleading are preempted by federal laws and regulations permitting certain levels of biocides to be present in food.

     A copy of the decision is attached hereto as Exhibit A.


DATED: October 30, 2019          Respectfully submitted.

          **RICHMAN LAW GROUP**

          _____

          Kim E. Richman
          krichman@richmanlawgroup.com
          8 West 126th Street
          New York, New York 10027
          Telephone: (718) 878-4707
          Facsimile: (212) 687-8292

          *Attorneys for Plaintiff*

Filed
D.C. Superior Court
11/06/2019 14:16PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| TOXIN FREE USA | : | Case Number:  2019 CA 3192 B |
| v. | : | Judge: Florence Y. Pan |
| THE J.M SMUCKER COMPANY and AINSWORTH PET NUTRITION, LLC | : : | Next Hearing: November 22, 2019 |

## <u>ORDER</u>

This matter comes before the Court on consideration of defendants The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC's Motion to Dismiss ("Defs. Mot."), filed on August 26, 2019; plaintiff Toxin Free USA's Opposition ("Pl. Opp."), filed on September 26, 2019; and defendant's Reply ("Defs. Reply"), filed on October 9, 2019.  The Court has considered the papers, the relevant law, and the entire record.  For the following reasons, defendants' Motion to Dismiss is denied.

## PROCEDURAL HISTORY

On May 14, 2019, plaintiff Toxin Free USA filed a complaint against The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC (collectively, "defendants"), alleging violations of the D.C. Consumer Protection Procedures Act ("CPPA"). *See generally* Compl.

Plaintiff is a non-profit organization "whose mission is to harness independent science and agroecology concepts to advocate for clean and healthy food and ecological systems." *See id.* ¶ 14.  According to plaintiff, "[c]onsumers value natural foods for themselves and their pets for myriad . . . reasons, including avoiding chemicals and additives, attaining health and wellness, helping the environment, and financially supporting companies that share these values." *See id.* ¶ 27.  Plaintiff alleges that "a majority of consumers seek out products with a

'natural' label, believing that 'natural' means that the products are produced without pesticides or artificial ingredients." *See id.* ¶ 29 (citing national surveys).

The Complaint alleges that plaintiff bought one package each of defendants' "Real Chicken & Brown Rice Recipe Super Premium Food for Cats" and "Real Beef, Pea & Brown Rice Recipe Super Premium Food for Dogs" (the "Pet Food"), in order to test whether the Pet Food is "natural" and contains "no artificial . . . preservatives" as its packaging indicates. *See id.* ¶ 1, 19.  Plaintiff alleges that it performed quantitative testing on the Pet Food that revealed the presence of the pesticide "glyphosate" and residues of the artificial preservative "ethoxyquin." *See id.* ¶¶ 39-40, 44-45.  Plaintiff alleges that defendants knew or should have known that the Pet Food contains glyphosate and ethoxyquin. *See id.* ¶ 59.  Plaintiff additionally alleges that consumers have purchased these products in reliance on defendants' misrepresentations; that "consumers were in fact deceived" by defendants; and that "[c]onsumers are at risk of real, immediate, and continuing harm" if the products continue to be sold as currently labeled. *See id.* ¶¶ 68, 82, 89.  Plaintiff brings various claims under the CPPA based on these allegations. *See id.* ¶ 80.

On August 26, 2019, defendants filed the instant Motion to Dismiss, arguing that: (1) plaintiff lacks standing; (2) plaintiff's claims are preempted by federal law; (3) the Court should dismiss the case under the primary jurisdiction doctrine; and (4) plaintiff's allegations are implausible.  *See generally* Defs. Mot.  On September 26, 2019, plaintiff filed its Opposition, arguing that: (1) plaintiff has standing under the CPPA's provisions addressing non-profit and public interest organizations; (2) plaintiff's claims do not conflict with federal law; (3) application of the primary jurisdiction doctrine is inappropriate; and (4) plaintiff alleges plausible claims under the CPPA. *See generally* Pl. Opp.  Defendant filed its Reply on October 9, 2019.

2

## APPLICABLE LEGAL STANDARD

A complaint should be dismissed for failure to state a claim upon which relief can be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *See Fingerhut v. Children's Nat'l Med. Ctr.*, 738 A.2d 799, 803 (D.C. 1999); Super. Ct. Civ. R. 12(b)(6). When considering a motion to dismiss a complaint for failure to state a claim, the Court must "construe the facts on the face of the complaint in the light most favorable to the non-moving party, and accept as true the allegations in the complaint." *See Fred Ezra Co. v. Pedas*, 682 A.2d 173, 174 (D.C. 1996). A court should not dismiss a complaint merely because it "doubts that a plaintiff will prevail on a claim." *See Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 210 (D.C. 1997).

A pleading must contain a "short and plain statement of the claim showing that the pleading is entitled to relief." *See* Super. Ct. Civ. R. 8(a); *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). Plaintiffs who wish to survive a motion to dismiss under Super. Ct. Civ. R. 12(b)(6) must provide "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (plaintiffs must "[nudge] their claims across the line from conceivable to plausible"); *Mazza v. Housecraft LLC*, 18 A.3d 786, 791 (D.C. 2011) (holding that *Twombly* and *Iqbal* apply in our jurisdiction because Super. Ct. Civ. R. 8(a) is identical to its federal counterpart). The "plausibility" pleading standard does not require "detailed factual allegations" at the initial litigation stage of filing the complaint, but "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *See Iqbal*, 556 U.S. at 678. A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See id.*

3

# ANALYSIS

## I.    Standing

### A.  Injury In Fact

Plaintiff has standing to bring the instant case.  To have standing, a plaintiff must demonstrate that: "(1) he or she has suffered injury in fact—an actual or imminent, concrete and particularized, invasion of a legally protected interest; (2) the injury is fairly traceable to defendant's challenged actions; and (3) it is likely the injury will be redressed by a favorable decision."  *See Equal Rights Ctr. v. Props. Int'l*, 110 A.3d 599, 603 (D.C. 2015) (internal citations omitted); *see also Grayson v. AT&T Corp.*, 15 A.3d 219, 224 (D.C. 2011) (en banc) ("[E]ven though Congress created the District of Columbia court system under Article I of the Constitution, rather than Article III, this court has followed consistently the constitutional standing requirement embodied in Article III.  Thus, appellants must allege some threatened or actual injury resulting from putatively illegal action.").

Judges on the D.C. Superior Court have repeatedly held that non-profit groups that test the quality of products have standing to bring CPPA claims on behalf of consumers and the general public.  *See, e.g.*, *Organic Consumers Ass'n v. Bigelow Tea Co.*, No. 2017 CA 8375, 2018 D.C. Super. LEXIS 11, at *1-5 (D.C. Super. Ct. Oct. 31, 2018) (Rigsby, J.) (non-profit organization that purchased products for testing purposes had standing to allege that defendant violated the CPPA);  *Nat'l Consumers League v. Gerber Prods. Co.*, No. 2014 CA 8202, 2015 D.C. Super. Ct. LEXIS 10, at *14-18 (D.C. Super. Ct. Aug. 5, 2015) (Ross, J.) (same); *Nat'l Consumers League v. Bimbo Bakeries USA*, No. 2013 CA 6548, 2015 D.C. Super. Ct. LEXIS 5, at *11-15 (D.C. Super. Ct. Apr. 2, 2015) (Mott, J.) (same).

4

As in the foregoing cases, plaintiff here has standing under D.C. Code § 28-3905(k)(1)(D) (hereinafter "Subparagraph D"), and D.C. Code § 28-3905(k)(1)(C) (hereinafter "Subparagraph C"). Subparagraph D allows a "public interest organization" to "bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District" on behalf of the "interests of a consumer or a class of consumers." *See* D.C. Code § 28-3905(k)(1)(D). The provision also requires that the public interest organization have a "sufficient nexus to the interests involved of the consumer." *See id.* Plaintiff meets the definition of a public interest organization because it is a non-profit that educates consumers about clean and healthy foods, and increases consumers' awareness of the kinds of biocides and artificial preservatives allegedly found in defendants' products. *See* Compl. ¶¶ 14-18; D.C. Code § 28-3901(a)(15). Plaintiff's mission, goal, and work regarding food transparency also provide the required nexus. *See* Compl. ¶¶ 17, 18, 83. Finally, plaintiff sufficiently alleges an injury to those consumers who have been or will be deceived by defendants' alleged mislabeling. *See id.* ¶¶ 29, 68, 82, 89. Plaintiff therefore has standing under Subparagraph D.

Defendants argue that plaintiff does not have standing under Subparagraph D because "the Complaint says [p]laintiff is only suing on behalf of itself and the general public" and not on behalf of "consumers." *See* Defs. Reply at 1. To the contrary, the Complaint repeatedly references D.C. consumers and the alleged injuries that plaintiff seeks to remediate on their behalf. *See, e.g.*, Compl. ¶ 89 ("consumers within the district have purchased [defendant's products] under the misrepresentations made by [defendants]"); *id.* ¶ 82 ("consumers were in fact deceived" by defendants); *id.* ¶ 68 ("consumers are at risk of real, immediate, and continuing harm if the [p]roducts continue to be sold"). Defendants are therefore mistaken.

5

Plaintiff also has standing under Subparagraph C, which states a "nonprofit organization may, on behalf of itself or any of its members . . . and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District, including a violation involving consumer goods or services that the organization purchased or received in order to test or evaluate . . . ." *See* D.C. Code § 28-3905(k)(1)(C). Plaintiff, a non-profit organization, purchased the Pet Food "in order to evaluate [its] purported qualities" and brings this action "on behalf of itself and the general public." *See* Compl. ¶ 19, 72. Plaintiff therefore has standing under Subparagraph C.

Defendants argue that plaintiff cannot satisfy the requirements of Subparagraph C because plaintiff bought the Pet Food for testing purposes and any injury it alleges is therefore "self-inflicted." *See* Defs. Mot. at 7. Defendants do not address the holdings in *Bigelow Tea*, *Bimbo*, and *Gerber*, each of which held that plaintiffs had standing in analogous "tester" cases. *See generally* Defs. Mot; Defs. Reply. Nor do defendants dispute the meaning of Subparagraph C's plain language that a non-profit organization may bring a claim arising from "consumer goods or services that the organization purchased or received in order to test or evaluate." *See* D.C. Code § 28-3905(k)(1)(C).[1]

Defendant instead relies on *Beyond Pesticides v. Dr Pepper Snapple Grp., Inc.*, Case No. 17-1431, 2019 U.S. Dist. LEXIS 109812 (D.D.C. July 1, 2019)). *See, e.g.*, Defs. Mot. at 1, 5, 6. There, the court held that the economic injury created by a non-profit's decision to buy a product for testing was insufficient, by itself, to confer standing. *See Beyond Pesticides*, 2019 U.S. Dist.

---

[1] "[A] testing organization that has not actually been misled may nevertheless have standing based on a violation of its right to truthful information about the goods or services it tests." Yvette M. Alexander, Report on Bill 19-0581, the "Consumer Protection Amendment Act of 2012," at 5 (Nov. 28, 2012) (Alexander Report). Indeed, the 2012 amendments to the CPPA were specifically intended to confer standing for "testers . . . .without running afoul of [the] smattering of decisions denying standing based on based on notions of 'self-inflicted harm' or 'manufactured standing.'"). *See id.* at 4; *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 366, 373 (1982) (acknowledging the validity of "tester" standing for statutory injuries arising from the "enforceable right to truthful information").

LEXIS 109812 at *2-3.  But the *Beyond Pesticides* court specifically distinguished the local

District of Columbia courts when it found that the plaintiff in that case failed to establish "Article

III standing," despite stating a claim under the CPPA.  *See id.* at *4 (citing *Atchison v. District of*

*Columbia*, 585 A.2d 150, 153 for the proposition that "D.C. courts 'enjoy[] flexibility in regard

to [the case or controversy requirement] not possessed by the federal courts.'")).  Thus, *Beyond*

*Pesticides* is not persuasive in determining the issue of standing in the instant case.

Finally, defendants argue that plaintiff has failed to plead a sufficiently "particularized"

injury.  *See* Defs. Mot. at 9.  Defendants essentially argue that just because the Pet Food plaintiff

bought contained glyphosate and ethoxyquin does not mean that the Pet Food purchased by other

consumers will contain these substances.  *See id.* at 9, 11.  Defendants support this argument

with a pair of cases which hold that an individual plaintiff must plead that the specific products

she purchased are mislabeled, rather than relying on the allegations of third-party organizations

that tested other products.  *See id.* at 9, 10 (citing *Gaminde v. Lang Pharma Nutrition, Inc.*, No.

1:18-cv-300, 2019 U.S. Dist. LEXIS 48595, *2 (N.D.N.Y. Mar. 25, 2019) and *Wallace v.*

*ConAgra Foods, Inc.*, 747 F.3d 1025, 1028 (8th Cir. 2014)).

Unlike the plaintiffs in *Gaminde* and *Wallace*, plaintiff here repeatedly alleges that the

"particular packages" it "personally purchased" contain glyphosate and ethoxyquin.  *See* Defs.

Mot. at 10; *see generally* Compl.  Defendants ask the Court to turn *Gaminde* and *Wallace* on

their heads and require plaintiff to allege not that the samples it actually purchased are

mislabeled, but rather that all of the other products on the market – those it has not tested – are

mislabeled.  As plaintiff points out, this argument "ignores the explicit purpose of the [CPPA's]

'tester' standing provision, which allows testing organizations . . . to analyze a *sample* of a

manufacturer's  product and bring an on action . . . on behalf of the general public."  *See* Pl. Opp.

at 10 (emphasis in original) (internal quotations and citations omitted).  Indeed, it is precisely because the average consumer lacks the resources and technical expertise to test these products that the CPPA gives standing to public interest organizations to sue on the general public's behalf.  The Court therefore finds that Complaint's allegations are sufficiently particular.

### B.  Injunctive Relief

Defendants also argue that plaintiff lacks standing to bring claims for injunctive relief because the Complaint alleges that only consumers are at risk of future harm, and "not [p]laintiff itself."  *See* Defs. Mot. at 8.  To support this argument, defendant relies on authority from other jurisdictions that concern neither the CPPA nor non-profit organizations suing on behalf of consumers.  *See id.* (citing *Parks v. Ainsworth Pet Nutrition, LLC*, 377 F. Supp. 3d 241, 249 (S.D.N.Y. 2019) (individual plaintiff suing under New York law) and *Cordes v. Boulder Brands United States, Inc.*, No. CV 18-6534 PSG, 2018 U.S. Dist. LEXIS 217534, at *1 (C.D. Cal. Oct. 17, 2018) (individual plaintiff suing under California law)).

One of the available remedies for claims brought under the CPPA is "[a]n injunction against the use of the unlawful trade practice."  *See* D.C. Code § 28-3905(k)(2).  As the Honorable Todd E. Edelman explained in *Organic Consumers Ass'n v. General Mills, Inc.*:

> Plaintiffs do not seek injunctive relief based upon possible future purchases of Defendant's products; rather, having procured standing by the purchase of one such product, they seek injunctive relief against practices that they allege to be unlawful under the CPPA.  By its explicit terms, the CPPA permits parties to sue on behalf of others for violations of the Act, including those related to consumer goods and services, *see* D.C. Code §§ 28-3905(k)(1)(B)-(D), and it permits injunctive relief, *see id.* at § 28-3905(k)(2)(D).  Our Court of Appeals has made explicit the connection between those provisions, holding in *Grayson* that a plaintiff-purchaser had standing to seek an injunction based upon past purchases of defendant's phone card product under the principle that the actual or threatened injury required by Art. III of

the Constitution may exist solely by virtue of statutes creating legal
rights, the invasion of which creates standing.

*Organic Consumers Ass'n v. General Mills, Inc.*, Case No. 2016 CA 6309, 2017 D.C. Super.

LEXIS 4, at *17-18 (D.C. Super. Ct. July 6, 2017) (Edleman, J.).  The Court agrees, and finds

that plaintiff may pursue injunctive relief.

## II.    Preemption

Defendant argues that plaintiff's claims are expressly preempted by the Nutrition

Labeling and Education Act ("NLEA"), which was passed in 1990 by Congress to amend the

Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301-399i.  *See* Defs. Mot. at 11.

Section 343-1(a) of the FDCA contains an express preemption provision which provides that "no

State . . . may directly or indirectly establish . . . any requirement for the labeling of food that is

not identical to the requirement[s]" of the FDCA.  *See* 21 U.S.C. § 343-1(a); *see also In Re*

*Estate of Couse*, 850 A.2d 304, 308 (D.C. 2004) (noting that one of the three ways in which a

federal statute can preempt state law is by express preemption, "where statutory language reveals

an explicit congressional intent to preempt state law") (internal citations omitted).  Defendants

argue that federal law does not require defendants to include glyphosate and ethoxyquin on their

labels.  *See* Defs. Mot. at 12.

To the extent that plaintiff asserts that defendants must adhere to standards that differ

from – and conflict with – federal labeling requirements, such claims clearly would be

preempted.  But the Court understands plaintiff to be arguing that the labels in question violate

applicable federal regulations as well as the CPPA.  *See* Pl. Opp. at 2 (citing 21 U.S.C. §

343(a)(1)).  Plaintiff is not seeking to have defendants list glyphosate and ethoxyquin on their

packages.  *See* Pl. Opp. at 1-2.  Rather, plaintiff claims that it is defendants' representation that

the Pet Food is "natural" and contains "no . . . artificial preservatives" that makes the presence of

9

glyphosate and ethoxyquin unlawful.  *See* Pl. Opp. at 2.  Under the FDCA, food is misbranded if "its labeling is false or misleading in any particular."  21 U.S.C. § 343(a)(1).  "Because the FDA has not created a rule for when food products may be labeled 'natural,' courts have found that plaintiffs' state law claims challenging the use of 'natural' as false and misleading are not preempted by the FDCA."  *Axon v. Citrus World, Inc.*, 354 F. Supp. 3d 170, 181 (E.D.N.Y. 2018) (citing  *Silva v. Smucker Nat. Foods, Inc.*, No. 14-CV-6154 (JG)(RML), 2015 U.S. Dist. LEXIS 122186, at *5 (E.D.N.Y. Sept. 14, 2015).  Plaintiff's claims are therefore not preempted by federal law.

## III.    Primary Jurisdiction Doctrine

As an alternative to preemption, defendants ask the Court to exercise its discretion and dismiss the case under the primary jurisdiction doctrine.  *See* Defs. Mot. at 13.  "The primary jurisdiction doctrine applies 'whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.'"  *Organic Consumers Ass'n v. Pret A Manger (USA) Ltd.*, No. 2018 CA 006750, 2019 D.C. Super. LEXIS 5, at *8-9 (D.C. Super. Ct. Apr. 29, 2019) (Williams, J.) (quoting *Lawlor v. District of Columbia*, 758 A.2d 964, 973 (D.C. 2000)).  "The doctrine advances two important policy objectives: greater uniformity of result and the utilization of the specialized and expert knowledge of the agency."  *Id.* (internal quotations and citations omitted). Morever, "[t]he doctrine should be invoked sparingly."  *Id.* (quoting *APCC Servs., Inc. v. WorldCom, Inc.*, 305 F. Supp. 2d 1, 12-13 (D.D.C. 2001)).

Defendants argue that whether a product that contains glyphosate and ethoxyquin may be labeled as "natural" or free from artificial preservatives is an issue best left to the competence of the EPA and FDA.  *See* Defs. Mot. at 13.  Defendants argue that the EPA is currently reviewing

the use of glyphosate in farming, and is proposing certain labeling updates. *See* Def. Mot. at 13-14. Defendants also point out that the FDA is in the process of addressing what types of foods can have the "natural" label. *See id.* at 14; Def. Reply at 5, Ex. B (FDA letter to Congress, dated December 19, 2018) ("FDA Letter").

As discussed above in the context of preemption, plaintiff's claims do not concern whether defendants are required to list glyphosate on its packaging. The EPA's efforts to update labeling requirements for glyphosate are therefore irrelevant to the applicability of the primary jurisdiction doctrine. With regard to the FDA's efforts to regulate use the term "natural," the Honorable Yvonne M. Williams addressed an identical argument earlier this year and reasoned that:

> the Court is not being asked to rule on whether the glyphosate levels found in [defendants' products] are acceptable, rather the Court is being asked to address "whether a reasonable consumer is likely to be deceived by the use of the term 'natural' on foods that contain synthetic residues" in violation of the CPPA. The claims brought by [plaintiff] fall directly under the conventional experience of the judiciary. Moreover, any decision related to whether [defendants] violated the CPPA will not lead to inconsistent rulings related to any FDA guidelines issued on acceptable glyphosate levels in food labeled "natural." Furthermore, the delay in any comment from the FDA regarding its policy on labeling products as "natural" is a significant factor. The Court sees no reason to assume that any agency guidance on the matter is forthcoming given that the comment period closed in 2016, and it is now 2019. Given these reasons, the Court finds it inappropriate to invoke the doctrine of primary jurisdiction.

*Pret A Manger*, 2019 D.C. Super. LEXIS 5, at *10-11. As we near the end of 2019, the FDA has not yet issued any guidance on what products may be labeled "natural," despite the agency's 2018 letter to Congress stating that it had planned to take action this year. *See* FDA Letter. Given this delay, and the reasons expressed by Judge Williams in *Pret A Manger*, the Court declines to rely on the primary jurisdiction doctrine.

IV.    **Adequacy of the Complaint**

Defendants' last argument for dismissal is that the Complaint's allegations are inadequate. *See* Defs. Mot. at 14. Defendants contend that: (1) a "reasonable consumer" would not feel deceived or misled if she found that there were trace amounts of glyphosate and ethoxyquin in a product labeled "natural" and free of "artificial preservatives"; (2) the amount of glyphosate and ethoxyquin plaintiff alleges are in the Pet Food is too small to be considered "material"; (3) the Complaint fails to allege that defendants themselves added glyphosate and ethoxyquin to the Pet Food; and (4) plaintiff fails to sufficiently detail its "quantitative testing" process. *See* Def. Mot. 15-20. The Court rejects each of these contentions.

Plaintiff adequately alleges that a "reasonable consumer" would be deceived or misled by the statement that a product is "natural" when the product in fact contains glyphosate residue. The Complaint cites multiple surveys indicating "that 63% of consumers understand a 'natural' label to mean that no toxic pesticides were used" and that "68.1% more consumers perceive crops sprayed with synthetic pesticides' like glyphosate . . . to be 'unnatural' than 'natural.'" *See* Compl. ¶ 29, n. 2). The same studies support plaintiff's claims that a "reasonable consumer" would be deceived by the presence of the artificial preservative ethoxyquin in a product labeled as "natural" and free of artificial preservatives. *See id.*; *see also Bigelow Tea*, 2018 D.C. Super. LEXIS 11, at *11.[2]

Plaintiff also adequately pleads that defendant's misrepresentations are "material." A misstatement is material under the CPPA "if a significant number of unsophisticated consumers

---

[2]    "[T]he Court is persuaded that Plaintiff has alleged enough facts to advance a plausible claim that consumers could be misled by Defendant's use of terms such as 'Natural' in advertising its products. Specifically, Plaintiff points to a 2015 Consumer Reports of 1,005 adults indicating that 'sixty-three percent of all respondents' said that 'a natural label on packaged and processed foods means that no toxic pesticides were used.' Thus, by representing the tea as being 'natural' when it allegedly contains glyphosate, Defendant may mislead consumers seeking to purchase only 'natural' foods, and Plaintiff has alleged enough facts to survive a motion to dismiss." *Id.*

would find that information important in determining a course of action." *Saucier,* 64 A.3d at 442 (citation omitted). Defendants argue that the amount of glyphosate and ethoxyquin allegedly found in the Pet Food is less than the threshold "tolerance" amount proscribed by the FDA. *See* Defs. Mot. at 15-16. Defendants argue that since the presence of these substances in amounts less than the FDA tolerance levels is not "harmful to pets[,] . . . 'it is not likely to affect consumers' decisions in purchasing the product and is thus not material.'" *See id.* at 15-16 (citing *Parks*, 377 F. Supp. 3d at 248). Defendants make a similar argument based on the labeling requirements for use of the term "organic." *Id.* at 16 (citation omitted).

"While [defendants] may use FDA regulations for organic products or the prevalence of glyphosate as evidence to persuade the fact finder at trial of its labeling, it is not persuasive at the motion to dismiss stage." *Pret A Manger*, 2019 D.C. Super. LEXIS 5, at *7. Materiality does not turn on whether the presence of glyphosate and ethoxyquin in the Pet Food is in fact harmful to pets. Rather, the question is whether an "unsophisticated consumer" would consider the presence of these substances, in any amount, "important in determining a course of action." *See Saucier*, 64 A.3d at 442. "The precise wording on the products' labels has the potential to mislead consumers who reasonably may believe that a food product with the label 'natural' does not contain any chemical agents." *Pret A Manger*, 2019 D.C. Super. LEXIS 5, at *7-8. Accordingly, the Court finds that the Complaint adequately pleads materiality.

Defendants next argue that the Complaint fails because it is does not allege that defendants "added" glyphosate and ethoxyquin as ingredients to the Pet Food. *See* Defs. Mot. at 17-18. Defendants argue that, while the products they use to make their Pet Food may be produced with glyphosate and preserved with ethoxyquin "early in the production process," plaintiff's failure to allege that they added these substances themselves is fatal to its claims. *See*

13

*id.*  Regardless of how the substances were added to the Pet Food, the Complaint adequately alleges that defendants "knew or should have known" that the Pet Food contained glyphosate and ethoxyquin, and that the products were mislabeled.  *See* Compl. ¶¶ 59, 60.

Finally, defendants argue that the Complaint fails "to allege sufficient information about the 'quantitative testing'" plaintiff allegedly performed on the Pet Food.  *See* Defs. Mot. at 19. The very pleading standards that defendants cite to support their argument belie their position. *See, e.g., id.* (citing *Potomac Dev. Corp. v. Dist. Of Columbia*, 28 A.3d 531, 544 (D.C. 2011) ("A complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.")).  The Complaint specifically alleges that, on February 22, 2019, plaintiff purchased the Pet Food "at a Target Store located at 3100 14h St NW #201, Washington, DC 20010."  *See* Compl. ¶ 19.  Plaintiff alleges that "[q]uantitative testing" on the Pet Food "reveals the presence of glyphosate and ethoxyquin."  *See id.* ¶¶ 39, 44.  Plaintiff even provides the precise amounts of glyphosate and ethoxyquin that its testing revealed.  *See id.* ¶ 55. These are not "naked assertions devoid of . . . factual enhancement."  *See Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 709 (D.C. 2013).  Rather, the Complaint provides sufficient "factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Iqbal*, 556 U.S. at 678.

Accordingly, it is this 6th day of November, 2019, hereby

**ORDERED** that defendants' Motion to Dismiss plaintiff's Complaint is **DENIED**.

**SO ORDERED**.

Judge Florence Y. Pan
Superior Court of the District of Columbia

14

Copies to:

Kim Rochman, Esq.
*Counsel for Plaintiff*

Ronald Rothstein, Esq.
*Counsel for Defendants*

Filed
D.C. Superior Court
11/18/2019 10:00AM
Clerk of the Court

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | | |
|---|---|---|
| TOXIN FREE USA, | : | |
| | : | |
| Plaintiff, | : | Case No. 2019 CA 3192 B |
| | : | |
| v. | : | Judge Florence Y. Pan |
| | : | |
| THE J.M. SMUCKER COMPANY and | : | |
| AINSWORTH PET NUTRITION, LLC, | : | |
| | : | |
| | : | |
| Defendants. | : | |

**JOINT PRAECIPE REQUESTING ENTRY OF SCHEDULING ORDER**

Pursuant to D.C. Superior Court Rule of Civil Procedure 16, Plaintiff Toxin Free USA and

Defendants the J.M. Smucker Company and Ainsworth Pet Nutrition (collectively, "the Parties")

jointly request entry by the Court of a scheduling order.

The Parties hereby certify that this lawsuit is at issue; all parties are represented by counsel;

there are no pending motions; and that the only matter requiring the Court's attention is a

scheduling order.

The Parties request that a scheduling order following a modified form of Civil II Track III

be entered, as set forth below:

| Event | Custom Plan Proposed by Parties |
|---|---|
| Exchange Lists of Fact Witnesses | 90 days (2/20/2020) |
| Plaintiffs' Rule 26(a)(2)(B) Report (Track III) | 180 days (5/20/2020) |
| Defendant's Rule 26(a)(2)(B) Report (Track III) | 240 days (7/20/2020) |

| Event | Custom Plan Proposed by Parties |
|---|---|
| Discovery Requests | 200 days (6/9/2020) |
| Close of Discovery | 270 days (8/18/2020) |
| Filing of Motions | 300 days (9/17/2020) |
| Dispositive Motions Decided | 330 days (10/19/2020) |
| ADR Mediation Case Evaluation | 360-390 days (11/16/2020, 12/16/2020) |
| Pre-Trial | 420-450 days (1/15/2021, 2/15/2021) |

WHEREFORE, the Parties respectfully request that the Court issue an Order approving the above Proposed Case Management Plan and vacate the November 22, 2019 scheduling conference.

Dated:    November 15, 2019                    Respectfully submitted,

 /s/Kim E. Richman                              /s/ Ronald Y. Rothstein
 Kim E. Richman (D.C. Bar No. 1022978)         Ronald Y. Rothstein (D.C. Bar No. 451950)
 **RICHMAN LAW GROUP**                          **WISNTON & STRAWN LLP**
 8 West 126th Street                            35 West Wacker Drive
 New York, NY 10027                             Chicago, Illinois 60601
 Phone: (718) 878-4707                          (312) 558-5600
 krichman@richmanlawgroup.com                   RRothste@winston.com

 *Attorneys for Plaintiff Toxin Free USA*       *Attorneys for Defendants*
                                                *The J. M. Smucker Company and*
                                                *Ainsworth Pet Nutrition, LLC*

Filed
D.C. Superior Court
11/20/2019 17:42PM
Clerk of the Court

**DOCKSUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

---

**TOXIN FREE USA**

        Plaintiff,

v.

**THE J. M. SMUCKER COMPANY** and
**AINSWORTH PET NUTRITION, LLC**,

        Defendants.

---

Case No. 2019 CA 003192 B

HON. FLORENCE Y. PAN

**DEFENDANT AINSWORTH PET NUTRITION, LLC's**
**ANSWER TO PLAINTIFF'S COMPLAINT**

Defendant Ainsworth Pet Nutrition, LLC ("Ainsworth"), offers the following Answer to Plaintiff Toxin Free USA's ("Plaintiff") Complaint. For ease of reference only, and without making any admission, this Answer uses the same headings as the Complaint. Further, Ainsworth denies all allegations in the Complaint to the extent such allegations are not otherwise responded to in this Answer. Similarly, Ainsworth reserves the right to amend this Answer.

**ANSWER**

**COMPLAINT**

On behalf of itself and the general public, Plaintiff Toxin Free USA ("Toxin Free USA") brings this action against Defendants THE J.M. SMUCKER COMPANY, its wholly-owned subsidiary AINSWORTH PET NUTRITION, LLC (collectively, "Rachael Ray Nutrish" or "Defendant"), regarding the deceptive labeling, marketing, and sale of Defendant's pet food products that were or are sold under the Rachael Ray Nutrish® brand and marketed as "natural"

1

and containing "no . . . artificial preservatives" (collectively, the "Products"),[1] and alleges the following based upon information, belief, and the investigation of counsel:

**ANSWER**: Ainsworth denies the allegations in this unnumbered paragraph and the allegation in the footnote of this unnumbered paragraph.

## INTRODUCTION

1.    Due to concerns about health, sustainability, and the increasing use of synthetically created chemicals in the production of food, consumers are increasingly considering with how [sic] food, both for them and for their animal companions, is grown, processed, and prepared.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 1, and, on that basis, denies the allegations of Paragraph 1.

2.    Rachael Ray Nutrish knows that consumers seek out and wish to purchase whole, natural foods for their pets that do not contain synthetic chemicals, and that consumers will pay more for foods for their pets that they believe to be natural than they will pay for foods that they do not believe to be natural.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 2, and, on that basis, denies the allegations of Paragraph 2.

3.    To capture this growing market, Rachael Ray Nutrish advertises and promotes the Products as "natural" and as containing "no . . . artificial preservatives." See Figures 1 & 2, below.

---

[1] Discovery may demonstrate that additional Rachael Ray Nutrish® products are within the scope of this Complaint. Plaintiffs reserve the right to amend this complaint to include additional food items identified through the course of discovery.



**Figure 1.**



**Figure 2.**

**ANSWER**: Ainsworth admits it sells products that have the words "natural" and "no . . . artificial preservatives" on the packaging. Otherwise, Ainsworth denies the remaining allegation in Paragraph 3.

4.      These claims are false, deceptive, and misleading. The Products at issue are not "natural" or free of artificial preservatives. The Products contain residues of the unnatural biocide glyphosate, as well as residues of the artificial preservative ethoxyquin.

**ANSWER**: No response is required to the legal conclusions of Paragraph 4. To the extent a response is required, Ainsworth specifically denies that the alleged claims are "false, deceptive, and misleading." Ainsworth also denies Nutrish products contain unnatural biocides and artificial preservatives.  Otherwise, Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the remaining allegations of Paragraph 4, and, on that basis, denies the remaining allegations of Paragraph 4.

5.      No reasonable consumer, seeing these "natural" and "no . . . artificial preservatives" representations, would expect that the Products contain unnatural biocides and artificial preservatives.

**ANSWER**: Ainsworth denies that its products contain unnatural biocides and artificial preservatives. Ainsworth otherwise lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 5, and, on that basis, denies the remaining allegations of Paragraph 5.

6.      In sum, Rachael Ray Nutrish is deceiving consumers into believing the Products are "natural" and contain "no . . . artificial preservatives" when, in fact, they are not natural and do contain artificial preservatives.

**ANSWER**: No response is required to the legal conclusions of Paragraph 6. To the extent a response is required, Ainsworth denies the allegations of Paragraph 6.

7.      By deceiving consumers about the nature, quality, and/or ingredients of the Products, Rachael Ray Nutrish is able to sell a greater volume of the Products, to charge higher prices for the Products, and to take away market share from competing products, thereby increasing its own sales and profits.

**ANSWER**: No response is required to the legal conclusions of Paragraph 7. To the extent a response is required, Ainsworth denies that it is "deceiving consumers about the nature, quality, and/or ingredients of the Products." Beyond that, Ainsworth lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 7, and, on that basis, denies the remaining allegations of Paragraph 7.

8.      Rachael Ray Nutrish's false and misleading representations and omissions violate D.C. Code § 28-3904.

**ANSWER**: No response is required to the legal conclusions of Paragraph 8. To the extent a response is required, Ainsworth denies the allegations of Paragraph 8.

9.      Because Rachael Ray Nutrish's labeling and advertising of the Products tend to mislead and are materially deceptive about the true nature, quality, and ingredients of the Products, Toxin Free USA brings this deceptive advertising case on behalf of itself and the general public, and seeks relief including an injunction to halt Rachael Ray Nutrish's false marketing and sale of the Products.

**ANSWER**: No response is required to the legal conclusions of Paragraph 9. To the extent a response is required, Ainsworth admits that Plaintiff is seeking the requested relief in Paragraph

9, but denies that Plaintiff is entitled to such relief. Ainsworth denies the remaining allegations in Paragraph 9.

## JURISDICTION AND VENUE

10.    This Court has personal jurisdiction over the parties in this case. Plaintiff Toxin Free USA (formerly known as GMO Free USA), by filing this Complaint, consents to this Court having personal jurisdiction over it.

**ANSWER**: No response is required to the legal conclusions of Paragraph 10. To the extent a response is required, Ainsworth denies the allegations of Paragraph 10.

11.    Plaintiff Toxin Free USA has members in the District of Columbia.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 11, and, on that basis, denies the allegations of Paragraph 11.

12.    This Court has personal jurisdiction over Rachael Ray Nutrish pursuant to D.C. Code § 13-423. Rachael Ray Nutrish has sufficient minimum contacts with the District of Columbia to establish personal jurisdiction of this Court over it because, inter alia, Rachael Ray Nutrish is engaged in deceptive schemes and acts directed at persons residing in, located in, or doing business in the District of Columbia, or otherwise purposefully avails itself of the laws of this District through its marketing and sales of the Products in this District.

**ANSWER**: No response is required to the legal conclusions of Paragraph 12. To the extent a response is required, Ainsworth denies the remaining allegations contained in Paragraph 12.

13.    This Court has subject matter jurisdiction over this action pursuant to D.C. Code §§ 28-3905(k)(1)(B), (k)(1)(C), (k)(1)(D), and (k)(2).

**ANSWER**: No response is required to the legal conclusions of Paragraph 13. To the extent a response is required, Ainsworth denies the allegations of Paragraph 13.

## PARTIES

14.    Toxin Free USA is a 501(c)(3) non-profit organization whose mission is to harness independent science and agroecology concepts to advocate for clean and healthy food and ecological systems. Toxin Free USA educates consumers about potential hazards of synthetic ingredients, pesticides and biocides, and genetically engineered organisms.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a conclusive belief as to the truth or falsity of the allegations of Paragraph 14, but, on information and belief, denies the allegations of Paragraph 14.

15.    Toxin Free USA performs its work throughout the United States, including in the District of Columbia.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a conclusive belief as to the truth or falsity of the allegations of Paragraph 15, but, on information and belief, denies the allegations of Paragraph 15.

16.    Toxin Free USA was formed in 2012 with the intent of organizing national boycotts of food companies that use genetically modified ingredients and related synthetic herbicides and pesticides in their products and pressuring companies to remove those ingredients or contaminants.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a conclusive belief as to the truth or falsity of the allegations of Paragraph 16, but, on information and belief, denies the allegations of Paragraph 16.

17.    Consequently, Toxin Free USA firmly believes in food transparency. The organization diligently works to promote food and ecological systems that are clean, accessible,

and free of contamination. To that end, Toxin Free USA educates consumers, increasing their awareness and knowledge of glyphosate use in agricultural production and its effect on health and the environment, as well as the use and effects of artificial preservatives.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a conclusive belief as to the truth or falsity of the allegations of Paragraph 17, but, on information and belief, denies the allegations of Paragraph 17.

18.     Toxin Free USA's website, publications, public education, research, network building, and mobilization activities provide an important service to consumers and community activists every month.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a conclusive belief as to the truth or falsity of the allegations of Paragraph 18, but, on information and belief, denies the allegations of Paragraph 18.

19.     On February 22, 2019, Toxin Free USA purchased one package of Rachael Ray Nutrish's "Real Chicken & Brown Rice Recipe" Super Premium Food for Cats and one package of "Real Beef, Pea & Brown Rice Recipe" Super Premium Food for Dogs at a Target store located 3100 14th St NW #201, Washington, DC 20010, [sic] in order to evaluate their purported qualities as "natural" products containing "no . . . artificial preservatives."

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a conclusive belief as to the truth or falsity of the allegations of Paragraph 19, but, on information and belief, denies the allegations of Paragraph 19.

20.     At all times mentioned herein, Rachael Ray Nutrish was and is a Pennsylvania corporation that maintains its principal place of business and headquarters in Meadville, Pennsylvania.

**ANSWER**: Ainsworth denies the allegations of Paragraph 20.

21.     Rachael Ray Nutrish is a wholly owned subsidiary of The J.M. Ainsworth Company.

**ANSWER**: Ainsworth admits the allegations of Paragraph 21.

22.     At all times mentioned herein, The J.M. Smucker Company was and is a Pennsylvania corporation that maintains its principal place of business and headquarters in Columbus, Ohio.

**ANSWER**: Ainsworth denies the allegations of Paragraph 22.

23.     Rachael Ray Nutrish markets and distributes the Products in retail outlets in the District of Columbia and throughout the United States.

**ANSWER**: Ainsworth admits the allegations of Paragraph 23.

24.     Upon information and belief, Rachael Ray Nutrish has caused harm to the general public of the District of Columbia.

**ANSWER**: Ainsworth denies the allegations of Paragraph 24.

25.     Toxin Free USA is acting on behalf of the general public as private attorneys general pursuant to D.C. Code § 28-3905(k)(1). Plaintiff is a non-profit organization pursuant to D.C. Code § 28-3901(a)(14) and a public-interest organization pursuant to D.C. Code § 28-3901(a)(15).

**ANSWER**: No response is required to the legal conclusions of Paragraph 25. To the extent a response is required, Ainsworth denies the allegations of Paragraph 25.

# FACTUAL ALLEGATIONS

26.    American consumers increasingly and consciously seek out natural and healthful food products for themselves and their pets. Once a small niche market, healthful, natural foods are now sold by conventional retailers, and their sales continue to soar.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 26, and, on that basis, denies the allegations of Paragraph 26.

27.    Consumers value natural foods for themselves and their pets for myriad health, environmental, and political reasons, including avoiding chemicals and additives, attaining health and wellness, helping the environment, and financially supporting companies that share these values.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 27, and, on that basis, denies the allegations of Paragraph 27.

**A.    Rachael Ray Nutrish Cultivates a "Natural" Brand Image for its Pet Food Products.**

**ANSWER**: Given the vague phrasing of this unnumbered paragraph Ainsworth denies the allegations in this unnumbered paragraph.

28.    Rachael Ray Nutrish knows that consumers seek out and wish to purchase whole, natural foods for their pets that do not contain artificial chemicals, and that consumers will pay more for pet foods that they believe to be natural than they will pay for pet foods that they do not believe to be natural.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 28, and, on that basis, denies the allegations of Paragraph 28.

29.    Recent national surveys have found that a majority of consumers seek out products with a "natural" label, believing that "natural" means that the products are produced without pesticides or artificial ingredients.[2]

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 29, and, on that basis, denies the allegations of Paragraph 29 and the allegations in the footnote to Paragraph 29.

30.    To capture this market, Rachael Ray Nutrish markets its "Super Premium" pet food as "natural" and as containing "no . . . artificial preservatives."

**ANSWER**: Ainsworth admits that certain brands of its "Super Premium" products have the words "natural" and "no . . . artificial preservatives" on the packaging. Otherwise, Ainsworth denies the remaining allegations of Paragraph 30.

31.    Rachael Ray Nutrish does not qualify these statements with any disclaimer regarding the presence of glyphosate or ethoxyquin.

**ANSWER**: Given the vague phrasing of this allegation, Ainsworth denies the allegations of Paragraph 31.

---

[2] *See, e.g.*, Jayson L. Lusk, *Consumer Perceptions of Healthy and Natural Food Labels*, 29 (Jan. 15, 2019), https://bit.ly/2Hy06ML (finding that 68.1% more consumers perceive crops "sprayed with synthetic pesticides like glyphosate or chlorpyrifos" to be "unnatural" than "natural," and that 58.8% of consumers understand "natural" to mean "no preservatives"); Consumer Reports National Research Center, *Natural Food Labels Survey* (2015) (finding that 63% of consumers understand a "natural" label to mean that "no toxic pesticides were used").

**B.**    **Rachael Ray Nutrish Presents the Products as "Natural" and as Containing "No . . . Artificial Preservatives."**

**ANSWER**: Given the vague phrasing of this unnumbered paragraph Ainsworth denies the allegations in this unnumbered paragraph.

32.    Rachael Ray Nutrish labels the Products as "natural" and as containing "no . . . artificial preservatives."

**ANSWER**: Ainsworth admits that some of its products have the words "natural" and "no . . . artificial preservatives" on the packaging. Otherwise, Ainsworth denies the allegations of Paragraph 32.

33.    Upon information and belief, Rachael Ray Nutrish has profited enormously from its falsely marketed products and its carefully orchestrated label and image.

**ANSWER**: Ainsworth denies that its products are falsely marketed. Otherwise, given the vague phrasing of this allegation, Ainsworth denies the remaining allegations of Paragraph 33.

34.    Consumers reasonably believe that a product or ingredient represented as "natural" does not contain residues of synthetic chemicals.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 34, and, on that basis, denies the allegations of Paragraph 34.

35.    Consumers reasonably believe that a product or ingredient represented as "natural" does not contain residues of unnatural biocides.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 35, and, on that basis, denies the allegations of Paragraph 35.

36.    In 2015, the Consumer Reports National Research Center conducted a nationally representative phone survey to assess consumer opinion regarding food labeling.[3]

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 36 and, on that basis, denies the allegations of Paragraph 36 and the allegations in the footnote to Paragraph 36.

37.    Sixty-three percent of all respondents in the Consumer Reports survey said that a "natural" label on packaged and processed foods means that "no toxic pesticides were used."[4]

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 37 and, on that basis, denies the allegations of Paragraph 37 and the allegations in the footnote to Paragraph 37.

38.    Rachael Ray Nutrish knows and intends that when consumers see the product labels or advertisements promising the products are "natural," consumers will understand that to mean that, at the very least, that the products do not contain synthetic chemicals like pesticides and biocides.

**ANSWER**: Ainsworth denies the allegations of Paragraph 38.

**C.    Glyphosate Is Not Natural.**

**ANSWER**: Given the vague phrasing of this unnumbered paragraph Ainsworth denies the allegations in this unnumbered paragraph.

39.    Quantitative testing has revealed that the Products contain glyphosate.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 39 and, on that basis, denies the allegations of Paragraph 39.

---

[3] Consumer Reports National Research Center, *supra* note 2.
[4] *Id.* at 2.

40.    Glyphosate was invented by the agrochemical and agricultural biotechnology corporation Monsanto, which began marketing the herbicide in 1974 under the trade name Roundup.[5]

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 40 as phrased and, on that basis, denies the allegations of Paragraph 40 and the allegations in the footnote of Paragraph 40.

41.    Glyphosate is derived from the amino acid glycine.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 41 as phrased and, on that basis, denies the allegations of Paragraph 41.

42.    To create glyphosate, one of the hydrogen atoms in glycine is artificially replaced with a phosphonomethyl group.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 42 as phrased and, on that basis, denies the allegations of Paragraph 42.

43.    Over the past several years, consumers have become increasingly conscious of the potential detrimental health effects of biocides such as glyphosate.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 43 as phrased and, on that basis, denies the allegations of Paragraph 43.

---

[5] *See* Shannon Van Hoesen, Study: Monsanto's Glyphosate Most Heavily Used Weed-Killer in History, Environmental Working Group (Feb. 2, 2016), ttps://www.ewg.org/release/study-monsanto-s-glyphosate-most-heavily-used-weed-killer-history.

### D.    Ethoxyquin is an Artificial Preservative.

**ANSWER**: Given the vague phrasing of this unnumbered paragraph Ainsworth denies the allegations in this unnumbered paragraph.

44.    Quantitative testing has revealed that the Products contain residues of ethoxyquin.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 44 and, on that basis, denies the allegations of Paragraph 44.

45.    Ethoxyquin is a synthetic[6] chemical commonly used as an artificial preservative in pet food.[7]

**ANSWER**: Ainsworth lacks sufficient knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 45 as phrased and, on that basis, denies the allegations of Paragraph 45 and the allegations in the footnotes of Paragraph 45 as phrased.

46.    Over the past several years, consumers have become increasingly conscious of the potential detrimental health effects of artificial preservatives such as ethoxyquin.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 46 and, on that basis, denies the allegations of Paragraph 46.

---

[6] *See, e.g.*, A.K. Lundebye et. al, *Levels of synthetic antioxidants (ethoxyquin, butylated hydroxytoluene and butylated hydroxyanisole) in fish feed and commercially farmed fish*, Part A, 27:12 Food Additives & Contaminants 1652 (2010).

[7] *See, e.g.*, 21 C.F.R. § 573.380 ("[Ethoxyquin] is intended for use only: (1) As a chemical preservative for retarding oxidation of carotene, xanthophylls, and vitamins A and E in animal feed and fish food and, (2) as an aid in preventing the development of organic peroxides in canned pet food").

47.    Rachael Ray Nutrish is aware of these concerns. In a December 21, 2018 blog post on Rachael Ray Nutrish's website, the company listed ethoxyquin as one of the "5 Most Harmful Ingredients in Cat Food." Rachael Ray Nutrish has since taken down this post. **Figure 3**, below.



# 5 Most Harmful Ingredients in Cat Food

Feeding our furry family members is the single most important thing we do as pet parents. With so many options available, it's hard to know what cat food ingredients are safe and which ones are dangerous. To stay on top of your cat's health, check food labels carefully for these five harmful ingredients before dishing out her next meal.

**Meat by-products**

As the name implies, meat by-products are inferior animal parts not meant for human consumption. Meat by-products can be organs, feet, nails and even rotten or cancerous meats. Bottom line—keep meat by-products off your kitty's plate. Always feed cat food (https://nutrish.com/cat/) that contains real meat.

**Cornmeal**

Healthy cats require a high-protein diet. Some pet food manufacturers use cornmeal as a cheap substitute for more expensive meat options. Cats that eat cornmeal are at a higher risk for allergies, obesity and feline diabetes. Cornmeal also contains melamine, which can cause kidney failure.

**Artificial food coloring**

Don't be fooled by the tempting color of your cat's food. Artificial colorings are known carcinogens. Be on the lookout for any cat food label with the colors Red #40 or Blue #2. These colors are known to give kitties severe allergies.

**Ethoxyquin**

If you see Ethoxyquin (http://www.feedingfidoandfluffy.com/is-ethoxyquin-safe-in-pet-food/) in your cat food ingredient list, you might think again. Ethoxyquin is a chemical primarily used to make pesticides and rubber products. Some pet food manufacturers use Ethoxyquin as a preservative to lengthen the shelf life of cat food claiming it is perfectly safe. However, it is considered a carcinogen in humans and its effects on animals has not been well studied.

**Propylene Glycol**

**Figure 3.** Source: https://nutrish.com/blog/post/5-most-harmful-ingredients-in-cat-food.

**ANSWER**: Ainsworth denies the allegations of Paragraph 47.

48.    Indeed, federal regulations now require disclosure of ethoxyquin in pet food.[8] Rachael Ray Nutrish makes no such disclosure.

**ANSWER**: No response is required to the legal conclusions of Paragraph 48. Ainsworth denies the remaining allegations of Paragraph 48 and the allegations in the footnote of Paragraph 48.

**E.    Rachael Ray Nutrish's Marketing Is Misleading and Omits Material Facts.**

**ANSWER**: The allegations in this unnumbered paragraph are legal conclusions to which no response is required. To the extent a response is required, Ainsworth denies the allegations in this unnumbered paragraph.

49.    Rachael Ray Nutrish's conduct in marketing or representing that the Products are "natural" and contain "no . . . artificial preservatives" misleds [sic] and/or tends to mislead the public.

**ANSWER**: Ainsworth admits that some of its products have the words "natural" and "no . . . artificial preservatives" on the packaging. Otherwise, Ainsworth denies the allegations of Paragraph 49.

50.    D.C. consumers cannot discover the true nature of the Products from Rachael Ray Nutrish's marketing. D.C. consumers cannot discover the true nature of the Products even by visiting Rachael Ray Nutrish's website, which makes no mention of glyphosate or ethoxyquin.

**ANSWER**: Ainsworth denies the allegations of paragraph 50.

51.    Discovery of the true nature of the content of the Products requires knowledge of chemistry and access to laboratory testing that is not available to the average reasonable consumer.

**ANSWER**: Ainsworth denies the "allegations in paragraph 51.

---

[8] *Id.*

52.     Rachael Ray Nutrish deceptively and misleadingly conceals material facts about the Products, namely, that the Products are not "natural" and do contain artificial preservatives, because in fact the Products contain the residues of glyphosate and ethoxyquin; and that the Products are not what a reasonable consumer would consider "natural" or free of "artificial preservatives" because they in fact contain the residues of glyphosate and ethoxyquin.

**ANSWER**: No response is required to the legal conclusions of Paragraph 52. To the extent a response is required, Ainsworth denies the allegations of Paragraph 52.

53.     The production process Rachael Ray Nutrish uses for the Products is known only to Rachael Ray Nutrish and its suppliers.

**ANSWER**: Ainsworth denies the allegations of Paragraph 53.

54.     Rachael Ray Nutrish has not disclosed such information to Toxin Free USA or, on information and belief, to D.C. consumers.

**ANSWER**: Ainsworth denies the allegations in Paragraph 54.

55.     Testing reveals the presence of glyphosate and ethoxyquin residues in the Products, but only Rachael Ray Nutrish knows the methods by which its pet food is processed, or what would account for the presence of glyphosate and ethoxyquin residues in its Products.

| Product | Purchase Date | Glyphosate Residue (ppb) | Ethoxyquin Residue (ppb) |
|---------|---------------|--------------------------|--------------------------|
| "Real Chicken & Brown Rice Recipe" Super Premium Food for Cats | 2/22/19 | 417 | 16 |
| "Real Beef, Pea & Brown Rice Recipe" Super Premium Food for Dogs | 2/22/19 | 175 | 352 |

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 55 and, on that basis, denies the allegations of Paragraph 55.

56.    Rachael Ray Nutrish's concealment tolls the applicable statute of limitations.

**ANSWER**: No response is required to the legal conclusions of Paragraph 56. To the extent a response is required, Ainsworth denies the allegations of Paragraph 56.

57.    To this day, Rachael Ray Nutrish continues to conceal and suppress the true nature, identity, source, and method of production of its Products.

**ANSWER**: Ainsworth denies the allegations of Paragraph 57.

**F.    Rachael Ray Nutrish Knew or Should Have Known That Its Representations Were False.**

**ANSWER**: The allegations in this unnumbered paragraph are legal conclusions to which no response is required. To the extent a response is required, Ainsworth denies the allegations in this unnumbered paragraph.

58.    Rachael Ray Nutrish holds itself out to the public as a trusted expert in the sourcing and processing of pet food.

**ANSWER**: Ainsworth admits that Nutrish has partnered with experts on the sourcing and processing of pet food. Given the vague phrasing of this allegation, however, Ainsworth otherwise denies the remaining allegations in Paragraph 58.

59.    Rachael Ray Nutrish knew what representations it made on the labels of the Products. Rachael Ray Nutrish also knew how the pet food was sourced and processed, and therefore knew or should have known that the pet food contains residues of glyphosate, an unnatural biocide, and ethoxyquin, an artificial preservative.

**ANSWER**: Ainsworth admits it knew what the packaging of its products stated. Ainsworth admits it knew how its branded pet food was sourced and processed. Ainsworth otherwise denies the remaining allegations of Paragraph 59.

60.    Rachael Ray Nutrish thus knew, or should have known, the facts demonstrating that the Products were mislabeled and falsely advertised.

**ANSWER**: No response is required to the legal conclusions of Paragraph 60. To the extent a response is required, Ainsworth denies that its products were mislabeled and falsely advertised. Ainsworth denies the remaining allegations of Paragraph 60.

61.    Consumers frequently rely on label representations and information in making purchase decisions, especially in purchasing food.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegation in Paragraph 61, and, on that basis, denies the allegations in Paragraph 61.

62.    Rachael Ray Nutrish made the false, misleading, and deceptive representations and omissions intending for consumers to rely upon these representations and omissions in purchasing the Products.

**ANSWER**: No response is required to the legal conclusions of Paragraph 62. To the extent a response is required, Ainsworth denies the allegations of Paragraph 62.

63.    In making the false, misleading, and deceptive representations and omissions at issue, Rachael Ray Nutrish knew and intended that consumers would purchase the Products when consumers would otherwise purchase a competing product.

**ANSWER**: No response is required to the legal conclusions of Paragraph 63. To the extent a response is required, Ainsworth denies the allegations of Paragraph 63.

64.    Consumers are willing to pay more for products that purport to be "natural" and free of artificial preservatives.

**ANSWER**: Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegation in Paragraph 64, and, on that basis, denies the allegations in Paragraph 64.

65.    In making the false, misleading, and deceptive representations and omissions at issue, Rachael Ray Nutrish also knew and intended that consumers would pay more for "natural" products that are purportedly free of unnatural agents than they would pay for products that are not "natural," furthering Rachael Ray Nutrish's private interest of increasing sales of the Products and decreasing sales of competing products that are truly natural and/or free from artificial preservatives.

**ANSWER**: No response is required to the legal conclusions of Paragraph 65. To the extent a response is required, Ainsworth denies the allegations of Paragraph 65.

66.    Rachael Ray Nutrish knows that consumers prefer natural pet foods and pet foods that do not contain unnatural or potentially dangerous chemicals or their residues. Rachael Ray Nutrish knows that consumers will pay more for "natural" pet foods or may not purchase them at all unless they are "natural" and free from unnatural and potentially dangerous chemicals.

**ANSWER**: Ainsworth denies the allegations of Paragraph 66.

67.    Upon information and belief, Rachael Ray Nutrish has failed to remedy the problem with the Products, thus causing ongoing harm to consumers.

**ANSWER**: Ainsworth denies the existence of any "problem" that caused or is continuing to cause harm to its consumers. Ainsworth denies the remaining allegations in Paragraph 67.

68.    D.C. Consumers are at risk of real, immediate, and continuing harm if the Products continue to be sold with the misleading representations.

**ANSWER**: Ainsworth denies the allegations of Paragraph 68.

69.    Plaintiff contends that the Products were sold pursuant to unfair and unconscionable trade practices because the sale of Rachael Ray Nutrish's Product offends public policy and is immoral, unethical, oppressive, unscrupulous, and causes substantial economic injuries to consumers.

**ANSWER**: Ainsworth denies the allegations of Paragraph 69.

70.    Reasonable consumers do not expect the Products, represented and advertised as "natural," and as containing "no . . . artificial preservatives" to contain unnatural chemical residues such as glyphosate or artificial preservative residues such as ethoxyquin. Rachael Ray Nutrish's statements and other representations convey a series of express and implied claims and/or omissions that Rachael Ray Nutrish knows are material to the reasonable consumer in making a purchasing decision, and that Rachael Ray Nutrish intends for consumers to rely upon when choosing whether to purchase the Products and how much to pay for them.

**ANSWER**: No response is required to the legal conclusions of Paragraph 70. To the extent a response is required, Ainsworth denies the allegations of Paragraph 70.

71.    Rachael Ray Nutrish misrepresented the nature, quality, and/or ingredients of the Products and/or failed to disclose the unnatural aspects of the Products and/or the presence of residues of artificial preservatives, which was and is false, misleading, and/or likely to deceive reasonable consumers.

**ANSWER**: No response is required to the legal conclusions of Paragraph 71. To the extent a response is required, Ainsworth denies the allegations of Paragraph 71.

## CAUSE OF ACTION

## VIOLATION OF THE DISTRICT OF COLUMBIA
## CONSUMER PROTECTION PROCEDURES ACT

72.    Pursuant to D.C. Code §§ 28-3905(k)(1) and 28-3905(k)(2), Toxin Free USA brings this Count against Rachael Ray Nutrish, on behalf of itself and the general public of the District of Columbia, for Rachael Ray Nutrish's violation of DC CPPA, D.C. Code § 28-3901, *et seq.*

**ANSWER**: Ainsworth admits that Plaintiff purports to bring an action on behalf of itself and the general public on the basis of the provisions cited in Paragraph 72, but denies that Plaintiff is entitled to relief under such provisions. Ainsworth denies the remaining allegations in Paragraph 72.

73.    Plaintiff incorporates by reference all the allegations in the preceding paragraphs of this Complaint.

**ANSWER**: Ainsworth incorporates by reference all the answers in the preceding paragraphs of this Answer.

74.    Rachael Ray Nutrish has labeled and advertised the Products as "natural" and has otherwise presented an image and marketing materials suggesting that the Products are natural, when in fact the Products contain residues of an unnatural chemical biocide and an artificial preservative.

**ANSWER**: Ainsworth admits that certain Nutrish products have the word "natural" on the packaging. Otherwise, Ainsworth denies the remaining allegations in Paragraph 74 as phrased.

75.    Rachael Ray Nutrish has labeled and advertised the Products as containing "no artificial preservatives" and has otherwise presented an image and marketing materials suggesting

that the Products contain no artificial preservatives, when in fact the Products contain residues of an artificial preservative.

**ANSWER**: Ainsworth admits that certain Nutrish products have the words "no artificial preservatives" on the packaging. Otherwise, Ainsworth denies the remaining allegations in Paragraph 75 as phrased.

76.    Rachael Ray Nutrish's advertising of the Products misrepresents, tends to mislead, and omits facts regarding the source, characteristics, standard, quality, and grade of the Products.

**ANSWER**: No response is required to the legal conclusions of Paragraph 76. To the extent a response is required, Ainsworth denies the allegations of Paragraph 76.

77.    The Products lack the characteristics, ingredients, benefits, standards, qualities, or grades that Rachael Ray Nutrish states and implies in advertisements.

**ANSWER**: Ainsworth denies the allegations of Paragraph 77.

78.    Rachael Ray Nutrish's misstatements, innuendo, and omissions are material and have the tendency to mislead.

**ANSWER**: No response is required to the legal conclusions of Paragraph 78. To the extent a response is required, Ainsworth denies the allegations of Paragraph 78.

79.    Rachael Ray Nutrish knowingly did not sell the Products as advertised.

**ANSWER**: Ainsworth denies the allegations of Paragraph 79.

80.    The facts as alleged above demonstrate that Rachael Ray Nutrish has violated the DC CPPA, D.C. Code § 28-3901 *et seq.* Specifically, Rachael Ray Nutrish has violated D.C. Code § 28-3904, which makes it an unlawful trade practice to:

(a)     represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; . . .

(d)     represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(e)     misrepresent as to a material fact which has a tendency to mislead; . . .

(f)     fail to state a material fact if such failure tends to mislead;

(f-1)    [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead; ... [or]

(h)     advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered.

**ANSWER**: No response is required to the legal conclusions of Paragraph 80. To the extent a response is required, Ainsworth denies the allegations of Paragraph 80, and refers to the D.C. C.P.P.A., D.C. Code § 28-3901 *et seq.* for its meaning.

81.     The DC CPPA makes such conduct an unlawful trade practice "whether or not any consumer is in fact misled, deceived or damaged thereby." D.C. Code § 28-3904.

**ANSWER**: No response is required to the legal conclusions of Paragraph 81. To the extent a response is required, Ainsworth denies the allegations of Paragraph 81, and refers to D.C. Code § 28-3904 for its meaning.

82.     Though Toxin Free USA need not show proof of deception to succeed on its DC CPPA claim, consumers were in fact deceived. Rachael Ray Nutrish knows and should have known that reasonable consumers would believe that the Products are "natural" and contain "no . . . artificial preservatives" as advertised.

**ANSWER**: No response is required to the legal conclusions of Paragraph 82. To the extent a response is required, Ainsworth denies the allegations of Paragraph 82.

83.    Toxin Free USA has a sufficient nexus to D.C. consumers of the Products to adequately represent their interests.

**ANSWER**: No response is required to the legal conclusions of Paragraph 82. To the extent a response is required, Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 83, and, on that basis, denies the allegations of Paragraph 83.

84.    Because Rachael Ray Nutrish misrepresents the characteristics, ingredients, and benefits of the Products; misrepresents the standard, quality, and grade of the Products; misrepresents, fails to state, and uses innuendo and ambiguity in ways which tend to mislead reasonable consumers with regard to material facts about the Products; and advertises the Products without the intent to sell the Products as advertised, Rachael Ray Nutrish's marketing of the Products as "Natural Food" violates D.C. Code §§ 28-3904(a), (d), (e), (f), (f-1), and (h).

**ANSWER**: No response is required to the legal conclusions of Paragraph 84. To the extent a response is required, Ainsworth denies the allegations of Paragraph 84, and refers to D.C. Code §§ 28-3904(a), (d), (e), (f), (f-1), and (h) for their meaning.

85.    Rachael Ray Nutrish is a "person" within the meaning of D.C. Code § 28-3901(a)(1), is a merchant under § 28-3901(a)(3), and provides "goods" within the meaning of § 283901(a)(7).

**ANSWER**: No response is required to the legal conclusions of Paragraph 85. To the extent a response is required, Ainsworth denies the allegations of Paragraph 85, and refers to D.C. Code §§ 28-3901(a)(1), (a)(3), and (a)(7) for their meaning.

86.    Pursuant to D.C. Code § 28-3905(k)(1)(C), "[a] nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District, including a violation involving consumer goods or services that the organization purchased or received in order to test or evaluate qualities pertaining to use for personal, household, or family purposes."

**ANSWER**: No response is required to the legal conclusions of Paragraph 86. To the extent a response is required, Ainsworth denies the allegations of Paragraph 86, and refers to D.C. Code § 28-3905(k)(1)(C) for its meaning.

87.    Toxin Free USA is a nonprofit organization pursuant to D.C. Code § 28-3905(k)(1)(C) that on February 22, 2019 purchased Products in order to test or evaluate their qualities.

**ANSWER**: No response is required to the legal conclusions of Paragraph 87. To the extent a response is required, Ainsworth denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegation Plaintiff purchased Nutrish brand products on February 22, 2019, and, on that basis, denies said allegation. Ainsworth denies the remaining allegations of Paragraph 87, and refers to D.C. Code § 28-3905(k)(1)(C) for its meaning.

88.    Rachael Ray Nutrish's conduct violates the DC CPPA regardless of whether "any consumer is in fact misled, deceived or damaged thereby." D.C. Code § 28-3904. Pursuant to D.C. Code § 28-3905(k)(1)(A), "[a] consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District."

**ANSWER**: No response is required to the legal conclusions of Paragraph 88. To the extent a response is required, Ainsworth denies the allegations of Paragraph 88, and refers to D.C. Code §§ 28-3904 and 28-3905(k)(1)(A) for their meaning.

89.    Any consumer has the right to bring an action for redress of Rachael Ray Nutrish's unlawful behavior, *see* D.C. Code § 28-3905(k)(1)(A), and the statute does not limit consumer plaintiffs according to whether they purchased the product at issue. Nevertheless, as alleged in this Complaint, the Rachael Ray Nutrish Products are marketed and sold in the District, *see supra* ¶¶ 20, 24, and consumers within the District have purchased these Products under the misrepresentations made by Rachael Ray Nutrish. Therefore, a variety of purchasing and non-purchasing consumers could bring an action against Rachael Ray Nutrish based on the misrepresentations and omissions listed in this Complaint.

**ANSWER**: No response is required to the legal conclusions of Paragraph 89. To the extent a response is required, Ainsworth admits that Nutrish brand pet food was sold within the District. Ainsworth denies Nutrish's brand pet food labels or packaging contained misrepresentations or material omissions. Ainsworth denies the remaining allegations of Paragraph 89, and refers to D.C. Code § 28-3905(k)(1)(A) for its meaning.

90.    Pursuant to D.C. Code § 28-3905(k)(1)(D)(i), "a public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice."

**ANSWER**: No response is required to the legal conclusions of Paragraph 90. To the extent a response is required, Ainsworth denies the allegations of Paragraph 90, and refers to D.C. Code § 28-3905(k)(1)(D)(i) for its meaning.

91.    The only limitation on this power of a public interest organization to act on behalf of consumers is that the public interest organization must have "sufficient nexus to the interests involved of the consumer or class to adequately represent those interests." D.C. Code § 28-3905(k)(1)(D)(ii). As set forth in this Complaint, *see supra* ¶¶ 15-19, Plaintiff Toxin Free USA was founded with the purpose of advocating for and educating consumers, including consumers in the District of Columbia, in the arena of clean and healthy food and ecological systems. In addition, Plaintiff Toxin Free USA has retained the undersigned competent counsel, with significant experience in litigating under the DC CPPA, to pursue this action.

**ANSWER**: No response is required to the legal conclusions of Paragraph 91. To the extent a response is required, Ainsworth lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations regarding the founding purpose of Toxin Free USA, and, on that basis, denies said allegation. Ainsworth denies the remaining allegations of Paragraph 91, and refers to D.C. Code § 28-3905(k)(1)(D)(ii) for its meaning.

92.    Toxin Free USA is a public-interest organization pursuant to D.C. Code § 28-3905(k)(1)(D) and brings this action on behalf of consumers who could bring the action under D.C. Code § 28-3905(k)(1)(A).

**ANSWER**: Ainsworth admits that Plaintiff purports to bring this action on behalf of consumers who could bring this action under D.C. Code § 28-3905(k)(1)(A). No response is required to the legal conclusions of Paragraph 92. To the extent a response is required, Ainsworth

denies the allegations of Paragraph 92, and refers to D.C. Code §§ 28-3905(k)(1)(D) and (k)(1)(A) for their meaning.

93.    Via §§ 28-3905(k)(1)(C) and (k)(1)(D)(i), the DC CPPA allows for non-profit organizational standing and public interest organizational standing to the fullest extent recognized by the D.C. Court of Appeals in its past and future decisions addressing the limits of constitutional standing under Article III.

**ANSWER**: No response is required to the legal conclusions of Paragraph 93. To the extent a response is required, Ainsworth denies the allegations of Paragraph 93, and refers to D.C. Code §§ 28-3905(k)(1)(C) and (k)(1)(D)(i) for their meaning.

94.    Toxin Free USA is a "person" within the meaning of D.C. Code § 28-3901(a)(1), and a "non-profit organization" within the meaning of D.C. Code § 28-3901(a)(14).

**ANSWER**: No response is required to the legal conclusions of Paragraph 94. To the extent a response is required, Ainsworth denies the allegations of Paragraph 94, and refers to D.C. Code §§ 28-3901(a)(1) and (a)(14) for their meaning.

## PRAYER FOR RELIEF

**ANSWER**: Ainsworth denies that Plaintiff has any valid claim and denies that Plaintiff is entitled to any of the relief requested in its Prayer for Relief.

## AFFIRMATIVE DEFENSES

Discovery and investigation may reveal that one or more of the following defenses are available to Ainsworth in this matter.  Thus, Ainsworth reserves the right to assert these separate defenses.  If the facts warrant, Ainsworth may withdraw any of these defenses.  Ainsworth further reserves the right to modify, clarify, amend, or supplement the Answer and Affirmative Defenses, and to assert additional defenses and other claims, as discovery proceeds.  By way of defense, and

without assuming the burden of proof for such defenses it would otherwise not have the burden to prove, Ainsworth hereby asserts the following affirmative defenses to Plaintiff's Complaint

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Cause of Action)

Plaintiff's Complaint fails to allege facts sufficient to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Federal Preemption)

Plaintiff's claims are expressly and impliedly preempted by federal law, including but not limited to, the Food, Drug and Cosmetic Act; the Nutrition Labeling and Education Act of 1990; and the U.S. Food and Drug Administration's regulations.

## THIRD AFFIRMATIVE DEFENSE

### (Actions Pursuant to Local, State or Federal Authority)

Ainsworth is not liable for any acts or omissions undertaken by or at the direction of local, state or federal authority, including, without limitation, acts or omissions made in accordance with regulations, ordinances, statutes, and laws applicable at the time of the acts or omissions at issue.

## FOURTH AFFIRMATIVE DEFENSE

### (Conduct Not Unlawful)

The business practices relating to the allegations in the Complaint are not unlawful. The representations and advertising regarding the Ainsworth Products are not unlawful. No representation or advertisement contains any false or misleading statement or promises any good not intended to be delivered. As such, the representations and advertising are not, and were not, in violation of any law or regulation.

## FIFTH AFFIRMATIVE DEFENSE

### (Primary Jurisdiction)

Plaintiff's claims are barred, in whole or in part, by the doctrine of primary jurisdiction.

## SIXTH AFFIRMATIVE DEFENSE

### (Puffery)

Plaintiff's claims for false advertising are barred to the extent that any alleged deceptive statements were such that no reasonable person could have reasonably relied upon or misunderstood Ainsworth's statements as claims of fact.

## SEVENTH AFFIRMATIVE DEFENSE

### (No Deceptive Act or Practice)

Plaintiff's claims for false advertising are barred, in whole or in part, because there was no deceptive act or practice. Each and every representation and advertisement for the products at issue in Plaintiff's Complaint correctly portrayed the characteristics, ingredients, uses, benefits, quantities, standard, quality, and grade of the Products.

## EIGHTH AFFIRMATIVE DEFENSE

### (Conduct Not Fraudulent nor Likely to Deceive)

Ainsworth's conduct alleged in the Complaint is not fraudulent and was not likely to mislead or deceive consumers and/or the public.

## NINTH AFFIRMATIVE DEFENSE

### (Actual Knowledge)

Plaintiff's claims for misrepresentation are barred because Plaintiffs had actual knowledge of the facts and circumstances that make up the allegations in the Complaint.

## TENTH AFFIRMATIVE DEFENSE

### (Express or Implied Consent)

Plaintiffs expressly and/or impliedly consented to and/or had knowledge of all activities or conditions alleged in their Complaint to have caused their harm, and thus, are barred from seeking relief for such harm.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Lack of Materiality)

Plaintiff's claims based on alleged misrepresentations are barred because the representations alleged by Plaintiffs were not material, in that, in light of information commonly known to consumers, they were not likely to affect their purchasing decisions. Ainsworth's representations and actions alleged in the Complaint were not likely to mislead consumers acting reasonably under the circumstances.

## TWELFTH AFFIRMATIVE DEFENSE

### (Lack of Reasonable Reliance)

Plaintiff's claims are barred, in whole or in part, because of the lack of reasonable reliance by consumers on the alleged misrepresentations by Ainsworth identified in the Complaint.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Lack of Awareness)

Plaintiff's claims are barred, in whole or in part, because consumers lacked awareness of the alleged misrepresentations by Ainsworth described in the Complaint.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Lack of Standing)

Plaintiffs lack either standing and/or capacity to bring some or all of the claims alleged in the Complaint.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

Plaintiff's claims are barred by the applicable statutes of limitations.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Mootness)

Plaintiff and putative class members' claims are barred, in whole or part, to the extent that the claims or relief sought are moot.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Class Treatment Not Appropriate)

This action may not be maintained as a class action pursuant to Rule 23 of the Superior Court Rules of Civil Procedure for reasons including, but not limited to: Plaintiff is not adequate or typical representatives of the Class it purports to represent, Plaintiff's counsel is not adequate for the class they claim to represent, there are insufficient questions common to the Class, there are insufficient common factual issues relating to injury and causation, class action is not superior to other remedies, the class is unmanageable, and because the variations in state law and relevant facts governing Plaintiff's claims override any common issues.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Lack of Causation)

Each cause of action is barred, in whole or in part, because Plaintiff has not sustained any injury or damage by reason of any act or omission on Ainsworth's part.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Damages Caused by Other Causes)

To the extent that Plaintiff suffered any damages, such damages were proximately caused by persons, entities, and/or factors or events other than Ainsworth and for which Ainsworth was and is not responsible.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Negligence and Misconduct of Others)

If there was any negligence or other misconduct proximately causing the damages allegedly sustained by Plaintiff, such negligence or misconduct was that of parties other than Ainsworth, and recovery should be barred or eliminated to that extent.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Plaintiff's Own Negligence)

Plaintiff's claims are barred, in whole or in part, or must be mitigated by reason of her own negligence or other conduct.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

Without admitting any wrongful conduct on the part of Ainsworth, and without admitting that Plaintiff has suffered any loss, damage, or injury, recovery for any such loss, damage, or injury is barred, in whole or in part, because Plaintiff failed to mitigate such loss, damage, or injury.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Lack of Damage)

Plaintiff has not suffered any damage as a result of any actions allegedly taken by Ainsworth, and are thus barred from asserting any claim against Ainsworth.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Set-off)

Ainsworth alleges that, even if Plaintiff's claims are meritorious, which Ainsworth denies, those claims are subject to setoff and recoupment.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (No Right to Injunctive Relief)

Plaintiff does not allege an adequate basis for injunctive relief. Plaintiff is not entitled to such relief because the hardship that would be imposed on Ainsworth by any such relief would be greatly disproportionate to any hardship that Plaintiff might suffer in its absence. Further, any injunctive relief that would require regulation by the Court on an ongoing basis is inappropriate, and Ainsworth's advertising and marketing activities are already monitored by various federal and state agencies.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (No Attorneys' Fees)

Plaintiff's request for attorneys' fees in this matter is barred because it lacks any basis in law or contract.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (Laches)

Plaintiff's claims are barred by the doctrine of laches.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

### (Pari Delicto or Unclean Hands)

Plaintiff's claims are barred, in whole or in part, by the doctrines of *in pari delicto* or unclean hands.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

### (Payment, Release, Estoppel, Waiver, Disclaimer, Acquiescence, or Accord and Satisfaction)

Plaintiff's claims are barred, in whole or in part, by the doctrines of payment, release, estoppel, waiver, disclaimer, acquiescence, or accord and satisfaction.

## THIRTIETH AFFIRMATIVE DEFENSE

### (Reservation)

Further responding, Ainsworth states that it currently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, affirmative defenses available. Ainsworth reserves the right to assert additional affirmative defenses in the event that discovery indicates it would be appropriate.

WHEREFORE, Ainsworth respectfully requests that the Court enter judgment in its favor and against Plaintiff and putative class members and granting such further relief as the Court deems just and proper.

Dated: November 20, 2019        Respectfully submitted,

By:   /s/ Ronald Y. Rothstein
       Ronald Y. Rothstein (D.C. Bar No. 451950)
       **WINSTON & STRAWN LLP**
       35 West Wacker Drive
       Chicago, Illinois 60601
       (312) 558-5600
       RRothste@winston.com

       *Counsel for Defendants*
       *The J. M. Smucker Company and*
       *Ainsworth Pet Nutrition, LLC*

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

**TOXIN FREE USA,**

      Plaintiff,

    v.

**THE J. M. SMUCKER COMPANY** and
**AINSWORTH PET NUTRITION, LLC,**

    Defendants.

Case No. 2019 CA 003192 B

HON. FLORENCE Y. PAN

## CERTIFICATE OF SERVICE

On November 20, 2019, the undersigned certifies that a true and correct copy of Ainsworth

Pet Nutrition, LLC's Answer was electronically served via the CaseFileXpress system on:

Kim E. Richman
Richman Law Group
8 West 126th Street
New York, NY 10027
Phone: (718) 878-4707
Fax: (212) 687-8292
E-mail: krichman@richmanlawgroup.com

*Counsel for Plaintiff Toxin Free USA*

By:  _/s/ Ronald Y. Rothstein_____
      Ronald Y. Rothstein (D.C. Bar No. 451950)
      **WINSTON & STRAWN LLP**
      35 West Wacker Drive
      Chicago, Illinois 60601
      (312) 558-5600
      RRothste@winston.com

      *Counsel for Defendants*
      *The J. M. Smucker Company and*
      *Ainsworth Pet Nutrition, LLC*

Filed
D.C. Superior Court
11/20/2019 17:39PM
Clerk of the Court

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

---

**TOXIN FREE USA**

　　　　Plaintiff,

v.

**THE J. M. SMUCKER COMPANY** and
**AINSWORTH PET NUTRITION, LLC**,

　　　　Defendants.

---

Case No. 2019 CA 003192 B

Hon. Florence Y. Pan

---

**DEFENDANT THE J. M. SMUCKER COMPANY'S**
**ANSWER TO PLAINTIFF'S COMPLAINT**

Defendant J.M. Smucker Company ("Smucker"), offers the following Answer to Plaintiff

Toxin Free USA's ("Plaintiff") Complaint. For ease of reference only, and without making any

admission, this Answer uses the same headings as the Complaint. Further, Smucker denies all

allegations in the Complaint to the extent such allegations are not otherwise responded to in this

Answer. Similarly, Smucker reserves the right to amend this Answer.

**ANSWER**

**COMPLAINT**

On behalf of itself and the general public, Plaintiff Toxin Free USA ("Toxin Free USA")

brings this action against Defendants THE J.M. SMUCKER COMPANY, its wholly-owned

subsidiary AINSWORTH PET NUTRITION, LLC (collectively, "Rachael Ray Nutrish" or

"Defendant"), regarding the deceptive labeling, marketing, and sale of Defendant's pet food

products that were or are sold under the Rachael Ray Nutrish® brand and marketed as "natural"

and containing "no . . . artificial preservatives" (collectively, the "Products"),[1] and alleges the following based upon information, belief, and the investigation of counsel:

**ANSWER**: Smucker denies the allegations in this unnumbered paragraph and the allegation in the footnote of this unnumbered paragraph.

## INTRODUCTION

1.    Due to concerns about health, sustainability, and the increasing use of synthetically created chemicals in the production of food, consumers are increasingly considering with how [sic] food, both for them and for their animal companions, is grown, processed, and prepared.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 1, and, on that basis, denies the allegations of Paragraph 1.

2.    Rachael Ray Nutrish knows that consumers seek out and wish to purchase whole, natural foods for their pets that do not contain synthetic chemicals, and that consumers will pay more for foods for their pets that they believe to be natural than they will pay for foods that they do not believe to be natural.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 2, and, on that basis, denies the allegations of Paragraph 2.

3.    To capture this growing market, Rachael Ray Nutrish advertises and promotes the Products as "natural" and as containing "no . . . artificial preservatives." See Figures 1 & 2, below.

---

[1] Discovery may demonstrate that additional Rachael Ray Nutrish® products are within the scope of this Complaint. Plaintiffs reserve the right to amend this complaint to include additional food items identified through the course of discovery.



**Figure 1.**



**Figure 2.**

**ANSWER**: Smucker admits that Ainsworth Pet Nutrition, LLC ("Ainsworth" or "Nutrish") sells products that have the words "natural" and "no . . . artificial preservatives" on the packaging. Otherwise, Smucker denies the remaining allegation in Paragraph 3.

4.     These claims are false, deceptive, and misleading. The Products at issue are not "natural" or free of artificial preservatives. The Products contain residues of the unnatural biocide glyphosate, as well as residues of the artificial preservative ethoxyquin.

**ANSWER**: No response is required to the legal conclusions of Paragraph 4. To the extent a response is required, Smucker specifically denies that the alleged claims are "false, deceptive, and misleading." Smucker also denies Nutrish products contain unnatural biocides and artificial preservatives.  Otherwise, Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the remaining allegations of Paragraph 4, and, on that basis, denies the remaining allegations of Paragraph 4.

5.     No reasonable consumer, seeing these "natural" and "no . . . artificial preservatives" representations, would expect that the Products contain unnatural biocides and artificial preservatives.

**ANSWER**: Smucker denies that Nutrish's products contain unnatural biocides and artificial preservatives. Smucker otherwise lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 5, and, on that basis, denies the remaining allegations of Paragraph 5.

6.     In sum, Rachael Ray Nutrish is deceiving consumers into believing the Products are "natural" and contain "no . . . artificial preservatives" when, in fact, they are not natural and do contain artificial preservatives.

**ANSWER**: No response is required to the legal conclusions of Paragraph 6. To the extent a response is required, Smucker denies the allegations of Paragraph 6.

7.      By deceiving consumers about the nature, quality, and/or ingredients of the Products, Rachael Ray Nutrish is able to sell a greater volume of the Products, to charge higher prices for the Products, and to take away market share from competing products, thereby increasing its own sales and profits.

**ANSWER**: No response is required to the legal conclusions of Paragraph 7. To the extent a response is required, Smucker denies that Nutrish is "deceiving consumers about the nature, quality, and/or ingredients of the Products." Beyond that, Smucker lacks knowledge and information sufficient to form a belief as to the truth or falsity of the remaining allegations of Paragraph 7, and, on that basis, denies the remaining allegations of Paragraph 7.

8.      Rachael Ray Nutrish's false and misleading representations and omissions violate D.C. Code § 28-3904.

**ANSWER**: No response is required to the legal conclusions of Paragraph 8. To the extent a response is required, Smucker denies the allegations of Paragraph 8.

9.      Because Rachael Ray Nutrish's labeling and advertising of the Products tend to mislead and are materially deceptive about the true nature, quality, and ingredients of the Products, Toxin Free USA brings this deceptive advertising case on behalf of itself and the general public, and seeks relief including an injunction to halt Rachael Ray Nutrish's false marketing and sale of the Products.

**ANSWER**: No response is required to the legal conclusions of Paragraph 9. To the extent a response is required, Smucker admits that Plaintiff is seeking the requested relief in Paragraph

9, but denies that Plaintiff is entitled to such relief. Smucker denies the remaining allegations in Paragraph 9.

## JURISDICTION AND VENUE

10.     This Court has personal jurisdiction over the parties in this case. Plaintiff Toxin Free USA (formerly known as GMO Free USA), by filing this Complaint, consents to this Court having personal jurisdiction over it.

**ANSWER**: No response is required to the legal conclusions of Paragraph 10. To the extent a response is required, Smucker denies the allegations of Paragraph 10.

11.     Plaintiff Toxin Free USA has members in the District of Columbia.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 11, and, on that basis, denies the allegations of Paragraph 11.

12.     This Court has personal jurisdiction over Rachael Ray Nutrish pursuant to D.C. Code § 13-423. Rachael Ray Nutrish has sufficient minimum contacts with the District of Columbia to establish personal jurisdiction of this Court over it because, inter alia, Rachael Ray Nutrish is engaged in deceptive schemes and acts directed at persons residing in, located in, or doing business in the District of Columbia, or otherwise purposefully avails itself of the laws of this District through its marketing and sales of the Products in this District.

**ANSWER**: No response is required to the legal conclusions of Paragraph 12. To the extent a response is required, Smucker denies the remaining allegations contained in Paragraph 12.

13.     This Court has subject matter jurisdiction over this action pursuant to D.C. Code §§ 28-3905(k)(1)(B), (k)(1)(C), (k)(1)(D), and (k)(2).

**ANSWER**: No response is required to the legal conclusions of Paragraph 13. To the extent a response is required, Smucker denies the allegations of Paragraph 13.

## PARTIES

14.     Toxin Free USA is a 501(c)(3) non-profit organization whose mission is to harness independent science and agroecology concepts to advocate for clean and healthy food and ecological systems. Toxin Free USA educates consumers about potential hazards of synthetic ingredients, pesticides and biocides, and genetically engineered organisms.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a conclusive belief as to the truth or falsity of the allegations of Paragraph 14, but, on information and belief, denies the allegations of Paragraph 14.

15.     Toxin Free USA performs its work throughout the United States, including in the District of Columbia.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a conclusive belief as to the truth or falsity of the allegations of Paragraph 15, but, on information and belief, denies the allegations of Paragraph 15.

16.     Toxin Free USA was formed in 2012 with the intent of organizing national boycotts of food companies that use genetically modified ingredients and related synthetic herbicides and pesticides in their products and pressuring companies to remove those ingredients or contaminants.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a conclusive belief as to the truth or falsity of the allegations of Paragraph 16, but, on information and belief, denies the allegations of Paragraph 16.

17.     Consequently, Toxin Free USA firmly believes in food transparency. The organization diligently works to promote food and ecological systems that are clean, accessible,

and free of contamination. To that end, Toxin Free USA educates consumers, increasing their awareness and knowledge of glyphosate use in agricultural production and its effect on health and the environment, as well as the use and effects of artificial preservatives.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a conclusive belief as to the truth or falsity of the allegations of Paragraph 17, but, on information and belief, denies the allegations of Paragraph 17.

18.     Toxin Free USA's website, publications, public education, research, network building, and mobilization activities provide an important service to consumers and community activists every month.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a conclusive belief as to the truth or falsity of the allegations of Paragraph 18, but, on information and belief, denies the allegations of Paragraph 18.

19.     On February 22, 2019, Toxin Free USA purchased one package of Rachael Ray Nutrish's "Real Chicken & Brown Rice Recipe" Super Premium Food for Cats and one package of "Real Beef, Pea & Brown Rice Recipe" Super Premium Food for Dogs at a Target store located 3100 14th St NW #201, Washington, DC 20010, [sic] in order to evaluate their purported qualities as "natural" products containing "no . . . artificial preservatives."

**ANSWER**: Smucker lacks sufficient knowledge and information to form a conclusive belief as to the truth or falsity of the allegations of Paragraph 19, but, on information and belief, denies the allegations of Paragraph 19.

20.     At all times mentioned herein, Rachael Ray Nutrish was and is a Pennsylvania corporation that maintains its principal place of business and headquarters in Meadville, Pennsylvania.

**ANSWER**: Smucker denies the allegations of Paragraph 20.

21.    Rachael Ray Nutrish is a wholly owned subsidiary of The J.M. Smucker Company.

**ANSWER**: Smucker admits the allegations of Paragraph 21.

22.    At all times mentioned herein, The J.M. Smucker Company was and is a Pennsylvania corporation that maintains its principal place of business and headquarters in Columbus, Ohio.

**ANSWER**: Smucker denies the allegations of Paragraph 22.

23.    Rachael Ray Nutrish markets and distributes the Products in retail outlets in the District of Columbia and throughout the United States.

**ANSWER**: Smucker admits the allegations of Paragraph 23.

24.    Upon information and belief, Rachael Ray Nutrish has caused harm to the general public of the District of Columbia.

**ANSWER**: Smucker denies the allegations of Paragraph 24.

25.    Toxin Free USA is acting on behalf of the general public as private attorneys general pursuant to D.C. Code § 28-3905(k)(1). Plaintiff is a non-profit organization pursuant to D.C. Code § 28-3901(a)(14) and a public-interest organization pursuant to D.C. Code § 28-3901(a)(15).

**ANSWER**: No response is required to the legal conclusions of Paragraph 25. To the extent a response is required, Smucker denies the allegations of Paragraph 25.

## **FACTUAL ALLEGATIONS**

26.    American consumers increasingly and consciously seek out natural and healthful food products for themselves and their pets. Once a small niche market, healthful, natural foods are now sold by conventional retailers, and their sales continue to soar.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 26, and, on that basis, denies the allegations of Paragraph 26.

27.    Consumers value natural foods for themselves and their pets for myriad health, environmental, and political reasons, including avoiding chemicals and additives, attaining health and wellness, helping the environment, and financially supporting companies that share these values.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 27, and, on that basis, denies the allegations of Paragraph 27.

A.    **Rachael Ray Nutrish Cultivates a "Natural" Brand Image for its Pet Food Products.**

**ANSWER**: Given the vague phrasing of this unnumbered paragraph Smucker denies the allegations in this unnumbered paragraph.

28.    Rachael Ray Nutrish knows that consumers seek out and wish to purchase whole, natural foods for their pets that do not contain artificial chemicals, and that consumers will pay more for pet foods that they believe to be natural than they will pay for pet foods that they do not believe to be natural.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 28, and, on that basis, denies the allegations of Paragraph 28.

29.     Recent national surveys have found that a majority of consumers seek out products with a "natural" label, believing that "natural" means that the products are produced without pesticides or artificial ingredients.[2]

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 29, and, on that basis, denies the allegations of Paragraph 29 and the allegations in the footnote to Paragraph 29.

30.     To capture this market, Rachael Ray Nutrish markets its "Super Premium" pet food as "natural" and as containing "no . . . artificial preservatives."

**ANSWER**: Smucker admits that certain brands of Nutrish's "Super Premium" products have the words "natural" and "no . . . artificial preservatives" on the packaging. Otherwise, Smucker denies the remaining allegations of Paragraph 30.

31.     Rachael Ray Nutrish does not qualify these statements with any disclaimer regarding the presence of glyphosate or ethoxyquin.

**ANSWER**: Given the vague phrasing of this allegation, Smucker denies the allegations of Paragraph 31.

**B.     Rachael Ray Nutrish Presents the Products as "Natural" and as Containing "No . . . Artificial Preservatives."**

**ANSWER**: Given the vague phrasing of this unnumbered paragraph Smucker denies the allegations in this unnumbered paragraph.

32.     Rachael Ray Nutrish labels the Products as "natural" and as containing "no . . . artificial preservatives."

---

[2] *See, e.g.*, Jayson L. Lusk, *Consumer Perceptions of Healthy and Natural Food Labels*, 29 (Jan. 15, 2019), https://bit.ly/2Hy06ML (finding that 68.1% more consumers perceive crops "sprayed with synthetic pesticides like glyphosate or chlorpyrifos" to be "unnatural" than "natural," and that 58.8% of consumers understand "natural" to mean "no preservatives"); Consumer Reports National Research Center, *Natural Food Labels Survey* (2015) (finding that 63% of consumers understand a "natural" label to mean that "no toxic pesticides were used").

**ANSWER**: Smucker admits that some Nutrish products have the words "natural" and "no

. . . artificial preservatives" on the packaging. Otherwise, Smucker denies the allegations of

Paragraph 32.

33.    Upon information and belief, Rachael Ray Nutrish has profited enormously from

its falsely marketed products and its carefully orchestrated label and image.

**ANSWER**: Smucker denies that Nutrish products are falsely marketed. Smucker denies

the remaining allegations of Paragraph 33.

34.    Consumers reasonably believe that a product or ingredient represented as "natural"

does not contain residues of synthetic chemicals.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the

truth or falsity of the allegations of Paragraph 34, and, on that basis, denies the allegations of

Paragraph 34.

35.    Consumers reasonably believe that a product or ingredient represented as "natural"

does not contain residues of unnatural biocides.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the

truth or falsity of the allegations of Paragraph 35, and, on that basis, denies the allegations of

Paragraph 35.

36.    In 2015, the Consumer Reports National Research Center conducted a nationally

representative phone survey to assess consumer opinion regarding food labeling.[3]

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the

truth or falsity of the allegations of Paragraph 36 and, on that basis, denies the allegations of

Paragraph 36 and the allegations in the footnote to Paragraph 36.

---

[3] Consumer Reports National Research Center, *supra* note 2.

37.    Sixty-three percent of all respondents in the Consumer Reports survey said that a "natural" label on packaged and processed foods means that "no toxic pesticides were used."[4]

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 37 and, on that basis, denies the allegations of Paragraph 37 and the allegations in the footnote to Paragraph 37.

38.    Rachael Ray Nutrish knows and intends that when consumers see the product labels or advertisements promising the products are "natural," consumers will understand that to mean that, at the very least, that the products do not contain synthetic chemicals like pesticides and biocides.

**ANSWER**: Smucker denies the allegations of Paragraph 38.

**C.    Glyphosate Is Not Natural.**

**ANSWER**: Given the vague phrasing of this unnumbered paragraph Smucker denies the allegations in this unnumbered paragraph.

39.    Quantitative testing has revealed that the Products contain glyphosate.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 39 and, on that basis, denies the allegations of Paragraph 39.

40.    Glyphosate was invented by the agrochemical and agricultural biotechnology corporation Monsanto, which began marketing the herbicide in 1974 under the trade name Roundup.[5]

---

[4] *Id.* at 2.
[5] *See* Shannon Van Hoesen, Study: Monsanto's Glyphosate Most Heavily Used Weed-Killer in History, Environmental Working Group (Feb. 2, 2016), ttps://www.ewg.org/release/study-monsanto-s-glyphosate-most-heavily-used-weed-killer-history.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 40 as phrased and, on that basis, denies the allegations of Paragraph 40 and the allegations in the footnote of Paragraph 40.

41.    Glyphosate is derived from the amino acid glycine.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 41 as phrased and, on that basis, denies the allegations of Paragraph 41.

42.    To create glyphosate, one of the hydrogen atoms in glycine is artificially replaced with a phosphonomethyl group.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 42 as phrased and, on that basis, denies the allegations of Paragraph 42.

43.    Over the past several years, consumers have become increasingly conscious of the potential detrimental health effects of biocides such as glyphosate.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 43 as phrased and, on that basis, denies the allegations of Paragraph 43.

**D.    Ethoxyquin is an Artificial Preservative.**

**ANSWER**: Given the vague phrasing of this unnumbered paragraph Smucker denies the allegations in this unnumbered paragraph.

44.    Quantitative testing has revealed that the Products contain residues of ethoxyquin.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 44 and, on that basis, denies the allegations of Paragraph 44.

45.     Ethoxyquin is a synthetic[6] chemical commonly used as an artificial preservative in pet food.[7]

**ANSWER**: Smucker lacks sufficient knowledge and information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 45 as phrased and, on that basis, denies the allegations of Paragraph 45 and the allegations in the footnotes of Paragraph 45.

46.     Over the past several years, consumers have become increasingly conscious of the potential detrimental health effects of artificial preservatives such as ethoxyquin.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 46 and, on that basis, denies the allegations of Paragraph 46.

47.     Rachael Ray Nutrish is aware of these concerns. In a December 21, 2018 blog post on Rachael Ray Nutrish's website, the company listed ethoxyquin as one of the "5 Most Harmful Ingredients in Cat Food." Rachael Ray Nutrish has since taken down this post. **Figure 3**, below.

---

[6] *See, e.g.*, A.K. Lundebye et. al, *Levels of synthetic antioxidants (ethoxyquin, butylated hydroxytoluene and butylated hydroxyanisole) in fish feed and commercially farmed fish*, Part A, 27:12 Food Additives & Contaminants 1652 (2010).
[7] *See, e.g.*, 21 C.F.R. § 573.380 ("[Ethoxyquin] is intended for use only: (1) As a chemical preservative for retarding oxidation of carotene, xanthophylls, and vitamins A and E in animal feed and fish food and, (2) as an aid in preventing the development of organic peroxides in canned pet food").



# 5 Most Harmful Ingredients in Cat Food

Feeding our furry family members is the single most important thing we do as pet parents. With so many options available, it's hard to know what cat food ingredients are safe and which ones are dangerous. To stay on top of your cat's health, check food labels carefully for these five harmful ingredients before dishing out her next meal.

**Meat by-products**

As the name implies, meat by-products are interior animal parts not meant for human consumption. Meat by-products can be organs, feet, nails and even rotten or cancerous meats. Bottom line—keep meat by-products off your kitty's plate. Always feed cat food (https://nutrish.com/cat) that contains real meat.

**Cornmeal**

Healthy cats require a high-protein diet. Some pet food manufactures use cornmeal as a cheap substitute for more expensive meat options. Cats that eat cornmeal are at a higher risk for allergies, obesity and feline diabetes. Cornmeal also contains melamine, which can cause kidney failure.

**Artificial food coloring**

Don't be fooled by the tempting color of your cat's food. Artificial colorings are known carcinogens. Be on the lookout for any cat food label with the colors Red #40 or Blue #2. These colors are known to give kitties severe allergies.

**Ethoxyquin**

If you see Ethoxyquin (http://www.feedingfidoandfluffy.com/is-ethoxyquin-safe-in-pet-food/) in your cat food ingredient list, you might think again. Ethoxyquin is a chemical primarily used to make pesticides and rubber products. Some pet food manufacturers use Ethoxyquin as a preservative to lengthen the shelf life of cat food claiming it is perfectly safe. However, it is considered a carcinogen in humans and its effects on animals has not been well studied.

**Propylene Glycol**

**Figure 3.** Source: https://nutrish.com/blog/post/5-most-harmful-ingredients-in-cat-food.

**ANSWER**: Smucker denies the allegations of Paragraph 47.

48.     Indeed, federal regulations now require disclosure of ethoxyquin in pet food.[8]
Rachael Ray Nutrish makes no such disclosure.

---

[8] *Id.*

**ANSWER**: No response is required to the legal conclusions of Paragraph 48. Smucker denies the remaining allegations of Paragraph 48 and the allegations in the footnote of Paragraph 48.

**E.    Rachael Ray Nutrish's Marketing Is Misleading and Omits Material Facts.**

**ANSWER**: The allegations in this unnumbered paragraph are legal conclusions to which no response is required. To the extent a response is required, Smucker denies the allegations in this unnumbered paragraph.

49.    Rachael Ray Nutrish's conduct in marketing or representing that the Products are "natural" and contain "no . . . artificial preservatives" misleds [sic] and/or tends to mislead the public.

**ANSWER**: Smucker admits that some Nutrish products have the words "natural" and "no . . . artificial preservatives" on the packaging. Otherwise, Smucker denies the allegations of Paragraph 49.

50.    D.C. consumers cannot discover the true nature of the Products from Rachael Ray Nutrish's marketing. D.C. consumers cannot discover the true nature of the Products even by visiting Rachael Ray Nutrish's website, which makes no mention of glyphosate or ethoxyquin.

**ANSWER**: Smucker denies the allegations of paragraph 50.

51.    Discovery of the true nature of the content of the Products requires knowledge of chemistry and access to laboratory testing that is not available to the average reasonable consumer.

**ANSWER**: Smucker denies the allegations in paragraph 51.

52.    Rachael Ray Nutrish deceptively and misleadingly conceals material facts about the Products, namely, that the Products are not "natural" and do contain artificial preservatives, because in fact the Products contain the residues of glyphosate and ethoxyquin; and that the

Products are not what a reasonable consumer would consider "natural" or free of "artificial preservatives" because they in fact contain the residues of glyphosate and ethoxyquin.

**ANSWER**: No response is required to the legal conclusions of Paragraph 52. To the extent a response is required, Smucker denies the allegations of Paragraph 52.

53.     The production process Rachael Ray Nutrish uses for the Products is known only to Rachael Ray Nutrish and its suppliers.

**ANSWER**: Smucker denies the allegations of Paragraph 53.

54.     Rachael Ray Nutrish has not disclosed such information to Toxin Free USA or, on information and belief, to D.C. consumers.

**ANSWER**: Smucker denies the allegations of Paragraph 54.

55.     Testing reveals the presence of glyphosate and ethoxyquin residues in the Products, but only Rachael Ray Nutrish knows the methods by which its pet food is processed, or what would account for the presence of glyphosate and ethoxyquin residues in its Products.

| Product | Purchase Date | Glyphosate Residue (ppb) | Ethoxyquin Residue (ppb) |
|---|---|---|---|
| "Real Chicken & Brown Rice Recipe" Super Premium Food for Cats | 2/22/19 | 417 | 16 |
| "Real Beef, Pea & Brown Rice Recipe" Super Premium Food for Dogs | 2/22/19 | 175 | 352 |

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations of Paragraph 55 and, on that basis, denies the allegations of Paragraph 55.

56.     Rachael Ray Nutrish's concealment tolls the applicable statute of limitations.

**ANSWER**: No response is required to the legal conclusions of Paragraph 56. To the extent a response is required, Smucker denies the allegations of Paragraph 56.

57.    To this day, Rachael Ray Nutrish continues to conceal and suppress the true nature, identity, source, and method of production of its Products.

**ANSWER**: Smucker denies the allegations of Paragraph 57.

**F.    Rachael Ray Nutrish Knew or Should Have Known That Its Representations Were False.**

**ANSWER**: The allegations in this unnumbered paragraph are legal conclusions to which no response is required. To the extent a response is required, Smucker denies the allegations in this unnumbered paragraph.

58.    Rachael Ray Nutrish holds itself out to the public as a trusted expert in the sourcing and processing of pet food.

**ANSWER**: Smucker admits that Nutrish has partnered with experts on the sourcing and processing of pet food. Given the vauge phrasing of this allegation, however, Smucker otherwise denies the remaining allegations in Paragraph 58.

59.    Rachael Ray Nutrish knew what representations it made on the labels of the Products. Rachael Ray Nutrish also knew how the pet food was sourced and processed, and therefore knew or should have known that the pet food contains residues of glyphosate, an unnatural biocide, and ethoxyquin, an artificial preservative.

**ANSWER**: Smucker admits it knew what the packaging of Nutrish's products stated. Smucker admits it knew how Nutrish branded pet food was sourced and processed. Smucker otherwise denies the remaining allegations of Paragraph 59.

60.    Rachael Ray Nutrish thus knew, or should have known, the facts demonstrating that the Products were mislabeled and falsely advertised.

**ANSWER**: No response is required to the legal conclusions of Paragraph 60. To the extent a response is required, Smucker denies that Nutrish's products were mislabeled and falsely advertised. Smucker denies the remaining allegations of Paragraph 60.

61.     Consumers frequently rely on label representations and information in making purchase decisions, especially in purchasing food.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegation in Paragraph 61, and, on that basis, denies the allegations in Paragraph 61.

62.     Rachael Ray Nutrish made the false, misleading, and deceptive representations and omissions intending for consumers to rely upon these representations and omissions in purchasing the Products.

**ANSWER**: No response is required to the legal conclusions of Paragraph 62. To the extent a response is required, Smucker denies the allegations of Paragraph 62.

63.     In making the false, misleading, and deceptive representations and omissions at issue, Rachael Ray Nutrish knew and intended that consumers would purchase the Products when consumers would otherwise purchase a competing product.

**ANSWER**: No response is required to the legal conclusions of Paragraph 63. To the extent a response is required, Smucker denies the allegations of Paragraph 63.

64.     Consumers are willing to pay more for products that purport to be "natural" and free of artificial preservatives.

**ANSWER**: Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegation in Paragraph 64, and, on that basis, denies the allegations in Paragraph 64.

65.    In making the false, misleading, and deceptive representations and omissions at issue, Rachael Ray Nutrish also knew and intended that consumers would pay more for "natural" products that are purportedly free of unnatural agents than they would pay for products that are not "natural," furthering Rachael Ray Nutrish's private interest of increasing sales of the Products and decreasing sales of competing products that are truly natural and/or free from artificial preservatives.

**ANSWER**: No response is required to the legal conclusions of Paragraph 65. To the extent a response is required, Smucker denies the allegations of Paragraph 65.

66.    Rachael Ray Nutrish knows that consumers prefer natural pet foods and pet foods that do not contain unnatural or potentially dangerous chemicals or their residues. Rachael Ray Nutrish knows that consumers will pay more for "natural" pet foods or may not purchase them at all unless they are "natural" and free from unnatural and potentially dangerous chemicals.

**ANSWER**: Smucker denies the allegations of Paragraph 66.

67.    Upon information and belief, Rachael Ray Nutrish has failed to remedy the problem with the Products, thus causing ongoing harm to consumers.

**ANSWER**: Smucker denies the existence of any "problem" that caused or is continuing to cause harm to Nutrish's consumers. Smucker denies the remaining allegations in Paragraph 67.

68.    D.C. Consumers are at risk of real, immediate, and continuing harm if the Products continue to be sold with the misleading representations.

**ANSWER**: Smucker denies the allegations of Paragraph 68.

69.    Plaintiff contends that the Products were sold pursuant to unfair and unconscionable trade practices because the sale of Rachael Ray Nutrish's Product offends public policy and is

immoral, unethical, oppressive, unscrupulous, and causes substantial economic injuries to consumers.

**ANSWER**: Smucker denies the allegations of Paragraph 69.

70.    Reasonable consumers do not expect the Products, represented and advertised as "natural," and as containing "no . . . artificial preservatives" to contain unnatural chemical residues such as glyphosate or artificial preservative residues such as ethoxyquin. Rachael Ray Nutrish's statements and other representations convey a series of express and implied claims and/or omissions that Rachael Ray Nutrish knows are material to the reasonable consumer in making a purchasing decision, and that Rachael Ray Nutrish intends for consumers to rely upon when choosing whether to purchase the Products and how much to pay for them.

**ANSWER**: No response is required to the legal conclusions of Paragraph 70. To the extent a response is required, Smucker denies the allegations of Paragraph 70.

71.    Rachael Ray Nutrish misrepresented the nature, quality, and/or ingredients of the Products and/or failed to disclose the unnatural aspects of the Products and/or the presence of residues of artificial preservatives, which was and is false, misleading, and/or likely to deceive reasonable consumers.

**ANSWER**: No response is required to the legal conclusions of Paragraph 71. To the extent a response is required, Smucker denies the allegations of Paragraph 71.

## CAUSE OF ACTION

## VIOLATION OF THE DISTRICT OF COLUMBIA
## CONSUMER PROTECTION PROCEDURES ACT

72.    Pursuant to D.C. Code §§ 28-3905(k)(1) and 28-3905(k)(2), Toxin Free USA brings this Count against Rachael Ray Nutrish, on behalf of itself and the general public of the

District of Columbia, for Rachael Ray Nutrish's violation of DC CPPA, D.C. Code § 28-3901, *et seq*.

**ANSWER**: Smucker admits that Plaintiff purports to bring an action on behalf of itself and the general public on the basis of the provisions cited in Paragraph 72, but denies that Plaintiff is entitled to relief under such provisions. Smucker denies the remaining allegations in Paragraph 72.

73.    Plaintiff incorporates by reference all the allegations in the preceding paragraphs of this Complaint.

**ANSWER**: Smucker incorporates by reference all the answers in the preceding paragraphs of this Answer.

74.    Rachael Ray Nutrish has labeled and advertised the Products as "natural" and has otherwise presented an image and marketing materials suggesting that the Products are natural, when in fact the Products contain residues of an unnatural chemical biocide and an artificial preservative.

**ANSWER**: Smucker admits that certain Nutrish products have the word "natural" on the packaging. Otherwise, Smucker denies the remaining allegations in Paragraph 74 as phrased.

75.    Rachael Ray Nutrish has labeled and advertised the Products as containing "no artificial preservatives" and has otherwise presented an image and marketing materials suggesting that the Products contain no artificial preservatives, when in fact the Products contain residues of an artificial preservative.

**ANSWER**: Smucker admits that certain Nutrish products have the words "no artificial preservatives" on the packaging. Otherwise, Smucker denies the remaining allegations in Paragraph 75 as phrased.

76.     Rachael Ray Nutrish's advertising of the Products misrepresents, tends to mislead, and omits facts regarding the source, characteristics, standard, quality, and grade of the Products.

**ANSWER**: No response is required to the legal conclusions of Paragraph 76. To the extent a response is required, Smucker denies the allegations of Paragraph 76.

77.     The Products lack the characteristics, ingredients, benefits, standards, qualities, or grades that Rachael Ray Nutrish states and implies in advertisements.

**ANSWER**: Smucker denies the allegations of Paragraph 77.

78.     Rachael Ray Nutrish's misstatements, innuendo, and omissions are material and have the tendency to mislead.

**ANSWER**: No response is required to the legal conclusions of Paragraph 78. To the extent a response is required, Smucker denies the allegations of Paragraph 78.

79.     Rachael Ray Nutrish knowingly did not sell the Products as advertised.

**ANSWER**: Smucker denies the allegations of Paragraph 79.

80.     The facts as alleged above demonstrate that Rachael Ray Nutrish has violated the DC CPPA, D.C. Code § 28-3901 *et seq.* Specifically, Rachael Ray Nutrish has violated D.C. Code § 28-3904, which makes it an unlawful trade practice to:

(a)     represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; . . .

(d)     represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(e)     misrepresent as to a material fact which has a tendency to mislead; . . .

(f)     fail to state a material fact if such failure tends to mislead;

(f-1)    [u]se innuendo or ambiguity as to a material fact, which has a tendency to
mislead; ... [or]

(h)    advertise or offer goods or services without the intent to sell them or
without the intent to sell them as advertised or offered.

**ANSWER**: No response is required to the legal conclusions of Paragraph 80. To the extent a response is required, Smucker denies the allegations of Paragraph 80, and refers to the D.C. C.P.P.A., D.C. Code § 28-3901 *et seq.* for its meaning.

81.    The DC CPPA makes such conduct an unlawful trade practice "whether or not any consumer is in fact misled, deceived or damaged thereby." D.C. Code § 28-3904.

**ANSWER**: No response is required to the legal conclusions of Paragraph 81. To the extent a response is required, Smucker denies the allegations of Paragraph 81, and refers to D.C. Code § 28-3904 for its meaning.

82.    Though Toxin Free USA need not show proof of deception to succeed on its DC CPPA claim, consumers were in fact deceived. Rachael Ray Nutrish knows and should have known that reasonable consumers would believe that the Products are "natural" and contain "no . . . artificial preservatives" as advertised.

**ANSWER**: No response is required to the legal conclusions of Paragraph 82. To the extent a response is required, Smucker denies the allegations of Paragraph 82.

83.    Toxin Free USA has a sufficient nexus to D.C. consumers of the Products to adequately represent their interests.

**ANSWER**: No response is required to the legal conclusions of Paragraph 82. To the extent a response is required, Smucker lacks sufficient knowledge and information to form a belief as to

the truth or falsity of the allegations of Paragraph 83, and, on that basis, denies the allegations of Paragraph 83.

84.     Because Rachael Ray Nutrish misrepresents the characteristics, ingredients, and benefits of the Products; misrepresents the standard, quality, and grade of the Products; misrepresents, fails to state, and uses innuendo and ambiguity in ways which tend to mislead reasonable consumers with regard to material facts about the Products; and advertises the Products without the intent to sell the Products as advertised, Rachael Ray Nutrish's marketing of the Products as "Natural Food" violates D.C. Code §§ 28-3904(a), (d), (e), (f), (f-1), and (h).

**ANSWER**: No response is required to the legal conclusions of Paragraph 84. To the extent a response is required, Smucker denies the allegations of Paragraph 84, and refers to D.C. Code §§ 28-3904(a), (d), (e), (f), (f-1), and (h) for their meaning.

85.     Rachael Ray Nutrish is a "person" within the meaning of D.C. Code § 28-3901(a)(1), is a merchant under § 28-3901(a)(3), and provides "goods" within the meaning of § 283901(a)(7).

**ANSWER**: No response is required to the legal conclusions of Paragraph 85. To the extent a response is required, Smucker denies the allegations of Paragraph 85, and refers to D.C. Code §§ 28-3901(a)(1), (a)(3), and (a)(7) for their meaning.

86.     Pursuant to D.C. Code § 28-3905(k)(1)(C), "[a] nonprofit organization may, on behalf of itself or any of its members, or on any such behalf and on behalf of the general public, bring an action seeking relief from the use of a trade practice in violation of a law of the District, including a violation involving consumer goods or services that the organization purchased or received in order to test or evaluate qualities pertaining to use for personal, household, or family purposes."

**ANSWER**: No response is required to the legal conclusions of Paragraph 86. To the extent a response is required, Smucker denies the allegations of Paragraph 86, and refers to D.C. Code § 28-3905(k)(1)(C) for its meaning.

87.    Toxin Free USA is a nonprofit organization pursuant to D.C. Code § 28-3905(k)(1)(C) that on February 22, 2019 purchased Products in order to test or evaluate their qualities.

**ANSWER**: No response is required to the legal conclusions of Paragraph 87. To the extent a response is required, Smucker denies knowledge and information sufficient to form a belief as to the truth or falsity of the allegation Plaintiff purchased Nutrish brand products on February 22, 2019, and, on that basis, denies said allegation. Smucker denies the remaining allegations of Paragraph 87, and refers to D.C. Code § 28-3905(k)(1)(C) for its meaning.

88.    Rachael Ray Nutrish's conduct violates the DC CPPA regardless of whether "any consumer is in fact misled, deceived or damaged thereby." D.C. Code § 28-3904. Pursuant to D.C. Code § 28-3905(k)(1)(A), "[a] consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District."

**ANSWER**: No response is required to the legal conclusions of Paragraph 88. To the extent a response is required, Smucker denies the allegations of Paragraph 88, and refers to D.C. Code §§ 28-3904 and 28-3905(k)(1)(A) for their meaning.

89.    Any consumer has the right to bring an action for redress of Rachael Ray Nutrish's unlawful behavior, *see* D.C. Code § 28-3905(k)(1)(A), and the statute does not limit consumer plaintiffs according to whether they purchased the product at issue. Nevertheless, as alleged in this Complaint, the Rachael Ray Nutrish Products are marketed and sold in the District, *see supra* ¶¶ 20, 24, and consumers within the District have purchased these Products under the

misrepresentations made by Rachael Ray Nutrish. Therefore, a variety of purchasing and non-purchasing consumers could bring an action against Rachael Ray Nutrish based on the misrepresentations and omissions listed in this Complaint.

**ANSWER**: No response is required to the legal conclusions of Paragraph 89. To the extent a response is required, Smucker admits that Nutrish brand pet food was sold within the District. Smucker denies Nutrish's brand pet food labels or packaging contained misrepresentations or material omissions. Smucker denies the remaining allegations of Paragraph 89, and refers to D.C. Code § 28-3905(k)(1)(A) for its meaning.

90.     Pursuant to D.C. Code § 28-3905(k)(1)(D)(i), "a public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice."

**ANSWER**: No response is required to the legal conclusions of Paragraph 90. To the extent a response is required, Smucker denies the allegations of Paragraph 90, and refers to D.C. Code § 28-3905(k)(1)(D)(i) for its meaning.

91.     The only limitation on this power of a public interest organization to act on behalf of consumers is that the public interest organization must have "sufficient nexus to the interests involved of the consumer or class to adequately represent those interests." D.C. Code § 28-3905(k)(1)(D)(ii). As set forth in this Complaint, *see supra* ¶¶ 15-19, Plaintiff Toxin Free USA was founded with the purpose of advocating for and educating consumers, including consumers in the District of Columbia, in the arena of clean and healthy food and ecological systems. In addition,

Plaintiff Toxin Free USA has retained the undersigned competent counsel, with significant experience in litigating under the DC CPPA, to pursue this action.

**ANSWER**: No response is required to the legal conclusions of Paragraph 91. To the extent a response is required, Smucker lacks sufficient knowledge and information to form a belief as to the truth or falsity of the allegations regarding the founding purpose of Toxin Free USA, and, on that basis, denies said allegation. Smucker denies the remaining allegations of Paragraph 91, and refers to D.C. Code § 28-3905(k)(1)(D)(ii) for its meaning.

92.    Toxin Free USA is a public-interest organization pursuant to D.C. Code § 28-3905(k)(1)(D) and brings this action on behalf of consumers who could bring the action under D.C. Code § 28-3905(k)(1)(A).

**ANSWER**: Smucker admits that Plaintiff purports to bring this action on behalf of consumers who could bring this action under D.C. Code § 28-3905(k)(1)(A). No response is required to the legal conclusions of Paragraph 92. To the extent a response is required, Smucker denies the allegations of Paragraph 92, and refers to D.C. Code §§ 28-3905(k)(1)(D) and (k)(1)(A) for their meaning.

93.    Via §§ 28-3905(k)(1)(C) and (k)(1)(D)(i), the DC CPPA allows for non-profit organizational standing and public interest organizational standing to the fullest extent recognized by the D.C. Court of Appeals in its past and future decisions addressing the limits of constitutional standing under Article III.

**ANSWER**: No response is required to the legal conclusions of Paragraph 93. To the extent a response is required, Smucker denies the allegations of Paragraph 93, and refers to D.C. Code §§ 28-3905(k)(1)(C) and (k)(1)(D)(i) for their meaning.

94.     Toxin Free USA is a "person" within the meaning of D.C. Code § 28-3901(a)(1), and a "non-profit organization" within the meaning of D.C. Code § 28-3901(a)(14).

**ANSWER**: No response is required to the legal conclusions of Paragraph 94. To the extent a response is required, Smucker denies the allegations of Paragraph 94, and refers to D.C. Code §§ 28-3901(a)(1) and (a)(14) for their meaning.

## PRAYER FOR RELIEF

**ANSWER**: Smucker denies that Plaintiff has any valid claim and denies that Plaintiff is entitled to any of the relief requested in its Prayer for Relief.

## AFFIRMATIVE DEFENSES

Discovery and investigation may reveal that one or more of the following defenses are available to Smucker in this matter.  Thus, Smucker reserves the right to assert these separate defenses.  If the facts warrant, Smucker may withdraw any of these defenses.  Smucker further reserves the right to modify, clarify, amend, or supplement the Answer and Affirmative Defenses, and to assert additional defenses and other claims, as discovery proceeds.  By way of defense, and without assuming the burden of proof for such defenses it would otherwise not have the burden to prove, Smucker hereby asserts the following affirmative defenses to Plaintiff's Complaint

### FIRST AFFIRMATIVE DEFENSE

**(Failure to State a Cause of Action)**

Plaintiff's Complaint fails to allege facts sufficient to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Federal Preemption)

Plaintiff's claims are expressly and impliedly preempted by federal law, including but not limited to, the Food, Drug and Cosmetic Act; the Nutrition Labeling and Education Act of 1990; and the U.S. Food and Drug Administration's regulations.

## THIRD AFFIRMATIVE DEFENSE

### (Actions Pursuant to Local, State or Federal Authority)

Smucker is not liable for any acts or omissions undertaken by or at the direction of local, state or federal authority, including, without limitation, acts or omissions made in accordance with regulations, ordinances, statutes, and laws applicable at the time of the acts or omissions at issue.

## FOURTH AFFIRMATIVE DEFENSE

### (Conduct Not Unlawful)

The business practices relating to the allegations in the Complaint are not unlawful. The representations and advertising regarding the Smucker Products are not unlawful. No representation or advertisement contains any false or misleading statement or promises any good not intended to be delivered. As such, the representations and advertising are not, and were not, in violation of any law or regulation.

## FIFTH AFFIRMATIVE DEFENSE

### (Primary Jurisdiction)

Plaintiff's claims are barred, in whole or in part, by the doctrine of primary jurisdiction.

## SIXTH AFFIRMATIVE DEFENSE

### (Puffery)

Plaintiff's claims for false advertising are barred to the extent that any alleged deceptive statements were such that no reasonable person could have reasonably relied upon or misunderstood Smucker's statements as claims of fact.

## SEVENTH AFFIRMATIVE DEFENSE

### (No Deceptive Act or Practice)

Plaintiff's claims for false advertising are barred, in whole or in part, because there was no deceptive act or practice. Each and every representation and advertisement for the products at issue in Plaintiff's Complaint correctly portrayed the characteristics, ingredients, uses, benefits, quantities, standard, quality, and grade of the Products.

## EIGHTH AFFIRMATIVE DEFENSE

### (Conduct Not Fraudulent nor Likely to Deceive)

Smucker's conduct alleged in the Complaint is not fraudulent and was not likely to mislead or deceive consumers and/or the public.

## NINTH AFFIRMATIVE DEFENSE

### (Actual Knowledge)

Plaintiff's claims for misrepresentation are barred because Plaintiffs had actual knowledge of the facts and circumstances that make up the allegations in the Complaint.

## TENTH AFFIRMATIVE DEFENSE

### (Express or Implied Consent)

Plaintiffs expressly and/or impliedly consented to and/or had knowledge of all activities or conditions alleged in their Complaint to have caused their harm, and thus, are barred from seeking relief for such harm.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Lack of Materiality)

Plaintiff's claims based on alleged misrepresentations are barred because the representations alleged by Plaintiffs were not material, in that, in light of information commonly known to consumers, they were not likely to affect their purchasing decisions. Smucker's representations and actions alleged in the Complaint were not likely to mislead consumers acting reasonably under the circumstances.

## TWELFTH AFFIRMATIVE DEFENSE

### (Lack of Reasonable Reliance)

Plaintiff's claims are barred, in whole or in part, because of the lack of reasonable reliance by consumers on the alleged misrepresentations by Smucker identified in the Complaint.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Lack of Awareness)

Plaintiff's claims are barred, in whole or in part, because consumers lacked awareness of the alleged misrepresentations by Smucker described in the Complaint.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Lack of Standing)

Plaintiffs lack either standing and/or capacity to bring some or all of the claims alleged in the Complaint.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

Plaintiff's claims are barred by the applicable statutes of limitations.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Mootness)

Plaintiff and putative class members' claims are barred, in whole or part, to the extent that the claims or relief sought are moot.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Class Treatment Not Appropriate)

This action may not be maintained as a class action pursuant to Rule 23 of the Superior Court Rules of Civil Procedure for reasons including, but not limited to: Plaintiff is not adequate or typical representatives of the Class it purports to represent, Plaintiff's counsel is not adequate for the class they claim to represent, there are insufficient questions common to the Class, there are insufficient common factual issues relating to injury and causation, class action is not superior to other remedies, the class is unmanageable, and because the variations in state law and relevant facts governing Plaintiff's claims override any common issues.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Lack of Causation)

Each cause of action is barred, in whole or in part, because Plaintiff has not sustained any injury or damage by reason of any act or omission on Smucker's part.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Damages Caused by Other Causes)

To the extent that Plaintiff suffered any damages, such damages were proximately caused by persons, entities, and/or factors or events other than Smucker and for which Smucker was and is not responsible.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Negligence and Misconduct of Others)

If there was any negligence or other misconduct proximately causing the damages allegedly sustained by Plaintiff, such negligence or misconduct was that of parties other than Smucker, and recovery should be barred or eliminated to that extent.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Plaintiff's Own Negligence)

Plaintiff's claims are barred, in whole or in part, or must be mitigated by reason of her own negligence or other conduct.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

Without admitting any wrongful conduct on the part of Smucker, and without admitting that Plaintiff has suffered any loss, damage, or injury, recovery for any such loss, damage, or injury is barred, in whole or in part, because Plaintiff failed to mitigate such loss, damage, or injury.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Lack of Damage)

Plaintiff has not suffered any damage as a result of any actions allegedly taken by Smucker, and are thus barred from asserting any claim against Smucker.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Set-off)

Smucker alleges that, even if Plaintiff's claims are meritorious, which Smucker denies, those claims are subject to setoff and recoupment.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (No Right to Injunctive Relief)

Plaintiff does not allege an adequate basis for injunctive relief. Plaintiff is not entitled to such relief because the hardship that would be imposed on Smucker by any such relief would be greatly disproportionate to any hardship that Plaintiff might suffer in its absence. Further, any injunctive relief that would require regulation by the Court on an ongoing basis is inappropriate, and Smucker's advertising and marketing activities are already monitored by various federal and state agencies.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (No Attorneys' Fees)

Plaintiff's request for attorneys' fees in this matter is barred because it lacks any basis in law or contract.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (Laches)

Plaintiff's claims are barred by the doctrine of laches.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

### (Pari Delicto or Unclean Hands)

Plaintiff's claims are barred, in whole or in part, by the doctrines of *in pari delicto* or unclean hands.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

### (Payment, Release, Estoppel, Waiver, Disclaimer, Acquiescence, or Accord and Satisfaction)

Plaintiff's claims are barred, in whole or in part, by the doctrines of payment, release, estoppel, waiver, disclaimer, acquiescence, or accord and satisfaction.

36

## THIRTIETH AFFIRMATIVE DEFENSE

### (Reservation)

Further responding, Smucker states that it currently has insufficient knowledge or information on which to form a belief as to whether it may have additional, as yet unstated, affirmative defenses available. Smucker reserves the right to assert additional affirmative defenses in the event that discovery indicates it would be appropriate.

WHEREFORE, Smucker respectfully requests that the Court enter judgment in its favor and against Plaintiff and putative class members and granting such further relief as the Court deems just and proper.

Dated: November 20, 2019                    Respectfully submitted,

By:  _/s/ Ronald Y. Rothstein_____
     Ronald Y. Rothstein (D.C. Bar No. 451950)
     **WINSTON & STRAWN LLP**
     35 West Wacker Drive
     Chicago, Illinois 60601
     (312) 558-5600
     RRothste@winston.com

     *Counsel for Defendants*
     *The J. M. Smucker Company and*
     *Ainsworth Pet Nutrition, LLC*

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **TOXIN FREE USA,** | |
| Plaintiff, | |
| v. | Case No. 2019 CA 003192 B |
| **THE J. M. SMUCKER COMPANY** and **AINSWORTH PET NUTRITION, LLC,** | HON. FLORENCE Y. PAN |
| Defendants. | |

**CERTIFICATE OF SERVICE**

On November 20, 2019, the undersigned certifies that a true and correct copy of The J. M.

Smucker Company's Answer was electronically served via the CaseFileXpress system on:

Kim E. Richman
Richman Law Group
8 West 126th Street
New York, NY 10027
Phone: (718) 878-4707
Fax: (212) 687-8292
E-mail: krichman@richmanlawgroup.com

*Counsel for Plaintiff Toxin Free USA*

By:  _/s/ Ronald Y. Rothstein_____
Ronald Y. Rothstein (D.C. Bar No. 451950)
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
RRothste@winston.com

*Counsel for Defendants*
*The J. M. Smucker Company and*
*Ainsworth Pet Nutrition, LLC*



# Superior Court of the District of Columbia

Civil Division -- Washington, D.C. 20001



FILED
QUALITY REVIEW BRANCH
NOV 2 0 2019
Superior Court
of the District of Columbia
Washington

## SCHEDULING ORDER

Case Number: **2019 CA 003192 B**

**TOXIN FREE USA Vs. THE J.M. SMUCKER COMPANY et al**

This Order may not be modified except by leave of Court upon a showing of good cause. Stipulations by counsel will not be effective to change any deadlines in the Order without court approval. Failure to comply with this Order and the deadlines set forth herein may result in dismissal, default judgment, refusal to let witnesses testify, refusal to admit exhibits, the assessment of costs and expenses, including attorney's fees, or other sanctions.

November 20, 2019

JUDGE FLORENCE Y PAN

---

ADR Selected:  Mediation ☒          Case Evaluation ☐

---

### Track 3 - Mediation

**PRETRIAL DEADLINES**

| | |
|---|---|
| **EXCHANGE LISTS OF FACT WITNESSES** | 02/20/2020 |
| **PROPONENT'S RULE 26(a)(2)(B) REPORT** | 05/20/2020 |
| **OPPONENT'S RULE 26(a)(2)(B) REPORT** | 07/20/2020 |
| **DISCOVERY REQUESTS** | 06/9/2020 |
| **CLOSE OF DISCOVERY**[1] | 08/18/2020 |
| **FILING MOTIONS**[2] | 09/17/2020 |
| **DISPOSITIVE MOTIONS DECIDED** | 10/19/2020 |
| **ADR  (MEDIATION/CASE EVALUATION)** | 11/16/2020-12/16/2020 |
| **PRETRIAL DATE**[3] | 1/15/2021 - 2/15/2021 (TO BE SET UPON COMPLETION OF ADR) |

[1] No motion relating to discovery and no deposition or other discovery may be had after this date, except by leave of court. Notices of deposition must be served not less than 5 days before the date scheduled for the deposition, and no deposition may be noticed to take place after the close of discovery date.

[2] This deadline does not apply (1) to motions relating to discovery, which must be filed by the close of discovery, or (2) to motions in limine, motions to bifurcate, or any other motion respecting the conduct of the trial, which must be filed at least 3 weeks prior to the pretrial conference.

[3] A Joint Pretrial Statement is required unless otherwise ordered by the Court.

DOCKETED   NOV 2 0 2019          MAILED   NOV 2 0 2019



# Superior Court of the District of Columbia
Civil Division -- Washington, D.C. 20001

## SCHEDULING ORDER

Case Number: <u>**2019 CA 003192 B**</u>

## <u>TOXIN FREE USA Vs. THE J.M. SMUCKER COMPANY et al</u>

| <u>**PARTY**</u> | <u>**NAME / ADDRESS / BAR NUMBER**</u> |
|---|---|

<u>Plaintiff</u>  TOXIN FREE USA  P.O. Box 458   UNIONVILLE  CT 06085
KIM E. RICHMAN  Richman Law Group 8 West 12th Street   NEW YORK  NY 10027   **1022978**

<u>Defendant</u>   THE J.M. SMUCKER COMPANY   4400 Easton Commons Way, Suite 125  COLUMBUSOH 43219
Mr RONALD Y ROTHSTEIN   WINSTON & STRAWN 35 W WACKER DR   Chicago  IL 60601   **451950**

<u>Defendant</u>   AINSWORTH PET NUTRITION, LLC   18746 Mill Street  MEADVILLE PA 16335
Mr RONALD Y ROTHSTEIN  WINSTON & STRAWN35 W WACKER DR   Chicago   IL 60601   **451950**

# EXHIBIT A

Form 8. Application for Admission Pro Hac Vice.

DISTRICT OF COLUMBIA
COURT OF APPEALS

[or]

SUPERIOR COURT OF
THE DISTRICT OF COLUMBIA

TOXIN FREE USA                          )
                Plaintiff/Appellant,    )        APPLICATION FOR ADMISSION
                                        )              PRO HAC VICE
        v.                              )
                                        )
THE J.M. SMUCKER CO., ET AL,            )        Case No: 2019 CA 003192 B
                                        )
                Defendant/Appellee.     )
                                        )

I declare under penalty of perjury:

☑ (1) That I have not applied for admission pro hac vice in more than five cases in courts of the District of Columbia this calendar year;

☑ (2) That I am a member in good standing of the highest court(s) of the State(s) of ___New York State___;
                                        (state all states)

☑ (3) That there are no disciplinary complaints pending against me for violation of the rules of the courts of those states;

☑ (4) That I have not been suspended or disbarred for disciplinary reasons from practice in any court;

☑ (5) That I am associated with _____
                Kim E. Richman (D.C. Bar #: 1022978)

                (name the D.C. Bar member under Super. Ct. Civ. R. 101;
                and give his/her D.C. Bar Number)

☑ (6) That I do not practice or hold out to practice law in the District of Columbia; and

☑ (7) That I have read all of the rules of the relevant division of the Superior Court of the District of Columbia and the District of Columbia Court of Appeals, and have complied fully with District of Columbia Court of Appeals Rule 49 and, as applicable, Super. Ct. Civ. R. 101. The reason(s) I am applying for admission pro hac vice are as follows:

To represent Plaintiffs' in the above-captioned case.

I acknowledge the jurisdiction of the courts of the District of Columbia over my professional conduct, and I agree to be bound by the District of Columbia Court of Appeals Rules of Professional Conduct, in this matter, if I am admitted pro hac vice. I have applied for admission pro hac vice in the courts of the District of Columbia ___ I times previously in this calendar year.

I attach hereto the receipt issued by the District of Columbia Court of Appeals Committee on the Unauthorized Practice of law as proof of my prior payment of the pro hac vice fee.

*Jay Shooster*

_____        Jay Shooster
Signature                       Print Name

November 18, 2019
Date

Richman Law Group

8 W. 126th St.

New York, NY 10027
Address

718.705.4579
Telephone Number

# EXHIBIT B



District of Columbia Court of Appeals
Committee on Unauthorized Practice of Law
430 E Street, N.W. - Room 123
Washington, D.C. 20001
202 / 879-2777

## R E C E I P T

APPLICATION TO APPEAR *PRO HAC VICE*

Of  <u>Jay Shooster</u>
　　　Name of Attorney

Case No.  <u>2019 CA 003192 B</u>
　　　　　<u>Toxin Free USA v. The J.M. Smucker Co., et al.</u>

The District of Columbia Court of Appeals Committee on Unauthorized Practice of Law, in accordance with the provisions of D.C. App. Rule 49(c)(7), has received a copy of the application to appear *pro hac vice* and the required filing fee.  As of this date, the Committee's records indicate that the attorney has not applied for admission *pro hac vice* in more than five (5) cases in the courts of the District of Columbia this calendar year.

<u>11/25/2019</u>
Date

_____
for the
Committee on Unauthorized Practice of Law
Room 123 - 202/879-2777

# EXHIBIT C

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

TOXIN FREE USA,

                Plaintiff,

      v.

THE J. M. SMUCKER COMPANY and
AINSWORTH PET NUTRITION, LLC,

                Defendant.

Civil Action No. 2019 CA 003192 B

HON. FLORENCE Y. PAN

### [PROPOSED] ORDER

Upon consideration of the Motion for Admission Pro Hac Vice for Jay Shooster, it is on

this _____ day of _____, 20__ hereby

**ORDERED**, that the **Motion** is **GRANTED**.

SO ORDERED.

_____
Hon. Florence Y. Pan

COPIES TO:
Counsel of record

Filed
D.C. Superior Court
12/20/2019 18:40PM
Clerk of the Court

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

TOXIN FREE USA,

               Plaintiff,

    v.

THE J. M. SMUCKER COMPANY and
AINSWORTH PET NUTRITION, LLC,

             Defendant.

Civil Action No. 2019 CA 003192 B

HON. FLORENCE Y. PAN

**UNOPPOSED MOTION FOR ADMISSION *PRO HAC VICE* - JAY SHOOSTER**

Plaintiff Toxin Free USA ("Plaintiff") by and through undersigned counsel, moves for admission of Jay Shooster for purposes of this case and in support thereof states:

1. Mr. Shooster is an attorney at Richman Law Group, 8 W. 126th St., New York, NY 10027; T: 718-705-4579, Em: jshooster@richmanlawgroup.com.

2. Mr. Shooster is a member in good standing of the State of New York Bar.

3. Mr. Shooster has not applied for admission *Pro Hac Vice* in more than five cases in the courts of the District of Columbia this calendar year.

4. Mr. Shooster requests admittance for purposes of this case.

5. Attached as Exhibit A to this Motion is a true and correct copy of Mr. Shooster's Application for Admission *Pro Hac Vice.*

6. Attached as Exhibit B to this Motion is a true and correct copy of Mr. Shooster's receipt for the required $100 fee to the CUPL office.

7. Movant obtained consent from opposing counsel to be admitted *Pro Hac Vice.*

1

WHEREFORE, Plaintiff respectfully requests that its unopposed motion for *Pro Hac Vice* admission be granted, and that Jay Shooster be admitted for purposes of this case.

Dated: December 20, 2019                              Respectfully submitted,

                                                     */s/Kim Richman*
                                                     **RICHMAN LAW GROUP**
                                                     8 W. 126th St.
                                                     New York, NY 10027
                                                     T: 718.705.4579
                                                     F: 212.687.8292
                                                     krichman@richmanlawgroup.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of December 2019, a true and correct copy of the foregoing Consent Motion for Admission *Pro Hac Vice* for Jay Shooster and accompanying documents were served by electronic means through CaseFileXpress filing system, concurrent with the filing of this document, to:

Ronald Y. Rothstein
(D.C. Bar No. 451950)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
RRothste@winston.com
*Counsel for Defendants*

**Filed**
**D.C. Superior Court**
**01/06/2020 15:08PM**
**Clerk of the Court**

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

TOXIN FREE USA                    :    Case Number:  2019 CA 3192 B

v.                                :    Judge: Florence Y. Pan

THE J.M SMUCKER COMPANY and        :
AINSWORTH PET NUTRITION, LLC       :

## <u>ORDER</u>

This matter comes before the Court on consideration of plaintiff Toxin Free USA's

Motion for Admission *Pro Hac Vice* of Jay Shooster, Esq. ("Mot."), filed on December 20, 2019.

Plaintiff's Motion indicates that Mr. Shooster has fully satisfied the requirements of the relevant

rules.  *See* Mot., Ex. A; *see also* Super. Ct. Civ. R. 101(a)(3).  The Motion is also accompanied

by a receipt from the District of Columbia Court of Appeals Committee on Unauthorized

Practice of Law, indicating that Mr. Shooster has paid the filing fees, and that he has not applied

for admission *pro hac vice* in more than five cases in District of Columbia courts this calendar

year.  *See* Mot., Ex. A.

Accordingly, it is this 6th day of January, 2020, hereby

**ORDERED** that plaintiff's Motion for Admission *Pro Hac Vice* of Jay Shooster is

**GRANTED**; and it is further

**ORDERED** that Jay Shooster is admitted *pro hac vice* as counsel for plaintiff Toxin Free

USA in this action pursuant to Super. Ct. Civ. R. 101;[1] and it is further

---

[1]    Mr. Shooster is directed to register for CaseFile Express within seven days of the filing of this Order so that he may receive electronic service of orders and other filings in this matter.

**ORDERED** that the Clerk of the Court enter the appearance of Jay Shooster as an additional attorney on behalf of plaintiff Toxin Free USA.

**SO ORDERED**.


*Florence Pan*

Judge Florence Y. Pan
Superior Court of the District of Columbia


Copies to:

Kim Richman, Esq.
*Counsel for Plaintiff*

Ronald Rothstein, Esq.
*Counsel for Defendants*

Jay Shooster, Esq.
Richman Law Group
8 W. 126th Street
New York, N.Y.
(718) 705-5479

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

|  |  |
|---|---|
| **TOXIN FREE USA,**<br><br>    Plaintiff,<br><br>    v.<br><br>**THE J. M. SMUCKER COMPANY** and<br>**AINSWORTH PET NUTRITION, LLC,**<br><br>    Defendants. | Case No. 2019 CA 003192 B<br><br>Hon. Florence Y. Pan |

## DEFENDANTS THE J. M. SMUCKER COMPANY AND
## AINSWORTH PET NUTRITION, LLC'S
## <u>INITIAL LIST OF FACT WITNESSES</u>

Defendants The J.M. Smucker Company and Ainsworth Pet Nutrition, LLC (collectively,

"Defendants"), by and through their undersigned counsel, provide their initial list of fact witnesses:

| Witness Name | Address | Possible Discoverable Information |
|---|---|---|
| Diana Reeves, Founder & Executive Director, GMO Free USA[1] | GMO Free USA P.O. Box 458 Unionville, CT 06085 | Ms. Reeves is the Founder and Executive Director of GMO Free USA and knows about GMO Free USA's decision to bring this lawsuit and advance GMO Free USA's "educational" campaigns, boycotts, food testing, research, and efforts against certain food manufacturers. |
| Luan Van Le, Development & Communications Director, GMO Free USA | GMO Free USA P.O. Box 458 Unionville, CT 06085 | Mr. Luan is the Development & Communications Director of GMO Free USA and knows about GMO Free USA's decision to bring this lawsuit and advance GMO Free USA's "educational" campaigns, boycotts, food testing, research, and efforts against certain food manufacturers. |

---

[1] On information and belief, Defendants believe that discovery may reveal that Plaintiff Toxin Free USA is actually GMO Free USA. Because the only information Defendants have to date is that GMO Free USA is the actual party in interest, Defendants will refer to the known name and address of witnesses for the purposes of this witness list.

| Pamm Larry, Board of Directors, GMO Free USA | GMO Free USA P.O. Box 458 Unionville, CT 06085 | Ms. Larry is on the Board of Directors of GMO Free USA and knows about GMO Free USA's decision to bring this lawsuit and advance GMO Free USA's "educational" campaigns, boycotts, food testing, research, and efforts against certain food manufacturers. |
|---|---|---|
| Lakin Bayless, Campaigns Manager, GMO Free USA | GMO Free USA P.O. Box 458 Unionville, CT 06085 | Ms. Bayless is the Campaigns Manager for GMO Free USA and knows about GMO Free USA's decision to bring this lawsuit and advance GMO Free USA's "educational" campaigns, boycotts, food testing, research, and efforts against certain food manufacturers. |
| Mike Hurst, Outreach Manager, GMO Free USA | GMO Free USA P.O. Box 458 Unionville, CT 06085 | Mr. Hurst is the Outreach Manager for GMO Free USA and knows about GMO Free USA's decision to bring this lawsuit and advance GMO Free USA's "educational" campaigns, boycotts, food testing, research, and efforts against certain food manufacturers. |
| Janet Lee, Graphics Designer, GMO Free USA | GMO Free USA P.O. Box 458 Unionville, CT 06085 | Ms. Lee is the Graphics Designer for GMO Free USA and knows about GMO Free USA's decision to bring this lawsuit and advance GMO Free USA's "educational" campaigns, boycotts, food testing, research, and efforts against certain food manufacturers. |
| AGQ Labs | 2451 Eastman Avenue, Suite 1 Oxnard, CA 93030 | AGQ Labs purportedly has knowledge of the alleged laboratory testing performed on samples of Defendants' Products for chemical residues. |
| Joe Ferrone, The J. M. Smucker Company | 1 Strawberry Ln, Orrville, OH 44667 (To be contacted through counsel) | Mr. Ferrone has knowledge about what Defendants currently understand the scope of Plaintiff's allegations to be based on the Complaint, this Court's ruling, and discovery thus far. |
| Jenni McClintic, The J. M. Smucker Company | 1 Strawberry Ln, Orrville, OH 44667 (To be contacted through counsel) | Ms. McClintic has knowledge about what Defendants currently understand the scope of Plaintiff's allegations to be based on the Complaint, this Court's ruling, and discovery thus far. |

In addition, past and present employees of GMO Free USA/Toxin Free USA, AGQ Labs, and Defendants may have discoverable information relevant to the facts and circumstances

2

underlying this action, including, but not limited to Plaintiff's reasoning for bringing this lawsuit, the testing that was allegedly done on Defendants' products, if any, and the information that Plaintiffs are seeking to elicit at trial in this case.

The identities of many of these individuals are in the possession, custody, or control of Plaintiff. Otherwise, past and present employees of Defendants may have discoverable information relevant to the facts and circumstances underlying this action but are presently unknown as the parties are currently discussing the scope of discovery and custodian lists for this case. Defendants will supplement this list accordingly after the parties reach a resolution on the scope of discovery and the evidence at issue in this lawsuit.

Dated: March 6, 2020                    Respectfully submitted,

                                        **The J. M. Smucker Company and**
                                        **Ainsworth Pet Nutrition, LLC**

                                        By:  /s/ Ronald Y. Rothstein
                                        Ronald Y. Rothstein (D.C. Bar No. 451950)
                                        Sean H. Suber *(Pro Hac Vice Forthcoming*)
                                        **WINSTON & STRAWN LLP**
                                        35 West Wacker Drive
                                        Chicago, Illinois 60601
                                        (312) 558-5600
                                        RRothste@winston.com
                                        SSuber@winston.com

                                        *Counsel for Defendants*
                                        *The J. M. Smucker Company and*
                                        *Ainsworth Pet Nutrition, LLC*

## <u>CERTIFICATE OF SERVICE</u>

On March 6, 2020, the undersigned certifies that a true and correct copy of The J. M. Smucker Company and Ainsworth Pet Nutrition, LLC's Initial List of Fact Witnesses were electronically served via the CaseFileXpress system on:

> Kim E. Richman
> Richman Law Group
> 8 West 126th Street
> New York, NY 10027
> Phone: (718) 878-4707
> Fax: (212) 687-8292
> E-mail: krichman@richmanlawgroup.com

                                   By:  _/s/ Ronald Y. Rothstein_____
                                        Ronald Y. Rothstein (D.C. Bar No. 451950)
                                        **WINSTON & STRAWN LLP**
                                        35 West Wacker Drive
                                        Chicago, Illinois 60601
                                        (312) 558-5600
                                        RRothste@winston.com

                                        *Counsel for Defendants*
                                        *The J. M. Smucker Company and*
                                        *Ainsworth Pet Nutrition, LLC*

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| **TOXIN FREE USA**<br><br>Plaintiff,<br><br>v.<br><br>**THE J. M. SMUCKER COMPANY** and<br>**AINSWORTH PET NUTRITION, LLC**,<br><br>Defendants. | Case No. 2019 CA 003192 B<br><br>HON. FLORENCE Y. PAN |

## PLAINTIFF'S INITIAL LIST OF FACT WITNESSES

Plaintiff Toxin Free USA, by and through its undersigned counsel, hereby provides its initial list of fact witnesses.

| Witness Name | Address | Possible Discoverable Information |
|---|---|---|
| Diana Reeves, Founder & Executive Director, Toxin Free USA | Toxin Free USA P.O. Box 458 Unionville, CT 06085 (Contact through Plaintiffs' counsel) | Ms. Reeves has knowledge of the harm Defendants' activities have caused to the general public of the District of Columbia and Toxin Free USA's efforts to inform the public about the quality and advertising of consumer products, including Defendants'. |
| Luan Van Le, Development & Communications Director, Toxin Free USA | Toxin Free USA P.O. Box 458 Unionville, CT 06085 (Contact through Plaintiffs' counsel) | Mr. Van Le has knowledge of the harm Defendants' activities have caused to the general public of the District of Columbia and Toxin Free USA's efforts to inform the public about the quality and advertising of consumer products, including Defendants'. |
| AGQ Labs | 2451 Eastman Avenue, Suite 1 Oxnard, CA 93030 | AGQ Labs has knowledge of the laboratory testing performed on samples of Defendants' Products for chemical residues. |

Additionally, past and present employees of Defendants are likely to have discoverable information relevant to the facts and circumstances underlying this action, including, but not limited to, Defendants' marketing strategies, supply sources, and quality control procedures. The identities of these persons are in the possession, custody, or control of Defendants.

Date: March 6, 2020

**RICHMAN LAW GROUP**

/s/ Kim E. Richman
Kim E. Richman (D.C. Bar No. 1022978)
8 W. 126th Street
New York, New York 10027
Telephone: (212) 687-8291
Facsimile: (212) 687-8292
krichman@richmanlawgroup.com

### CERTIFICATE OF SERVICE

I, Kim E. Richman, hereby certify that on March 6, 2020, I caused a copy of the foregoing document to be served on counsel of record for Defendants via CaseFileXpress.

/s/ Kim E. Richman
Kim E. Richman